JANET M. HEROLD
Regional Solicitor
BRUCE L. BROWN
Associate Regional Solicitor
JOSEPH M. LAKE
Senior Trial Attorney
California State Bar Number 246679
JEREMIAH MILLER
Senior Trial Attorney
miller.jeremiah@dol.gov
Washington State Bar Number 40949
United States Department of Labor
Office of the Solicitor
300 Fifth Ave., Suite 1120
Seattle, WA 98104
Phone:     (206) 757-6762
Facsimile: (206) 757-6761

Attorneys for Plaintiff, Thomas E. Perez
Secretary of Labor, United
States Department of Labor

**HON. RICARDO S. MARTINEZ**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor,<br><br>        Plaintiff,<br><br>   v.<br><br>LANTERN LIGHT CORPORATION, d/b/a ADVANCED INFORMATION SYSTEMS, a corporation; DIRECTV LLC, a limited liability company; and RAMON MARTINEZ, an individual,<br><br>        Defendants. | Case No.: 2:12-cv-01406-RSM<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT DIRECTV LLC**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Noting date: April 10, 2015 |

TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.  UNDISPUTED MATERIAL FACTS ........................................................................ 2

   A.   Installers at AIS worked exclusively for DirecTV ............................................ 2

   B.   DirecTV controlled Instalut their worklers' work throughoday ......................... 3

   C.   DirecTV monitored and enforced Installer performance ................................... 4

   D.   DirecTV maintained power over Installer pay.................................................... 6

   E.   DirecTV imposed Installer hiring requirements ................................................ 7

III.    ARGUMENT .......................................................................................................... 7

   1.   DirecTV directed and controlled the conditions of Installer employment.................... 10

   2.   DirecTV controlled the Installers' schedule................................................................. 17

   3.   Installers provide integral work to DirecTV on a piece rate basis that required no special

        skills and provided no opportunity for profit or loss............................................... 19

   4.   DirecTV imposes all hiring and eligibility requirements............................................. 20

   5.   Installers worked exclusively and permanently for DirecTV ....................................... 21

   6.   Installers had a permanent relationship only with DirecTV, not AIS .......................... 22

   7.   DirecTV had power over firing ................................................................................. 22

   8.   DirecTV impacted Installer pay ................................................................................ 23

   9.   DirecTV maintained authority over Installer records ................................................. 24

   10.     Premises and equipment ....................................................................................... 24

IV.  CONCLUSION........................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242 (1986) ··································································································· 7, 8

*Barfield v. New York City Health and Hospitals Corp.,*

537 F.3d 132 (2nd Cir. 2008). ····················································································· 23

*Bonnette v. California Health & Welfare Agency,*

704 F. 2d 1465 (9th Cir. 1983) ············································································· 8, 9, 17

*Brinson v. Linda Rose Joint Venture,*

53 F.3d 1044 (9th Cir. 1995) ························································································ 8

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,*

213 F.3d 474 (9th Cir. 2000) ························································································ 7

*Carrillo v. Schneider Logistics Trans-Loading & Distribution, Inc.,*

2:11-CV-8557, 2014 WL 183956 (C.D. Cal. Jan. 14, 2014) ································· 12, 21

*Celotex Corp. v. Catrett,*

477 U.S. 317 (1986) ·································································································· 7

*Keeton v. Time Warner Cable, Inc.,*

09–CV–1085, 2011 WL 2618926 at *6 (S.D. Ohio July 1, 2011) ···························· 19

*Lemus v. Timberland Apartments, LLC,*

2011 WL 7068078 (D. Or. Dec. 21, 2011) ········································· 12, 14, 18

*Matsushita Elec. Indus. Co. v. Zenith Radio,*

475 U.S. 574 (1986 ······································································································ 8

*Nationwide Mut. Ins. Co. v. Darden,*

503 U.S. 318 (1992) ·································································································· 8

*Rogan v. City of Boston*,

   267 F.3d 24 (1st Cir. 2001) ·················································································· 8

*Scantland v. Jeffry Knight, Inc.*,

   721 F.3d 1308 (11th Cir. 2013) ········································································ 9, 21

*Solis v. Cascom, Inc.*,

   2011 WL 10501391 (S.D. Ohio Sept. 21, 2011) ······························· 16, 21

*Tony & Susan Alamo Found. v. Sec'y of Labor*,

   471 U.S. 290 (1985) ············································································································· 9

*Torres-Lopez v. May*,

   111 F. 3d 633 (9th Cir. 1997) ··························· 9, 13, 17, 19, 20, 22, 24

*U.S. v. Rosenwasser*,

   323 U.S. 360 (1945) ······································································································ 8, 9

*Villiarimo v. Aloha Island Air, Inc.*,

   281 F.3d 1054 (9th Cir. 2002) ········································································ 8

**Statutes and Regulations**

29 C.F.R. § 791.2 ················································································································· 9

29 U.S.C. § 203 ·················································································································· 8

29 U.S.C. §§ 201 ················································································································ 1

**Rules**

Fed. R. Civ. P. 56(c)(1) ·································································································· 8

Fed. R. Civ.P. 56(a) ········································································································· 7

## I.      INTRODUCTION

Plaintiff Thomas E. Perez, Secretary of Labor, United States Department of Labor ("Secretary"), pursuant to Federal Rule of Civil Procedure 56, hereby moves the Court to find, as a matter of law, that Defendant DirecTV LLC ("DirecTV") was an employer of the satellite television installers ("Installers") at issue in this case.  The Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.* ("FLSA" or "the Act") defines employment broadly to further the reach of the Act's workplace protections, and there is no genuine dispute that DirecTV meets that expansive definition in this action.  The Installers at Lantern Light Corporation, d/b/a Advanced Information Systems ("AIS") were economically dependent on DirecTV, because the contract between DirecTV and AIS required that Installers work exclusively for DirecTV – leaving DirecTV as AIS's only source of income and work.  This dependence enabled DirecTV to  have pervasive control over every aspect of the Installers employment: DirecTV imposed Installer hiring and eligibility requirements, set work schedules, directed and monitored the Installers' work, and enforced performance standards through bonuses and discipline.  DirecTV even dictated Installers' appearance, the quality of the vehicles they drove, and the length of conversation Installers had to have with DirecTV customers during the installation.  Since the Installers worked exclusively for DirecTV, DirecTV effectively capped Installer pay based on the rates they were willing to pay for each installation.  As a matter of economic reality, AIS served as nothing more than a labor contractor for DirecTV supplying manpower to perform DirecTV work under DirecTV control.

DirecTV had all the benefits of an employer, being able to tell Installers what to wear, where to go, and what to do, and holding out the Installers as employees to DirecTV customers.  It also had the power of an employer to set rates, track employee performance and hours worked.  DirecTV treated Installers at AIS at DirecTV employees, without accepting responsibility to ensure the Installers were paid the wages required by the FLSA.  DirecTV was the entity with the power over the workplace to remedy violations of the FLSA, but it chose instead to continue using the Installers as contract labor because it was cheaper to do so.

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 1

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

1    The Secretary seeks summary adjudication so that the Court may end this subterfuge and

2    recognize, as a matter of law, that the ubiquitous control exercised by DirecTV rendered the

3    company a joint employer of the Installers at AIS.  As an employer of the Installers, DirecTV is

4    jointly responsible for compliance with all provisions of the FLSA, and jointly and severally

5    liable, along with Defendants Lantern Light Corporation, d/b/a Advanced Information Systems

6    ("AIS") and Ramon Martinez, for all back wages found due.

7    **II.      UNDISPUTED MATERIAL FACTS**

8    The undisputed material facts demonstrate the control DirecTV exercised over the

9    Installers in all facets of the employer-employee relationship.

10   **A.  Installers at AIS worked exclusively for DirecTV**

11   DirecTV used its own employee installers, and Installers at AIS, to perform installation

12   and upgrade services in the Seattle area during the relevant time period.  Exhibit A to

13   Declaration of Joseph Lake in Support of Plaintiff's Motion for Partial Summary Judgment, *filed*

14   *concurrently herewith* ("Ex."), Transcript of Deposition of Steven Crawford as DirecTV's

15   person most knowledgeable, pursuant to Rule (30)(b)(6)("30(b)(6) Depo") at 27:15-21.

16   The contract between AIS and DirecTV mandated that AIS not provide services to any

17   other television providers.  Ex. B, DirecTV, Inc. Services Provider Agreement ("DirecTV

18   Contract") at DTV000289-290. [1]  As a result, AIS earned over ninety-nine percent of its revenue

19   from DirecTV.  Ex. D, AIS's Fourth Amended Answers to the Secretary's Interrogatories (First

20   Set) at 20, 23 (From August 21, 2009, through October 24, 2013, DirecTV provided 99.67% of

21   AIS's revenue).  Installers worked at AIS on an indefinite full-time basis exclusively for

22   DirecTV until October 2014, when AIS closed down, and the Installers moved over to another

23

24   [1] The DirecTV Contract was entered into by DirecTV and AIS's predecessor, Lumin, Inc.
25   effective August 3, 2009.  Ex. B, DirecTV Contract at DTV000283.  On January 17, 2011, AIS
     signed an "Assumption Agreement," stepping into its predecessor's shoes, and assuming all
26   rights, obligations, and liabilities under the DirecTV Contract.  Ex. C, Assumption Agreement,
     DTV 000043-44.
27

28   Secretary's Motion for Partial Summary Judgment        Office of the Solicitor, U.S. Department of Labor
     Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                                    300 Fifth Avenue, Suite 1120
     Page 2                                                                                            Seattle, WA 98101
                                                                                                         (206) 757-6742

1    entity, Next Solutions, to continue working exclusively for DirecTV.  Ex. E, E-mail exchange

2    dated October 10-13, 2014, DTV e0200777 (DirecTV management describing changeover of

3    Installers to Next Solutions); Ex. F, Transcript of Deposition of Marc Mastin ("Mastin Depo") at

4    89:10-22.  DirecTV management deemed this "just operating under a different name," and there

5    is no evidence of any change in the relationship between the Installers and DirecTV since they

6    moved over to Next Solutions.  Ex. E, E-mail exchange dated October 10-13, 2014, DTV

7    e0200777.

8              **B.  DirecTV controlled Installers' work throughout their workday**

9              DirecTV supplied Installers all of their work, and instructed Installers how that work was

10   to be performed.  Each day, DirecTV assigned Work Orders to Installers with the tasks to be

11   performed at each DirecTV customer's home.  *See*, *e.g.*, Ex. G, Work Order, dated December 6,

12   2012, DOL 003498.  These Work Orders were assigned to specific Installers, and AIS had to

13   receive DirecTV approval before re-assigning any Work Order to a different Installer.  *See*, *e.g.*,

14   Ex. H, E-mail exchange dated November 4, 2011, DTV e0143795-796 (AIS requesting Work

15   Order be moved to different Installer and follow-up on that request); Ex. I, Transcript of

16   Deposition of Joshua Guttormsen ("Guttormsen Depo") at 47:1-48:7.

17             The Work Orders assigned by DirecTV to Installers had to be performed during specified

18   time windows in the morning, afternoon, and evening.  *See*, *e.g.*, Ex. G, Work Order, DOL

19   003498 (afternoon window).  Since the appointment window for morning Work Orders began at

20   8 a.m., DirecTV required Installers to be at their first Work Order by 8 a.m.  Ex. F, Mastin Depo

21   at 27:1-14; *and* Ex. J, E-mail exchange dated November 10-13, 2013, DTV e0172877-e0172879,

22   (DirecTV "expectation is 8:00am, just as it is for…in-house teams.").  DirecTV also had to

23   approve any time off for an Installer.  Ex. I, Guttormsen Depo at 38:7-39:13.  In addition, during

24   the summer, DirecTV required AIS to have Installers available for appointments from 4 p.m. to 8

25   p.m.  Ex. K, Transcript of Deposition of David Baker ("Baker Depo") at 56:24-57:15.  Also,

26   when DirecTV was experiencing a large volume of business, it required Installers' go from five

27

28

Secretary's Motion for Partial Summary Judgment          Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                              300 Fifth Avenue, Suite 1120
Page 3                                                                                              Seattle, WA 98101
                                                                                                      (206) 757-6762

days per week of work to six days per week.  *See* Ex. L, E-mail dated July 1, 2011,

DTVe0128506 (DirecTV Regional Director Marc Mastin ordering schedule increase).

DirecTV imposed exhaustive procedures that Installers had to follow in carrying out their

duties.  *See* Ex. M, DirecTV Field Services Standard Professional Installation Guidelines and

Installation & Customer Service Manual ("DirecTV Installer Manual"), DTV004202-4239; *and*

Ex. B, DirecTV Contract at DTV000307-309, Personnel, Vehicles, and Uniforms.  DirecTV

rules required Installers contact DirecTV dispatch each time the Installer arrived and departed

the DirecTV customer's home.  *See* Ex. M, DirecTV Installer Manual at DTV004206; Ex. N,

Transcript of Deposition of Chris King ("King Depo") at 50:23-51:4; Ex. F, Mastin Depo at

20:9-23:9.  DirecTV also mandated the way Installers looked and interacted with customers

down to exacting detail – requiring, for example, that Installers spend a minimum of twenty

minutes educating customers on the DirecTV equipment.  *See* Ex. M, DirecTV Installer Manual

at DTV004208; Ex. B, DirecTV Contract at DTV000299.

DirecTV also provided regular direction to AIS on how many Installers should be

working at AIS – indirectly by the amount of Work Orders assigned by DirecTV, and directly by

telling AIS when it was overstaffed and understaffed on Installers.  *See*, *e.g.*, Ex. O, E-mail

Exchange dated November 17, 2012, DOL Martinez 0025-27 (DirecTV management reminding

AIS that AIS was overstaffed and needed to only be "13-15 strong performers"); Ex. P, E-mail

exchange dated April 15, 2014, DTV e0172479-172480 (DirecTV Regional Director Marc

Mastin directing AIS to increase Installer staffing from twenty to thirty individuals).

### C.  DirecTV monitored and enforced Installer performance

DirecTV monitored Installers on a day-to-day basis to evaluate how they were

performing the Work Orders assigned to them by DirecTV.  *See*, *e.g.*, Ex. G, Work Order, DOL

003498.  This included statistically reviewing Installers on over twenty metrics – including

customer satisfaction, whether the Installer properly identified himself as being with DirecTV,

and if follow-up work was required by another installer.  *See*, *e.g.*, Ex. Q, Customer Satisfaction

Rates for Week Ending 02/27/2012, DOL 002807 (Weekly report with columns evaluating

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 4

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

overall "Index" score and whether Installer "Showed Picture ID"); *and* Ex. R, Spreadsheet report of installer performance from June 2012 to May 2013, produced by DirecTV, DTV 000276.[2]

DirecTV used this metric data to supervise Installer performance in various ways. DirecTV management communicated regularly with AIS management about Installer performance. *See*, *e.g.*, Ex. S, E-mail dated July 30, 2013, DTV e0172820 (DirecTV Regional Director Marc Mastin telling AIS that Installer performance on a metric called NCCK was "so sub-par they are currently costing me money"). DirecTV also refused to provide Work Orders to Installers who did not meet DirecTV's performance expectations. Ex. F, Mastin Depo at 56:22-58:21; 59:12-61.22.

DirecTV also regulated Installer performance through bonuses, penalties and fines. DirecTV charged AIS fines on a weekly basis when Installers failed to meet DirecTV's standards. Ex. B, DirecTV Contract at DTV000317-319, <u>Performance Standards/ Chargebacks/ Incentives</u>. DirecTV additionally provided incentives AIS for Installers to meet certain objectives. *See*, *e.g.*, Ex. T, Letter from DirecTV to "Contracting Partner," dated March 5, 2012, DOL 001528 (Outlining "incentive plan to reward excellent customer service as measured by the post call survey results."). DirecTV's close supervision of the Installers also impacted firing, because AIS relied on DirecTV's metric data when deciding whether to fire an Installer. *See* Ex. U, Transcript of Deposition of Ramon Martinez as AIS's person most knowledgeable pursuant to Rule 30(b)(6) ("Martinez Depo") at 27:9-11.

///

///

---

[2] "Tech ID" is the individual number assigned to each Installer by DirecTV. Among the numerous metrics, "SIN7" rate refers to percentage of Work Orders by an Installer that required DirecTV to perform follow-up service within seven days. Ex. A, 30(b)(6) Depo at 38:13-20. "OTG" rate refers to the percentage of Work Orders when an Installer failed to arrive in the scheduled appointment window (did not comply with DirecTV's On Time Guarantee). *Id.* at 38:25-39:18. "DPP Sold" and "DPP Eligible" refer to the number of DirecTV Protection Plans sold by the Installers to eligible customers. *Id.* at 40:2-6.

Secretary's Motion for Partial Summary Judgment          Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                              300 Fifth Avenue, Suite 1120
Page 5                                                                                                    Seattle, WA 98101
                                                                                                              (206) 757-6762

1

2

### D.  DirecTV maintained power over Installer pay

3

DirecTV set a piece rate it paid AIS for Installers to complete certain tasks, such as

4

installing DirecTV equipment, selling protection plans, and upgrading a customer's television

5

programming.  *See* Ex. B, DirecTV Contract at DTV000321, Rate Card, effective July 4, 2009;

6

*see also* Ex. V, Rate Card, undated, DOL 001530; *and* Ex. W, <u>Addendum to DirecTV Services</u>

7

<u>Provider Agreement</u>, DOL Martinez 0013-15 (Detailing amounts DirecTV will pay to AIS for

8

selling each protection plan). Because Direct TV was the only source of income for Installers,

these rates effectively capped the pay that AIS could pay its Installers.

9

AIS used the money from DirecTV to cover overhead and profits, with the remainder

10

going to the Installers as a piece rate for each completed task.  "own rate card with DirecTV that

11

pays us specific amounts for specific tasks…[AIS takes] the rate card and we decide what

12

percentage we can afford to pay our technicians."  Ex. U, Martinez Depo at 98:7-24.  Since

13

DirecTV was the only source of money for DirecTV, AIS could not pay Installers any more than

14

DirecTV was paid by AIS.  Neither AIS nor DirecTV adjusted the amount paid to Installers to

15

factor in how long a task actually took, or provide any compensation when an Installer attempted

16

to, but was unable to complete a task.  Ex. B, DirecTV Contract at DTV 000287 (AIS "not

17

entitled to any payment for [Work Orders] not completed for any reason, including a cancellation

18

by the DirecTV customer at the door"); Ex. K, Baker Depo at 34:10-36:17; Ex. U, Martinez

19

Depo 98:7-99:13.

20

AIS offered financial incentives to Installers on the same measures for which DirecTV

21

offered incentives to AIS.  *See* Ex. W, E-mail dated January 23, 2013, DOL 004832 (AIS

22

Operations Manager Justin Masencup outlining how much Installers earned in the month to date

23

by performing well on DirecTV's customer satisfaction survey); *and* Ex. X, E-mail dated July

24

13, 2011, DOL 004790 (AIS Controller Lisa Kelly detailing bonus to Installers for selling

25

protection plans).  So when AIS received bonus money from DirecTV, AIS passed a percentage

26

of that money down to the Installers. Accordingly, as to pay and the other traditional functions of

27

28

Secretary's Motion for Partial Summary Judgment          Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                    300 Fifth Avenue, Suite 1120
Page 6                                                                                        Seattle, WA 98101
                                                                                                    (206) 757-6762

1  an employer, the facts are not disputed which establish that DirecTV exercised authority over the

2  Installers.

3  **E.  DirecTV imposed Installer hiring requirements**

4  To be eligible to work as an Installer at AIS and receive work from DirecTV, an

5  applicant must satisfy multiple pre-requisites imposed by DirecTV.  First, DirecTV required each

6  installer applicant to pass drug and background checks performed by a vendor approved by

7  DirecTV.  *See* Ex. U, Martinez Depo at 44:11-18; Ex. B, DirecTV Contract at DTV000307.

8  Second, DirecTV required that every installer undergo training and receive two certifications

9  related to installing DirecTV satellite equipment.  Ex. U, Martinez Depo at 39:23-40:20 *and*

10  42:12-22; Ex. N, King Depo at 74:24-75:4.  These screening, certification and training

11  requirements were the only pre-requisites to working as an Installer at AIS and receive work

12  from DirecTV, and all of these requirements came from DirecTV.

13  **III.    ARGUMENT**

14  **A.  Standard of review**

15  A motion for summary judgment should be granted if there is no genuine dispute as to

16  any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.P.

17  56(a).  A factual dispute is genuine if there is sufficient evidence for a reasonable fact finder to

18  find for the non-moving party, while a fact is material if it "might affect the outcome of the suit

19  under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  When the

20  party moving for summary judgment would bear the burden of proof at trial, "the moving party

21  has the initial burden of establishing the absence of a genuine issue of fact on each issue material

22  to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc*., 213 F.3d 474, 480 (9th Cir.

23  2000).  Once the moving party satisfies this burden, summary judgment should be granted unless

24  the opposing party produces specific facts showing there is a genuine dispute for trial.  *Celotex*

25  *Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

26  The opposing party may not rest on mere allegations or denials from the pleadings, but

27  instead must demonstrate by affidavits or other materials in the record that there is a genuine

28

Secretary's Motion for Partial Summary Judgment         Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                          300 Fifth Avenue, Suite 1120
Page 7                                                                                                 Seattle, WA 98101
                                                                                                          (206) 757-6762

dispute for trial.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1048 (9th Cir. 1995). Although the court must draw "all reasonable inferences supported by the evidence" in favor of the non-moving party, *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir. 2002), the opposition "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 588.  A mere "scintilla of evidence" in support of the nonmoving party's position—or evidence that is "merely colorable" or "not significantly probative"— is insufficient to defeat summary judgment.  *Anderson*, 477 U.S. at 249-50, 252; *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001) ("conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative" is insufficient to defeat summary judgment).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party" on a particular issue, there is no genuine dispute for trial.  *Matsushita*, 475 U.S. at 587.  Here, there is no genuine dispute of any of the material facts necessary to establish DirecTV jointly employed the Installers.

### B.  The FLSA broadly defines employment

The FLSA defines an "employee" as "any individual employed by an employer," and "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §§ 203(d) and 203(e)(1).  The Act further defines "employ" to "include[] to suffer or permit to work."  29 U.S.C. § 203(g).  The FLSA's definition of "employee" is "'the broadest definition that has ever been included in any one act.'"  *U.S. v. Rosenwasser*, 323 U.S. 360, 363 n. 3 (1945) (*quoting* 81 Cong. Rec. 7657 (statement of Senator Black)); *see Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) ("employ" is defined with "striking breadth").  "The definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes."  *Bonnette v. California Health & Welfare Agency*, 704 F. 2d 1465, 1469 (9th Cir. 1983).  Congress's intent in creating such broad

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 8

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

definitions was to ensure the Act's scope of coverage is broad.  *See Rosenwasser*, 323 U.S. at 362-63.  Accordingly, the Supreme Court "has consistently construed the Act 'liberally to apply to the furthest reaches consistent with congressional direction,' recognizing that broad coverage is essential to accomplish the [Act's] goal . . . ."  *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985).

The Ninth Circuit "has recognized that the concept of joint employment should be defined expansively under the FLSA."  *Torres-Lopez v. May*, 111 F. 3d 633, 639 (9th Cir. 1997).  While the Ninth Circuit has enunciated many factors which may assist in analyzing "the total employment situation and the economic realities of the work relationship," the overarching focus of the inquiry is economic dependence" of the worker on the alleged employer.  *Bonnette*, 704 F. 2d at 1470; *see also* 29 C.F.R. § 791.2; *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1312 (11th Cir. 2013).

### C. As a matter of law, DirecTV jointly employed the Installers

Direct TV exercised control over Installers' employees' wages, hours, appearance and working conditions.  Accordingly, the factors analyzed by Courts to determine joint employment, as well as the broader question of economic dependence, demonstrate that DirecTV jointly employed the Installers at AIS.

The Installers were akin to the farmworkers in *Torres-Lopez.  Torres-Lopez*, 111 F.3d at 633.  In that case, cucumber grower Bear Creek Farms contracted with a farm labor contractor to supply farmworkers to harvest Bear Creek Farms' cucumber crop.  *Id.* at 637.  The farmworkers worked only for Bear Creek Farms, and were paid a piece rate by the farm labor contractor from the monies paid to the contractor by Bear Creek Farms.  *Id.*  Bear Creek Farms determined when the farmworkers began harvesting, what days they worked, and how many farmworkers were needed.  *Id.* at 642.  In addition, Bear Creek Farms management was present in the fields each day supervising the performance of the farmworkers.  *Id.*  Considering "all those factors which are 'relevant to [the] particular situation' in evaluating the 'economic reality' of an alleged joint employment relationship," the Ninth Circuit recognized that the farm labor contractor was no

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 9

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

more than a middleman finding manpower for Bear Creek Farms, and held that Bear Creek Farms jointly employed the farmworkers. *Id.* at 645. Relying on the factors outlined by the *Torres-Lopez* court, it is clear that AIS served a similar function as the farm labor contractor while DirecTV possessed and exercised the control of an employer over the Installers.

### 1.  DirecTV directed and controlled the conditions of Installer employment

There is no genuine dispute that DirecTV exercised substantial control of the day-to-day work of Installers. Evidence that a company can direct, control, or supervise the work performed by a group of workers weighs in favor of finding joint employment under the FLSA. *Bonnette*, 704 F. 2d at 1470; *see Torres-Lopez*, 111 F.3d at 642. DirecTV mandated how Installers performed their work, closely supervised Installer performance, and directed where Installers would perform their work.

### a.  DirecTV constantly monitored Installer compliance and performance

It is undisputed that DirecTV ensured AIS and the Installers adhered to DirecTV's standards by micromanaging Installers through meticulous tracking and ongoing supervision of their performance at AIS. DirecTV used this information to enforce compliance by Installers with DirecTV's expectations.

DirecTV was constantly gathering data on Installer performance across over twenty metrics. DirecTV used numerous means to gather this data. To track when Installers arrived and departed from a jobsite, DirecTV required the Installers check in with DirecTV dispatchers on every Work Order. Ex. M, DirecTV Installer Manual at DTV004206; Ex. N, King Depo at 50:23-51:4; Ex. F, Mastin Depo at 20:9-23:9. DirecTV also contacted the customer after the work was done to ask for their opinion on the Installer's work, and to determine whether the Installer followed the required protocol, such as showing their ID badge. Ex. K, Baker Depo at 51:4-14 *and* 58:3-16; Ex. Q, Customer Satisfaction Rates for Week Ending 02/27/2012, DOL 002807. DirecTV additionally evaluated the quality of work by determining whether the DirecTV equipment was operating as expected. So, for example, if DirecTV had to send a technician out to service the satellite dish within seven or thirty days after an Installer installed it

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 10

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

(the "SIN7" and "SIN30" metric), that reflected negatively on the Installer's performance.  Ex. A, 30(b)(6) Depo at 38:13-20; Ex. B, DirecTV Contract at DTV000317; Ex. Y, E-mail exchange dated April 6-7, 2014, DTV e0172475 (DirecTV criticizing Installers on these metrics).

DirecTV reviewed Installer performance on these metrics with AIS on an ongoing basis.  First, DirecTV management met with AIS management on a weekly or bi-weekly basis to discuss how Installers were doing.  Ex. Z, E-mail dated March 13, 2012, DTV e0172078 (meeting reminder between DirecTV Regional Director and AIS management); Ex. F, Mastin Depo 14:5-16:13.  In addition, DirecTV management sent constant e-mails to AIS about how Installers were doing.  A few examples from the e-mails turned over by DirecTV in discovery include:

- DirecTV Regional Director Marc Mastin, upset with Installer performance on the SIN 30 metric, stated, in an e-mail to AIS President Ramon Martinez, that "I sent a note a little over a weeks ago and you said you got it…Now you are worse than you were.  I don't want to hear it, I want to see it in results.  Make it happen!"  According to Mastin, "[t]here's a problem that needs to be addressed and it's impacting our customers."  Ex. Y, E-mail exchange dated April 6-7, 2014, DTV e0172475.

- In another e-mail to Martinez, Mastin was unhappy with the "Net Promoter Score" Installers were receiving from DirecTV customers.  To determine this score, DirecTV asked customers whether they would recommend DirecTV to others.  Mastin started the e-mail by telling Martinez that he "can't begin to explain how frustrating [AIS's score] is."  Ex. AA, E-mail dated December 2, 2013, DTV e0172823.  Mastin made clear that he "will be evaluating this very closely in the weeks to come and looking for DRASTIC improvement."  *Id.*

- DirecTV also monitored whether Installers arrived at their first assignment by 8 a.m., and when Mastin felt Installers at AIS were arriving late too often, he e-mailed AIS management to made clear to Martinez, in an e-mail that the "expectation is 8:00am, just as it is for [DirecTV] in-house teams. This has to be corrected immediately without

Secretary's Motion for Partial Summary Judgment          Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                    300 Fifth Avenue, Suite 1120
Page 11                                                                                        Seattle, WA 98101
                                                                                                  (206) 757-6762

exception."  Ex. J, E-mail exchange dated November 10-13, 2013, DTV e0172877-
e0172879; Ex. F, Mastin Depo at 27:1-14.

- DirecTV tracked Installer productivity,  and Mastin told AIS that it was "completely
disappointing" that Installers at AIS were only closing 2.3 Work Orders per day,
compared to 3.3 Work Orders per day by DirecTV's in-house installers.  Ex. BB, E-mail
exchange dated September 6, 2013, DOL Martinez 0048-49.  Mastin stated that he "will
do a 30 day review" starting immediately, and consider giving no more work to AIS if
productivity did not improve.  *Id.*

There can be no genuine dispute that DirecTV was doing much more than simply sending work
to AIS and hoping Installers completed it according to DirecTV guidelines.  DirecTV was
conducting ongoing supervision of the Installers as if they were DirecTV employees by closely
and constantly tracking their performance, and making clear through frequent communication to
AIS how DirecTV perceived Installers were doing their work.

In *Carrillo v. Schneider Logistics Trans-Loading & Distribution, Inc.*, 2:11-CV-8557,
2014 WL 183956 (C.D. Cal. Jan. 14, 2014), Walmart sought summary judgment that it did not
jointly employ individuals who worked in warehouses that received imported merchandise and
shipped that merchandise to regional distribution centers.  *Carillo*, 2014 WL 183956, at *1.  The
Central District Court of California denied summary judgment in part, because of "Walmart's
extensive oversight and enforcement of its own guidelines and standards," including tracking
worker productivity and auditing worker compliance with Walmart's procedures.  *Id.* at *8-*10.
Similarly here, DirecTV conducted extensive supervision to ensure that the Installers performed
up to DirecTV's expectations and followed DirecTV's rules.

Moreover, the high frequency of communication between DirecTV and AIS further
evidences the control DirecTV had over the Installers.  In *Lemus v. Timberland Apartments,
LLC*, 2011 WL 7068078 (D. Or. Dec. 21, 2011), a construction worker alleged he was jointly
employed by the developer overseeing the construction project he worked on, and the District
Court of Oregon found the developer's daily communication with the framing company who

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 12

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

1   hired the worker led "to much more pronounced control." *Lemus*, 2011 WL 7068078 at *1-*2,

2   *13.

3          The fact that DirecTV communicated to AIS, rather than directly to the Installers, does

4   not negate that DirecTV was supervising the Installer's work.  In *Torres-Lopez*, the Ninth Circuit

5   specifically rejected the district court's finding that the control exercised by the grower alleged to

6   be a joint employer was insignificant because the grower communicated to the labor contractor

7   rather than the workers.  111 F.3d at 643.  The court made clear "that indirect control as well as

8   direct control can demonstrate a joint employment relationship." *Id.*  Accordingly, DirecTV's

9   ongoing supervision of Installers through closely tracking and communicating with AIS

10  regarding their performance weighs in favor of finding DirecTV was a joint employer.

11                      b.   DirecTV compelled Installer compliance with its rules

12         DirecTV relied on its diligent tracking of Installers to enforce compliance with

13  DirecTV's standards – primarily through disciplining Installers and AIS for failing to meet

14  expectations.  To compel Installers and AIS to perform as needed, DirecTV used a proverbial

15  carrot and stick.  As a carrot, DirecTV offered bonuses to AIS of $6.00 per completed Work

16  Order when Installers at AIS received a companywide Post-call Score above a certain threshold.

17  *See* Ex. T, Letter from DirecTV to "Contracting Partner," dated March 5, 2012, DOL 001528

18  (Outlining "incentive plan to reward excellent customer service as measured by the post call

19  survey results.").  However, DirecTV's primary means to force acceptable performance by the

20  Installers was disciplining underperformance.

21         DirecTV imposed fines called "chargebacks" each week when Installers failed to meet

22  certain requirements, such as charging AIS $50 whenever an Installer failed to arrive during the

23  specified appointment window.  Ex. B, DirecTV Contract at DTV 000318.  In *Scantland*, cable

24  installers alleged they were employees under the FLSA of an installation company who

25  classified the workers as independent contractors.  *Scantland*, 721 F. 3d at 1310.  The Eleventh

26  Circuit found "chargebacks" similar to those here to be "more consistent with disciplining

27

28

Secretary's Motion for Partial Summary Judgment          Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                                  300 Fifth Avenue, Suite 1120
Page 13                                                                                              Seattle, WA 98101
                                                                                                         (206) 757-6762

1   employees," because the fines did not correlate to the actual cost of damages to the alleged

2   employer.  *Id.* at 1316.

3          DirecTV went beyond just imposing chargebacks to discipline the Installers.  DirecTV

4   simply stopped providing work to Installers who performed too poorly on its metrics.  DirecTV

5   called this placing the Installers on "forced time off," and it served as a powerful deterrent

6   against underperformance since DirecTV was the only source of work for the Installers.  Ex. F,

7   Mastin Depo at 56:22-58:21 *and* 59:12-61:22; Ex. CC, E-mail exchange, dated November 23,

8   2011, DTV e0139105-106 (DirecTV management discussing AIS's attempt to schedule

9   Installers DirecTV had placed on forced time off).  According to DirecTV's Regional Director

10  Marc Mastin, this meant that DirecTV is "not going to provide [the Installer] work for a period

11  of time."  Ex. F, Mastin Depo at 58:4-5.  Since Installers at AIS received all their work from

12  DirecTV, this had the effect of placing the individual on unpaid leave.  In fact, when AIS

13  scheduled an Installer who was supposed to be on forced time off for performance issues,

14  DirecTV increased the suspension for that Installer, because AIS was "not in a position to be

15  making 'executive decisions'" about when an Installer could be taken off unpaid leave.  Ex. DD,

16  E-mail exchange, dated November 23, 2011, DTV e0139107-110; Ex. F, Mastin Depo at 62:23-

17  63:11.

18          In *Lemus v. Timberland Apartments, L.L.C.*, the District Court of Oregon found such

19  authority was "a sanction somewhat equivalent to firing" that weighed in favor of finding joint

20  employment where, as here, the employees relied on the putative joint employer for their work.

21  *See Lemus*, 2011 WL 7068078, at *10.  Here, DirecTV exercised this authority and refused to

22  provide work to Installers who it deemed to be underperformers.  So, it cannot be genuinely

23  disputed that DirecTV exercised significant supervisory control over the Installers – by closely

24  tracking Installer performance and acting on metric data to induce Installers to follow DirecTV's

25  rules.

26  ///

27  ///

28
Secretary's Motion for Partial Summary Judgment        Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                    300 Fifth Avenue, Suite 1120
Page 14                                                                             Seattle, WA 98101
                                                                                       (206) 757-6762

c. DirecTV controlled the manner in which Installers performed their work

DirecTV set the rules on how Installers work was to be performed, and mandated that Installers comply with these protocols. *See* Ex. M, DirecTV Installer Manual. DirecTV imposed these standards on all Installers – whether they worked as a DirecTV employee or worked for DirecTV through an outside entity like AIS. Ex. K, Baker Depo at 22:3-8. AIS President and Defendant Ramon Martinez testified that AIS's role was to simply pass on DirecTV's rules to the Installers: "[t]here's a standard installation practice and policy guideline, and it's all directed by DirecTV. They tell us exactly how they want to see the work performed." Ex. U, Martinez Depo at 51:2-51:8.

DirecTV controlled Installer appearance, ensuring the Installers appear to DirecTV customers to be DirecTV employees. DirecTV requires Installers who work for AIS to "wear no less than the approved DIRECTV shirt and cap while performing" their duties, with such clothing to be purchased from DirecTV at AIS's expense. Ex. B, DirecTV Contract at DTV 000309. The Installers must wear identification badges that "shall indicate that the installer is an authorized DIRECTV installer." Ex. B, DirecTV Contract at 308; *see also* Ex. M, DirecTV Installer Manual at DTV 004214 ("A picture ID card identifying the installer as a DIRECTV representative should be in plain view"). DirecTV mandates that Installer's vehicles must be "new or like new and damage free," and "identify the vehicle as "a service provider for DirecTV." Ex. B, DirecTV Contract at DTV 000307-308; Ex. M, DirecTV Installer Manual at DTV 004214. Whether intentional or not, such requirements over Installer appearance would cause a reasonable DirecTV customer to believe the Installers are DirecTV employees.

DirecTV's procedural rules also imposed minute specifications on how an Installer is to perform their work. These rules require, *inter alia*, that Installers provide a minimum twenty-minute education session to each customer on the DirecTV equipment on topics including caring for the satellite dish in inclement weather to teaching the customer how DirecTV interacts with the customer's stereo equipment. Ex. M, DirecTV Installer Manual at DTV 004231-4235. DirecTV requires this tutorial go for a minimum of twenty minutes. *Id.* The service guidelines

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 15

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

are specific enough to require that Installers use "DirecTV approved RG-6 coaxial cable with a max loop resistance at 100 feet of 2 ohms or less."  Ex. M, DirecTV Installer Manual at DTV 004226.  In *Solis v. Cascom, Inc.*, 2011 WL 10501391 (S.D. Ohio Sept. 21, 2011), the Southern District of Ohio, found Cascom, an installation service company, to be an employer of cable installers and cited as support for its holding that Cascom required the cable installers follow "Cascom's detailed instructions for installation methods and work practices," as well as wear shirts and vehicles with Cascom's logo.  *Cascom, Inc.*, 2011 WL 10501391 at *5.  Additionally, in *Scantland*, the Eleventh Circuit found that the installation company exhibited control over cable installer's by "tightly regulated" their work through tracking cable installer's work and "left the [cable installers] with no discretion in how to approach a particular job" by specifying exactly how work was to be performed and closely tracking the installers.  There is no genuine dispute that DirecTV exercises similar control over Installer appearance and how the Installers executed their duties, and such tight control weighs in favor of joint employment.

### d.   DirecTV determined Installer's work location

It is undisputed that DirecTV exhibited additional control over the Installer's conditions of employment by directing where Installers performed their work.  On a general level, DirecTV determined where Installers worked because Installers exclusively worked for DirecTV – meaning Installers could only work where they were assigned by DirecTV.  DirecTV exhibited specific control through its assignment of Work Orders.  DirecTV prepared Work Orders each day in its database, and assigned the Work Orders to available installers in a given area – whether that installer worked internally for DirecTV or for a contractor like AIS.  Ex. K, Baker Depo at 21:17-23.  DirecTV assigned these Work Orders to specific Installers.  *See*, *e.g.*, Ex. G, Work Order, DOL 3498 (Tech ID in the upper-right corresponds to specific Installer).

Although the parties dispute the extent to which AIS altered DirecTV's initial assignment of which Installer would handle which Work Orders, there is no dispute that AIS had to receive approval from DirecTV before being able to change which Installer would handle a given Work Order.  *See*, *e.g.*, Ex. H, E-mail exchange dated November 4, 2011, DTV e0143795-796 (AIS

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 16

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

requesting Work Order be moved to different Installer and follow-up on that request).[3]  DirecTV did not simply grant this approval as a matter of course.  In one instance, DirecTV Regional Director Marc Mastin denied AIS's request to re-assign a Work Orders to an Installer because DirecTV had placed the Installer on forced time off due to performance issues. Ex. DD, E-mail exchange, dated November 23, 2011, DTV e0139107-110.  Mastin also punished both AIS and Installer for trying to route the suspended Installer by increasing his forced time off by one day, because AIS "should not be making decisions to bring [Installers] in without receiving specific direction and permission from us."  *Id.*  DirecTV cannot dispute that it broadly determined where Installers worked because DirecTV provided all of the work to the Installers.  In addition, there is no genuine dispute that DirecTV specifically managed and approved the assignment of Work Orders to Installers.

DirecTV had dominant authority over the Installers' conditions of employment – determining how and where Installer work is done, as well as rigorously evaluating and supervising the performance of the Installers.  The control that DirecTV exercises over the Installers weighs heavily in favor of finding, as a matter of law, that DirecTV is a joint employer.

### 2.  *DirecTV controlled the Installers' schedule*

DirecTV went beyond controlling how and where Installers worked, and effectively dictated when the Installers' worked and how many Installers should be working at AIS.  The Ninth Circuit has held that an employer's power to direct the overall schedule, including when and how much work must be done, exhibited control over working conditions supporting a finding joint employment.  *See Bonnette*, 704 F. 2d at 1470; *Torres-Lopez*, 111 F.3d at 642.

Here, Installers received work only from DirecTV, and DirecTV limited the hours Installers could perform that work by providing Work Orders to Installers in specified time

---

[3] DirecTV also freely moved Work Order assignments between DirecTV in-house installers and the Installers at AIS as needed.  Ex. EE, E-mail exchange dated September 7, 2011, DTVe0114958 (moving Work Orders from DirecTV in-house to AIS); and Ex. I, Guttormsen Depo at 36:10-21 (DirecTV has moved Work Orders from AIS to DirecTV in-house installers).

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 17

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

windows – either in the morning, afternoon, or, during the summer, in the evening from 4 p.m. to 8 p.m.  Ex. K, Baker Depo at 56:15-20.  In *Lemus*, the Central District of Oregon recognized that limiting work hours demonstrated indirect control over employees.  *Lemus*, 2011 WL 7068078 at *11.

DirecTV also demonstrated direct control over Installers' schedule in numerous ways. DirecTV required Installers to be at the site of their first Work Order by 8 a.m.  Ex. F, Mastin Depo at 27:1-14; *and* Ex. J, E-mail exchange dated November 11-13, 2013, DTV e0172877-e0172879.  DirecTV also directed Installers change their days and hours worked during certain periods.  In the summer, DirecTV required at least ten percent of the Installers at AIS be available from 4 p.m. to 8 p.m.  Ex. K, Baker Depo at 56:24-57:3.  In addition, during busy periods, DirecTV required Installers move from a five-day per week to a six-day per week schedule during the busy periods.  *See*, *e.g.*, Ex. L, E-mail dated July 1, 2011DTV e0128506 (DirecTV Regional Director Mastin directing AIS management that "[w]e do need your entire staff to begin working a 6th day starting on Tuesday.").

DirecTV further showed their power over Installers' schedules by wielding authority over whether to approve or deny time off requests from Installers.  As with much of DirecTV's other authority, this did not exist just on paper, as DirecTV denied requests for time off.  In one instance, AIS requested that DirecTV give an Installer the next day off from DirecTV assignments to receive additional training.  DirecTV refused because it already had prepared a fully day of work for the Installer.  Ex. FF, E-mail exchange dated April 29, 2012, DTV e0125683 (DirecTV Field Operations Supervisor Joshua D. Dart denying request); *see also* Ex. I, Guttormsen Depo at 38:7-39:13 (DirecTV required two weeks' notice for any time off request). On another occasion, AIS requested that DirecTV allow an Installer to take off New Year's Eve and New Year's Day, but DirecTV Operations Manager Dustin Dunlap denied the time off, reminding AIS that he "sent out an email a while back when we stopped accepting holiday time off requests."  Ex. GG, E-mail exchange dated December 13, 2011, DTVe0130876.  So it was DirecTV, not AIS, who had ultimate authority over the days and hours worked by the Installers.

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 18

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

1   AIS simply acted as a conduit, passing along to the Installers what hours and days DirecTV

2   assigned to them, and whether or not DirecTV approved their time off.

3       DirecTV had control over not only when Installers worked, but how many Installers

4   worked at AIS.  In April 2014, DirecTV needed AIS to increase Installer staffing from twenty to

5   thirty individuals.  DirecTV Regional Directors Marc Mastin made clear to AIS that getting

6   staffing levels up "is huge for us."  Ex. P, E-mail exchange dated April 15, 2014, DTV

7   e0172479-172480.  In June 2013, when DirecTV again needed staffing from AIS, Mastin told

8   AIS that their "lack of delivery on staffing…will kill my business."  Ex. HH, E-mail exchange

9   dated June 28, 2013, DOL Martinez 0057.  Conversely, in November 2012, DirecTV determined

10  that AIS was overstaffed.  DirecTV manager Rich Heddon told AIS that he did "not have enough

11  work" for the current number of Installers at AIS.  Ex. O, E-mail Exchange dated November 17,

12  2012, DOL Martinez 0025-27.

13      In *Torres-Lopez*, 111 F.3d at 642, the Ninth Circuit recognized that alleged employer

14  Bear Creek Farms' power to direct the overall schedule of the farmworkers, including when and

15  how much work must be done, exhibited control over working conditions.  DirecTV wields

16  similar authority here over setting when and how many Installers worked at AIS, and this weighs

17  strongly in favor of finding DirecTV to be a joint employer.

18          *3.  Installers provide integral work to DirecTV on a piece rate basis that required*

19              *no special skills and provided no opportunity for profit or loss*

20      DirecTV cannot plausibly dispute that Installers provided integral labor to DirecTV.

21  *Torres-Lopez*, 111 F.3d at 644.  Courts elsewhere have recognized that "there is no question that

22  the installation of cable systems is an integral part" of the business of a television provider like

23  DirecTV.  *See Keeton v. Time Warner Cable, Inc.*, 09–CV–1085, 2011 WL 2618926 at *6 (S.D.

24  Ohio July 1, 2011) (analyzing potential employment of installers by Time Warner).  In *Keeton*,

25  the Southern District of Ohio found the integral nature of the installer's work "indisputably

26  weighs in favor of finding that an employment relationship exists."  *Id.*  Without installers to

27

28

Secretary's Motion for Partial Summary Judgment          Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                              300 Fifth Avenue, Suite 1120
Page 19                                                                                          Seattle, WA 98101
                                                                                                    (206) 757-6762

1   install satellite television equipment, DirecTV would have no customers and no revenue from

2   customers purchasing cable television from DirecTV.

3        The nature of the work performed by the Installers also weighs in favor of finding joint

4   employment, as the Installers performed piece work that required no special skills.  *Torres-*

5   *Lopez*, 111 F.3d at 644.  According to Ramon Martinez, AIS has hired persons with no prior

6   experience who worked at the Gap to serve as Installers.  Ex. U, Martinez Depo at 39:4-14.

7   Once hired, the Installers typically underwent four to five weeks of training.  Ex. U, Martinez

8   Depo at 40:24-41:1.  This is identical to the installer background in *Cascom*, and there the

9   Southern District of Ohio rightly held that being able to train people with no prior experience to

10  be cable installers in six weeks demonstrated that the position required no special skills.

11  Installers also have no opportunity to exercise any managerial skill to realize any profit or loss –

12  the Installers had work assigned to them by DirecTV, who determines how much piecework

13  Installers could perform each day.  Like the farmworkers in *Torres-Lopez*, who could only earn

14  more money by picking more cucumbers, the Installers could not use any managerial skill to earn

15  any profit.  *Torres-Lopez*, 111 F.3d at 644.

16       Taken together, these factors powerfully demonstrate that the dependence Installers had

17  on DirecTV and vice versa, as the Installers performed piecework integral to DirecTV that was

18  part of DirecTV's line of production.

19       *4.  DirecTV imposes all hiring and eligibility requirements*

20       It is undisputed that DirecTV sets all of AIS's hiring standards for Installers, as well as

21  imposing other prerequisites before an Installer can begin receiving work.  To be hired as an

22  Installer at AIS, an applicant was required to pass a drug test and background check.  Ex. U,

23  Martinez Depo at 38:19-23.  AIS only imposed this screening because it was mandated by the

24  contract with DirecTV.  *See* Ex. U, Martinez Depo at 44:11-18; Ex. B, DirecTV Contract at

25  DTV000307.  Not only did DirecTV require AIS to screen all of its applicants, AIS had to use

26  vendors approved by DirecTV.  Ex. B, DirecTV Contract at DTV000307.  DirecTV also

27  determined which substances and which prior crimes would fail the background checks and drug

28

Secretary's Motion for Partial Summary Judgment     Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM     300 Fifth Avenue, Suite 1120
Page 20     Seattle, WA 98101
(206) 757-6762

tests.  Ex. U, Martinez Depo at 45:10-16.  According to AIS President Ramon Martinez, passing these screenings was the only requirement to be hired as an Installer.  Ex. U, Martinez Depo at 39:9-11.  In *Carrillo*, Walmart imposed a similar requirement that its contractor "utilize only such workers…whose character and background have been vetted," which the court cited in deciding Walmart had sufficient power over hiring to weigh against finding Walmart was not a joint employer.  2014 WL 183956, at *7-*8.  DirecTV's screening requirements demonstrate that AIS simply functioned as an intermediary imposing DirecTV's hiring rules on the Installers.

DirecTV also required the Installers be certified before they could start working.  The DirecTV Contract mandates that Installers at AIS receive two certifications, one of which is designed by DirecTV.  Ex. U, Martinez Depo at 39:23-40:20 *and* 42:12-22; Ex. N, King Depo at 74:24-75:4.  As with the hiring pre-requisites, these certifications are imposed on Installers by DirecTV, not AIS.  So once Installers are hired, they must master training materials provided by DirecTV to complete certifications required by DirecTV before they can start receiving work from their only source – DirecTV.  Ex. U, Martinez Depo at 43:19-44:5; Ex. N, King Depo at 76:7-25.  Therefore, every step that must be accomplished before an Installer can be hired and start receiving work comes from DirecTV.

### 5. *Installers worked exclusively and permanently for DirecTV*

As well-stated by the Eleventh Circuit in *Scantland*, "long tenure, along with control, and lack of opportunity for profit, point strongly toward economic dependence."  721 F.3d at 1319.  Here, DirecTV required that Installers at AIS work only for DirecTV, five or six days per week.  Installers could not move freely between DirecTV and other cable companies.  These Installers worked for DirecTV on an at-will basis until they quit or were terminated.  According to AIS's work records, Installers performed work for DirecTV over several years.  *See* Declaration of Michael Hoffman in Support of Secretary's Motion for Partial Summary Judgment.  This was "similar to an at-will employment arrangement," just like the installers in *Cascom*, and the Court should find, just as in *Cascom*, that such an arrangement weighs in favor of DirecTV being a joint employer of the Installers.  *Cascom, Inc.*, 2011 WL 10501391 at *6.

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 21

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

### 6. *Installers had a permanent relationship only with DirecTV, not AIS*

The Installers moved from Lumin, AIS's predecessor, to AIS, to Next Solutions, with no evidence of any material change to the terms of their employment. When AIS went out of business on October 30, 2014, the Installers' began working *the next day* for Next Solutions, in a change DirecTV management called "just operating under a different name." Ex. E, E-mail exchange dated October 10-13, 2014, DTV e0200777. That is because these entities are no more than "labor contractors [that] are interchangeable and lack autonomy, and that actual control over the employees comes from an entity that operates above the labor contractors." *Carrillo*, 2014 WL 183956 at *12. The free movement of Installers between entities, along with the Installers' permanent relationship with DirecTV, shows that actual control of the Installers came from DirecTV.

As further evidence that DirecTV had actual control, the DirecTV Contract was not the product of negotiation between DirecTV and AIS, but was instead the form contract used by DirecTV around the country. Like the contract between the farm labor contractor and grower in *Torres-Lopez*, the DirecTV Contract was "standard for the industry and involved little negotiation." 111 F.3d at 643. That is made clear by the contract between DirecTV and another contractor in California, which is *entirely identical* to the DirecTV Contract with AIS, including fine amounts. Ex. II, DirecTV, Inc. Services Provider Agreement between DirecTV and Modern Day Satellite, dated July 29, 2009. DirecTV's intermediaries – be they Lumin, Inc., AIS, or Next Solutions – or no more than middlemen, operating on terms set by DirecTV.

### 7. *DirecTV had power over firing*

The only information used by AIS and DirecTV to evaluate Installers was the individual's performance on DirecTV's metrics. As a result, Defendant and AIS President Ramon Martinez testified that he relied on DirecTV's performance data when deciding to fire Installers. Ex. U, Martinez Depo at 27:9-11. The Ninth Circuit made clear in *Torres-Lopez*, that "indirect control as well as direct control can demonstrate a joint employment relationship" and

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 22

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

DirecTV exhibited such control by providing the information which determined whether Installers would be fired.  111 F.3d at 643.

### 8.   *DirecTV impacted Installer pay*

DirecTV did not directly pay the Installers, but the undisputed evidence shows that, as a matter of economic reality, DirecTV impacted Installers' rate and method of pay in two important ways.

First, DirecTV unilaterally set the piece rate it paid AIS.  The Second Circuit was faced with a similar scenario in *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 144-45 (2nd Cir. 2008).  In *Barfield*, a nursing assistant was directly employed and paid by a referral agency, but worked only at Bellevue hospital, and alleged she was jointly employed by Bellevue.  *Id.* at 135.  Bellevue paid the referral agency who then paid the nursing assistant for her work.  *Id.* at 144-45.  The Second Circuit ruled that Barfield still "exerted some control over [the nursing assistant's] pay" because "the hourly rate Bellevue paid the referral agencies effectively set a cap on the hourly rate that the agencies would pay" the nursing assistant.  *Id.* DirecTV also effectively capped Installer pay because AIS depended on DirecTV for all revenue to pay the Installers.

DirecTV also influenced Installer pay because AIS paid their Installers bonuses if the Installers performed well on the metrics that DirecTV used to decide whether to give AIS bonuses.  For example, if AIS's Installers had a companywide score on the post-installation survey called the Post-call Score of 96 or higher, AIS received a $6.00 bonus companywide for all Work Orders in the month.  Ex. T, Letter from DirecTV to "Contracting Partner," dated March 5, 2012, DOL 001528.  So AIS gave each Installer an incentive of $4.00 per work order to achieve the same score.  *See* Ex. W, E-mail dated January 23, 2013, DOL 004832.  AIS also gave a report each week to all the Installers detailing how much each installer had earned or lost based on their Post-Call Score for the month so far:

Secretary's Motion for Partial Summary Judgment                     Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                                    300 Fifth Avenue, Suite 1120
Page 23                                                                                                          Seattle, WA 98101
                                                                                                                    (206) 757-6762

| Rank | Name | # Of Post Calls | Average Score | Overall Influence | ID Badge | On Time | Equipmnt Working | Fully Educate | Quality of Work | Professionalism | Total Potential Incentive | Lost Potential Incentive |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 1 | Stephen Myron | 12 | 100.00 | 48 | 100.00% | 100.00% | 100.00% | 10.00 | 10.00 | 10.00 | $48.00 | $0.00 |
| 2 | Robert Meek | 15 | 98.27 | 34 | 100.00% | 100.00% | 100.00% | 9.67 | 9.73 | 9.67 | $60.00 | $0.00 |
| 3 | Gary Michaels | 9 | 98.89 | 26 | 100.00% | 100.00% | 100.00% | 9.67 | 9.89 | 9.89 | $36.00 | $0.00 |
| 4 | Randy Agustin | 13 | 97.77 | 23 | 100.00% | 100.00% | 100.00% | 9.54 | 9.62 | 9.62 | $52.00 | $0.00 |
| 5 | Merle Patterson | 6 | 99.67 | 22 | 100.00% | 100.00% | 100.00% | 9.83 | 10.00 | 10.00 | $24.00 | $0.00 |
| 6 | Adam Boynton | 5 | 99.20 | 16 | 100.00% | 100.00% | 100.00% | 9.60 | 10.00 | 10.00 | $20.00 | $0.00 |
| 7 | Oleg Katko | 7 | 98.14 | 15 | 100.00% | 100.00% | 100.00% | 9.00 | 10.00 | 10.00 | $28.00 | $0.00 |
| 8 | Mark Hanicker | 7 | 97.86 | 13 | 100.00% | 100.00% | 100.00% | 9.43 | 9.71 | 9.71 | $28.00 | $0.00 |
| 9 | Austin Carrigan | 12 | 96.50 | 6 | 91.67% | 100.00% | 100.00% | 9.75 | 9.50 | 9.67 | $48.00 | $0.00 |
| 10 | Gregg Wood | 4 | 97.25 | 5 | 100.00% | 100.00% | 100.00% | 9.00 | 9.75 | 9.75 | $16.00 | $0.00 |
| 11 | Jerry Brogan | 1 | 96.00 | 0 | 100.00% | 100.00% | 100.00% | 9.00 | 9.00 | 10.00 | $4.00 | $0.00 |
| 12 | Lucas Anderson | 16 | 95.94 | -1 | 87.50% | 100.00% | 100.00% | 9.38 | 9.88 | 9.75 | $0.00 | $64.00 |
| 13 | Miguel Rocha | 11 | 95.82 | -2 | 100.00% | 100.00% | 90.91% | 9.09 | 9.45 | 10.00 | $0.00 | $44.00 |
| 14 | Damon Irwin | 9 | 95.56 | -4 | 88.89% | 100.00% | 100.00% | 8.89 | 9.89 | 9.89 | $0.00 | $36.00 |

*Id.* DirecTV also provided AIS up to $7.00 for every protection plan sold by an Installer at AIS, which caused AIS to offer Installers $2.00 for each protection plan they sold to a DirecTV customer. Ex. W, <u>Addendum to DirecTV Services Provider Agreement</u>, DOL Martinez 0013-15; Ex. X, E-mail dated July 13, 2011, DOL 004790. Accordingly, DirecTV indirectly controlled Installer pay by setting the ceiling on how much AIS could pay Installers, and by determining whether Installers would receive bonuses from AIS.

### 9. *DirecTV maintained authority over Installer records*

DirecTV maintained its own records on Installers, and also played a role in AIS's recordkeeping. DirecTV maintained information on when Installers arrived and departed appointments, and extensive metric data on how Installers performed their duties. In addition, DirecTV required AIS to "keep accurate and complete books and records regarding its performance of its obligations under" the DirecTV Contract, such as Installer background checks. Ex. B, DirecTV Contract at DTV000285-286. So DirecTV maintained records of Installers' hours worked, and their performance, as well as requiring AIS to maintain records pertinent to the DirecTV Contract.

### 10. *Premises and equipment*

One factor identified by the Ninth Circuit in *Torres-Lopez* does not weigh for or against joint employment. *Torres-Lopez*, 111 F.3d at 640. Neither the Installers nor DirecTV invested in the equipment used to do the Installers' work – instead, tools were provided by AIS. Ex. U,

Secretary's Motion for Partial Summary Judgment
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM
Page 24

Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98101
(206) 757-6762

Martinez Depo at 91:8-20.  In addition, the Installers did not perform their duty on the premises of property owned by DirecTV.  However, the established facts show that every other factor identified by the Ninth Circuit to analyze joint employment weighs towards finding DirecTV jointly employed the Installers.

## IV.   CONCLUSION

There is no genuine dispute over any of the material facts which establish that DirecTV exercised pervasive authority over the Installers just like any other employer – DirecTV set the hiring requirements; provided the work; determined how, when, and where the work would be performed; decided who would perform the work; supervised and evaluated the Installers; capped Installer pay; and disciplined Installers.  It is not surprising that DirecTV would exercise such control over the Installers, because the work they did was absolutely integral to DirecTV's business.  Yet DirecTV chose to shirk its responsibility to ensure that the Installers were paid as required by the FLSA.  Instead, DirecTV found an entity, AIS, who would supply cheap manpower, and would cede control to DirecTV.  The Secretary files this motion for partial summary judgment to finally hold DirecTV jointly and severally liable for violations of the FLSA related to the Installers, and any back wages due.  As a matter of law, the Secretary is entitled to a finding from the Court that DirecTV did jointly employer the Installers.


Dated:  March 19, 2015                          M. PATRICIA SMITH
                                                Solicitor of Labor

                                                JANET M. HEROLD
                                                Regional Solicitor

                                  By:    _/s/ Joseph Lake_____
                                                JOSEPH M. LAKE
                                                Senior Trial Attorney

                                                JEREMIAH MILLER
                                                Senior Trial Attorney
                                                Attorneys for the Plaintiff Secretary of Labor,
                                                United States Department of Labor

Secretary's Motion for Partial Summary Judgment          Office of the Solicitor, U.S. Department of Labor
Perez v. Lantern Light Corp., et al., 2:12-cv-01406-RSM                      300 Fifth Avenue, Suite 1120
Page 25                                                                      Seattle, WA 98101
                                                                            (206) 757-6762