```
 1            UNITED STATES DISTRICT COURT FOR THE

 2               WESTERN DISTRICT OF WASHINGTON

 3

 4   THOMAS PEREZ, Secretary of      )
     Labor, United States Department )
 5   of Labor,                       )
                                     )
 6            Plaintiff,             )
                                     )
 7        vs.                        )No. 2:12-cv-01406-RSM
                                     )
 8   LANTERN LIGHT CORPORATION,      )
     d/b/a ADVANCED INFORMATION      )
 9   SYSTEMS, a corporation; DIRECTV )
     LLC, a limited liability        )
10   company; and RAMON MARTINEZ,    )
     an individual,                  )
11                                   )
              Defendants.            )
12   _____)

13

14           DEPOSITION UPON ORAL EXAMINATION

15                        OF

16                    MARC MASTIN

17           Thursday, January 29, 2015

18                    9:30 a.m.

19               300 Fifth Avenue

20               Seattle, Washington

21

22

23
     Reported by:
24   Cheryl Macdonald, CRR, RMR
     Court Reporter
25   JOB No. 150129CMA
```

1

**EXHIBIT F**

```
1                   A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4                   JEREMIAH MILLER
                    Senior Trial Attorney
5                   UNITED STATES DEPARTMENT OF LABOR
                    Office of the Solicitor
6                   300 Fifth Avenue
                    Suite 1120
7                   Seattle, Washington 98104
                    miller.jeremiah@dol.gov
8

9
    FOR THE DEFENDANT:
10
                    JOEL P. KELLY
11                  Attorney at Law
                    JACKSON LEWIS
12                  725 South Figueroa Street
                    Suite 2500
13                  Los Angeles, California 90017
                    kelly@jacksonlewis.com
14

15

16

17

18

19

20

21

22

23

24

25
                                                            2
```

**EXHIBIT F**

```
 1                    I N D E X

 2

 3   EXAMINATION                               PAGE

 4   BY MR. MILLER:     ..........................    5

 5

 6

 7

     EXHIBITS MARKED                           PAGE

 8

 9   No. 1            Bates-stamped DTVe172078
                      one page...................    15
10

     No. 2            Bates-stamped DTVe0172877-79
11                    three pages................    23

12   No. 3            Bates-stamped DTVe0172888-89
                      two pages..................    29
13

     No. 4            Bates-stamped DTVe0172820
14                    one page...................    39

15   No. 5            Bates-stamped DTVe0128835-36
                      two pages..................    41
16

     No. 6            Bates-stamped DTVe0155984-86
17                    three pages................    45

18   No. 7            Bates-stamped DTVe0172901
                      one page...................    47
19

     No. 8            Bates-stamped DTVe0172745
20                    one page...................    49

21   No. 9            Bates-stamped DTVe0130876       52
                      one page...................
22

     No. 10           Bates-stamped DTVe0139105-06
23                    two pages..................    55

24

25
                                                        3
```

**EXHIBIT F**

1                          I N D E X (Cont'd.)

2

3    EXHIBITS                                               PAGE

4    No. 11              Bates-stamped DTVe0139107-10
                         four pages.................    59
5
     No. 12              Bates-stamped DTVe0139136
6                        one page...................    63

7    No. 13              Bates-stamped DTVe0128898
                         one page...................    66
8
     No. 14              Bates-stamped DTVe0172851-52
9                        two pages..................    68

10   No. 15              Bates-stamped DTVe0114958
                         one page...................    74
11
     No. 16              Bates-stamped DTVe0128847-48
12                       two pages..................    81

13   No. 17              Bates-stamped DOL 001528
                         one page...................    96
14
     No. 18              Bates-stamped DTVe0172891-92
15                       two pages..................    98

16

17

18

19

20

21

22

23

24

25

                                                             4

**EXHIBIT F**

```
 1   MARC MASTIN,    witness herein, having been first
                     duly sworn by the Certified Court
 2                   Reporter, deposed and said as
                     follows:

 3

 4                        EXAMINATION

 5   BY MR. MILLER:

 6        Q.   Good morning, Mr. Mastin.  My name is

 7   Jeremiah Miller.  I'm an attorney for the United

 8   States Department of Labor, and I'm here to take your

 9   deposition today in the matter of Secretary of Labor

10   vs. Lantern Light Corporation doing business as

11   Advanced Information Systems, Ramon Martinez and

12   DirecTV.

13             Have you ever had your deposition taken

14   before?

15        A.   No, sir.

16        Q.   So before we get started, I'm just going to

17   tell you a little bit about the process and let you

18   know the ground rules for a deposition.  I'm going to

19   ask you questions, and unless your attorney instructs

20   you not to answer those questions, you've got to give

21   me an answer.  You'll see today there's a court

22   reporter here, and she's taking down everything we

23   say, and she's typing it.  And that means that there

24   are a couple of things we've got to do to be sure that

25   the transcript makes sense.
```

5

**EXHIBIT F**

1          The first thing is you need to give out

2   loud, verbal answers.  So shaking your head or nodding

3   your head, that won't show up on the transcript.  Do

4   you understand?

5          A.    Sure.

6          Q.    Similarly, you know, you need to answer in

7   words.  Things like "uh-huh" and "huh-uh," they kind

8   of look the same on a transcript, so "Yes" or "No."

9   You understand that?

10         A.    Yes.

11         Q.    The other important thing for the purposes

12  of getting a clean transcript is that we have to try

13  to not talk over one another.  It will undoubtedly

14  happen during the deposition, that's just how people

15  converse, but I will try very hard to let you finish

16  your answers, and you need to try to let me finish my

17  questions before you give an answer.  Do you

18  understand that?

19         A.    Sure.

20         Q.    Is there any reason that you'll have any

21  difficulty giving your best and most truthful answers

22  today?  Do you have any medical conditions?

23         A.    No, sir.

24         Q.    Are you on any medication that might affect

25  your ability to answer my questions?

6

**EXHIBIT F**

1          A.     No, sir.

2          Q.     Another sort of housekeeping thing here,

3     you know, I'm willing to take breaks whenever you need

4     them.  If you need to stretch your legs, you need to

5     use the restroom, drink of water, that's fine.  The

6     only caveat to that is if I've asked a question, I

7     need an answer before we go on break.  So, please ask

8     whenever you need them.

9               And when you answer the questions, if you

10    don't tell me you don't understand the question I

11    asked, I'm going to assume you understood it.  I will

12    undoubtedly ask you a complicated question at some

13    point during this deposition that won't make any

14    sense.  I just need you to say, "I don't understand

15    that.  Can you please rephrase it?"

16              Do you understand that?

17         A.     Sure.

18         Q.     And then if you need to correct an answer,

19    or you want to clarify anything you said, you can do

20    that any time.  This happens.  You'll give me answer

21    where you say, "Oh, I don't remember," but then 10

22    minutes later, "Oh, yeah, actually, I do remember.  I

23    know the name of that person."  If that happens,

24    please just tell me and we'll be sure we get it in the

25    record.

7

**EXHIBIT F**

1          A.      Okay.

2          Q.      So, before we get into the substance of

3    these questions, I'd just like to get a sense of your

4    background.  Are you currently employed?

5          A.      Yes, I am.

6          Q.      By whom are you currently employed?

7          A.      DirecTV.

8          Q.      What position do you hold with DirecTV?

9          A.      Regional director of operations.

10         Q.      How long have you been regional director of

11   operations?

12         A.      Two years and two months.

13         Q.      What job did you have before that?

14         A.      I was the site manager.

15         Q.      Also for DirecTV?

16         A.      Yes.

17         Q.      Where were you site manager?

18         A.      Lynnwood, Washington.

19         Q.      How long were you site manager at Lynnwood?

20         A.      Roughly 18 months.

21         Q.      What job did you have before that?

22         A.      I was the operations manager with Verizon.

23         Q.      And where was that located?

24         A.      Bellevue, Washington.

25         Q.      And how long were you there?

                                                            8

**EXHIBIT F**

1      A.     Two and a half years, I believe.  Almost

2   three.

3      Q.     And before you were operations manager with

4   Verizon?

5      A.     I was with -- I was a field supervisor with

6   Comcast.

7      Q.     And where was that located?

8      A.     Seattle, Washington.

9      Q.     And how long did you have that job?

10      A.     As a supervisor for six and a half years.

11   With the company, 11 and a half.

12      Q.     What did you do before you were field

13   supervisor?

14      A.     I was a technician.

15      Q.     Doing cable installs?

16      A.     Correct.

17      Q.     What's your educational history?

18      A.     Graduated from high school and have some

19   college credits.

20      Q.     So starting with your employment as site

21   manager in Lynnwood for DirecTV, can you tell me --

22   well, first of all, so that job started roughly 2011?

23      A.     Correct.

24      Q.     Do you remember the month?

25      A.     April.

9

**EXHIBIT F**

1          Q.    Can you tell me what your job duties were

2    as a site manager?

3          A.    Oversight for 130 personnel.  Day to day --

4    oversight of day-to-day work activities, be it

5    installation and service.  Overall responsibility for

6    warehousing, training, payroll.

7          Q.    So who were those 130 personnel you

8    mentioned?  Who reported to you or who did you

9    oversee, I should say?

10         A.    So I had my direct reports.  I had -- I'm

11   trying to remember if it was six or seven supervisors

12   at the time.  An operations manager, a warehouse

13   manager.  In the beginning the trainers reported to me

14   before I had an operations manager, and then they

15   reported directly to the operations manager.  And then

16   the administration team.  And then they also then

17   reported to the operations manager.

18         Q.    And among those 130 personnel, did you have

19   installers?

20         A.    Yes.  Overall responsibility, yeah.

21         Q.    Yeah, but they were directly --

22         A.    Yeah.

23         Q.    For the 18 months you were site manager,

24   did you -- what kind of installers did you have?

25               MR. KELLY:  What do you mean specifically?

                                                        10

**EXHIBIT F**

1      Q.    I'll clarify for you.  I mean DirecTV has

2  in-house technicians, right, in-house installers; is

3  that correct?

4      A.    Correct.

5      Q.    And then DirecTV has also, at various

6  times, used various non-in-house technicians or

7  installers; right?

8      A.    Correct.

9      Q.    So when you were a site manager, did you

10  have responsibility for both in-house technicians and

11  non-in-house technicians or installers?

12          MR. KELLY:  Vague and ambiguous as to

13  "responsibility."  You can explain.

14      A.    So I have responsibility for the W-2's.  I

15  have a partnership that worked in conjunction with the

16  owner of the subcontractors.

17      Q.    Then, when you say W-2's, you're talking

18  about the in-house technicians, the people DirecTV

19  considers their employees?

20      A.    Correct.

21      Q.    How many -- during that 18 months you were

22  site manager at Lynnwood, how many subcontractor

23  companies were there?

24      A.    Just the one.

25      Q.    And was that one subcontractor AIS?

11

1    A.    Yes.   When I first started they were under

2  the umbrella of, I believe it was, All Nations, and

3  then changed to AIS, but it was the same owner.

4    Q.    When I say "AIS," I mean Advanced

5  Information Systems, one of the defendants in this

6  lawsuit.  You understand that; right?

7    A.    Yes.

8    Q.    So how many -- while you were site manager,

9  how many in-house technicians or installers did you

10  have working for you?

11    A.    In-house?

12    Q.    Yeah.

13    A.    Roughly 120.

14    Q.    And how many subcontractors were doing

15  installer business?

16    MR. KELLY:  He only told you one, AIS.

17    MR. MILLER:  No.  I'm talking about

18  subcontractor installers.  How many --

19    MR. KELLY:  Just for clarification, so that

20  we're using the same terminology, because we're using

21  different terminology today than we have in other

22  depositions, we have referred to the men and women who

23  do the installations either as "techs" or

24  "installers."  We have referred to AIS by name or as a

25  contractor.  You're using the term "subcontractor"

                                                        12

**EXHIBIT F**

 1   today.  I don't understand you to make any distinction

 2   by the difference in the terminology.  If you're

 3   referring to the techs I would ask, for simplicity, we

 4   call them "techs" or "installers."  If you mean

 5   anybody else, just let us know.  Otherwise the

 6   transcript is going to be confusing.

 7          MR. MILLER:  Well, I was just following the

 8   deponent's lead, but I can call them techs or

 9   installers.

10      Q.   How many AIS installers were there?

11          MR. KELLY:  How many what installers?

12          MR. MILLER:  AIS installers.

13          MR. KELLY:  If you know.

14      A.   It fluctuated based on seasonality of the

15   workload.

16      Q.   Can you tell me what the maximum was?

17      A.   I think the maximum they -- in Lynnwood,

18   around 35, I believe.

19      Q.   And do you know what the minimum was?

20      A.   I think they've had as low as eight.  Eight

21   to 10.

22      Q.   So as a site manager you had what I believe

23   you described as a partnership with the AIS

24   subcontractor; is that right?

25      A.   Correct.

                                                     13

1      Q.    How did that work out on a day-to-day

2  basis, that partnership with AIS?

3      A.    Do you have specifics that you're looking

4  for?

5      Q.    Yeah.  How frequently did you confer with

6  AIS management?

7      A.    Myself?

8      Q.    Yes.

9      A.    Weekly to biweekly with the principal, who

10  was Ray Martinez.

11      Q.    Did you talk to other managers at AIS?

12      A.    Yes.

13      Q.    Do you remember who they were?

14      A.    Justin Masencup.  I believe he was the

15  operations manager.  And a Jason Scarry, who was

16  operations manager prior to Justin Masencup.

17      Q.    Did you talk to any lower level AIS --

18      A.    On occasion.  On occasion, supervisors.

19      Q.    So you say you talked to Ray Martinez or

20  conferred with Ray Martinez either weekly or biweekly.

21  How frequently for Jason Masencup and Richard Scarry?

22      A.    Jason Scarry.

23      Q.    Sorry.  Jason Scarry.

24      A.    Probably the same amount of time.  And

25  sometimes they would join him at the weekly meetings,

14

**EXHIBIT F**

```
 1   so they would come together.  Sometimes more

 2   frequently just through e-mail or over the phone.

 3        Q.    So it sounds like you had an established

 4   schedule for meetings and then also unplanned

 5   interactions with AIS management; is that right?

 6        A.    Correct.

 7              MR. MILLER:  I'd like to show you an

 8   exhibit which I'll have the court reporter mark as

 9   Exhibit 1.

10              (Marked for identification Exhibit 1.)

11        Q.    Mr. Mastin, if you'd just take a moment to

12   review the exhibit.  Take your time and let me know

13   when you've looked at it, and I'm just going to ask

14   you a question or two about it.

15              So, first, do you see in the lower

16   right-hand corner this is marked DTVe0172078?

17        A.    Yes.

18        Q.    Do you recognize this document?

19        A.    The document or that number?

20        Q.    The document.  Not number.

21        A.    Yes.

22        Q.    What is it?

23        A.    It's a meeting request for a meet between

24   myself, my operations manager, Ray Martinez, and

25   Justin Masencup.
```

                                                          15

**EXHIBIT F**

1      Q.     And is Billy Maez your operations manager?

2      A.     At that time, yes.

3      Q.     And, so, is this an example of a scheduling

4  request for that regular meeting we were discussing?

5      A.     Correct.

6      Q.     And you had lots of these, presumably?

7      A.     Yes.

8      Q.     So what happened at those regularly

9  scheduled meetings?

10     A.     What happened?

11     Q.     (Nodding head.)

12     A.     We would review performance, discuss work

13  flow, and forecasting.

14     Q.     So when you say "forecasting," is that

15  forecasting in terms of how much work there would be

16  coming up?

17     A.     Correct.

18     Q.     And, then, why were you discussing the

19  projections for the work that was going to be in the

20  future?

21     A.     Based on work flow given to DirecTV, we

22  would determine if we had enough staff internally, and

23  if we did not we would present to AIS, this is how

24  much work we have, can you support this.  And they

25  would say either yes or no.

                                                    16

1        Q.     Do you recall them ever saying no?

2        A.     Generally no.

3        Q.     I mean, I know you have lots of these

4   meetings, right, but can you recall any instances

5   where they said, oh, we cannot satisfy that projected

6   amount of work?

7        A.     No.

8        Q.     When you were projecting that the work flow

9   or the work coming in was going to decrease, did they

10  ever have any feedback about that?  Did you have

11  discussions about that where they would discuss what

12  they were going to do in response?

13       A.     We would tell them that -- you know, we

14  would provide them notification that, yeah, the work

15  is slowing down so there's going to be less jobs

16  available.  As to how they would react to that, no.

17       Q.     So you also said that you said you

18  discussed work flow.  Is that different than

19  forecasting?

20       A.     No.  Same thing.

21       Q.     And then you say that you discussed

22  performance.  Can you tell me what you mean by that?

23       A.     Sure.  We would review performance results

24  based on jobs completed and determine whether they met

25  some of the agreed-upon parameters within their

                                                        17

1    contract.

2        Q.    So their contract specified performance to

3    certain metrics?

4        A.    To certain levels, yes.

5        Q.    Were those levels different from the

6    in-house technicians or installers?

7        A.    No, not to my knowledge.

8        Q.    What kind of metrics were you looking at in

9    terms of the performance for AIS?

10       A.    We looked at job completion rate, so how

11   many jobs they completed.  Customer satisfaction.  And

12   that's -- customer satisfaction was defined by a

13   couple of different parameters, whether they met the

14   time window, post-call satisfaction surveys.

15       Q.    And the post-call satisfaction survey, is

16   that sometimes called the NPS?

17       A.    Separate, but they're two different -- post

18   calls was used prior to NPS.  NPS is now our most

19   prevalent metric that we look at.

20       Q.    What does NPS stand for?

21       A.    Net promoter score.

22       Q.    So that and the post-call satisfaction

23   survey serve a similar purpose?

24       A.    Yes.

25       Q.    Can you think of any other metric you used

                                                          18

1   to evaluate the performance of AIS?

2       A.    We look at the quality.  So, service on

3   installs within seven days, 30 days, 60 days, 90 days.

4   We would also gauge return path of our product, so is

5   it communicating appropriately through the Internet or

6   phone.  And that's defined by nonCCK or broadband

7   DECA.

8             THE COURT REPORTER:  Or broadband what?

9             THE WITNESS:  Broadband DECA.

10            MR. KELLY:  D-E-C-A.

11      Q.    What is the nonCCK?  What does that mean?

12      A.    It means that it's not through the

13  Internet.  It's through the phone system.  So it's a

14  matter of how many times they plugged the phone into

15  the box.

16      Q.    And when you were talking about service

17  returns on 7, 30, 60, 90 days, is that sometimes

18  abbreviated SIN7, 30, 60, 90?

19      A.    Correct.

20      Q.    How did you have these metrics for AIS?

21            MR. KELLY:  What do you mean, please.

22      Q.    If you evaluated them on these metrics,

23  where were you getting the data that told you whether

24  or not they were hitting a predetermined level for,

25  say, a SIN7?

                                                    19

**EXHIBIT F**

1        A.     Our analytics team at corporate puts

2   together reports based on completed jobs.  And it's

3   provided to a share point which we have access to on a

4   daily basis.

5        Q.     The Windows database program share point?

6        A.     Yeah, I believe so.  Whether it's Windows

7   or not, I'm not that savvy.

8        Q.     And where did the underlying data for those

9   analytic reports come from?

10        A.     I guess I'm not clear on the question.

11        Q.     Sure.  I'm just trying to figure out, you

12   know, if you were looking at how frequently you have

13   to return to a customer's house within seven days of

14   installation, how did you know what that actual number

15   was?  How were you collecting, or where did that

16   information come from as to what AIS installers were

17   doing?

18        A.     I'm not sure I understand the question.

19        Q.     Sure.  Perhaps a little confusing.  I'll

20   try asking it this way.  When you were site manager at

21   Lynnwood, were the AIS installers using hand-held

22   devices that were issued by DirecTV?

23        A.     Not by DirecTV.  They had a mixture of, I

24   believe, their own hand-held devices and cell phones.

25        Q.     And then those hand-held devices or cell

                                                          20

**EXHIBIT F**

1    phones communicated with a DirecTV database?

2         A.    Yes.

3         Q.    And so were they required to enter details

4    about the job into either their cell phones or their

5    hand-helds?

6         A.    Details, all it will tell you is whether

7    the -- it will give you the details of the job itself,

8    and then you would close the job on your hand-held.

9    So it's more or less just a visual of the work you're

10   going to complete or the customer is intending to

11   receive and then it's completed.

12        Q.    Did it have -- like, did they record

13   arrival time through that system?

14        A.    Correct.

15        Q.    And then departure time?

16        A.    Correct.

17        Q.    So that would be one source of information

18   about, like, how long jobs were taking, for instance;

19   right?

20        A.    Correct.

21        Q.    And then SIN7s would be generated by

22   combining that data with then another report, I

23   presume, that would show whether or not they were back

24   to the same customer within seven days; is that right?

25        A.    Correct.  So it would be generated by -- if

21

**EXHIBIT F**

1    the customer was having an issue and called DirecTV,

2    and a new work order was generated, then it would be

3    determined by the original completion of the first

4    job, was it within seven days or 30 days.

5        Q.    That makes sense.  So beyond the "I arrived

6    at the job at this time and departed from the job at

7    this time," are you aware of other information that

8    DirecTV was collecting about what AIS installers were

9    doing?

10        A.    Not specifically.  Because I've never used

11   the hand-held, I can't tell you what other information

12   was put in there because I've never used the system

13   myself.

14        Q.    So, for instance, with the return path

15   communication metric that you mentioned a moment ago

16   --

17        A.    Yes.

18        Q.    -- the information to determine whether or

19   not it had been correctly hooked up, some of that

20   would have to have come from the installers, right,

21   because they would have to tell you either it went

22   through BB DECA or it went through the phone; right?

23        A.    Correct.  So they would -- depending on the

24   equipment that they would close the job with it will

25   be determined on whether -- so a broadband DECA has an

                                                        22

**EXHIBIT F**

1    zero number that defines it as an Internet device

2    whereas a nonCCK is the box itself.

3         Q.    And that would be --

4         A.    Those devices communicate back and forth

5    through the system itself, not through the hand-held.

6         Q.    But the information in the hand-held would

7    be what told DirecTV whether or not it was broadband

8    connection or a phone connection; right?

9         A.    Correct.

10        Q.    And then some of these other metrics, the

11   customer satisfaction, the NPS or the post-call

12   satisfaction survey, those were direct interactions

13   with the customer after the AIS installer had been

14   there?

15        A.    Correct.

16        Q.    And completion rates would be another thing

17   that would be determined effectively by what came in

18   from the hand-helds, either the phones or, I don't

19   know, whatever the hand-held devices were?

20        A.    Correct.

21             MR. MILLER:  So I'd like to show you

22   another exhibit now that I'm going to ask the court

23   reporter to mark as Exhibit 2.

24             (Marked for identification Exhibit 2.)

25        Q.    Again, please feel free to look through

                                                        23

**EXHIBIT F**

```
 1   that.  You can read it all if you want to.  You can
 2   scan it to get an idea.  Whatever you need to do.  And
 3   then I'll ask you some questions about it.
 4         A.    Okay.
 5         Q.    So, first, do you see in the lower
 6   right-hand corner the first page of Exhibit 2 there's
 7   a stamp which reads DTVe0172877?
 8         A.    Correct.
 9         Q.    And then the -- there are three pages to
10   this exhibit, and they're consecutively numbered
11   ending in 879?
12         A.    Yes.
13         Q.    And the last page only has the DirecTV logo
14   on it?
15         A.    Correct.
16         Q.    Do you recognize this e-mail exchange?
17         A.    Yes.
18         Q.    So, it appears to be a series of
19   correspondence between you and Ray Martinez, who, I
20   understand it, is the principal of AIS; is that right?
21         A.    Correct.
22         Q.    And this is -- this is happening in
23   November of 2013.  So at this point were you regional
24   director of operations?
25         A.    2013?
```

                                                        24

1            MR. KELLY:  November.

2       A.    November '13, yes.

3       Q.    You were, okay.  So, starting on the second

4  page here at the bottom, you've got this part of what

5  looks like a chart or something.  Is this a report you

6  would have received?

7       A.    Yes.

8       Q.    And then like we were discussing a moment

9  ago, what's your -- what's captured here is the time

10 at which an AIS installer arrived at a job?

11      A.    Yes.  This is showing what time stamp they

12 arrived at their first job.

13      Q.    And this would be information that was

14 collected either from their cell phone or their

15 hand-held?

16      A.    Correct.

17      Q.    So in this first e-mail, which I guess is

18 at the bottom of the second page where you're sending

19 this e-mail to Ray Martinez, this is 9:20 a.m. on

20 Sunday, November 10th?

21      A.    Yes.

22      Q.    What does "OTG" mean?  That's at the end of

23 the first paragraph.

24      A.    It's on-time guarantee.

25      Q.    And is that another metric by which you

                                                      25

**EXHIBIT F**

1    evaluate performance?

2         A.    Yes.

3         Q.    Am I right in thinking that what that is is

4    DirecTV had some kind of on-time guarantee, and if the

5    tech didn't arrive when they were supposed to --

6               Is it arrive when they were supposed to or

7    complete the job when they were supposed to?

8         A.    It's arrive within the time frame.

9         Q.    -- then there was some sort of -- was there

10   a benefit to the customer, a detriment to DirecTV?

11        A.    It resulted in a $50 credit to the

12   customer.

13        Q.    Okay.  And then going down to the last

14   paragraph, you say, "There's a 10 point delta in

15   NPS results when showing up in the last two hours of

16   the time frame versus the first two."  Do you see that

17   sentence?

18        A.    Yes.

19        Q.    So the NPS again is this customer

20   satisfaction survey we talked about?

21        A.    Correct.

22        Q.    And so I guess what you're getting at here

23   is that arriving later in the window for the

24   installation results in less satisfied customers?

25        A.    Yes.

26

**EXHIBIT F**

1    Q.    So, based on this e-mail we're looking at

2    -- this is bottom of page 2 of Exhibit 2 -- it looks

3    like you're telling Mr. Martinez that the AIS

4    installers need to arrive by 8 a.m.; is that right?

5    A.    That would be the expectation of the

6    customer if it was an 8 to 12 appointment, yes.

7    Q.    And so when you tell him you expect this to

8    be monitored and cleaned up, are you telling him that

9    you expect him to get his AIS installers there by 8

10   a.m.?

11   A.    I expect him to handle his team

12   appropriately.

13   Q.    Well, in this context what does that mean?

14   A.    That means be on site by 8 a.m.

15   Q.    And then on the first page of Exhibit 2,

16   there's three e-mails here.  And there's a discussion

17   in the middle e-mail and the top e-mail about, I

18   guess, FS scheduler.  Do you see this?

19   A.    Yeah.

20   Q.    What is FS scheduler?

21   A.    It's what we refer to as "click."  It's a

22   routing platform.

23   Q.    Is that the way in which routes or jobs are

24   assigned?

25   A.    Yes.

27

**EXHIBIT F**

1       Q.    Do you know what kind of information goes

2   into FS scheduler?

3       A.    It's based on their availability to work.

4   It's based on the skill sets that they have and their

5   geography.

6       Q.    And then what sort of reports does that

7   FS scheduler generate?

8       A.    Reports?  It just tells us time of arrival,

9   time of completion.  More or less that's pretty much

10  it.  When they arrive, when they completed the job.

11  It operates differently for in-house versus

12  subcontractors.

13      Q.    What's the difference?

14      A.    For in-house, it's drip fed so they only --

15  the installers only have visibility to one job at any

16  point.  For subcontractors it's bulk fed, so all jobs

17  for that assigned company are given to the company,

18  and they have full visibility to all jobs that they

19  would be handling for that day.

20      Q.    Okay.  So when a scheduler would generate a

21  route list for the jobs for that day, AIS would get

22  all of the jobs for that day; is that right?

23      A.    Correct.

24      Q.    And then the in-house technicians would

25  just get "Here's your first job"?

                                                      28

**EXHIBIT F**

1        A.      Correct.

2                MR. MILLER:  I'd like to show you another

3    exhibit that I will have the court reporter mark as

4    Exhibit 3.  It's a two-page exhibit.

5                (Marked for identification Exhibit 3.)

6        Q.      And again, please review this e-mail

7    exchange and let me know when you're done so I can ask

8    you some questions about it.

9        A.      Okay.

10       Q.      So, first, do you see on the first page of

11   Exhibit 3 in the lower right-hand corner there's a

12   mark that says DTVe0172888?

13       A.      Yes.

14       Q.      And that the second page continues at 889?

15       A.      Yes.

16       Q.      So, this looks like an e-mail exchange that

17   was perhaps parallel to Exhibit 2?

18       A.      Okay.

19               MR. KELLY:  It seems to include some of the

20   same e-mails that were in Exhibit 2.

21       Q.      So if you compare Exhibit 2 and Exhibit 3,

22   on the second page of Exhibit 2, that bottom e-mail

23   that we talked about, the one on November 10 at 9:20

24   a.m., 2013, is the same e-mail that starts at the

25   bottom of page 1 of Exhibit 3 and goes to the second

                                                        29

**EXHIBIT F**

1  page; is that right?

2       A.    Correct.

3       Q.    And then comparing further, you can see

4  that then the next e-mail up -- so this is on Exhibit

5  3, page 1.  This is an e-mail that's November 10,

6  2013, at 6 p.m., 6:04 p.m., is the same as the e-mail

7  at the bottom of the first page of Exhibit 2; right?

8       A.    Uh-huh.

9       Q.    And then it looks like the e-mails that are

10  contained in this exchange are different, right, from

11  that, going forward in time.  So the next e-mail on

12  Exhibit 3 -- I'm sorry, I misspoke.  No, that's right.

13  The next e-mail on Exhibit 3.  So on the first page is

14  one on November 26, 2013 at 9:21 a.m.?

15      A.    Yes.

16      Q.    And this is an e-mail you're sending to Ray

17  Martinez and, I guess, Justin Masencup; is that right?

18      A.    Yes.

19      Q.    And you've copied Billy Maez and Cameron

20  Malanify?

21      A.    Yes.

22      Q.    And then at the top of Exhibit 3 on the

23  first page --

24      A.    Yes.

25      Q.    -- you've got an e-mail to Billy Maez.

                                                        30

1  What position was Billy Maez holding at this point?

2      A.    Site manager for Lynnwood.

3      Q.    The position you had previously had?

4      A.    Yes.

5      Q.    And then you say here, "Yep" -- it says

6  "is" but I assume that would be "I'd"?

7      A.    Yeah.

8      Q.    That's a very frequent mistype for my

9  keyboard, too.  So, "Yep, I'd hate to have to cut

10 more, but he has to learn at some point."

11          What do you mean by "cut more" in this

12 e-mail?

13     A.    It means reduce his workload.

14     Q.    And this now is, like, a little more than

15 two weeks after you first pointed out this problem

16 with arrivals; right?

17     A.    Yes.  It appears to be, yes.

18     Q.    And so the second sentence in this e-mail

19 at the top of Exhibit 3, the first page, is, "Of

20 course I'm still yet to hear a response."  What does

21 that mean?

22     A.    What does it say?

23     Q.    Sorry.  It's the first page of Exhibit 3 at

24 the very top, the second sentence of the e-mail.

25     A.    It means I haven't heard a response from

                                                      31

**EXHIBIT F**

1   Ray Martinez.

2        Q.    About the start time issue?

3        A.    Yes.

4        Q.    So these e-mails Exhibit 2 and Exhibit 3

5   you've been discussing, you told me that these were

6   from the period where you were, I'm sorry, regional --

7        A.    Regional director.

8        Q.    Regional director of operations?

9        A.    Yes.

10       Q.    I'd like to ask you a few questions about

11  that job.  So you started that job, then, in?

12       A.    December of 2012.

13       Q.    December of 2012.  And what were your job

14  duties?

15       A.    Responsible for all installation and

16  service for state of Washington.

17       Q.    So, as I understand it, for Western

18  Washington there was a Lacey DirecTV office and a

19  Lynnwood DirecTV office; is that right?

20       A.    Correct.

21       Q.    What other offices are there in the state

22  of Washington?

23       A.    Kennewick, Yakima, and Spokane.

24       Q.    And Lynnwood covers, effectively, the whole

25  Seattle metropolitan area up to -- or down to Federal

                                                      32

```
 1   Way, I should say?
 2        A.    Yeah.  It's -- it borders between Federal
 3   Way and Tacoma.
 4        Q.    And then Lacey covers everything south of
 5   that, roughly to Vancouver, Washington; right?
 6        A.    Just north of Vancouver.  Vancouver does
 7   come slightly north, but they cover the peninsula
 8   also.
 9        Q.    Are you still regional director of
10   operations for Washington state?
11        A.    No, I'm not.
12        Q.    What's your current position?
13        A.    Regional director of operations for
14   northern California.
15        Q.    How long have you had that position?
16        A.    This would be month four.  So since
17   October, first week of October.
18        Q.    So you were regional director of operations
19   for Washington state up until October of 2014?
20        A.    I had dual responsibilities until December.
21        Q.    Well, that sounds easy.  So, when you were
22   regional director of operations for Washington state,
23   who were your direct reports?
24        A.    Site managers.
25        Q.    And that's for each of the offices we
```

33

**EXHIBIT F**

1  covered, Lynnwood, Lacey, Kennewick, Yakima and

2  Spokane?

3      A.    Yeah.   Kennewick and Yakima had the same

4  manager.

5      Q.    So you had one site manager that split

6  those offices?

7      A.    Yeah.

8      Q.    Do you have any other direct reports?

9      A.    Regional service manager.

10     Q.    What was the regional service manager's

11 job?

12     A.    Responsible for service and project

13 management-type activities for the state of

14 Washington.

15     Q.    So as regional director of operations,

16 based on at least what I was looking at, what we were

17 talking about here in Exhibit 2 and Exhibit 3, you

18 were still getting performance reports related to AIS

19 installers or the AIS subcontractors; is that right?

20     A.    I have visibility to all performance for

21 the entire state.

22     Q.    Did you frequently counsel -- well, let me

23 back up.  Were there other contractors besides AIS

24 working in the state of Washington at the time you

25 were regional director of operations?

                                                   34

1        A.     No, sir.

2        Q.     Did you have these kinds of interactions

3   with supervisors -- let me try to ask you a better

4   question.  So, in Exhibit 2 and Exhibit 3, you know,

5   as we discussed, you're reaching out to AIS because of

6   the start times.  Did you have those kinds of

7   interactions with front-line supervisors for in-house

8   technicians?

9             MR. KELLY:  Vague and ambiguous.

10       Q.     Do you understand what I'm asking?

11       A.     I believe so, yeah.

12            MR. KELLY:  You can answer if you

13   understand.

14       Q.     So did you?

15       A.     Yeah.  If a front-line supervisor was not

16   meeting expectations, I would ask what he's also doing

17   about it.

18       Q.     Did that happen frequently?  Did you

19   frequently end up reaching out to front-line

20   supervisors or in-house technicians?

21       A.     On occasion.  Not with great frequency.

22       Q.     Did you have to reach out to AIS

23   frequently?

24       A.     To their front-line supervisors?

25       Q.     No.  As you testified earlier, you dealt

                                                      35

```
 1   with Ray Martinez and Justin Masencup?

 2        A.    Correct.

 3        Q.    Did you have to reach out to them

 4   frequently?

 5        A.    As director?

 6        Q.    Yes.

 7        A.    On occasion.

 8        Q.    More than the in-house technician

 9   supervisors?

10        A.    Probably the same.

11        Q.    And really what I'm sort of curious about

12   is, you said as site manager part of your job is to

13   review the performance and to meet weekly with AIS

14   management to try to figure out what's going on;

15   right?

16        A.    Sure.

17        Q.    And it looks like you're doing some of the

18   same work here as regional director of operations; is

19   that right?

20        A.    Yes.

21        Q.    Why did you move to the north California

22   regional director of operations position?

23        A.    I was asked to take a vacant position.

24        Q.    What does -- what area does that cover?

25              MR. KELLY:  Objection, relevance.  Not
```

36

1    likely to lead to discovery of anything having to do

2    with this case, and instruct him not to get into

3    anything not involving the state of Washington.

4              MR. MILLER:  Well, are you again

5    instructing him not to answer the question?

6              MR. KELLY:  Yeah.  Come on, counsel, it

7    can't have anything to do with this case.

8              MR. MILLER:  I think it's relevant to

9    whether or not he got promoted to a more -- to a

10   position that's more interesting, that's higher status

11   within the company.

12             MR. KELLY:  I'm sure you're curious about

13   it, but it has no relevance to this case.

14             MR. MILLER:  It's relevant to whether or

15   not DirecTV approved of the management techniques that

16   were being applied in the state of Washington and what

17   they thought about the performance of the managers

18   involved.

19             MR. KELLY:  Make your argument.  We're not

20   going to get into anything having to do with

21   California.

22             MR. MILLER:  Let's go off the record for a

23   moment.

24             (Discussion off the record.)

25             MR. MILLER:  So, for the record, we are now

                                                    37

**EXHIBIT F**

1    trying to contact the court to resolve a dispute that

2    Mr. Kelly and I are having about whether or not he can

3    instruct his client not to answer the last question I

4    asked.

5            So if you could be ready to read back the

6    question for me, I would appreciate it.

7            MR. KELLY:  Can you read the question back.

8            (Record read as requested.)

9            MR. KELLY:  Answer that question.

10           THE WITNESS:  Northern California.

11           MR. KELLY:  Do you have another question?

12           MR. MILLER:  Nope.  That's good enough for

13   me.

14       Q.    (By Mr. Miller)  So, continue.  So, earlier

15   we were talking about various metrics by which you

16   evaluated AIS's performance as your subcontractor;

17   right?

18       A.    Yes.

19       Q.    And we discussed, you know, NPS surveys,

20   and then the post-call survey that preceded it.  And

21   then we also talked about NCCK scores; right?

22       A.    Correct.

23           MR. MILLER:  I'd like to show you another

24   exhibit I'm going to ask the court reporter to mark as

25   Exhibit 4.

38

1          (Marked for identification Exhibit 4).

2     Q.     And again, let me know when you've had a

3 chance to review this so I can ask you some questions

4 about it.

5     A.     Okay.

6     Q.     So, first, do you see in the lower

7 right-hand corner of this one-page exhibit there is a

8 number that is DTVe0172820?

9     A.     Yes.

10     Q.     Do you recognize this e-mail?

11     A.     Yes.

12     Q.     And so this was an e-mail that you sent to

13 Ray Martinez at AIS when you were regional director of

14 operations for the state of Washington?

15     A.     Correct.

16     Q.     So here you're again talking to him about

17 the NCCK performance, and this is the return call

18 feature that we discussed; right?

19     A.     Yes.

20     Q.     I'm just trying to understand why you're

21 talking to him about the difference between Lacey and

22 Lynnwood.  Did he have any -- did his installers work

23 any of the jobs out of Lacey?

24     A.     Yes.

25     Q.     They also worked jobs out of Lynnwood?

                                                    39

1        A.     Yes.

2        Q.     So, the Lacey techs you're talking about,

3   are those AIS installers?

4        A.     Correct.

5        Q.     So, what you're doing here is telling him

6   that the AIS installers in Lacey are doing such a bad

7   job that they're dragging the whole area down?

8        A.     Dragging, yes.  Dragging Lacey's

9   performance down.

10        Q.     What do you mean by costing you money?

11        A.     So when we -- our goal is 30 percent.  If

12   we don't meet the goal it impacts our profit and loss.

13        Q.     But you don't mean it was costing you

14   personally money?

15        A.     No.

16        Q.     You just meant as --

17        A.     My area of responsibility.

18        Q.     Sure.  And then who is Dustin you're

19   talking about here?

20        A.     Dustin is the site manager for Lacey.

21        Q.     Okay.  And when you say the goal is 30

22   percent, is that 30 percent of the nonCCK

23   installations actually make call backs?

24        A.     No.  It's 30 percent of all jobs call back.

25   So if we have one -- if everybody was to complete 100

                                                        40

**EXHIBIT F**

```
 1   percent of the work, we would expect 30 percent to
 2   call back.
 3              MR. MILLER:  Why don't we go off the record
 4   for a moment.  Let's take a 10-minute break.
 5              (Recess.)
 6              MR. MILLER:  Okay.  I'd like to show you
 7   another exhibit I'm going to ask the court reporter to
 8   mark as Exhibit 5.
 9              (Marked for identification Exhibit 5.)
10        Q.    And as with the other exhibits, please take
11   a moment to look at this exhibit, familiarize yourself
12   with it, and I'll ask you some questions.
13        A.    Okay.
14        Q.    First, the lower right-hand corner of the
15   first page of Exhibit 5, do you see there's a stamp
16   that says DTVe0128835?
17        A.    I do.
18        Q.    And then, it's a two-page exhibit, and the
19   next page continues consecutively on 836?
20        A.    Okay.
21        Q.    Do you recognize this e-mail exchange?
22        A.    Specifically, no.  It's a long time ago.
23        Q.    Do you have any reason --
24        A.    Yes.  My name is on there, and I've
25   responded.
```

                                                            41

**EXHIBIT F**

1      Q.    So you have no reason to think this isn't

2  an e-mail exchange you were engaged in?

3      A.    No.

4      Q.    So starting on the second page, you can see

5  there's a signature block at the bottom for, I guess,

6  what is the first e-mail in this exchange that really

7  starts on the first page and goes to the second page

8  for Josh Guttormsen.

9      A.    Okay.

10      Q.    Do you know who Josh Guttormsen is?

11      A.    Yes.

12      Q.    Who is he?

13      A.    He was my -- one of my field supervisors

14  and then trainer.

15      Q.    And so, at this point, this e-mail exchange

16  happened when you were still a site manager; yes?

17      A.    Yes.  One month into my tenure it looks

18  like.

19      Q.    So Josh has sent you a table that shows

20  activations, CSR desktop rate, FS portal rate, IVR

21  rate, HH rate, and STB rate; is that right?

22      A.    Yes.

23      Q.    And the table that he sent, he sent to you

24  and then also to a number of people at --

25      A.    It looks like he copied me, not to me.

42

**EXHIBIT F**

1       Q.      Fair enough.  He copied you on this e-mail

2   that was originally sent to people at aisystems.pro

3   e-mailing addresses?

4       A.      Uh-huh.

5       Q.      So is that AIS supervisors then?

6       A.      Yes.  As well as Ray.

7       Q.      Okay.  Ray Martinez.  So -- and then the

8   tech user ID, that will correspond to individual AIS

9   installers?

10      A.      This right here (indicating)?

11      Q.      Yes.

12      A.      Yes.

13      Q.      And what is the "Total Activations" column?

14      A.      Number of jobs that they were completed.

15      Q.      And then what is the "CSR Desktop Rate"?

16      A.      I believe that is how many times it had to

17  be completed through calling into DirecTV.

18      Q.      And then, I guess, as opposed to the FS

19  portal rate, which would be from their hand-held to

20  their cell phones?

21      A.      That's correct.

22      Q.      What is the IVR rate?

23      A.      That's done through the box itself.

24      Q.      And so that would be, like, a circumstance

25  where you've got a nonCCK connection?

                                                        43

**EXHIBIT F**

1        A.     You can do an activation through the box

2   itself.  So when they're completing their installs

3   they can complete the -- on the call box.

4        Q.     Okay.  And then what is the "HH Rate?"

5        A.     I believe that's hand-held.  FS portal, I'm

6   not -- I don't recall.  It's been too long.

7        Q.     You're not entirely sure what the

8   difference is between FS portal rate and HH rate?

9        A.     No.

10        Q.     What about STB rate?

11        A.     I want -- I think what I was referring to

12   as the IVR was actually set top box.  So the set top

13   box is where it's activated.  IVR, I don't recall.

14        Q.     So the top e-mail on page 1 of Exhibit 5 is

15   the one that you sent back to Josh Guttormsen, and

16   then various people at AIS including Ray Martinez;

17   right?

18        A.     Yes.

19        Q.     What activation rate are you talking about

20   when you say "The activation rate is critical" and

21   "needs to be 100 percent for those who have access"?

22        A.     For the people that have access to the

23   hand-held itself, we would prefer them to be 100

24   percent of their -- of their jobs done through the

25   hand-held versus calling into the call center and

                                                        44

 1   driving calls to the call center.

 2       Q.    So the preference would be for this HH rate

 3   column to be 100 percent?

 4       A.    Correct.  For those who have access.

 5       Q.    Is there any way to tell who has access to

 6   the hand-held?

 7       A.    I don't know.  No.  It would be dependent

 8   upon whether Ray provided them hand-helds or whether

 9   they had access through their cell phone.

10       Q.    So, really, what you're talking about is

11   the places where people have, like, a 70 percent

12   hand-held activation rate.  So they had a hand-held,

13   but then sometimes they weren't doing it through the

14   hand-held?

15       A.    Correct.

16             MR. MILLER:  I'd like to show you another

17   exhibit I'm going to ask the court reporter to mark as

18   Exhibit 6.

19             (Marked for identification Exhibit 6.)

20       Q.    And as with the other exhibits, if you'll

21   take a moment to look at these pages and let me know

22   when you've familiarized yourself with it and then

23   I'll ask you some questions.

24       A.    Okay.

25       Q.    So, first, looking at the lower right-hand

                                                        45

 1   corner of this exhibit, do you see that the first page

 2   is marked DTVe0155984?

 3       A.    Yes.

 4       Q.    And that it's consecutively numbered for

 5   the next two pages, ending in 986?

 6       A.    Yes.

 7       Q.    Do you recognize this e-mail and the

 8   attachment?

 9       A.    No.

10       Q.    You, in fact, aren't on the recipient list

11   or CC list, are you?

12       A.    No.

13       Q.    Have you ever heard of an 8 a.m. report?

14       A.    Yes.

15       Q.    What is it?

16       A.    Similar to what we discussed in one of the

17   previous exhibits.

18       Q.    Exhibit 2/Exhibit 3 chart that you were

19   talking to Ray Martinez about?

20       A.    Correct.  It shows which techs have been on

21   site by 8:00.

22       Q.    Actually, you called it an 8:00 report;

23   right?

24       A.    Yeah.

25       Q.    Which is what it says here on page 2 of

                                                             46

1    Exhibit 5; right?  And then at the top of page 2 of

2    Exhibit 5, do you see it says "Mastin 1"?

3        A.    Yes.

4        Q.    So is this, then, an 8:00 report for you?

5        A.    It's probably my region.  The person

6    sending it is from Dynamic Dispatch located in Denver,

7    Colorado.

8        Q.    What's Dynamic Dispatch?

9        A.    They're dispatchers that help us throughout

10   the day.

11       Q.    And they're located in Denver?

12       A.    Yeah.

13       Q.    Sorry, that's Exhibit 6; right?

14       A.    Yeah.

15             MR. MILLER:  Just to correct for the

16   record, we've just been discussing Exhibit 6, which is

17   marked DTVe0155984 through 986.

18             I'll show you another exhibit I'm going to

19   ask the court reporter to mark as Exhibit 7.

20             (Marked for identification Exhibit 7.)

21       Q.    And again, look at it and let me know when

22   you're done.  I'll ask you some questions.

23       A.    Okay.

24       Q.    First, looking at the lower right-hand

25   corner of Exhibit 7, do you see it's marked

                                                        47

**EXHIBIT F**

1    DTVe0172901?

2          A.     Yes.

3          Q.     Do you recognize this e-mail?

4          A.     Yes.

5          Q.     What is it?

6          A.     It appears to be Justin asking if DirecTV

7    is planning on being open for Christmas or New Year's

8    Day.  The site manager asking for what we've done in

9    the past and me responding that we actually are shut

10   down Christmas Day so we won't be providing them work,

11   and then we will see how the forecast looks before we

12   make a decision on New Year's.

13         Q.     So AFAD is an acronym for the forecast of

14   work?

15         A.     I'm trying to remember what the actual

16   acronym stands for.  I don't recall off the top of my

17   head, but it tells us how much work -- it's a depictor

18   of how much work is booked out in advance.  So are we

19   -- does it take us four days to get to our customers,

20   six days, eight days, that type of thing.

21         Q.     So then just what you're waiting to see is

22   whether or not there will actually be work that could

23   be scheduled at that point?

24         A.     Correct.

25                MR. MILLER:  I'm going to show you another

                                                            48

```
 1  exhibit I'm going to ask the court reporter to mark as
 2  Exhibit 8.
 3              (Marked for identification Exhibit 8.)
 4      Q.    And again, have a look at this exhibit, and
 5  let me know when you're ready for me to ask you some
 6  questions about it.
 7      A.    Okay.
 8      Q.    So first --
 9              MR. KELLY:  One second.  Thank you.
10      Q.    So, looking at the lower right-hand corner
11  of Exhibit 8, do you see that it's marked DTVe0172745?
12      A.    Yes.
13      Q.    Do you recognize this e-mail?
14      A.    Sure.
15      Q.    And so this is -- this e-mail exchange
16  happens in October of 2013, and so, at this point, you
17  were regional director of operations?
18      A.    Yes.
19      Q.    And for the state of Washington?
20      A.    Yes.
21      Q.    The first e-mail is actually at the bottom
22  of the page here from Alexander Stith.  What is this?
23      A.    So this is an escalated customer.  So,
24  customer has called in with an issue.  This is them
25  notifying us of the issue and that the job has been
```

49

 1   put into a reschedule status, but there's nothing --

 2   it appears that there's no appointments available for

 3   them to reassign the work.

 4        Q.   So you said this was elevated.  So it's

 5   been pushed beyond the first level of customer

 6   service?

 7        A.   It can be elevated for any particular

 8   reason, if the customer calls in and they're having to

 9   escalate to the local site because they can't do

10   anything about it because there's no available dates.

11        Q.   Did you see all of these kind of -- all

12   escalated complaints in your region?

13        A.   More or less.  I'm usually part of the

14   distribution, yes.

15        Q.   And part of the reason I'm asking is, from

16   looking at the "To" and the CC line on this e-mail

17   from Alexander Stith, it doesn't appear that you're

18   directly on there.

19        A.   Yeah.  I'm probably part of the -- I'm

20   probably one of the people within the distribution.

21        Q.   Okay.  So either in the Tumwater,

22   Washington wild blue or Hesperia dispatch?

23        A.   It would be the Tumwater, Washington.

24        Q.   Okay.  So you probably got it there and

25   that's how you're forwarding it?

**EXHIBIT F**

1          A.     Yeah.

2          Q.     So then you forwarded this to Ray Martinez

3    and Justin Masencup who work for AIS; right?

4          A.     Yes.

5          Q.     And clearly, you know, based on reading

6    your three-sentence e-mail here, you felt that this

7    was handled improperly; is that right?

8          A.     Correct.

9          Q.     What was wrong with what happened here?

10         A.     He called directly into the call center to

11   have the job rescheduled.  He's supposed to work with

12   his own management team to reschedule the job, and

13   they, in turn, Ray or Justin, would contact us so that

14   we could work together either to provide resolution

15   immediately or meet the customer's needs or

16   expectations.  This happened after the fact.

17         Q.     Was it also a problem that he was trying to

18   reschedule because it was too dark?

19         A.     It's not a problem that he's trying to

20   reschedule because it's too dark.  The problem is that

21   he didn't follow the process in that he's trying to

22   reschedule through an inappropriate source.  He should

23   have worked through his boss and Justin because, could

24   he not have been able to do it, we may have been able

25   to provide our own resource to get the job done and

                                                        51

**EXHIBIT F**

1    meet the customer's expectations.

2         Q.    When you say provide your own resource, do

3    you mean use an in-house tech or an in-house

4    installer?

5         A.    Correct.

6              MR. MILLER:  I'd like to show you another

7    exhibit I'm going to have the court reporter mark as

8    Exhibit 9.

9              MR. KELLY:  Can we go off the record for a

10   second?

11             (Off the record from 10:56 a.m. to 11:19

12             a.m.)

13             MR. MILLER:  Let's go on the record again.

14   So like I said, before we were taking a break, I'm

15   going to show you another exhibit that I'm going to

16   have the court reporter mark as Exhibit 9.

17             (Marked for identification Exhibit 9.)

18        Q.    And as with the other exhibit, please have

19   a look at this and let me know when you've reviewed

20   it, and I will ask you some questions about it.

21        A.    Okay.

22        Q.    So, first, do you see at the lower

23   right-hand corner of this exhibit it's marked

24   DTVe0130876?

25        A.    Yes.

                                                      52

1     Q.    Do you recognize this e-mail exchange?

2     A.    No.  Well, I'm on there, but no, it's too

3  long ago to recall.

4     Q.    Do you have the --

5     A.    I'm on there.

6     Q.    Do you have any reason to think that this

7  is anything other than an e-mail exchange that you

8  were involved with with both DirecTV personnel and AIS

9  personnel?

10    A.    No.

11    Q.    So, starting at the bottom, the first

12 e-mail in time here at the bottom, December 13, 2011,

13 at 8:59 a.m., from Matt Henderson with an AIS Systems

14 mail address.

15    A.    Okay.

16    Q.    Do you know who Matt Henderson is?

17    A.    Yes.  He was one of the supervisors for

18 AIS.

19    Q.    And because this is December of 2011, at

20 that point you were a site manager?

21    A.    Correct.

22    Q.    So what he's doing is requesting time off

23 for one of the AIS installers.

24    A.    Okay.

25    Q.    Is that what's happening here?

                                                        53

**EXHIBIT F**

1        A.     Appears to be, yes.

2        Q.     And then in the middle you've got Dustin

3    Dunlap, who would have been site manager at Lacey;

4    right?

5        A.     He was the operations manager for Lynnwood,

6    Washington at that particular time.

7        Q.     And he's copying you on his response?

8        A.     Uh-huh.

9        Q.     And he says:  "Two weeks late on that one.

10   I sent out an e-mail a while back when we stopped

11   accepting holiday time off requests.  We aren't

12   approving any more from our technicians either."

13              So, is it the time off request came too

14   close to the time that he wanted off?

15       A.     It appears to be.  I'm not the one

16   responding.  So...

17       Q.     Well, he copied you on it.

18       A.     Sure.

19       Q.     Why would he have copied you?

20       A.     Because I have overall responsibility.  So

21   he's just keeping me in the know, like no surprises

22   type thing, I guess.

23              MR. MILLER:  I'd like to show you another

24   exhibit I'm going to have the court reporter mark as

25   Exhibit 10.

                                                        54

1              (Marked for identification Exhibit 10.)

2        Q.     And as with the other exhibits, please look

3   at this and let me know when you've reviewed it

4   sufficiently so I can ask you some questions about it.

5        A.     Okay.

6        Q.     So on the first page of Exhibit 10, do you

7   see in the lower right-hand corner where it is marked

8   DTVe0139105?

9        A.     Yes.

10       Q.     And then the second page is consecutively

11  numbered 106?

12       A.     Correct.

13       Q.     Do you recognize this e-mail exchange?

14       A.     Sure.

15       Q.     So, starting at page 2 of Exhibit 10, it

16  look like there's an e-mail from a Ted Peeler with an

17  AIS Systems e-mail address.  And he's asking to change

18  -- do you know what he's asking for here in the body

19  of his e-mail where it starts "Region 81" and then

20  there's a bunch of statements?

21       A.     Yeah.  It appears that he is reassigning

22  the bulk work that they have from one technician to

23  another technician.

24       Q.     Okay.  And those are AIS installers that

25  he's assigning work between?

                                                        55

**EXHIBIT F**

1        A.      Yes.

2        Q.      And then the next e-mail up -- that e-mail

3    is November 23, 2011 at 7 a.m.   Then there's a

4    response from a Larry Roe on the same day at 8:21 a.m.

5    Do you see that?

6        A.      Yes.

7        Q.      And he says this is done.   Who is Larry

8    Roe?

9        A.      He was a supervisor for DirecTV.

10       Q.      So what is he telling Tim at AIS?

11       A.      He's confirming -- I'm assuming he's

12   confirming that the requests that Tim is asking for

13   has been completed.

14       Q.      So, Tim was asking DirecTV to change these

15   assignments?

16       A.      That's what it appears to be, yes.

17       Q.      And then based on these e-mails, what Larry

18   is saying, yeah, I changed the assignment?

19       A.      Yes.

20       Q.      And then the next e-mail up is from you?

21       A.      Yes.

22       Q.      And this is on the same day, like a minute

23   later.   It's 8:21 or 8:22 a.m.   And you say, "Can I

24   ask why we are transferring routes to techs who are

25   exempted out in Siebel?"   What does "exempted out"

                                                          56

1   mean?

2        A.    It means that they have been put -- there's

3   been a hold on their status saying that they're not

4   available.  Either they're on vacation, they can't

5   work that day, or they've been -- no work has been

6   provided to them.

7        Q.    Okay.  And then a few hours later -- and

8   we're now on the first page of Exhibit 10.  It looks

9   like Justin Masencup from AIS responded to you, and

10  this is now 11:38 a.m. on the same day.  And he's

11  saying that it looks like some guys came in on their

12  day off to help.

13           So this would be, if they were exempted out

14  for having a day off, they might have come in to help?

15  Is that more or less what he's suggesting?  Do you

16  know?

17       A.    It sounds like it, yeah.

18       Q.    Then the next e-mail up is from Dustin

19  Dunlap who, here in 2011, would have been operations

20  manager?

21       A.    Yes.

22       Q.    And then he says:  Can anyone tell me if

23  those techs are one of the two techs I put on

24  discipline or, in quotes, do not route.  Do you know

25  what that's about?

                                                        57

**EXHIBIT F**

1    A.    Yeah.  It appears that "do not route" would

2  mean that they've had -- we've had ongoing consecutive

3  problems with a specific technician impacting our

4  customer service.  And we've said we're not going to

5  provide him work for a period of time.

6    Q.    Okay.  And that is disciplinary as Mr.

7  Dunlap is suggesting here?

8    A.    I think that's an incorrect reference.

9  Discipline is -- we don't discipline their techs.  We

10  don't route them.  I can make the decision that I'm

11  not going to provide work to a certain technician if

12  they are impacting my customers in a negative way.

13    Q.    And then the top e-mail on the first page

14  of Exhibit 10 is from you, and now this is several

15  hours later.  It's six p.m. and you say, "It is, see

16  my next e-mail."  So, you don't think discipline is

17  the correct term here, but you didn't correct him in

18  your e-mail that that wasn't the correct term to use?

19    MR. KELLY:  Document speaks for itself.

20  You can answer.

21    A.    No.  I didn't correct him.

22    Q.    So when you say "it is," does that mean

23  that these are, in fact, techs that were put on the

24  "do not route" exempted list?

25    A.    I'm assuming so.  I don't see the rest of

58

**EXHIBIT F**

1    the e-mail after that, but this is 2011.  So, I'm

2    assuming -- my assumption would be that it is some of

3    the techs that have been identified as "do not route."

4              MR. MILLER:  I'd like to show you another

5    exhibit I'm going to have the court reporter mark as

6    Exhibit 11.

7              (Marked for identification Exhibit 11).

8         Q.    And this is a multi-page exhibit, so please

9    have a look at it and let me know when you're ready

10   for me to ask you some questions.

11        A.    Okay.

12        Q.    So, first page of Exhibit 11, do you see in

13   the lower right-hand corner it's marked DTVe0139107?

14        A.    Yeah.

15        Q.    And then the following pages are

16   consecutively numbered ending in 110?

17        A.    Yes.

18        Q.    So starting on the last page, which is the

19   fourth page of this exhibit, and actually looking

20   between the third and fourth page, do you see the

21   first e-mail in this exchange is the one we just

22   looked at in Exhibit 10?

23        A.    Sure, yes.

24        Q.    So this is the request to shift jobs from

25   one tech to another?

                                                        59

**EXHIBIT F**

1      A.    Yes.

2      Q.    And then the e-mail exchange continues just

3  like in Exhibit 10, up through Justin explaining at

4  the top, explaining that some guys came in on their

5  day off to help out.  And then in this exhibit, the

6  next e-mail is from you.

7      A.    Yes.

8      Q.    And it's to Justin Mastencup and Tim, the

9  person who originated this request, and a variety of

10  other AIS Systems individuals and Milly Maez.  Do you

11  see that?

12     A.    Uh-huh.

13     Q.    And you copy Dustin Dunlap?

14     A.    Uh-huh.

15     Q.    And you've said here:  As long as it is not

16  the tech who had been identified as performance issues

17  and are having forced time off.  What's forced time

18  off?

19     A.    As previously stated, I can retract the

20  work so he won't have work from us.

21     Q.    And that's the specific techs that are

22  being referenced in this first e-mail?

23     A.    Some of -- well, I don't know which one it

24  is specifically, but there's either one or two in

25  there that were identified as having performance

                                                      60

1  issues.

2      Q.    One or two of the AIS installers?

3      A.    Yes.

4      Q.    And so the next e-mail up on this chain

5  here, Exhibit 11, this is the top of page 2.  It's

6  from Dustin Dunlap.  Or, I'm sorry, it's not from

7  Dustin Dunlap.  It's from Samantha Pierron.  Do you

8  know who that is?

9      A.    Yes.  She was a supervisor with DirecTV.

10     Q.    Okay.  And then she's just explaining that

11 not only are some of these technicians, at least one

12 of them, not really scheduled for this day, but

13 they're also on --

14     A.    Exceptions.

15     Q.    An exception, right.

16     A.    Uh-huh.

17     Q.    And then just explaining what we were just

18 talking about, that he can't have a route or have

19 anything re-teched to him, and that the exceptions

20 will allow AIS to effectively to coach or up train the

21 technician?

22     A.    Correct.

23     Q.    So looking at the first page of Exhibit 11,

24 there's another intervening e-mail, from Tim again at

25 AIS Systems, sort of discussing some logistical issues

61

1    with this job.  And then the top is an e-mail from you

2    that goes to a variety of DirecTV employees and also a

3    variety of people at AIS Systems including, looks

4    like, Tim and maybe Matt Henderson is also an AIS

5    employee?

6         A.    Uh-huh.

7         Q.    Then you say the second question here -- or

8    second sentence, I'm sorry, in this e-mail at the top,

9    says, "As supervisors you should all be well aware of

10   the performance concerns we've instituted."  Do you

11   know what that means?

12        A.    Yeah.  We've identified him as having a

13   performance issue.  He's been exempted out.

14        Q.    So just in the case of this specific tech.

15   You're not talking about some larger performance

16   concerns?

17        A.    No.  I'm talking about the performance

18   issues that have been identified within this

19   technician.  He was exempted out for a reason.

20        Q.    Okay.

21        A.    That he should not be making the decision

22   to bring him back unless otherwise directed by us.

23        Q.    Okay.  And then you say that "Another day

24   will be added to him since you managed it poorly.  You

25   get to be the one to explain it to him."  So you've

                                                          62

**EXHIBIT F**

 1   increased the length of the exemption at that point?

 2        A.    Yeah.

 3        Q.    And then you say, "You're not in a position

 4   to be making 'executive' decisions."

 5        A.    Uh-huh.

 6        Q.    What did you mean by that?

 7        A.    They are not -- I have said:  You're not

 8   going.  This technician is not going to work on my

 9   account for this period of time.  They're not the ones

10   to be making executive decisions to bring him back

11   without consulting with me or my team.

12              MR. MILLER:  Okay.  I'd like to show you

13   another exhibit I'm going to ask the court reporter to

14   mark as Exhibit 12.

15              (Marked for identification Exhibit 12.)

16        Q.    As with the other exhibits, please read

17   this e-mail exchange over and let me know when you're

18   ready for me to ask you some questions about it.

19        A.    Okay.

20        Q.    So, first, do you see at the bottom of this

21   exhibit there's a stamp that says DTVe0139136?

22        A.    Okay.

23        Q.    And I read that correctly; right?

24        A.    139136?

25        Q.    That's right.

                                                        63

1        A.      Yeah.

2        Q.      Do you recognize this e-mail exchange?

3        A.      Sure.

4        Q.      So here we've got an e-mail from somebody

5    at AIS Systems.

6        A.      Uh-huh.

7        Q.      And it looks like they're identifying an

8    AIS installer; is that right?

9        A.      Uh-huh.

10       Q.      And they're telling you when to start

11   routing or when they want him to start routings; is

12   that right?

13       A.      Yeah.

14       Q.      And so this is the kind of information they

15   would need to provide you to get FS scheduler and that

16   sort of thing; right?

17       A.      Correct.

18       Q.      And then you reply to this e-mail.  And

19   this again is in 2011, so you're site manager at this

20   point?

21       A.      Yes.

22       Q.      Again to Josh Guttormsen and Dennis Edson.

23   Is Dennis Edson a DirecTV employee?

24       A.      No.

25       Q.      He was an AIS employee?

                                                        64

1       A.      Uh-huh.

2       Q.      And you say, "We need to hold off based on

3  conversation Justin and I had yesterday."

4       A.      Okay.

5       Q.      Do you know what that's about?

6       A.      No.  No idea.

7       Q.      Did you have conversations with -- and I

8  assume by "Justin" you mean by Justin Masencup.

9       A.      Justin Masencup, yes.

10      Q.      Did you have conversations with Justin

11  about individual installers when you were site

12  manager?

13              MR. KELLY:  Vague and ambiguous.  You can

14  still answer the question.

15      A.      Oh, yeah.  At times, yes.

16      Q.      What kinds of things did you talk about

17  with reference to an individual AIS installer?

18      A.      Performance-related issues.  If they were

19  -- somebody that was identified as continually having

20  -- not meeting the agreed-upon level of expectations,

21  or if we were putting an exemption on them because of

22  ongoing customer performance-related issues.  Those

23  types of discussion.

24      Q.      Okay.  And just to be clear, you just don't

25  recall what conversation you would have had about Mr.

                                                        65

**EXHIBIT F**

1  Bobo --

2       A.    No idea.

3       Q.    -- who was the tech identified on this

4  exhibit?

5       A.    Correct.

6             MR. MILLER:  I'd like to show you another

7  exhibit I'm going to ask the court reporter to mark as

8  Exhibit 13.

9             (Marked for identification Exhibit 13.)

10      Q.    So, again, review this e-mail and let me

11 know when you're ready for me to ask you some

12 questions about it.

13      A.    Okay.

14      Q.    First, looking at the lower right-hand

15 corner of this exhibit, do you see that it's marked

16 DTVe0128898?

17      A.    Correct.

18      Q.    Do you recognize this e-mail?

19      A.    Sure.

20      Q.    So, again, this is an e-mail that's sent in

21 July of 2011.  Or it's an exchange that happens in

22 July of 2011 when you were site manager at Lynnwood?

23      A.    Uh-huh.

24      Q.    So, again, this is an e-mail coming from

25 somebody at AIS, and they're telling you about another

                                                    66

**EXHIBIT F**

1    AIS installer; is that correct?

2         A.    Appears that way, yes.

3         Q.    And they give you days off and a start

4    date.  Looks like it's TBA which I assume is to be --

5    I don't know, unknown maybe.  Do you know?

6         A.    TBA.  To be available.

7         Q.    And you've responded to this e-mail from

8    this AIS Systems employee with "I want to discuss

9    these shifts that the new techs are on"?

10        A.    Okay.

11        Q.    Do you know what was going on there?

12        A.    My guess is, best guess back then, would be

13   that I don't have an appropriate amount of workload to

14   support the number of techs that they've identified

15   that he's going to work, that they're telling me he

16   wants the days off of.  So just saying, hey, I may not

17   have enough work to support those particular days.

18        Q.    How early into being site manager is this?

19        A.    July?  I started in April.  So month,

20   three.

21        Q.    And so, in that time period, few months

22   into the job, were you still working to get it -- to

23   figure out how many AIS installers you were going to

24   need to match your demand and that kind of thing?

25        A.    It's always changing.  I mean, like I said,

                                                           67

**EXHIBIT F**

1    it ebbs and flows.  It's a seasonal business.  So,

2    depending on the time of the year...

3         Q.    Did this sort of thing where AIS would tell

4    you, we've got a new installer and here's the days

5    they want to work, and then it wouldn't match up with

6    the work that you had, did that happen frequently with

7    AIS?

8         A.    It happened from time to time.

9         Q.    And what was your process for resolving the

10   difference between what the AIS installers were

11   wanting to work or were hired to work and what you

12   could actually provide work for?

13        A.    It was just a conversation with either

14   Justin or with Ray, letting them know that this is

15   where I have the work available to support.  Do you --

16   can they meet that shift; and, if not, then, you know,

17   you're going to have to figure something else out.

18   I'm not in charge of your employees, but this is where

19   I have the demand.

20             MR. MILLER:  I'd like to show you another

21   exhibit I'm going to ask the court reporter to mark as

22   Exhibit 14.

23             (Marked for identification Exhibit 14.)

24        Q.    As with the other exhibits, take a moment

25   to read this exhibit and let me know when you're ready

                                                      68

**EXHIBIT F**

```
 1   to be asked some questions.  And I apologize for the

 2   tiny font.

 3            MR. KELLY:  You're not kidding.

 4        A.    Okay.

 5        Q.    So first, at the lower right-hand corner of

 6   the first page of Exhibit 14, do you see it is marked

 7   DTVe0172851?

 8        A.    Yes.

 9        Q.    And then there's two pages in the exhibit,

10   and it's consecutively numbered to 852?

11        A.    Correct.

12        Q.    Do you recognize this e-mail exchange?

13        A.    Yes.

14        Q.    So looking at the second page of Exhibit

15   14, it appears to start with a discussion of some

16   glaring differences in NCCK performance between Lacey

17   and Lynnwood.  That's the e-mail that you've sent to

18   Ray Martinez; is that right?

19        A.    Correct.  It's previously referenced in one

20   of the other exhibits.

21        Q.    Sure.  And then on the first page of

22   Exhibit 14, it looks like there is some back and

23   forths between you and Justin Masencup about what the

24   report that you've sent in the first e-mail actually

25   covers.  Do you see that?
```
                                                          69

**EXHIBIT F**

1        A.     Yes.

2        Q.     What's this discussion about, do you know?

3        A.     He's stating that he's seeing a different

4    number than what the report is that I sent.

5        Q.     Okay.  And so here on the first page of

6    Exhibit 14, it's, I guess, about three e-mails down.

7    It's an e-mail from Dustin Dunlap, and this is July of

8    2013.  So, at this point, is Mr. Dunlap the site

9    manager for Lacey?

10       A.     Yes.

11       Q.     And he's saying, "It's the secondary team,"

12   in response to a question that Justin Masencup had

13   asked, and then asking whether or not these two

14   technicians need to be moved to DV0678; is that right?

15       A.     Appears that way, yes.

16       Q.     And the two technicians he's talking about

17   are AIS installers; right?

18       A.     Yes.

19       Q.     So do you know what DV0678 means?

20       A.     That's the team number by office.  So 854

21   would indicate that's his technicians under that

22   supervisor.  And then -- for Lynnwood, sorry.  And

23   then 678 would be technicians for Lacey.  So what it

24   appears currently here is there's techs from Lynnwood

25   reporting into Lacey's metrics.

                                                        70

1      Q.      And that's why the numbers weren't matching

2  up for Justin?

3      A.      Correct.

4      Q.      And then the top e-mail comes from you on

5  the same page.  July 30, 2013, you've sent a question

6  to, it looks like, Dustin Dunlap and Billy Maez;

7  right?

8      A.      Correct.

9      Q.      And those are both DirecTV employees?

10     A.      Correct.

11     Q.      And you're asking them, "Who moved them and

12 why?  Make sure we weren't getting shell games with

13 how many total techs we are supposed to have per

14 office."  What are you concerned about in this e-mail?

15     A.      So the concern is this is how much work we

16 have according to forecast for this office.  This is

17 how much work we have according to forecasts for this

18 office.  Based on forecasts, it equates to how many

19 jobs can be completed.  Equates to how many people

20 each office would need to support that workload that

21 Ray has agreed to.

22         My concern is are they moving technicians

23 without our knowledge to work from one office to the

24 other and we don't necessarily have the workload to

25 support it.

                                                        71

**EXHIBIT F**

1      Q.    So you would have needed to approve that

2  move in advance?

3      A.    Me or my team.  Not necessarily me in

4  particular, but my team would need to know.

5      Q.    DirecTV would have to know?

6      A.    DirecTV would need to know, yes.

7      Q.    Well, know or approve, then?  I guess there

8  is a difference.  Would DirecTV have had --

9      A.    We would have to approve --

10          MR. KELLY:  Let him get his question out.

11     Q.    Would DirecTV have to approve the move?

12     A.    Yes.

13          MR. KELLY:  Vague and ambiguous as to

14  "approve the move."

15     Q.    Well, I'll be clear.  DirecTV would have to

16  approve Ray assigning his AIS installers from Lynnwood

17  to Lacey?

18     A.    Correct.

19     Q.    So, when you were site manager, how did the

20  AIS installers get the equipment they needed to do

21  DirecTV's jobs?

22          MR. KELLY:  Vague and ambiguous as to

23  "equipment."  You can answer.

24     A.    There was either Ray or someone within his

25  team, one of his supervisors, would pick up the

                                                    72

1    equipment assigned to the amount of work expected for

2    them to perform on a weekly basis.  Take it back to

3    their office in Kent, and he and his team would

4    disperse it appropriately.

5         Q.    So somebody from AIS would come up to

6    Lynnwood, to your warehouse, pick up the equipment and

7    then take it back to Kent?

8         A.    Yes.

9         Q.    And when we're talking about "equipment,"

10   what sorts of things was DirecTV providing?

11            MR. KELLY:  Thank you.

12        A.    Dishes.  Posts.  The receivers.  Things of

13   that nature.

14        Q.    Did DirecTV provide uniforms for AIS

15   installers?

16        A.    No, we did not.

17        Q.    Were AIS installers required to wear

18   anything identifying them as DirecTV installers?

19        A.    I believe so, yes.

20        Q.    Did DirecTV provide AIS installers with,

21   like, signs for their trucks?

22        A.    We provided AIS signs that identify them as

23   an authorized subcontractor for DirecTV.

24        Q.    Did it say that on the signs?

25        A.    I believe so, yes.

                                                        73

**EXHIBIT F**

1        Q.    Is there any other equipment that DirecTV

2   provided to AIS?

3        A.    Off the top of my head, not that I can

4   recall.  I mean, broadband DECAs, receivers, dishes,

5   posts.

6        Q.    Did DirecTV provide any tools for the AIS

7   installers to complete the installation?

8        A.    No.

9              MR. MILLER:  I'd like to show you another

10  exhibit I'm going to have the court reporter mark as

11  Exhibit 15.

12              (Marked for identification Exhibit 15.)

13        Q.    And as with the other exhibits, please take

14  a moment to review this and let me know when you're

15  ready for me to ask you some questions about it.

16        A.    Okay.

17        Q.    First, looking at the bottom of Exhibit 15,

18  here on the right-hand corner, do you see that it is

19  marked DTVe0114958?

20        A.    Correct.

21        Q.    Do you recognize this e-mail exchange?

22        A.    Sure.

23        Q.    So, this is an e-mail exchange in September

24  of 2011.  So, at that point, you were site manager at

25  Lynnwood?

                                                    74

**EXHIBIT F**

1          A.     Yes.

2          Q.     And so the first e-mail, which is at the

3     bottom of the page here, is from Matt Henderson, an

4     AIS employee; right?

5          A.     Supervisor, yes.

6          Q.     And he is sending this e-mail to Josh

7     Guttormsen, Bronson Bloom, Lee Farquhar, Larry Roe,

8     Spencer Dennis, Samantha Pierron and you.  Do you see

9     that?

10         A.     Uh-huh.

11         Q.     And he's also copied some other AIS

12    employees; right?

13         A.     Correct.

14         Q.     And he's informing you, or DirecTV, I

15    guess, of the equipment that he needs?

16         A.     Uh-huh.

17         Q.     So given what you described earlier about

18    how equipment gets to DirecTV, why is he sending you

19    this "Equipment needed ASAP"?

20         A.     It's possible that due to work flow changes

21    -- I mean, we've said, hey, here's a predetermined

22    amount, but during the course of business maybe they

23    got more work, received more work, or they did not --

24    the order that was fulfilled for them, that they

25    picked up, may have been lacking this equipment

                                                      75

**EXHIBIT F**

1    initially.

2        Q.    And at the top you've got Dustin Dunlap

3    responding to -- I guess it's Lynn sups?

4        A.    So it's all the supervisors in DirecTV,

5    Lynnwood.

6        Q.    And he's also copied you on this?

7        A.    Yes.

8        Q.    And at this point, then, Dustin Dunlap is

9    the operations manager; right?

10       A.    Correct.

11       Q.    And so he's saying, "AIS is looking to

12   reschedule jobs today due to no equipment.  I know we

13   have a shortage and it's not fun.  If we haven't

14   already, can we take a look on the truck in AIS's

15   areas and see if we can help them out the same as we

16   did this morning for our own technicians?"

17            Do you know what this means?

18       A.    Yes.  So we have reports, on-truck reports,

19   for our own employees.  So he's asking for the

20   supervisors to review our inventory assigned to our

21   technicians, that are working within the same area as

22   AIS, so that potentially we could provide them

23   equipment from our own stock so that they can complete

24   the jobs assigned to them.

25       Q.    And so from this e-mail it sounds like you

**EXHIBIT F**

1  had had your in-house technicians moving equipment

2  around to satisfy individual in-house technician needs

3  earlier in the day; is that right?

4      A.    It sounds like it, yes.

5      Q.    Did that happen when you were site manager?

6      A.    Yeah.  We would have to move stuff around,

7  especially during that time.  There was a -- I don't

8  remember the exact instance, but shoreman disputes

9  that prevented us from having excessive amounts of

10 inventory.

11     Q.    Disputes at the port that were disrupting

12 the flow of electronics?

13     A.    Yes.

14     Q.    So it sounds like Mr. Dunlap is suggesting

15 that you would have the in-house technicians meet up

16 with AIS installers and give them the equipment they

17 needed; is that correct?

18     A.    No.  I don't see that.  It just says

19 providing -- can we see if we have the equipment

20 available.  Then we would notify their sups of which

21 -- where we can meet up with their particular sups.

22 They can take the equipment and transport it

23 themselves.

24     Q.    And when you say "sups" you mean

25 supervisors; right?

                                                     77

**EXHIBIT F**

1      A.      Yeah.

2      Q.      Did that happen with frequency that you

3   would get equipment off in-house technicians' trucks

4   and give it to the AIS supervisors for distribution?

5      A.      From time to time, yes.

6      Q.      And I take it, by the way you answered the

7   question, it didn't happen that you had in-house

8   technicians meet up with AIS installers to swap

9   equipment?

10     A.      That's not a general practice, no.

11     Q.      Do you know if it ever happened?

12     A.      No, I don't know.

13     Q.      So I believe earlier you told me that, when

14   you were site manager, one of your reports was Josh

15   Guttormsen; is that right?

16     A.      Correct.

17     Q.      And he was the field operations supervisor?

18     A.      He was a supervisor when I first started

19   before transitioning to becoming a trainer.

20     Q.      And he transitioned to becoming a trainer

21   after the point at which he would have -- the trainers

22   reported to you as regional director of operations;

23   right?

24     A.      No.  He -- as a site manager the trainers

25   still reported to the site.

                                                      78

**EXHIBIT F**

1      Q.    Okay.  So when he became a trainer, was he

2   reporting to you still?

3      A.    Yeah.

4      Q.    What areas of responsibility did Mr.

5   Guttormsen have as a field operations supervisor?

6      A.    As a supervisor either construct of -- back

7   then he was an intermediary kind of consultant.  He

8   oversaw interactions with the contractor specifically.

9   So he would provide them reports so that they could

10  ensure that they had the data to support their

11  operations and help their -- coach their technicians

12  appropriately.  He would also make sure that we would

13  do job checks.  So QC's, post.

14        What else would he do?  He was largely

15  responsible for the re-techs in the mornings.  On the

16  days that he worked, if they had jobs that needed to

17  be reassigned from one technician to another, he would

18  take care of that for that particular team.

19     Q.    And just to be clear, when you say

20  "re-tech" that's the switching one of his --

21     A.    Reassigning.

22     Q.    Pardon me.  Let me finish my question.

23     A.    Sorry.

24     Q.    No problem.  When you say "re-tech" you

25  mean -- that would be where AIS supervisors wanted to

79

**EXHIBIT F**

1   shift one AIS installer's job to another AIS installer

2   and then they would have to tell DirecTV?

3        A.    Correct.

4        Q.    And then that would run through Josh

5   Guttormsen?

6        A.    He would help make the assignment changes

7   if he was available and working that day.

8        Q.    When he had those responsibilities that you

9   just described with respect to the AIS installers or

10  AIS subcontractor, did you evaluate his performance in

11  achieving those job duties?

12       A.    Not really.  If you want the history, it

13  was kind of an ambiguous job, in my perspective.

14  That's why he was transferred to a training position.

15  I eliminated the need for that role.  I didn't feel it

16  was a necessary position to interact at that level

17  with AIS specifically.  I felt it was more my

18  responsibility.

19            MR. MILLER:  I'd like to show you an

20  exhibit I'm going to have the court reporter mark as

21  Exhibit 16.  Off the record for a couple of minutes.

22            (Recess.)

23            MR. MILLER:  Like I said just before we

24  went off there for a moment, I'm going to have you

25  look at what I'm going to have the court reporter mark

                                                    80

**EXHIBIT F**

1      as Exhibit 16.

2                  (Marked for identification Exhibit 16.)

3          Q.     As with the other exhibits, please take a

4      moment to look through this and let me know when

5      you're ready for me to ask you some questions.

6          A.     Yes.  Go ahead.

7          Q.     So first, do you see on the first page of

8      Exhibit 16, there's a stamp in the lower right-hand

9      corner that says DTVe0128847?

10         A.     Yes.

11         Q.     And the second page, which is largely

12     unnecessary, is consecutively numbered to 848?

13         A.     Yes.

14         Q.     And all that's on the second page is a

15     DirecTV logo; is that right?

16         A.     Correct.

17         Q.     Do you recognize this e-mail?

18         A.     Sure.

19         Q.     So looking at this e-mail, the dates on

20     this e-mail, they're May of 2011, so this would be

21     just about a month into your job as site manager;

22     right?

23         A.     Uh-huh.

24         Q.     And this appears to be an e-mail from Josh

25     Guttormsen to AIS managers and then also to you;

                                                              81

**EXHIBIT F**

1  right?

2      A.    Correct.

3      Q.    You don't have any reason to think it's

4  anything but that; right?

5      A.    No.

6      Q.    And it's a little chart that says "QC's,"

7  which appears to be the label, and then it's got

8  "Week," "Month," "Year," and "Year to Date," and then

9  some numbers under various columns; right?

10     A.    Sure.

11     Q.    Are "QC's," is that referring to the

12 quality control you mentioned earlier?

13     A.    Uh-huh.

14     Q.    That would have been Josh's responsibility?

15     A.    It was either Josh or -- we had a quality

16 control team at that particular time, but it was

17 either Josh or the quality control team.

18     Q.    And so the top e-mail here on this, on the

19 first page of Exhibit 16, it's from you to Josh

20 Guttormsen and AIS supervisors?

21     A.    Yeah.

22     Q.    And it says "Nice to see your weekly

23 monthly up over 50 percent.  Keep striving for 70 by

24 month's end."

25     A.    Sure.

82

1        Q.    Now, is that directed to Josh?

2        A.    No.  It's recognizing AIS for the quality

3   of their work and reiterating that the goal is 70.

4   Keep striving harder.  It's early in the month.

5   You've got plenty of time to make it.

6        Q.    So, if the number didn't get up to 70,

7   would that have been -- would that have reflected

8   negatively on Josh Guttormsen's performance?

9        A.    No.

10       Q.    So, just to see if I've got the timeline

11  right, when you became site manager, AIS was already

12  providing services; is that right?

13       A.    Correct.

14       Q.    Were you ever involved in any contract

15  negotiations with AIS after you arrived?

16       A.    (Shaking head.)

17       Q.    Even as a regional director of operations?

18       A.    No.

19       Q.    Have you been involved in the negotiation

20  of contracts for other subcontractors?

21       A.    No.

22       Q.    Is that because there haven't been any

23  other subcontractors in your area of responsibility?

24       A.    No.  We have a separate team at corporate

25  that handles contracted partner.

                                                        83

1      Q.    Would you have had any input into the terms

2  of the contracts?

3      A.    I've never been asked.

4      Q.    Do you know how AIS was paid for the

5  services it rendered to DirecTV?

6      A.    By tasks is my understanding.

7      Q.    What's that mean?

8      A.    So, paid by completed task.  They're paid

9  by the number of completed tasks that they did on a

10 weekly basis, monthly basis.

11     Q.    Do you know how frequently they were paid?

12     A.    I have no idea.

13     Q.    And when you say "completed tasks," is that

14 like -- do you mean a completed installation?

15     A.    Correct.

16     Q.    Or a completed service call?

17     A.    They didn't perform service for us at that

18 particular time.

19     Q.    Well, what services -- what services did

20 AIS provide to DirecTV?

21     A.    Installation and upgrades.

22     Q.    And then what other services does DirecTV

23 do?

24     A.    Installation, upgrades and service calls.

25     Q.    So the service calls are in-house

                                                            84

1  technicians?

2       A.    Only, yes.

3       Q.    So they were paid by installation or by

4  upgrade, AIS was?

5       A.    Correct.

6       Q.    Do you know how the price per task was set?

7       A.    No, I don't.

8       Q.    Did you have anything to do with the

9  mechanics of actually paying AIS?  Did you have to

10  sign off on something?

11       A.    The only time would be if, on occasion, if

12  they were billed back for a piece of missing equipment

13  or something of that nature, because it's -- our

14  equipment is like a consignment.  Here's the

15  equipment.  You're responsible to keep track of it.

16  If they lost something they would be billed back.  The

17  only time that I would be involved is if they were

18  billed back for something.

19                    And I believe either Ray or their

20  controller or Justin -- I think the controller's name

21   was Lisa -- would send requests to say "I think this

22  is incorrect, can you verify."  And if we found it to

23  be incorrect then we would -- I would say "Approved."

24       Q.    Okay.

25       A.    You know, so that they could be provided

                                                      85

**EXHIBIT F**

1  payment or not charged --

2      Q.    Okay.

3      A.      -- for that particular item.

4      Q.    That makes sense.  So there would be a

5  system-generated charge-back for some piece of

6  equipment.  Justin would contact you to say, "Well, we

7  have that piece of equipment and it wasn't destroyed,"

8  or some other answer, and if it was satisfactory to

9  you, you could say, "Okay, you're not going to get

10  charged back for that"?

11      A.    For that, yes.

12      Q.    How were the in-house technicians paid?

13      A.    My in-house technicians are paid on two

14  ways.  So they're paid hourly and commission.  So,

15  hourly above -- so DirecTV places what we call minimum

16  wage adjustments so it's not -- it's above minimum

17  wage.  So they're paid a minimum of $12.50; if their

18  commission would fall below the $12.50 that they would

19  be paid $12.50 an hour.  If they exceeded, their

20  commission would be in addition to their hourly.

21      Q.    Has that minimum wage plus some additional

22  money been the same the whole time you've been aware

23  of it?

24      A.    It's been since I've been here.

25      Q.    How does the commission system work?

                                                        86

**EXHIBIT F**

1          MR. KELLY:  Objection.  Just say it one

2     more time, please.

3          Q.    How does the commission system work for

4     your in-house technicians?

5          MR. KELLY:  Thank you.

6          A.    So it's based on per task.  So, number of

7     jobs they complete, how many boxes per job they could

8     install.  If they installed a broadband DECA, they

9     could receive funds for that.  They would receive a

10    bonus for safe work environment.  It's transitioned

11    now where they receive a bonus based on their

12    performance on a quarterly basis.

13         Q.    And for bonuses for performance, what

14    metrics does DirecTV use to determine if their

15    performance merits a bonus?

16         A.    Without having all the particulars in front

17    of me, it's SIN30.  So their quality of work, customer

18    experience.  So, their post-call score.  It's their

19    broadband DECA rate.  Those are the three that I can

20    remember off the top of my head.

21         Q.    Do you use the other SIN rate, the 7, 60

22    and 90?

23         A.    It's usually just 30.

24         Q.    Just 30.  Do you --

25         A.    SOS 30 also, for our in-house.  That's

                                                              87

1  service on service.  So, if they do a service call, do

2  we have to go back within the same time frame, 7, 30,

3  60 or 90.

4       Q.    Do those performance bonuses also include,

5  like, sales of a protection program or protection

6  plans?

7       A.    No.  That's a separate commission.  So if

8  they sell the protection plan they're paid -- at that

9  time it was a $4 commission.  And that would be paid

10  out biweekly on their checks.

11       Q.    You mentioned earlier that one of the

12  things that went into the commission was a per-box

13  installed amount?

14       A.    Sure.

15       Q.    Did DirecTV have other, or does it have

16  other, incentive programs like that that's tied to a

17  specific part of a job?

18       A.    I'm not clear on the question.

19       Q.    I guess what I'm wondering, when you come

20  in to do an install or an upgrade or a service call, I

21  assume there are various pieces that happen.  You come

22  in and you remove the old equipment or you put an

23  upgrade piece of equipment.

24            Does DirecTV offer commission bonuses or

25  incentives to do specific pieces of those tasks?

88

**EXHIBIT F**

```
 1        A.    It's not a bonus.  They're paid on
 2  different tasks within the job itself.  So, such as if
 3  they had to -- you know, the job could be -- a one-box
 4  is going to pay less than a job that's a four-box.  If
 5  they had to do a post with trenching, that would pay
 6  more because they would have to do -- there's more
 7  labor involved.  If they had to put -- I think it's
 8  the SWM 16 on the side of the house, then that would
 9  be a separate commissionable task.
10        Q.    Do you know whether AIS is still providing
11  services to DirecTV?
12        A.    No, they're not.
13        Q.    Do you know when they stopped?
14        A.    I believe it was October 31st.  Around that
15  time frame.  I don't know the exact date, but I think
16  it was October 31st of last year.
17        Q.    So 2014?
18        A.    Yeah.
19        Q.    Who is covering the work that AIS used to
20  do?
21        A.    There's a new company called Next
22  Solutions.
23        Q.    Do you know who the principal is of that
24  company?
25        A.    I do.
```

                                                            89

1        Q.    Who is it?

2        A.    His name is Morgan McChesney.

3        Q.    Do you know whether personnel from AIS work

4   for Next Solutions?

5        A.    I believe Mr. Martinez is now working for

6   them.

7        Q.    And where prior he was in charge of AIS,

8   now he's an employee of Next Solutions?

9        A.    I believe so.

10       Q.    What about other lower level supervisors

11  from AIS?

12       A.    I have no idea.

13       Q.    Do you know if they're using the same

14  installers AIS used?

15       A.    I don't know to what degree.  I'm sure

16  they're using them in some capacity.

17       Q.    Did you have anything -- or any interaction

18  with the contracting process for getting Next

19  Solutions on board?

20       A.    No.  They already had a contract in place

21  with DirecTV from a different part of the country.  So

22  they're operating under the same contract.  Just they

23  had to have the state licenses to perform work in

24  Washington state.

25       Q.    Do you know what other part of the country

                                                        90

1   Next Solutions came from?

2        A.    I believe it is the Midwest area.   Atlanta,

3   I believe.   I'm not sure of the exact geography.

4        Q.    Way back at the beginning of this

5   deposition I asked you about meetings you had with

6   AIS.  Do you remember that?

7        A.    Yeah.

8        Q.    And you told me you had weekly or biweekly

9   meetings that you regularly scheduled; right?

10       A.    Yeah.

11       Q.    How did those meetings occur?  Was it by

12  phone?

13       A.    On occasion.

14       Q.    Were they in person?

15       A.    Yes.

16       Q.    Where did you meet with AIS supervisors

17  when they were in person?

18       A.    I didn't meet with their supervisors.   I

19  met with Ray Martinez, the principal, and Justin

20  Masencup.  And that would be sometimes at my location,

21  once or twice at his location, depending on

22  availability.

23       Q.    Did other DirecTV personnel visit AIS's

24  office?

25       A.    Yes.

91

1          Q.     Who?

2          A.     A supervisor or -- so you're asking during

3    my time as a supervisor for AIS --

4          Q.     (Nodding head.)

5          A.     -- I mean as a site manager?

6          Q.     Yes.

7          A.     So, yeah, we would have a supervisor that

8    would visit on a monthly basis to reconcile the

9    equipment that was consigned to them.

10         Q.     When you were a site manager who was that

11   supervisor?

12         A.     It varied from month to month.

13         Q.     So it could have been --

14         A.     It could have been anybody, but generally

15   it was one.  Josh Dart was the one that was utilized

16   the most, but it could have been anybody.

17         Q.     Do you know if that practice continued when

18   you were regional director of operations for

19   Washington state?

20         A.     Yes.

21         Q.     Did DirecTV's in-house installers ever

22   visit AIS?

23         A.     Not that I'm aware of.  There would be no

24   need to.

25         Q.     And do you know if anyone beyond Ray

                                                          92

**EXHIBIT F**

1   Martinez came to DirecTV's offices for AIS?

2        A.    Yes.   Their supervisors would come and pick

3   up equipment.

4        Q.    You testified to that previously.   Sorry.

5   I forgot.

6        A.    It's okay.

7        Q.    During your time as site manager, did

8   DirecTV have training requirements for its in-house

9   technicians?

10        A.    Yes.

11        Q.    What were they?

12        A.    I guess I'm not clear on the question.

13        Q.    So, you just said that DirecTV did have

14   training requirement for the in-house technicians?

15        A.    Correct.

16        Q.    Can you tell me what training was required

17   for those in-house technicians?

18        A.    Sure.   New-hire training at that particular

19   time -- it's evolved as technology has evolved, but at

20   that particular time was a six-week new-hire training

21   with on-the-job and in-classroom training.   Covered

22   safety.   All those components within the new-hire

23   curriculum.   They would need to be recertified every

24   year for safety-related -- so driver safety, ladder

25   safety.   That's annually.   They would also be provided

93

```
 1   training for new technology.
 2           Sorry, go ahead.
 3       Q.    Please finish your answer.
 4           MR. KELLY:  Madam reporter -- no offense --
 5   can you start the answer again so he's keeping it in
 6   his head.
 7           (Record read as requested.)
 8       A.    And service.  Teaching them how to do
 9   service calls.
10       Q.    So there was a six-week new-hire training
11   that included safety.  Some information about new
12   technology and service calls?
13       A.    Yeah.
14       Q.    And then you would have annual
15   recertification on safety; is that right?
16       A.    And driver's training.
17       Q.    And then, I assume, as-needed training on
18   new technology?
19       A.    As needed, yeah.  Then they would do a
20   monthly -- this is kind of what's going on.  It was
21   like a monthly video that they would perform.
22   Questions would be asked.  They would answer the
23   questions.
24       Q.    Did you require AIS to ensure that its
25   installers had safety training?
```

94

1      A.     No.  That's up to AIS to provide or set

2  expectations.

3      Q.     So AIS could have had installers that had

4  no safety training?

5      A.     Quite possible.

6      Q.     And DirecTV would have scheduled them to

7  work?

8      A.     Yeah.  He's responsible for his own

9  interactions with OSHA.

10      Q.     What about new DirecTV technology?  Did AIS

11  installers have to be trained on that?

12      A.     Depending on what it was, they would need

13  training to be able to perform the function before

14  they could work that work order type.

15      Q.     So like -- I think I've heard about this

16  before.  So they would have to, in some way,

17  communicate to DirecTV that the AIS installer had had

18  the right training to do a specific job?

19      A.     Correct.

20      Q.     And then the training that would have had

21  to be provided to the AIS installer would have come

22  from DirecTV; right?

23      A.     We did not provide them training

24  specifically.  We put content available on a website,

25  and it's up to them to go seek that information out

95

1    and provide it to their people.

2        Q.    Okay.  So you provided the substance so

3    they would know what the new technology was?

4        A.    Yes.

5              MR. MILLER:  Let's go off the record.

6              (Recess.)

7              MR. MILLER:  Back on the record.  All

8    right.  Mr. Mastin, I'd like you to look at another

9    document I'm going to ask the court reporter to mark

10   Exhibit 17.

11             (Marked for identification Exhibit 17.)

12       Q.    As with the other exhibits, take a moment

13   to review this document and let me know when you're

14   ready to be asked a question about it.

15       A.    Okay.

16       Q.    Have you seen this document before?

17       A.    Yes.

18       Q.    So based on what's in the document, it

19   looks like there was an incentive program offered to

20   contractors related to the customer satisfaction; is

21   that correct?

22       A.    Yes.

23       Q.    And, you know, when it says "contracting

24   partner," that would have included a company like AIS;

25   right?

96

**EXHIBIT F**

1          A.      Correct.

2          Q.      Do you know whether or not there were other

3    incentives like this offered to contractors like AIS?

4          A.      I don't know, to be honest with you,

5    because I don't know the terms of the contract.  I've

6    never seen it.

7          Q.      But, I mean, this is something that's

8    outside the contract; right?

9          A.      Yeah.  So they're paid by task on their

10   completed work.  This is referencing they're going to

11   be paid in addition to an incentive.  So the better

12   they do on post-call survey, this is an additional

13   incentive that would be given to them on top of the

14   tasks that they completed.

15         Q.      And this is -- this letter is dated March

16   of 2012; right?

17         A.      Yes.

18         Q.      And so at that point were you still site

19   manager?

20         A.      Yes.

21         Q.      At that point was this same kind of

22   incentive offered to in-house technicians?

23              MR. KELLY:  Vague and ambiguous, the "same

24   kind of incentive."  You can answer.

25         A.      They were incentivized not at this same

97

1  level.  So the dollar amounts were not --

2       Q.     Could be different?

3       A.     Yeah.

4       Q.     But were they receiving incentives for

5  improved post-call indexes?

6       A.     They would receive in part of their

7  quarterly bonus incentive.

8              MR. MILLER:  I'll show you another exhibit

9  I'm going to ask the court reporter to mark as Exhibit

10 18.

11             (Marked for identification Exhibit 18.)

12      Q.     And as with the other exhibits, take a

13 moment to look at it and let me know when you're ready

14 for me to ask you some questions.

15      A.     Okay.

16      Q.     So first, if you look at the lower

17 right-hand corner of the first page of Exhibit 18, do

18 you see that it is marked DTVe0172891?

19      A.     Yes.

20      Q.     And that is consecutively numbered on to

21 the second page ending in 892?

22      A.     Yes.

23      Q.     Do you recognize this e-mail exchange?

24      A.     Yes.

25      Q.     What's it about?

98

1     A.    It's in reference to an opening that we had

2  in one of our Southern California sites that I was

3  aware of.  Knowing Justin's background, I felt that he

4  would -- and knowing that he was moving to California

5  himself, he was looking for opportunities, so I passed

6  his resume on to the site manager in Lacey at the

7  time, which was Rich Heddon.  And also to -- because

8  he was -- he knew the site manager in Southern

9  California that was hiring for the position, and then

10  also forwarded it on to the director of operations who

11  was John Stokes.

12     Q.    And when you say "Justin" you mean Justin

13  Masencup, the AIS employee?

14     A.    Correct.

15     Q.    Do you know if he ultimately got hired by

16  DirecTV?

17     A.    He was not.

18     Q.    I just want to ask you one more question

19  about Next Solutions, which is the contractor that

20  replaced AIS; right?

21     A.    Sure.

22     Q.    So that happened when you still had

23  responsibility for state of Washington; right?

24     A.    It began.  I don't believe it was

25  completed.  Actually, it was in transition.  So I

                                                      99

**EXHIBIT F**

 1  think they started -- let me think of the time.  Yes.

 2  AIS provided their notification.  I think their last

 3  day was -- it was either the 30th or 31st of October.

 4  And Next Solutions started a week or two after that

 5  because they had to go through background and

 6  licensing and things Of that nature.  I started in

 7  Northern California the first week of October, but I

 8  still -- like I said, I had dual duties.

 9      Q.    So, you were then aware of the transition

10  process; is that right?

11      A.    What part of it?

12      Q.    The winding down of AIS's operation and

13  their spooling up of --

14      A.    Correct.

15      Q.    And I think you told me earlier that you

16  didn't know for sure whether or not they were using

17  the same installers; is that right?

18      A.    Yeah.  I said I think that they are using

19  some of the same guys because they had to go through a

20  background process again under the new thing, but I

21  don't know how many.

22          MR. MILLER:  I think I don't have any more

23  questions for you, Mr. Mastin.

24          THE WITNESS:  Okay.

25          MR. KELLY:  We will agree to the same

                                                    100

**EXHIBIT F**

1    stipulation that we put on the record at the end of

2    the deposition yesterday.   Is that okay?

3                MR. MILLER:   That works for me.

4                (Deposition concluded at 12:42 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        101

**EXHIBIT F**

1                     D E C L A R A T I O N

2

3

4

5          I declare under penalty of perjury that I

6     have read my within deposition, and the same is true

7     and accurate, save and except for changes and/or

8     corrections, if any, as indicated by me on the

9     correction sheet hereof.

10          Dated this _____day of _____,

11     2015.

12

13                              _____

14                              MARC MASTIN

15

16

17

18

19

20

21

22

23

24

25

                                                    102

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF WASHINGTON       )

 4                              ) ss.

 5    COUNTY OF KING            )

 6

 7         I, the undersigned Washington Certified Court

 8    Reporter, pursuant to RCW 5.28.010, authorized to

 9    administer oaths and affirmations in and for the State

10    of Washington, do hereby certify:

11         That the annexed and foregoing deposition

12    consisting of Page 1 through 101 was taken

13    stenographically before me and reduced to a typed

14    format under my direction;

15         I further certify that according to CR 30(e) the

16    witness was given the opportunity to examine, read and

17    sign after the same was transcribed, unless indicated

18    in the record that the review was waived;

19         I further certify that all objections made at the

20    time of said examination to my qualifications or the

21    manner of taking the deposition, or to the conduct of

22    any party, have been noted by me upon said deposition;

23         I further certify that I am not a relative or

24    employee of any such attorney or counsel, and that I

25    am not financially interested in said action or the
```

103

**EXHIBIT F**

1  outcome thereof;

2      I further certify that the witness before

3  examination was by me duly sworn to testify to the

4  truth, the whole truth and nothing but the truth;

5      I further certify that the deposition, as

6  transcribed, is a full, true and correct transcript of

7  the testimony, including questions and answers, and

8  all objections, motions, and exceptions of counsel

9  made and taken at the time of foregoing examination

10  and was prepared pursuant to Washington Administrative

11  Code 308-14-135, the transcript preparation format

12  guideline;

13      I further certify that I am sealing the

14  deposition in an envelope with the title of the above

15  cause and the name of the witness visible, and I am

16  delivering the same to the appropriate authority;

17

18      IN WITNESS WHEREOF, I have hereunto set my hand,

19  and affixed my official seal this 9th day of

20  February 2015.

21                    _____

22                    Certified Court Reporter No. 2498

23                    in and for the State of

24                    Washington, residing at Shoreline,

25                    Washington.

                                                    104

**GRADILLAS COURT REPORTERS**
(310) 859-6677

**EXHIBIT F**

```
 1   ERRATA SHEET FOR THE DEPOSITION OF MARC MASTIN
     DATE TAKEN: JANUARY 28, 2015
 2   PAGE    LINE    CORRECTION

 3   _____   _____   _____

 4   _____   _____   _____

 5   _____   _____   _____

 6   _____   _____   _____

 7   _____   _____   _____

 8   _____   _____   _____

 9   _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25   DEPONENT'S SIGNATURE_____DATE_____
```

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

**EXHIBIT F**