```
 1            UNITED STATES DISTRICT COURT FOR THE

 2              WESTERN DISTRICT OF WASHINGTON

 3

 4  THOMAS PEREZ, Secretary of      )
    Labor, United States Department )
 5  of Labor,                       )
                                    )
 6            Plaintiff,            )
                                    )
 7      vs.                         )No. 2:12-cv-01406-RSM
                                    )
 8  LANTERN LIGHT CORPORATION,      )
    d/b/a ADVANCED INFORMATION      )
 9  SYSTEMS, a corporation; DIRECTV )
    LLC, a limited liability        )
10  company; and RAMON MARTINEZ,    )
    an individual,                  )
11                                  )
              Defendants.           )
12  _____)

13

14            DEPOSITION UPON ORAL EXAMINATION

15                        OF

16                  JOSHUA GUTTORMSEN

17             Wednesday, January 28, 2015

18                     9:23 a.m.

19                  300 Fifth Avenue

20                 Seattle, Washington

21

22

23

    Reported by:
24  Cheryl Macdonald, CRR, RMR
    Court Reporter
25  JOB No. 150128CMA

                                                      1
```

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4                    JEREMIAH MILLER
                      Senior Trial Attorney
 5                    UNITED STATES DEPARTMENT OF LABOR
                      Office of the Solicitor
 6                    300 Fifth Avenue
                      Suite 1120
 7                    Seattle, Washington 98104
                      miller.jeremiah@dol.gov
 8

 9

      FOR THE DEFENDANT:
10
                      JOEL P. KELLY
11                    Attorney at Law
                      JACKSON LEWIS
12                    725 South Figueroa Street
                      Suite 2500
13                    Los Angeles, California 90017
                      kelly@jacksonlewis.com
14

15
      ALSO PRESENT:   ALEX VAN SCHAICK
16

17

18

19

20

21

22

23

24

25

                                                              2
```

**EXHIBIT I**

```
 1                    I N D E X

 2

 3   EXAMINATION                                    PAGE

 4   BY MR. MILLER:    .........................      5

 5   BY MR. KELLY:    ...........................     77

 6

 7

 8   EXHIBITS MARKED                                 PAGE

 9

10   No. 1          Bates-stamped DTVe1043663
                    one page..................      37

11   No. 2          Bates-stamped DTVe0143839
                    one page..................      39
12
     No. 3          Bates-stamped DTVe144002
13                  one page..................      41

14   No. 4          Bates-stamped DTVe0143795-96
                    two pages.................      44
15
     No. 5          Bates-stamped DTVe0143835
16                  one page..................      48

17   No. 6          Bates-stamped DTVe0143981
                    one page..................      51
18
     No. 7          Bates-stamped DTVe0147523-28
19                  six pages.................      53

20   No. 8          Bates-stamped DOL 003531-34
                    four pages................      55
21
     No. 9          Bates-stamped DTVe0142865-74
22                  ten pages.................      58

23   No. 10         Bates-stamped DTVe0147615
                    one page..................      60
24

25
```

| EXAMINATION | | PAGE |
| --- | --- | --- |
| BY MR. MILLER: | | 5 |
| BY MR. KELLY: | | 77 |

| EXHIBITS MARKED | | PAGE |
| --- | --- | --- |
| No. 1 | Bates-stamped DTVe1043663 one page | 37 |
| No. 2 | Bates-stamped DTVe0143839 one page | 39 |
| No. 3 | Bates-stamped DTVe144002 one page | 41 |
| No. 4 | Bates-stamped DTVe0143795-96 two pages | 44 |
| No. 5 | Bates-stamped DTVe0143835 one page | 48 |
| No. 6 | Bates-stamped DTVe0143981 one page | 51 |
| No. 7 | Bates-stamped DTVe0147523-28 six pages | 53 |
| No. 8 | Bates-stamped DOL 003531-34 four pages | 55 |
| No. 9 | Bates-stamped DTVe0142865-74 ten pages | 58 |
| No. 10 | Bates-stamped DTVe0147615 one page | 60 |

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

**EXHIBIT I**

```
 1              I N D E X (Cont'd.)

 2

 3   EXHIBITS                                    PAGE

 4   No. 11          Bates-stamped DOL 002835
                     one page..................    61
 5
     No. 12          Bates-stamped DTVe0128847-48
 6                   two pages.................    66

 7   No. 13          Bates-stamped DOL 001528
                     one page..................    70
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                    4
```

**EXHIBIT I**

```
 1   JOSHUA GUTTORMSEN, witness herein, having been first
                        duly sworn by the Certified Court
 2                      Reporter, deposed and said as
                        follows:

 3

 4                          EXAMINATION

 5   BY MR. MILLER:

 6       Q.     Mr. Guttormsen, my name is Jeremiah Miller.

 7   I'm an attorney with the United States Department of

 8   Labor.  I'm here today to take your deposition in the

 9   matter of Perez vs. Lantern Light Corporation, doing

10   business as Advanced Information Services, Ray

11   Martinez, and DirecTV.

12             Have you ever had your deposition taken

13   before?

14       A.     I have not.

15       Q.     So, before we really get started, I'm just

16   going to go over some of the ground rules of the

17   deposition.  I'm going to ask you questions.  Unless

18   your attorney instructs you not to answer those

19   questions, you're required to give me an answer.  A

20   key part of this is that you give verbal answers.

21   Because you can see the court reporter is transcribing

22   what's happening here, nods or shakes of the head,

23   they just don't come across.

24             The same with things like "uh-huh" and

25   "huh-uh."  They look kind of the same in the
```

5

**EXHIBIT I**

1  transcript.  So if the answer is "Yes" I need a "Yes;"

2  if it's a "No" I need a "No."  If it's something else

3  I just need you to say it out loud.

4        The other key parts, sort of, to keep the

5  transcript clear is we need to really work hard to not

6  talk over each other.  It's hard; it inevitably

7  happens.  It's the way regular conversation goes, but

8  you have to wait for me to finish a question, and I

9  have to wait for you to finish an answer.

10        Do you understand that?

11     A.    I do understand.

12     Q.    When you give me these answers, you know,

13  I'm comfortable with you giving me estimates, but not

14  guesses.  Just to give you a brief example of the

15  difference between the two, you were outside today so

16  you might be able to estimate the temperature outside

17  here in Seattle.  However, unless you were recently in

18  Spain, I don't expect that you would know what the

19  temperature was in Barcelona.  So that would be a

20  guess versus an estimate.  So estimates are okay, but

21  I don't want any guesses today.

22        If you don't understand a question that

23  I've asked you, I need you to tell me you don't

24  understand it and ask for clarification.  I'm happy to

25  try to make it clearer.  Undoubtedly, as this goes on,

6

**EXHIBIT I**

```
 1   I will ask you a question that doesn't make any sense.

 2   So, please stop me, and ask questions if you need to.

 3              Do you understand that?

 4        A.    I do understand.

 5        Q.    I am amenable to taking breaks whenever you

 6   need them.  You need to have a glass of water, use the

 7   restroom, that's totally fine.  The only caveat on

 8   that is if there's a question outstanding I'll need

 9   an answer before I can agree to go on a break.

10        A.    Sounds good.

11        Q.    Is there any reason that you would have

12   trouble providing truthful or your best answers today?

13   Any medical conditions, medications, anything like

14   that?

15        A.    There is not.

16        Q.    So just to start this off, I want to find

17   out some background information about you.  Are you

18   currently employed?

19        A.    I am currently employed.

20        Q.    Who is your employer?

21        A.    DirecTV.

22        Q.    What position do you hold at DirecTV?

23        A.    Currently the systems trainer.

24        Q.    And how long have you been the assistant

25   trainer?
```

7

**EXHIBIT I**

1    A.    Systems trainer.  Sorry, although assistant

2 trainer is not a bad idea.  Three years and change.

3    Q.    And before that what job did you have?

4    A.    Supervisor.  Field operations supervisor.

5    Q.    Also for DirecTV?

6    A.    Yes, sir.

7    Q.    And how long were you a field operations

8 supervisor?

9    A.    I was for just about a year.

10    Q.    And before that job?

11    A.    I was a field technician for three months.

12    Q.    For DirecTV?

13    A.    Yes, sir.

14    Q.    So that would have been in roughly 2008 or

15 2009 that you were a field technician?

16    A.    2010.

17    Q.    That would make sense.  My math is not what

18 it used to be.  And before you were a field

19 technician?

20    A.    I was working for another company, Ma and

21 Pa.

22    Q.    What did you do there?

23    A.    It was computer repair A through Z, systems

24 build, computers.  IT stuff.

25    Q.    Did it have anything to do with cable

**EXHIBIT I**

```
 1  television or dish?

 2       A.    We installed DirecTV on a small scale as a

 3  retailer, so to speak, for DirecTV.

 4       Q.    Okay.  How long did you do that job?

 5       A.    A year and a half.

 6       Q.    What about before that?

 7       A.    I was a finish carpenter.  And then the

 8  market crashed.

 9       Q.    Construction jobs dried up a little.  All

10  right.  What kind of education do you have?

11       A.    High school.

12       Q.    Did you do any community college or

13  anything like that?

14       A.    I dabbled in DeVry, but didn't continue it

15  through.

16       Q.    All right.  So starting with when you were

17  working for DirecTV, what did you do as a field

18  technician?

19       A.    I was responsible for installing customers'

20  DirecTV systems.  Ensuring the project was installed

21  to their satisfaction and making sure they were happy

22  when I was walking out the door.

23       Q.    Did DirecTV employ you directly?

24       A.    Uh-huh, they did.

25       Q.    How did the process work when you were
```

**EXHIBIT I**

1    given a job to do installing a system?

2              MR. KELLY:  Vague and ambiguous.  Can you

3    be more specific, please.

4              MR. MILLER:  Sure.

5       Q.    When you were a field technician, how did

6    the process work being getting assigned a job, going

7    to do the job, and that sort of thing?

8       A.    First thing in the morning, supervisor at

9    the office that I reported to gave me my work for the

10   day.  And it was my job to make sure that they were

11   taken care of after that.

12      Q.    So when you say gave you the work for the

13   day, was it multiple jobs?  One job at a time?

14      A.    It could have been multiple.  It could have

15   been one, depending on what the day's workload looked

16   like.

17      Q.    But if there was more than one job you got

18   it all at the start of the day?

19      A.    Correct.

20      Q.    And how did you get to the work sites?

21      A.    With the company vehicle.

22      Q.    Did the company vehicle have DirecTV logos

23   on it?

24      A.    It did, yes, sir.

25      Q.    Did you have any financial responsibility

                                                      10

**EXHIBIT I**

1  for that vehicle?

2      A.    I did not.

3      Q.    What kind of equipment did you need to do

4  the job?  Again, let me be clear.  When you were a

5  field operations technician going out to do these

6  calls.

7      A.    Could you clarify what type of -- I mean,

8  there was a lot of equipment that went into the

9  process.  So it depends on -- there's a lot of gray

10 area in that question.

11     Q.    Fair enough.  What sorts of jobs were you

12 assigned as a field operations technician, or field

13 tech, sorry?

14     A.    New installs, upgrades, service calls,

15 former installs.

16     Q.    What's a former install?

17     A.    A customer that's been a customer before at

18 some point and is returning back to us.

19     Q.    What kind of equipment did you need for new

20 installs?

21     A.    A satellite to mount on the house.  Cable.

22 Receivers for inside the house.  Fittings to attach to

23 the end of the cables.  Video cords.  Audio cables to

24 attach to the customer's equipment in their premise.

25     Q.    Is there anything else?

11

**EXHIBIT I**

1    A.    Silicone.  Stuff to make the customer's

2  house aesthetically and leave it in the same or better

3  shape than when we left.

4    Q.    Did you have hand tools?

5    A.    I did.

6    Q.    So where did this equipment come from?

7    A.    Came from our warehouse at our facility.

8    Q.    Including the hand tools?

9    A.    They did.

10    Q.    Did you have any financial responsibility

11 for the equipment?

12    A.    Did not.

13    Q.    Just to be clear, when I say "financial

14 responsibility," you weren't required to pay for it or

15 to insure it or anything like that?

16    A.    I was not.

17    Q.    What kind of equipment did you need for

18 upgrades?

19    A.    Mostly receivers.  Some small times we

20 required video and audio cables to replace some cable.

21 Some upgrades required us to -- almost like a new

22 install.  So, ODU and the whole works.

23        THE COURT REPORTER:  What did you say?

24        THE WITNESS:  ODU, outdoor equipment.

25    Q.    And what kind of equipment did you need for

                                                      12

1  service calls?

2      A.    It depended on what we were going for.  If

3  we were going to replace a box that had died, then

4  just the receiver itself.  If we were going to realign

5  an ODU because they didn't -- the wind had knocked it

6  out or something along those lines, just the tools we

7  needed to upgrade those or to realign those.

8      Q.    And when you were doing a former install,

9  was that the same kind of equipment you needed for a

10  new install?

11      A.    Pretty much.

12      Q.    Were there any differences?

13      A.    Some former installs, they might already

14  have the equipment still because they were -- they

15  might have left to a new competitor, and it might have

16  been a couple weeks.  And then coming back with the

17  same equipment.

18      Q.    Sure.  When you were a field technician,

19  who did you report to?

20      A.    I reported to my field supervisor.

21      Q.    And is that the field operations supervisor

22  position you eventually held?

23      A.    That is correct.

24      Q.    Who was your field operations supervisor at

25  that point?

                                                    13

**EXHIBIT I**

```
 1        A.     His name?

 2        Q.     Yes.

 3        A.     Is Kevin Church.

 4        Q.     Do you know who his supervisor was?

 5        A.     At the time?

 6        Q.     Yes.

 7        A.     It was Mike Riles, R-I-L-E-S.

 8        Q.     And what position did Mr. Riles hold?

 9        A.     He was an operations manager, an area

10   operations manager.

11        Q.     When you were a field technician, did you

12   have any occasion to interact with other field

13   technicians?

14        A.     I did.

15        Q.     When did you meet them?

16        A.     If we were swapping equipment because they

17   needed something, or if I needed something, or towards

18   the end of the day, when we were tying up the last

19   part of -- bit of our jobs and we'd reach out to each

20   other, see if anyone needed any help.

21        Q.     Did you only talk to DirecTV's field

22   technicians, or did you ever talk to other field

23   technicians that weren't directly employed by DirecTV?

24        A.     Only DirecTV field technicians.

25        Q.     So you had no overlap with, say,
```

**EXHIBIT I**

```
 1  contractors?

 2       A.    Correct.

 3       Q.    So, how did you come to be field operations

 4  supervisor?

 5       A.    I sat down with the regional director of

 6  operations, Chris King, at the time, and made mention

 7  that I was interested in the opportunity, and got in

 8  front of a couple interviews, and transferred from

 9  Yakima to Lynnwood, Washington, and became field

10  supervisor.

11       Q.    You miss Yakima?

12       A.    No.

13       Q.    So what was the -- what were your job

14  duties as field operations supervisor for DirecTV?

15       A.    It was manage the daily life cycles of our

16  technicians through coaching and mentoring and

17  assisting them through their daily interactions with

18  our customers.

19       Q.    How many people did you supervise?

20       A.    At the most it was 19.

21       Q.    And were those all DirecTV employees?

22       A.    That is correct.

23       Q.    Did you have any responsibility for other

24  cable installers that weren't directly employed by

25  DirecTV?
```

**EXHIBIT I**

1     A.    There was a period of time where I was the

2   supervisor assigned to AIS.

3     Q.    How long were you assigned to AIS?

4     A.    For seven months.

5     Q.    And when we say "AIS" we're talking about

6   Advanced Information Services?

7     A.    Correct.

8     Q.    One of the parties to this lawsuit?

9     A.    Correct.

10     Q.    When were you responsible for AIS

11   installers?

12     A.    It was from 2010 to mid 2011.  Late 2010 to

13   late mid 2011.  Excuse me.

14     Q.    Do you know months, by any chance?

15     A.    I'm trying to remember.  October through to

16   August of 2011.

17     Q.    Okay.  October 2010, August 2011?

18     A.    Correct.

19     Q.    Was that in addition to the 19 DirecTV

20   installers that you were supervising?

21          MR. KELLY:  Vague and ambiguous as to "was

22   that in addition."  What are you asking, please.

23     Q.    Were the AIS installers that you had

24   responsibility for, was that in addition to the 19

25   DirecTV employees that you were supervising?

                                                    16

**EXHIBIT I**

1          MR. KELLY:  Mischaracterizes the prior

2    answer.  You can answer.

3          A.    I was not -- not at the same time, no.

4          Q.    So they switched you from the in-house

5    installers over to AIS?

6          A.    Correct.  No.  It was other way.  It was

7    AIS first and then in-house.

8          Q.    Okay.  So when you were promoted to field

9    office supervisor you initially had responsibility for

10   AIS installers?

11         A.    Correct.

12         Q.    So you told me you managed the daily cycles

13   of the technicians.  Can you tell me a little bit more

14   about that?

15         A.    As far as my in-house technicians?

16         Q.    Let's start with them, sure.

17         A.    Well, the in-house technicians, it was

18   making sure they had their work for the day, if they

19   needed any product or gear.  Making sure that they

20   were set up to be successful to take care of our

21   customers, and making sure they had the right mindset.

22   Sometimes you need the mindset to be successful out

23   there in the field.

24         Q.    Did you have any metrics by which you were

25   judging their performance?

                                                          17

**EXHIBIT I**

1      A.    I did.

2      Q.    What were those metrics?

3      A.    Cross SIN, which stands for service in X

4  amount of days.  Meaning we rolled to a job and a

5  service call was generated so many days later.  We

6  also measured service on service.  So if we rolled to

7  a service call and that job, after we closed the

8  service call, another service call was created, we

9  measured that metric.  If we -- DPP, which is our

10 protection plan sales.  Ensuring the customer's

11 product and their peace of mind is satisfied through

12 DPP.

13      The OTG, or on-time guarantee, making sure

14 that we're getting to our customers on time, in a

15 timely fashion.  And it's been a long time.  Those are

16 the major ones that we measured that were important to

17 our customers and to our staff.

18      Q.    Okay.  So the ones you mentioned, this SIN,

19 service on service, sometimes SOS --

20      Is that what it's called?

21      A.    Correct.

22      Q.    -- DPP sales and OTG, those are the ones

23 you recall as being important to DirecTV at that

24 point?

25      A.    To our customers.  Not to DirecTV.

**EXHIBIT I**

```
 1      Q.    Did DirecTV have a different set of metrics
 2   it was interested in?
 3            MR. KELLY:  Question is vague and
 4   ambiguous.
 5      A.    (Shaking head.)
 6      Q.    At that time?
 7            MR. KELLY:  Still vague and ambiguous.  You
 8   can answer if you understand.
 9      A.    (Shaking head.)
10      Q.    Got to answer out loud.
11      A.    No.  I didn't care what DirecTV was worried
12   about.  I cared about what my customer was worried
13   about.
14      Q.    So you said that you help the in-house
15   technicians with mindset sometimes; right?
16      A.    Uh-huh.
17      Q.    Was that, then, in response to the kinds of
18   numbers you were seeing on these metrics?
19      A.    That is correct.
20      Q.    So did you have one-on-one counseling
21   sessions with the technicians?
22      A.    Uh-huh, I did.
23      Q.    At that point did you have the power to
24   terminate in-house technicians if they weren't meeting
25   any of these requirements?
```

19

**EXHIBIT I**

1      A.    I could not terminate directly.  There was

2   a process it has to go through.  HR and legal has to

3   be involved.  There has to be lots of follow-up.  Lots

4   of kickoff to get the process going.

5      Q.    Could you recommend terminations?

6      A.    I could.

7      Q.    Did you?

8      A.    I did twice, yes.

9      Q.    Were the individuals terminated after your

10  recommendation?

11     A.    They were.

12     Q.    Did you have any power to hire the in-house

13  technicians?

14     A.    I did.  We were part of the interview

15  process, yes.

16     Q.    But, again, I assume you didn't have final

17  say on hires?

18     A.    No.

19     Q.    How many people did you hire during the

20  time you were a field operations supervisor as

21  in-house technicians?

22     A.    I'm guessing at this point.  It's well over

23  30.

24     Q.    Is that a guess or an estimate?

25     A.    It's -- yeah, we're going to go with an

                                                        20

**EXHIBIT I**

```
 1  estimate.  Yeah.

 2        Q.    Was there a lot of turnover?

 3        A.    We had a lot of churn, yeah.

 4        Q.    When you gave in-house technicians the

 5  product or the gear they needed to the jobs, this is

 6  the kind of product and gear we were discussing that

 7  you used as a field technician; right?

 8        A.    That is correct.

 9        Q.    Where was the equipment stored?

10        A.    In our local warehouse, in Lynnwood,

11  Washington.

12        Q.    So I'm just trying to get a sense of how

13  the business worked when you were a field office

14  supervisor.  Did you have, like, a main office where

15  people met in the morning?

16        A.    Uh-huh.

17        Q.    Is that a yes?

18        A.    We did, yes.

19        Q.    So you had an office where everyone met in

20  the morning to get their jobs; is that right?

21        A.    Correct.

22        Q.    And where was that in relationship to the

23  warehouse where the equipment was stored?

24        A.    The same location.

25        Q.    So one building had a warehouse plus office
```

                                                              21

**EXHIBIT I**

```
 1  space?
 2       A.    Correct.
 3       Q.    Do you know, is that the same location
 4  that's being currently used by DirecTV?
 5       A.    It is, yes.
 6       Q.    And how long had that been the location, if
 7  you know?
 8       A.    It's been over five years.  Six years.  So
 9  it's been over six years.
10       Q.    Okay.  So since before you started working
11  for DirecTV?
12       A.    Correct.
13       Q.    So you provided them with equipment and
14  gear.  You monitored their mindset with reference to
15  some metrics, some of which you described.  Was there
16  anything else you did in managing the in-house
17  technicians when you were a field operations
18  supervisor?
19            MR. KELLY:  Calls for a narrative.  You can
20  answer.
21       A.    Kind of being their go-to guy.  I called it
22  their Rock of Gibraltar.  Being there for the people
23  was our motto.  Making sure that they're taken care of
24  was our motto.  It was best driven so we could make
25  sure we had a good, positive work environment, and
```
                                                          22

**EXHIBIT I**

1  sometimes that required conversations outside of the

2  actual term of employment.  So, yeah, we did those

3  interactions with them.

4      Q.    What kind of conversations outside the term

5  of employment did you have?

6      A.    If they had personal issues going on.  Mom

7  just passed away or sister was sick.  Stuff like that.

8      Q.    So did you also respond to requests for

9  assistance if something was going wrong at a job and

10  they needed additional help?

11      A.    For the in-house technicians?

12      Q.    Yes.

13      A.    Yes.

14      Q.    What kind of problems did they have when

15  they called you, the in-house technicians?

16      A.    Mostly technical questions regarding the

17  product or the equipment that we're installing.

18  Sometimes they called for advice on how to handle a

19  situation when it came to doing the installation

20  itself.

21      Q.    Did you ever refer these technical

22  questions to anyone else?

23      A.    I was considered the go-to guy for

24  technical within the office, so if I did it was

25  someone else inside the company, but that was rare.

23

**EXHIBIT I**

1          Q.    So we've been talking about the in-house

         2     technicians, which is what you were, the field

         3     technician, right, before you became field operations

         4     supervisor.  Now I'd like to ask you some questions

         5     about the AIS installers.

         6          A.    Okay.

         7          Q.    So, again, you were field operations

         8     supervisor.  This is the period that's October of 2010

         9     to August of 2011; right?

        10          A.    Uh-huh.

        11          Q.    Is that yes?

        12          A.    That is correct.

        13          Q.    So what kind of interactions did you have

        14     with the AIS installers during that period?

        15          A.    I did not have any interactions with them,

        16     per se, like I would as a field supervisor for

        17     in-house technicians.

        18          Q.    How was it different?

        19          A.    I dealt directly with their supervising

        20     staff in a peer-to-peer fashion with AIS management

        21     team.

        22          Q.    And what kind of interactions did you have

        23     with the AIS management team?

        24          A.    If they had questions about any kind of

        25     products that we were about to launch.  New equipment.

                                                                    24

1  Make sure that they were taking care of the customers

2  the same way that we asked our technicians to take

3  care of our customers.  They would be there to support

4  the management team.

5       Q.    So was that less work than when you had the

6  in-house technicians?

7       A.    Oh, absolutely.

8       Q.    Who did you deal with on the AIS management

9  team?

10      A.    Name-wise?

11      Q.    If you remember.

12      A.    Jason Scarry, Matt Henderson.  Tim -- I

13 can't remember his last name.  And Ray Martinez on the

14 rare occasion.  He primarily directed me straight to

15 his management team.

16      Q.    When you did deal with Mr. Martinez, did

17 you find him easy to work with?

18      A.    Absolutely, I did.

19      Q.    Was the AIS management responsive to your

20 information?

21      A.    They were.

22      Q.    Why did you stop having responsibility for

23 the AIS installers?

24      A.    So we, internally as a company with DirecTV

25 staff in Lynnwood, we came to a conclusion that it was

                                                        25

truly a waste of time for me to directly supervise the
contracting team.  It was a business decision for --
in advance for my career, as well to prepare me for
some of my next comings that I was planning on.  It
gave me an opportunity to take over the team of 19 to
truly get the direct report status built under my
career and my resume.

Q.    Did you ever answer technical questions for
AIS installers?

A.    Only if one of their supervisors was
calling or asking the question.

Q.    Now, is it just that none of the installers
ever actually called you, or is it that you wouldn't
have taken the call for the AIS installers?

A.    Yeah.  I wouldn't have taken the call from
them.  I would have preferred them to have their
supervisor call me and speak with me directly.

Q.    Did it ever happen that an AIS installer
tried to call you directly?

MR. KELLY:  Calls for speculation.

A.    (Nodding head.)

Q.    It has?

A.    It has.

Q.    Do you remember anything about the
circumstances?

26

**EXHIBIT I**

1      A.    I don't.

2      Q.    And your response at that time, when they

3  tried to contact you, was "You need to call your

4  supervisor"?

5      A.    That is correct.

6      Q.    Going back to the in-house technician for a

7  moment.  What role did you play in setting their

8  schedules?  This is again in-house technicians, what

9  you were, a field technician.

10     A.    Depended on what we needed for the

11 business.  Depended on whether we were running five

12 days or six days.  And our customers always come

13 first, and we want to make sure that they have all

14 opportunity to -- for us to get to them within a

15 certain day's amount of period.  We always strive for

16 three or less days.  So we always work on our

17 availability within our in-house technicians to ensure

18 that we could achieve that goal.

19     Q.    Did you set the schedules for the in-house

20 technicians?

21     A.    We did it as a group, but there were some

22 individual opportunities when we saw fit through

23 approval process still with the site manager.

24     Q.    So do you know how the schedules were set

25 for the field technicians, the in-house installers?

27

**EXHIBIT I**

1    A.    It's been a while, but it was typically an

2 eight to six opportunity, just to soft book a window,

3 so to speak, and we would allow the work to fit into

4 that window based on the packages, the three S's, what

5 we called the skill set service region, and schedule.

6    Q.    And when these in-house installers went

7 out, did you provide them with the work assignment?

8    A.    We did sometimes.  Early in my time as a

9 supervisor, we were in the process of transitioning to

10 a digital hand-held type process.  So some techs got

11 paper copies.  Some techs got digital copies.

12    Q.    Did they get -- did these in-house

13 technicians get all of the jobs for a day or did they

14 get one job at a time?

15    A.    It was all the jobs.

16    Q.    Was that true the whole time you were a

17 field operations supervisor?

18    A.    (Nodding head.)

19    Q.    So, the actual assignment of routes was

20 done somewhere above you or did it involve you?

21    A.    No.  The assignment was way above.

22    Q.    All right.  So you would get some "Here are

23 the routes that need to go today"?

24    A.    (Nodding head.)

25    Q.    Did it tell you which installers need to

                                                    28

**EXHIBIT I**

1  have those routes or did you have any decision making

2  in that?

3       A.    It was kind of 50/50.  It depended on

4  customers' needs, what kind of specific customer times

5  we were dealing with.  The type of job as well.

6       Q.    So sometimes you would get installer A

7  needs to go do this job at this place, and sometimes

8  you would get, we have these jobs, find some

9  installers?

10      A.    (Nodding head.)

11      Q.    Is that right?

12      A.    Right.

13      Q.    For the in-house technicians, did you ever

14  change installers on a job?

15      A.    For the in-house?

16      Q.    Yes.

17      A.    We can.  We could.  We did.  Depended on

18  customer situation.

19      Q.    So you might do it in response to a

20  customer issue?

21      A.    (Nodding head.)

22      Q.    Are there any other reasons you might do

23  it?

24      A.    High profile jobs.  Example, Russell

25  Wilson's house.  We would send someone appropriate.

29

**EXHIBIT I**

1    Q.    So you'd send the best technician?

2    A.    Correct.

3    Q.    As a field operations supervisor, what kind

4    of -- or did you have any training responsibility with

5    respect to the in-house technicians?

6    A.    As a field supervisor?

7    Q.    Yeah.

8    A.    The continuation from what training they

9    were receiving via the trainer at the time.  Making

10   sure that they were implementing those practices out

11   in the field, yeah.

12   Q.    Did you do any kind of weekly trainings

13   with the in-house technicians?

14   A.    We did safety weekly topics.  Yes, we did.

15   Q.    How did you do the safety topics training?

16   A.    Our safety team provides us with a pre-

17   setup document, and they just want us to recap what's

18   on the document, and then the technician is required

19   to sign it stating that they've completed that.

20   Q.    And then do you just do these as meetings

21   like at the warehouse?

22   A.    Correct.

23   Q.    When you provided equipment to the in-house

24   technicians, did you actually physically provide the

25   equipment, or did you send a manifest to the

                                                        30

**EXHIBIT I**

1  warehouse?

2      A.    The manifest went to the warehouse and they

3  pulled it for us.

4      Q.    So we talked earlier with the in-house

5  technicians about, you know, helping them with their

6  mindset with relationship to some metrics that DirecTV

7  had that were customer driven.  Did you have a formal

8  performance review process with the in-house

9  technicians?

10     A.    Well, during the one-on-one phase, that's

11  when we did the formal review.

12     Q.    Was that once a year?

13     A.    Once a month, or whenever they requested.

14  I tried to do it once a month.

15     Q.    Did you document those performance reviews?

16     A.    Sometimes we did.  Sometimes we did not.

17     Q.    How were the in-house technicians paid?

18     A.    Via commission.

19     Q.    So they didn't have an hourly rate?  They

20  were just paid as per job?

21     A.    It's the best way to -- it's a very

22  convoluted question.  It's a loaded question.

23     Q.    Well, can you explain how they were paid?

24     A.    I still have struggled explaining how they

25  get paid.  The best way I've ever thought of it is you

                                                    31

**EXHIBIT I**

1 do the job and you're paid for that job is the

2 easiest, really, way to explain it.  There's a lot

3 that goes into that for the in-house technicians.

4      Q.   Can you tell me the things that go into it?

5      A.    The type of work order.  The type of line

6 items that are in the work order.  Any special

7 requests from the customer.  Some technicians are paid

8 for special items that they do in the home.

9      Q.   And so when you say "line items" that's

10 like an individual task within the job?

11      A.    Correct.

12      Q.   So, you know, install a second DirecTV box

13 would be a line item?

14      A.    Correct.

15      Q.   And so then there's some formula based on

16 what those line items are and how many of them are

17 that determine the value of the job?

18      A.    That is correct.

19      Q.   Did DirecTV ever run any incentive plans

20 for the in-house cable installers?

21      A.    Would you clarify "incentive plans"?

22      Q.   Sure.  Were there ever offers of more money

23 for the in-house installers for hitting certain kinds

24 of performance goals, say, related to -- I think you

25 mentioned DPP sales earlier?

                                                    32

**EXHIBIT I**

1      A.    DPP is one of them.  Depending on what --
2   at the time back in 2010 it was just DPP, protection
3   plan process.  It was -- for in-house technicians it
4   was four dollars for successful sign-up for the
5   protection plan.
6      Q.    So per sale they were getting four dollars?
7      A.    Correct.
8      Q.    So I'm going to ask you some more questions
9   about the AIS installers, obviously, but first I want
10  to ask you about your current position as systems
11  trainer.  Can you tell me what that job is?
12     A.    Sure.  Implement new field training.  New
13  programs.  We do the new-hire field training for --
14  anyone coming in to work with DirecTV as an installer
15  goes through our six or nine-week course.  Safety
16  training.  We're typically involved as the safety
17  go-to guy in the offices.
18     Q.    Okay.  Do you have any direct reports?
19     A.    I do not.
20     Q.    You say there's a six to nine-week course
21  for new installers; is that right?
22     A.    That is correct.
23     Q.    Is that only in-house technicians or does
24  that apply to everybody?
25     A.    That's for in-house only as far as I am

                                                    33

**EXHIBIT I**

```
 1  aware.
 2           MR. MILLER:  Can we go off the record for a
 3  moment.
 4           (Recess.)
 5      Q.    So when you were a field operations
 6  supervisor, who did you report to?
 7      A.    At the time, initially when I first got
 8  there it was Marsha Stephens.
 9      Q.    How long did you report to Ms. Stephens?
10      A.    It was until February of 2011.
11      Q.    Then who did you report to?
12      A.    Marc Mastin.  Marc With a C.
13      Q.    And who do you report to as systems
14  trainer?
15      A.    Currently?
16      Q.    Yes.
17      A.    Her name is Jody Wagner.
18      Q.    Have you reported to other people?
19      A.    So I'm going to go timeline.  From Marc it
20  went to Dustin Dunlap.  Dustin Dunlap's title was
21  operations manager, and then operations manager,
22  again, his name was Cameron Malanify.  Cameron
23  Malanify got promoted and then it became Johnny
24  Collins.  And then I moved to Denver, Colorado, and
25  reported to Jody Wagner.
```

                                                    34

**EXHIBIT I**

```
 1        Q.    So, Mr. Dunlap, Mr. Malanify --

 2        A.    Malanify.

 3        Q.    -- and Mr. Collins were all operations

 4   managers?

 5        A.    Correct.

 6        Q.    And they're all people you reported to when

 7   you were a field operations supervisor?

 8        A.    When I was a trainer.

 9        Q.    Okay.  So did you report to Marc Mastin for

10   the remainder of the time you were a field operations

11   supervisor?

12        A.    Correct.  Sorry I laughed because there's

13   been so many.

14        Q.    Do you currently live in Denver?

15        A.    I do.

16        Q.    When you were a field operations

17   supervisor, did you ever work on any installations

18   personally?

19        A.    With another technician on site, yes.

20        Q.    Did that occur frequently?

21        A.    Depended if the guys were calling me asking

22   for help, or if we're running late in the day and they

23   know they're going to be out there, I'll zip out there

24   and help them out.

25        Q.    So, is this part of your troubleshooting
```

                                                        35

**EXHIBIT I**

```
 1   function?

 2        A.    Yeah.

 3        Q.    Did you ever work on installations with AIS

 4   cable installers?

 5        A.    I did not.

 6              MR. KELLY:  Can you keep your voice up.

 7              THE WITNESS:  Yes.

 8              MR. KELLY:  Repeat your answer.

 9              THE WITNESS:  "I did not."

10        Q.    Did you ever cover installations that had

11   been initially assigned to AIS employees?

12        A.    "Cover"?  Can you elaborate on that?

13        Q.    Sure.  Did it ever occur that an AIS cable

14   installer was unable to complete a job for some reason

15   and you covered it?

16        A.    Myself?

17        Q.    Yes.

18        A.    No.

19        Q.    Did that ever occur where you assigned an

20   in-house technician to cover it?

21        A.    Yes.

22        Q.    Was that frequent?

23        A.    No, it was not.

24              MR. MILLER:  Okay.  I'd like to start

25   showing you some exhibits and ask you some questions
```

36

**EXHIBIT I**

1    about them.  These are all going to relate to AIS

     2    installers.

     3              I'll have the court reporter mark this as

     4    Exhibit 1.

     5              (Marked for identification Exhibit 1.)

     6         Q.    Take a moment to look at the exhibit.  It's

     7    a fairly short e-mail.  Let me know when you've had a

     8    chance to review it, and I'll ask you some questions.

     9         A.    Okay.

    10         Q.    First of all, Mr. Guttormsen, do you see at

    11    the bottom this is marked DTVe0143663?

    12         A.    I do.

    13         Q.    Do you recognize this e-mail?

    14         A.    I do.

    15         Q.    Is it an e-mail that you sent on December

    16    31st, 2011?

    17         A.    It is.

    18         Q.    So looking at this e-mail, there's an

    19    original at the bottom, and then it looks like your

    20    response; is that right?

    21         A.    Correct.

    22         Q.    Who's Chris Harfst, H-A-R-F-S-T?  This is

    23    on the original message.

    24         A.    He looks like a supervisor for AIS.

    25         Q.    And you're making that assumption based on

                                                              37

**EXHIBIT I**

```
 1   the fact that his e-mail address is Chris@AIS
 2   systems.pro?
 3        A.    Correct.
 4        Q.    Was that the e-mail extension for the AIS
 5   supervisors?
 6        A.    That is correct.
 7        Q.    So reading his message, it looks like he's
 8   telling you that one of the AIS installers requested a
 9   period of time off?
10        A.    Uh-huh.
11        Q.    Why is he sending you this message?
12        A.    So we have in the system that, as the soft
13   booking schedules process, they -- their technicians
14   are in that same system, and they don't have access to
15   remove their technicians when they need time off.  So
16   our policy from them was to send us an e-mail what
17   they need and then we'll reply that it's been
18   completed.
19        Q.    Were there ever occasions where you would
20   not approve the time that they requested?
21        A.    I would never un-approve them unless it was
22   within a one day or less than a 24-hour notice, unless
23   it was obviously the vehicle was broken or whatever
24   situation.  But, no, we would never deny their time-
25   off requests.
```

38

**EXHIBIT I**

1      Q.    Again, unless it was so close to the day
2   they were supposed to work that this would cause a
3   scheduling problem?
4      A.    Well, if it's an impacting process where
5   they're unable to work because they're sick, then
6   we're going to take those all the time.  He's
7   requesting time off in this e-mail, so we need a
8   two-week, at least, advance notice for that to happen.
9      Q.    And if it was less than two weeks then they
10  might not get the time off?
11     A.    No.  Based on case-by-case scenario.  We'll
12  work with them the best we can, but we did require at
13  least two weeks notice.
14           MR. MILLER:  All right.  I'm going to show
15  you another exhibit.  I'll have the court reporter
16  mark this as Exhibit 2.
17           (Marked for identification Exhibit 2.)
18     Q.    And, again, please take a moment to review
19  it.  Let me know when you've been through it to your
20  satisfaction, and then I'll ask you some questions.
21     A.    Okay.
22     Q.    So, again, if you look at the lower
23  right-hand corner of this e-mail, you see that it's
24  labeled DTVe0143839?
25     A.    That is correct.

**EXHIBIT I**

1      Q.    Do you recognize this e-mail?

2      A.    I do.

3      Q.    What is it?

4      A.    So it looks like the original e-mail from

5  Bronson we were stating that we were sending them

6  their route for the day.  The second e-mail from Matt

7  Henderson states "We got a route for Yair," who is

8  supposed to be on vacation the 8th of January, or

9  until the 8th of January, excuse me.  They stated they

10 will see what they can try to get picked up, but we

11 will need help.  And then I replied back saying his

12 route has been taken care of.

13     Q.    Okay.  So based on this, your understanding

14 is that Yair had been scheduled for some routes on

15 that day; is that correct?

16     A.    Uh-huh.

17     Q.    And what they were telling you is that he

18 was on vacation until the 8th?

19     A.    Correct.

20     Q.    And then you rearranged the schedule of

21 some other installers in order to cover his routes?

22     A.    Right.  Put it back into a big pool and

23 everyone had the opportunity to take care of it.

24     Q.    Did installers get to ask for specific

25 routes?

                                                    40

**EXHIBIT I**

```
 1            MR. KELLY:  Vague and ambiguous.

 2       A.    Their installers?

 3            MR. KELLY:  He just said the same thing.

 4       Q.    You were clarifying.  First the in-house

 5   technicians, did they have an opportunity to request

 6   specific routes?

 7       A.    No.

 8       Q.    What about the AIS installers?

 9       A.    I can't answer that question.  I didn't

10   directly supervise them.

11       Q.    How did the routes get given to AIS?

12       A.    So we had the work that was soft booked

13   into their tech numbers, and the routes were sent to

14   them via an e-mail the night before, and most recently

15   the same day, and their responsibility was to

16   disseminate to the appropriate technicians.

17            MR. MILLER:  I'd like to show you another

18   exhibit.  I'm going to have the court reporter mark

19   this as Exhibit 3.

20            (Marked for identification Exhibit 3.)

21       Q.    And, again, take a moment to look at it and

22   let me know when you've reviewed it.

23       A.    Okay.

24       Q.    And so, looking at Exhibit 3 again, on the

25   right-hand corner, do you see that it's marked
```

                                                        41

```
 1  DTVe0144002?

 2      A.    That is correct.

 3      Q.    Do you recognize this e-mail?

 4      A.    I do.

 5      Q.    What is it?

 6      A.    So they had a technician Igor and might --

 7  excuse me, Mike Knight.  Igor wanted to be off on the

 8  27th through the 28th, back on the 30th.  And Mike

 9  Knight was off on February 8th.  And my reply,

10  however, not so funny now, stated that they have been

11  entered.

12      Q.    When you say "they," you're talking about

13  AIS?

14      A.    Correct.

15      Q.    And so again this is just -- you were just

16  making a little joke about denying them; is that

17  right?

18      A.    Yes.

19      Q.    But as we discussed, there were certain

20  standards under which it might have been denied?

21      A.    Not that I've ever denied, but I can't

22  speak for anyone else if they've denied them.

23      Q.    But earlier you told me that if it was less

24  than two weeks request and it wasn't an emergency that

25  they might be denied; right?
```

                                                    42

**EXHIBIT I**

1          MR. KELLY:  Objection.  Record speaks for

        2     itself.  Mischaracterizing his testimony.  We're not

        3     going to back and say what he did tell you.  You can

        4     ask the question if you want, counsel, because that

        5     wasn't his answer.

        6          MR. MILLER:  He can still answer.

        7          MR. KELLY:  No.  That's not a question

        8     about what he already told you.  If you have a

        9     question you can clarify.  If you want him to clarify,

       10     I have no problem asking him to clarify.  That isn't

       11     what the record shows.

       12          MR. MILLER:  Again, are you instructing him

       13     not to answer?

       14          MR. KELLY:  That question because what I've

       15     put on the record.  If you want him to clarify what

       16     the practice was with respect to approving requests

       17     for time off, I have no objection to you asking him

       18     that question.

       19          MR. MILLER:  Well, I'm going to move on,

       20     but I don't think it's appropriate to instruct him not

       21     to answer unless it's a matter of privilege.  So, you

       22     know, in the future --

       23          MR. KELLY:  I don't want to get into it

       24     with you, Jeremiah, but we're not going to sit here

       25     and testify about what he did testify.  If you want to

                                                               43

**EXHIBIT I**

1    have his testimony read back, we can do that.

     2             MR. MILLER:  Look, I understand your

     3    position, but I'm just telling you mine, that unless

     4    it's a privilege I don't think it's appropriate for

     5    you to instruct him not to answer.

     6             Anyway, moving on.  I want to show you

     7    another exhibit.  I'm going to ask the court reporter

     8    to mark this as Exhibit 4.  It's a two-page exhibit.

     9             (Marked for identification Exhibit 4.)

    10        Q.    So, as usual, go ahead and review this.

    11        A.    Thank you.

    12        Q.    And let me know when you've finished.

    13        A.    Okay.

    14        Q.    So, first, do you see at the lower

    15    right-hand corner this is marked as DTVe0143795?

    16        A.    I do.

    17        Q.    And the second page is consecutively

    18    numbered ending in 796?

    19        A.    Yes.

    20        Q.    And in fact the second page contains

    21    exactly two words, "Thanks" and "Tim"?

    22        A.    Yeah.

    23        Q.    Do you recognize this e-mail exchange?

    24        A.    I do.

    25        Q.    Can you tell me what it is?

                                                            44

1    A.    So Tim's original e-mail at 10:18 stated
 2  they wanted tech No. 816975 to have customer's last
 3  name, account number, and have it be put on tech No.
 4  816993.  Approximately an hour-and-some-change later,
 5  they requested what the status of the re-tech was.
 6  Says:  The tech has now been on site for 45 minutes.
 7  Our operations manager, in-house operations manager,
 8  stated, "We need to take care of these quicker."  The
 9  accountability puts -- that we put on the AIS team, we
10  don't want them to have these types of excuses.
11         And then my excuse followed up with we were
12  extremely short-staffed for a period of time --
13    Q.    Okay.
14    A.    -- is basically what we're stating.
15    Q.    And when you say "they," Tim and the
16  request, that's all coming from AIS?
17    A.    Yeah.  The first two e-mails were the AIS
18  request.  The second two, Dustin's reply and my reply,
19  were in-house followed up only.
20    Q.    Do you know what he means by the
21  accountability, what Dustin means when he says "the
22  accountability we have put in place on the AIS team"?
23    A.    Getting them on site to their jobs the same
24  time that we require our technicians to be on site, by
25  8:00, and taking care of our customers through the

45

daily work flow.  Also, the accountability process is
during the day, the on-time guarantee process.
Ensuring that we're at our customer's house within the
window that we've told them to be there with.

    Q.    And then your response you say that there
were "only two of us working sup wise."  I assume
that's short for supervisor?

    A.    Supervisor, yes.

    Q.    And then you say, "Bronson is on the
islands and I just got done with a 40-foot job."  Who
is Bronson?

    A.    Bronson is a peer at this time.  He's a
supervisor with myself in-house.

    Q.    So he's another field operations
supervisor.  And "on the islands" you mean like the
San Juan Islands?

    A.    That is correct, yeah.

    Q.    And what's the 40-foot job?

    A.    So if we have a technician that calls in
for a 40-foot job we bring the ladder out to them.
It's not a ladder they carry on their vehicles because
it does require two people put the ladder up.

    Q.    So you were out assisting another
technician putting up a very high dish or something?

    A.    That is correct.

46

**EXHIBIT I**

1      Q.    Do you know what Mr. Dunlap thought you
2    should have done in response to this request?
3      A.    I was really trying to get Dustin to handle
4    it for us since he had the ability to do so.
5            MR. KELLY:  He's asking if you know what
6    Dustin meant.
7      A.    No.  Dustin was just making sure he was
8    doing his job.
9      Q.    Well, what could have been done to address
10   this request?
11     A.    Dustin could have done it for us and then
12   gave us the e-mail.
13     Q.    When you say did it for you, what do you
14   mean?  What would he have done?
15     A.    So down here when we -- at this stage of
16   2011, in our Siebel system, I had to take the job and
17   drag and drop it to the next technician, to the one
18   that they requested.  And that's all it took because
19   of my time that I was locked up on the 40-foot ladder
20   and Bronson was in a no cell-coverage area.
21     Q.    And then just one other question about
22   terminology.  In this e-mail, the second e-mail from
23   Tim at AIS Systems, this is the one that you pointed
24   out as about 11:28 a.m., about an hour after the first
25   one.  He says, "What is the status of the re-tech?"

47

**EXHIBIT I**

1   Is "re-tech" a term that you used in inside DirecTV?

2       A.   It was just kind of a term that they

3   started stating when they wanted it to go from tech 1

4   to tech 2 or tech A to tech B.

5       Q.   So it's just shorthand for changing the

6   technicians?

7       A.   Right.

8       MR. MILLER:  I think I'll show you another

9   exhibit I'm going to have the court reporter mark as

10   Exhibit 5.

11       (Marked for identification Exhibit 5.)

12       Q.   Take a moment to review it and let me know

13   when you're done.

14       A.   Okay.

15       Q.   All right.  So first, in the lower

16   right-hand corner, do you see this document is marked

17   DTVe0143835?

18       A.   I do.

19       Q.   Do you recognize this e-mail exchange?

20       A.   Yes, I do.

21       Q.   What is it?

22       A.   So Matt stated that he would be going --

23   they had no -- excuse me.  They had no equipment for

24   their routes tomorrow for two of their technicians

25   that lived up in Oak Harbor; would it be possible to

48

**EXHIBIT I**

1    exempt them, meaning that we could pull quota from
    2    them so they wouldn't soft book work and so they could
    3    get equipment to them.
    4            Spencer Dennis, my predecessor field
    5    supervisor with DirecTV, asked Dustin what his
    6    thoughts were.  And then I replied, because I was
    7    making a trip up to see in-house technicians on the
    8    island, that I could take the equipment with me and
    9    have them pick it up from the parking lot.
   10    Q.    At the time of this e-mail exchange, which
   11    is September 20, 2011, were you still a field
   12    technician?
   13    A.    September, okay.  Yes, I was.
   14    Q.    Because Spencer would have been the field
   15    operations supervisor?
   16    A.    Both of us were supervisors, field
   17    operations supervisors.
   18    Q.    Oh, at the same time?
   19    A.    At the same time.
   20    Q.    But you were a field tech here?
   21    A.    No.  So at September 2011 I was still a
   22    field supervisor.  Spencer Dennis was my predecessor
   23    for the contracting supervisors, a contract he did,
   24    what I took over.
   25    Q.    Okay.

                                                      49

**EXHIBIT I**

1    A.    And we kind of worked together.  I was also
2  in a phase here of starting to take over some in-house
3  technicians, which is why I was going up to the
4  island.
5    Q.    Okay.  So this is right before you stopped
6  doing contractor oversight; is that right?
7    A.    Right.
8    Q.    And then, just for clarification, the first
9  e-mail you're referring to from Matt, that's Matt
10 Henderson, who is again at AIS Systems or AIS
11 supervisor?
12   A.    Correct.
13   Q.    So, the idea was you would take the gear
14 from the warehouse in Lynnwood with you when you were
15 going up to the islands anyway and stop off someplace
16 and give it to the AIS installers; is that right?
17   A.    Correct.
18   Q.    Did that happen frequently?
19   A.    No.
20   Q.    Did you do that on more than this occasion?
21   A.    I think it happened a total of two times.
22   Q.    Do you know if that was a method that was
23 used by DirecTV to distribute equipment?
24   A.    It was to get our customers taken care of
25 so that we didn't have to reschedule any of their

50

**EXHIBIT I**

1  jobs.

2      Q.      Apart from giving AIS installers equipment

3  when they needed it to do the job, are you aware of

4  any other times that DirecTV gave the AIS installers

5  tools they needed?

6      A.      Tools?

7      Q.      Yeah.

8      A.      No.

9              MR. MILLER:  So I'm going to show you

10 another exhibit.  Have the court reporter mark this as

11 Exhibit 6.

12             (Marked for identification Exhibit 6.)

13     Q.      Go ahead and review this.  When you've

14 finished looking at it let me know and I'll ask you

15 some questions about it.

16     A.      Okay.

17     Q.      First, do you see in the lower right-hand

18 corner of this document it's marked DTVe0143981?

19     A.      Correct.

20     Q.      Do you recognize this e-mail?

21     A.      I do.

22     Q.      What is it?  Or e-mail exchange I should

23 say.

24     A.      So Spencer Dennis, our field supervisor

25 DirecTV, was asking the AIS supervisors if Miguel can

                                                      51

1 pick up a job on his way out to Issaquah.  They

2 replied back to us that they -- excuse me.  AIS

3 replied back to us saying that they did not have any

4 equipment until 11 today, and he also has four

5 technicians who he cannot give anything until 11 p.m.

6          To my reply to them, both in-house and AIS,

7 was a practice that we frequently used where if the

8 warehouse has nothing we try to recoup it off the

9 vehicles that currently have it in their -- in storage

10 in their vehicle.  Instead of stating we don't have

11 anything, let's go pull from what's out in the field

12 already to make something work, which is what I was

13 replying to them, saying, have you gone through all

14 your techs' vehicles and pulled any gear that you may

15 not need.  That way you're not waiting for 11 a.m.

16 keeping our customers happy process.

17     Q.    Okay.  So you were just suggesting a way

18 they can get equipment quicker than the --

19     A.    11 a.m.  And he replied 11 p.m. further

20 down, but yeah, before the 11 a.m. arrival of the

21 equipment.  "Is there a way you could make it

22 quicker?"

23     Q.    And, again at this point, you were a field

24 operations supervisor?

25     A.    December 30, 2011.  No.  I was a systems

                                                      52

**EXHIBIT I**

1    trainer.  I became 11-11 -- sorry -- 11-10-2011.

2        Q.    So if you were a systems trainer, do you

3    know why you were on this e-mail exchange?

4        A.    Still transitioning.  The e-mail that we

5    used, the "Lynnsups@mydtvhs.com" is a forwarding

6    e-mail for all the Lynnwood supervisors, all the

7    in-house supervisors.  So we were one team, one goal,

8    taking care of all of our customers.

9        Q.    So, at that point, you were still getting

10   some e-mail that related to your field operations

11   supervisor job?

12       A.    Correct.

13            MR. MILLER:  I'm going to show you another

14   exhibit that I'm going to have the court reporter mark

15   as Exhibit 7.  It will be a multi-page exhibit.

16            (Marked for identification Exhibit 7.)

17       Q.    So go ahead and have a look at this.  It's

18   a longer exhibit.  There's an e-mail followed by

19   what's an attachment.  You know, if you want to read

20   every word, you can.  If you just want to scan it to

21   see if you know what it is, that's probably sufficient

22   for the questions I want to ask you, but of course

23   take your time.

24            Have you looked at it?  Are you ready?

25       A.    I am ready.

                                                        53

1     Q.    So, first, do you see at the lower

2 right-hand corner of this exhibit the document is

3 marked DTVe0147523?

4     A.    It is.

5     Q.    And then that there are consecutively

6 numbered pages then going from -- all the way out to

7 ending in 528?

8     A.    528, correct.

9     Q.    So, first, on this first page of Exhibit 7,

10 do you recognize this e-mail?

11     A.    I do.

12     Q.    What is it?

13     A.    This is an e-mail from myself to the

14 in-house supervisors, care of Marc Mastin, site

15 manager, and Dave Clements, who is also a service

16 manager with DirecTV.  The e-mail is some of the

17 supervisors letting them know that their weekly safety

18 tailgate and sign-in sheet are attached, and I've also

19 printed out their sign-in sheets and hung them on

20 their clipboards that I've kept in my office.

21        The following pages are the weekly safety

22 tailgate topic that are required to be read by an

23 in-house technician, and that sign-in sheet that goes

24 on the clipboard is what they would sign stating that

25 they have read the material.

54

**EXHIBIT I**

1    Q.    So these are the safety trainings we talked

2    about earlier?

3    A.    Correct.

4    Q.    And you did these weekly; right?

5    A.    That is correct.

6          MR. MILLER:  I'll show you another exhibit

7    I'm going to have the court reporter mark as Exhibit

8    8.  It's another multi-page exhibit.

9          (Marked for identification Exhibit 8.)

10    Q.    And again, go ahead and review this.  You

11    know, take whatever time you need to read it, and then

12    let me know and I'll ask you some questions about it.

13    A.    I'm ready.

14    Q.    So first, looking at this exhibit, do you

15    see in the lower right-hand corner, on the first page,

16    it says DOL 003531?

17    A.    3531, that is correct.

18    Q.    And that the pages are then consecutively

19    numbered ending in 534 following that?

20    A.    534, correct.

21    Q.    Do you recognize the e-mail exchange in

22    this exhibit and the associated attachment?

23    A.    I do.

24    Q.    Can you tell me what it's about?

25    A.    Yeah.  The beginning e-mail from Matt to

EXHIBIT I

DirecTV in-house group was, does anyone know how to
reconfigure a Mac to hook up broadband. Dustin Dunlap
then forwarded it to myself because I was not included
on the original e-mail. Was I not part of the Lynn
sups distrib at that time.

         And then my reply back to Kent supervisors,
the Lynnwood supervisors, Dustin and Samantha Pierron,
who works down in the Lacey office, was a question:
"Are you hooking to up an airport or a what? A Mac is
a desktop or a laptop." And then I attached the tech
tip from satinstalltraining.com website that in-house
and contractors and ma and pa retailers all have
access to stating how to successfully do an Apple
airport connection.

    Q.    And then the attachment is the thing you
cited; right?

    A.    Right. This is the attachment, what would
be downloaded from satinstalltraining.com.

    Q.    Looking at the first page of Exhibit 8, the
e-mail that's at the bottom, it's from you. It's to
Kent supervisors, which has an aisystems.pro extension
to it?

    A.    Uh-huh.

    Q.    What is Kent supervisors?

    A.    So they did the same thing that we had

                                                    56

**EXHIBIT I**

1  created with the Lynn sups at myDTVHS.  That Kent,

2  that AIS systems pro, went to all of their management

3  team.

4       Q.    So AIS was located in Kent?

5       A.    Yes, sir.

6       Q.    Why were you sending this information to

7  AIS?

8       A.    Matt's original request was asking us if we

9  know how to reconfigure that broadband to a Mac or

10  hook up a Mac to a broadband, and Dustin forwarded to

11  me for me to answer their question.

12       Q.    I see.  So the first e-mail is from

13  somebody to AIS?

14       A.    Right.

15       Q.    So you see up here at the top that Matt

16  Henderson has forwarded this on to some people?

17       A.    Right.

18       Q.    Do you recognize any of these people on the

19  "To" line for this e-mail at the top of page 1 of

20  Exhibit 8?

21       A.    Ryan Caldara sounds like one of their

22  supervisors they had for a while.

23  "Ogaserv.dtv@comcast.net," I'm reading the e-mail

24  address up here, they don't ring a bell.  No.  Could

25  be their tech.  Speculation at this point.

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

**EXHIBIT I**

1      Q.    So you became a systems trainer in,

2  roughly, February of 2012.  Is that about right?

3      A.    It was November of 2011.

4      Q.    And I may have asked you this before.  You

5  know, if I did, tell me, but your training

6  responsibility as a systems trainer, does that cover

7  all installers or only the in-house technicians?

8      A.    Just the in-house technicians.

9            MR. MILLER:  I'm going to show you another

10 exhibit I'm going to have the court reporter mark as

11 Exhibit 9.

12           (Marked for identification Exhibit 9.)

13     Q.    And again, please have a look at this

14 exhibit and let me know when you've had a chance to

15 review it.  Again, it's fairly long.  For the purpose

16 of my question, I'm not sure you need to read every

17 sentence, but please take whatever time you need.

18           THE WITNESS:  I'm ready if you are.

19           MR. KELLY:  Thank you.  You can ask him.

20     Q.    So looking at the first page of Exhibit 9,

21 do you see in the lower right-hand corner it's marked

22 DTVe0142865?

23     A.    That is correct.

24     Q.    And then the exhibit continues

25 consecutively numbered to 874?

**EXHIBIT I**

```
 1        A.    That is correct.

 2        Q.    Do you recognize this e-mail and

 3   attachment?

 4        A.    I do.

 5        Q.    What is it?

 6        A.    So this was the afternoon of Friday, the

 7   9th of December, and it was their route sheet for the

 8   following day, the 10th of December.

 9        Q.    When you say "their route sheet"?

10        A.    AIS.

11        Q.    Excuse me.

12        A.    AIS, I'm sorry.

13        Q.    It's AIS's route sheet for that day, for

14   the following day?

15        A.    Yes.

16        Q.    So looking at the route sheet -- you can

17   just look at page 2 of this exhibit, the one that's

18   marked DTVe0142866.  So this chart is arranged where

19   it has a tech number, a tech name, a start time, an

20   order number, a customer name, service address, and

21   then some contact information; is that right?

22        A.    Correct.

23        Q.    So these route sheets that you sent to AIS,

24   or this route sheet that you sent to AIS, laid out the

25   actual jobs per technician?
```

59

**EXHIBIT I**

```
 1      A.     Correct.

 2      Q.     Is this how they looked always when you

 3 sent them out?

 4      A.     (Nodding head.)

 5      Q.     Yes?

 6      A.     Yes.

 7             MR. MILLER:  I'd like to show you another

 8 exhibit.  I'm going to have the court reporter mark

 9 this as Exhibit 10.

10             (Marked for identification Exhibit 10.)

11      Q.     Take a moment to review this e-mail and let

12 me know when you're done.

13      A.     Okay.

14      Q.     So, first, do you see at the lower

15 right-hand corner of this exhibit it's labeled

16 DTVe0147615?

17      A.     That is correct.

18      Q.     Do you recognize this e-mail?

19      A.     I do.

20      Q.     Can you tell me what it's about?

21      A.     So, it was a string of e-mails that are not

22 part of this, talking about work that was for pickup.

23 I replied to the Kent@AIS systems.pro work e-mail,

24 stating that one of the jobs for pickup, a Marita

25 Miller has been put on one of their technicians, and
```

**EXHIBIT I**

1  that I had called a customer to let her know that we

2  would be arriving outside of the window of

3  opportunity, which, at this time, was a four to eight.

4  And letting them know the dish was already mounted

5  the house and cables could be ran to the room, and it

6  should be a fairly simple install for them.

7      Q.   So you'd say this is missing a chain of

8  e-mails?

9      A.   The work for pickup.

10     Q.   Do you know what e-mails are missing?

11     A.   It would be an e-mail chain stating how

12 many jobs, what jobs are available for pickup.  And it

13 would have all the customers, the account number and

14 the customer's name, and what region that it was in so

15 that they could pick from that list, and we could pick

16 from that list until we got all of our customers

17 installed for the day.

18     Q.   And so this is sort of at the end where

19 you're responding, well, I gave this AIS installer

20 this job?

21     A.   Correct.

22          MR. MILLER:  I'm going to show you another

23 exhibit I'm going to have the court reporter mark as

24 Exhibit 11.

25          (Marked for identification Exhibit 11.)

                                                      61

**EXHIBIT I**

1      Q.    When you've had a moment to review this,

2    let me know and I'll ask you some questions.

3      A.    Okay.

4      Q.    Okay.  So first, looking at the lower

5    right-hand corner of this document, do you see that it

6    is labeled DOL 002835?

7      A.    I do.

8      Q.    Do you recognize this e-mail?

9      A.    I do.

10     Q.    What is it?

11     A.    This was an e-mail from myself to the AIS

12   management team with a CC to Chris King and Marc

13   Mastin -- Chris King, the RDO; Marc Mastin the site

14   manager -- stating that in the last seven days there

15   was no new SIN7's created.  So no service calls called

16   in on a customer that they've installed in the last

17   seven days, with an attaboy.  And then just the

18   details below, their technicians by week, which is the

19   first column you see in the middle of the page ending

20   3-26, ending 4-2, 4-9, and 4-16.

21           And then the below section is when the

22   activity was created, meaning when the customer called

23   in for the service call, the previous activity number

24   of the service call, why, or the reason -- the "sub

25   area" is why we were going back out.  And -- or,

                                                          62

**EXHIBIT I**

excuse me, the new activity number.  The prior

activity number, which is the fourth column, which is

the work order that the AIS team would have rolled out

to.  What type of prior install it was.  And then how

many days that job lasted, which is the service

duration days.

    Q.    Okay.  And so -- you may have said this, so

forgive me if I'm repeating this here -- this was an

e-mail you sent to AIS management; correct?

    A.    Correct.

    Q.    And then you copied -- you said the RDO.

What's an RDO?

    A.    Regional director of operations.

    Q.    And at this point that was Chris King?

    A.    Correct.

    Q.    And then Marc Mastin, who was your

supervisor at the time?

    A.    Correct.

    Q.    So, as part of your job in dealing with the

AIS installers, you monitored this, the SIN7 rates for

them?

    A.    Yeah.

    Q.    Did you monitor other metrics like that for

the AIS installers?

    A.    I did.

63

1      Q.    Which ones?

2      A.    These other metrics that we discussed

3 earlier today.

4      Q.    So the SO S?

5      A.    Yeah.  So, not necessarily SOS because it

6 wasn't a metric that they were measured on because

7 they didn't close service calls.  Yes.

8      Q.    So maybe not SOS, but then DPP sales?

9      A.    Yeah.

10     Q.    And then OT G?

11     A.    OTG.

12     Q.    So the on time guarantee?

13     A.    Yes, sir.

14     Q.    And would you provide them with feedback

15 about how those metrics were doing?

16     A.    We provide them the details.  We'd mark out

17 what details that we thought were items for them to

18 look at, primarily letting them control their business

19 so that they can operate and manage their technicians.

20     Q.    Sure.  So, during the period where you had

21 responsibility for the AIS contract, you had two

22 different supervisors; right?  You had Ms. Stephens

23 and then Marc Mastin; is that right?

24     A.    That is correct.

25     Q.    How was your performance as a field

                                                          64

**EXHIBIT I**

1  operations supervisor evaluated by those managers?

2              MR. KELLY:  Vague and ambiguous.  What do

3  you mean?

4       Q.    Do you want some more clarification on

5  that?

6       A.    Yeah.

7       Q.    So, you testified earlier that you reviewed

8  the performance of the in-house technicians that

9  worked for you; right?

10      A.    Uh-huh.

11      Q.    Was your performance also reviewed in a

12  similar way?

13      A.    From Marc and Marsha?

14      Q.    Yeah.

15      A.    That is correct.

16      Q.    What were they looking at when they were

17  reviewing your performance?

18      A.    So, we were measured under some of the

19  similar values that the technicians are measured as a

20  team.  So it wasn't -- it was an individual

21  performance but as a team metric, so as the SINs and

22  the SOS's and the DPPs process.

23              We were also measured on the overall

24  temperature of our team's, per se, the -- what's the

25  word I'm looking for?  Not ethics.  Culture.  The way

                                                      65

**EXHIBIT I**

the culture is being operated within the team.  So

we're having those discussions as well, what's going

well and what can be improved.

    Q.    Were you formally reviewed?

    A.    Yes.

    Q.    And the whole time you were field

operations supervisor, were they looking at the same

things with respect to your performance?

    A.    As a field supervisor?

    Q.    Yes.

    A.    Yes.

    MR. MILLER:  I'd like to show you another

exhibit I'm going to ask the court reporter to mark as

Exhibit 12.  It's another, unnecessarily, two-page

exhibit.

    (Marked for identification Exhibit 12.)

    Q.    So like with the other exhibits, take a

moment to review this and I'll ask you some questions

about it.

    A.    Okay.  I'm ready.

    Q.    Well, first, looking at the lower

right-hand corner of this exhibit on the first page,

do you see that it is marked DTVe0128847?

    A.    That is correct.

    Q.    And that there's a second page that

66

**EXHIBIT I**

1  continues at 848?

2       A.    That is correct.

3       Q.    And the only thing that's on the second

4  page is the DirecTV logo?

5       A.    Yes, sir.

6       Q.    Do you recognize this e-mail exchange?

7       A.    I do.

8       Q.    What is it?

9       A.    So, on Monday, May 9 of 2011, I took a

10 screenshot of our QC report that we have, one of our

11 metrics that we pull from, and slipped it in an e-mail

12 and sent it to the contractors, letting them know how

13 many visits, how many passes, their percentage, and

14 their month and year status, and then also their

15 year-to-date letting, them how much work was QC'd.

16 And this was sent to the AIS management team.

17      Q.    And then the top e-mail is an e-mail from

18 what would have been your supervisor at that point,

19 Marc Mastin?

20      A.    That is correct.

21      Q.    And he's telling you it's good to see your

22 weekly/monthly up over 50 percent.  Is he referring to

23 the QC score down here?

24      A.    That is correct.

25      Q.    And he wants you to keep trying for 70 by

**EXHIBIT I**

1   month's end; is that correct?

2        A.    That is correct.

3        Q.    So what this QC percentage?

4        A.    So the QC percentage is based on a

5   pass/fail questionnaire sheet.  We have -- at the time

6   we had a QC team whose responsibility was to hit 20

7   percent of our completed work across the office,

8   regardless if it was in-house or contractors.  And

9   with the goal of getting feedback to the technician.

10  Letting them know if he was doing installation correct

11  or what could -- what he could work on.

12       Q.    I've heard this term in another context.

13  Is this part of, like, an NPS survey?

14       A.    No.  This is specifically to the

15  craftsmanship, the quality that's installed in the

16  customer's home.

17       Q.    So, do you know what NPS stand for?

18       A.    I do.

19       Q.    What is it?

20       A.    Net promoter score.

21       Q.    And that's more of a measure of how happy

22  people are?

23       A.    Correct.

24       Q.    So it doesn't necessarily take into account

25  how competently the job was done?

                                                        68

**EXHIBIT I**

1      A.    That is correct.

2      Q.    Do you know if this is -- if this continues

3  to be used by DirecTV, this QC?

4      A.    By DirecTV?  There are some offices that

5  are using it.  I couldn't tell you who they are.

6  Lynnwood does not use this any more.

7      Q.    So is this like a different metric than the

8  categories for metrics we've been discussing with the

9  cable installers?

10      A.    That is correct.

11      Q.    Would this be another one of those metrics

12  that you would have been monitoring for in-house

13  technicians?

14      A.    That is correct.

15      Q.    And then is it also a metric you monitored

16  for the AIS installers?

17      A.    Not for the installers, but the information

18  here stated we passed to them and let them work with

19  their installers on this data.

20      Q.    And then, when Mr. Mastin is telling you

21  that it's good to see you over 50 and he wants you to

22  strive for 70, was that a goal that was set for you?

23      A.    So the office goal, per the QC department's

24  policy, was 70 percent pass rate or better.  And

25  that's why he was -- it's the good attaboy, you're at

                                                    69

EXHIBIT I

1 the right process, let's keep going (indicating).

2     Q.    And was that 70 for everyone?

3     A.    Yes.

4     Q.    When I say "everyone" I mean all the

5 installers.

6     A.    In-house, out-house, all-around house.

7     Q.    During the time you were a field operations

8 supervisor and responsible for the AIS contractors, do

9 you know how the AIS installers were paid?

10     A.    I do not.

11     Q.    Do you know how AIS was paid?

12     A.    I do not.

13     Q.    You had no responsibilities for the

14 paycheck going to those?

15     A.    No, sir, I did not.

16     MR. MILLER:  I'm going to show you another

17 exhibit I'm going to have the court reporter mark as

18 Exhibit 13.

19     (Marked for identification Exhibit 13.)

20     Q.    As with the other exhibits, please take a

21 moment to review this.  Let me know when you have and

22 I'll ask you some questions.

23     A.    Okay.

24     Q.    First, do you see at the lower left-hand

25 corner of Exhibit 13 it's marked DOL 001528?

70

**EXHIBIT I**

1     A.    That is correct.

2     Q.    Do you recognize this document?

3     A.    I do not.

4     Q.    Earlier we discussed some incentive

5  programs that DirecTV had?

6     A.    Okay.

7     Q.    Do you remember that?

8     A.    I do.

9     Q.    And those incentive programs applied to

10 in-house installers and also to the contracting

11 installers?

12    A.    As far as in-house, I can speak to.  For

13 the contractors, I don't know what incentive plans

14 they had.

15    Q.    Okay.  So we discussed some of the metrics

16 that you were following at various points when you

17 were a field operations supervisor for either in-house

18 technicians or the AIS installers.  Do you remember

19 that?

20    A.    I do.

21    Q.    Did you receive those metrics purely

22 electronically?

23    A.    I did.

24    Q.    And do you know where they came from?

25    A.    I believe it's a type of analytic group

                                                    71

**EXHIBIT I**

```
 1  from DirecTV headquarters somewhere that puts all the
 2  data together into kind of like a website suppository,
 3  so to speak, and we pull from there.  That's our term.
 4        Q.    Really?  Wow.
 5              (Discussion off the record.)
 6              MR. MILLER:  Back on the record.
 7        Q.    Mr. Guttormsen, do you know whether or not
 8  AIS still services DirecTV routes?
 9        A.    No.
10              MR. KELLY:  He does know.
11        A.    I do know, yes.  I do know.
12              MR. KELLY:  And the answer to the question
13  is, "No, they don't"?
14              THE WITNESS:  Yes.  That's what I'm trying
15  to say.
16        Q.    So AIS no longer services DirecTV routes?
17        A.    That is correct.
18        Q.    Do you know when they stopped?
19        A.    I don't.  No.  I transferred out, and
20  during the transfer process that stopped happening, I
21  think.
22        Q.    So at some point after you went to Denver?
23        A.    Yeah.
24        Q.    Which you went to Denver in like --
25        A.    November of last year.
```

72

**EXHIBIT I**

```
 1      Q.    November of 2014?

 2      A.    Yes.

 3      Q.    So sometime in that period is when it

 4  stopped?

 5      A.    It might have -- I was completely out of

 6  the picture for all supervisory access regarding

 7  contractors for almost the entire year of 2014 doing

 8  new-hire classes for in-house, so it might have even

 9  -- I know there was talks, but I didn't --

10      Q.    Do you know why?

11      A.    I don't, no.

12      Q.    And then I've got sort of an overall

13  question about the structure of the Lynnwood DirecTV

14  office.  There was a Lynnwood office and a Lacey

15  office; is that right?

16      A.    That is correct.

17      Q.    And you worked, when you were field op

18  supervisor and a field technician, you worked out of

19  Lynnwood?

20      A.    Field operations supervisor, Lynnwood;

21  technician, Yakima.

22      Q.    That's right.  What geographical area did

23  the Lynnwood office cover?

24      A.    Basically it was the most southern point of

25  Federal Way, all the way up to the Canadian border,
```
                                                     73

**EXHIBIT I**

```
 1  and this side of the peninsula out to Moses Lake/

 2  Wenatchee.

 3       Q.    And then what did Lacey cover?

 4       A.    Lacey was the northern tip of Federal Way,

 5  south, and the whole west side of the peninsula, and

 6  their territory stopped somewhere north of Vancouver,

 7  Washington.

 8       Q.    So Lynnwood had, effectively, the entire

 9  Seattle metropolitan area?

10       A.    Yes.

11       Q.    Did it also have Spokane, then?

12       A.    Did not have Spokane, but we did have the

13  Seattle metro.

14       Q.    When you reported to Marc Mastin, what was

15  his title?

16       A.    Site manager.

17       Q.    Do you know if he's still working for

18  DirecTV?

19       A.    He does.

20       Q.    Do you know what his current position is?

21       A.    It's regional director of operations.

22       Q.    As the systems trainer, do any of your

23  reports go through him?

24       A.    Currently?

25       Q.    Yeah.
```

74

1      A.    No.

2      Q.    Just trying to get a sense of sort of the

3   corporate structure.

4      A.    Sure.

5      Q.    So regional director of operations has

6   responsibility over field office supervisors?

7      A.    The site managers.

8      Q.    The site managers?

9      A.    Yes.

10     Q.    And then they have responsibility for the

11  field office supervisors?

12     A.    Correct.

13     Q.    And the field office supervisors have

14  technicians or contract responsibilities or whatever?

15     A.    Correct.  They may have contractors, yes,

16  but mostly in-house.

17     Q.    Mostly in-house.  When you were a field

18  office supervisor, were there other contractors

19  besides AIS?

20     A.    Not in Lynnwood, no.

21     Q.    Are you aware of whether there have been

22  other contractors in Lynnwood since then?

23     A.    Not that I'm aware of.

24     Q.    All right.  Well, I appreciate your time

25  today.  Before we close this down, are there any

                                                        75

1  corrections, additions, or clarifications you'd like

2  to make?

3          MR. KELLY:  You can clarify anything.

4      A.    The only one I wanted to clarify was

5  something back from Exhibit 10.

6      Q.    Okay.

7      A.    "The Francisco G only has one PM left in

8  Covington."  There might have been a phone

9  conversation that the contractor called in and asked

10 me to do this.  Going back and looking at it that --

11 we didn't always tag it with "per our conversation" or

12 "per our phone conversation" because the e-mail goes

13 out work for pickup and it has all the work reference

14 stated --

15         THE COURT REPORTER:  "And it has all the"

16 --

17         THE WITNESS:  Has all the work that's

18 available to be picked up stated in the e-mail.

19     A.    And sometimes they'll just call us because

20 it's easier to do that sometimes versus in an e-mail.

21 So there might not be a --

22     Q.    An e-mail chain?

23     A.    An e-mail chain from that process.

24     Q.    But you don't remember specifically with

25 regard to that e-mail?

                                                    76

1      A.     No, I don't remember.

2             MR. MILLER:  Okay.  Well, as we discussed

3    before we started this --

4             MR. KELLY:  I have two short

5    clarifications.  That's one of them.

6             MR. MILLER:  Sure.

7

8                        EXAMINATION

9    BY MR. KELLY:

10     Q.     With respect to Exhibit 10, would you pull

11   that?

12     A.     Okay.

13     Q.     Although you've told us that you don't have

14   a specific recollection of that e-mail, when DTV at

15   the time had work available for pickup -- is that a

16   phrase you guys used?

17     A.     Yes.

18     Q.     So that's a DTV concept as opposed to an

19   AIS concept?

20     A.     Yes.

21     Q.     Was it the practice to notify the

22   contractor that this work was available?

23     A.     Yes.

24     Q.     And what would you have expected to happen

25   once that notice went out?

77

**EXHIBIT I**

1      A.      So we wanted everyone, both in-house and

2   contractors, to have the opportunity to pick up the

3   work, and them getting typically first dibs on the

4   work that they wanted to pick up that best suited

5   their needs for their technicians, and allowing us to

6   pick up whatever is left over.  Because we had the gas

7   cards, we can go places.  They don't always have that

8   opportunity.

9      Q.      Can you tell us how you would have received

10  the name of "Francisco G" as somebody who had

11  availability to pick up that work?

12     A.      Again, it could have been a phone call that

13  they stated, hey, would you put that job on Francisco.

14  And because they only had one Francisco at the time

15  that's who we knew to put it on.

16     Q.      So you would have received that information

17  from AIS?

18     A.      Correct.

19     Q.      They told you to give the job to AIS?

20  That's your best recollection?

21     A.      Yeah.  From AIS supervisors telling us,

22  yes.

23             MR. MILLER:  You actually recall them

24  telling you to do that here?

25             THE WITNESS:  In this e-mail, no, but there

                                                         78

**EXHIBIT I**

1  have been times before where we did shoot a
2  work-for-pickup notification and they would call us
3  and state would you please put these jobs on
4  such-and-such-and-such.
5      Q.    (By Mr. Kelly)  With respect to Exhibit 9,
6  which is a multi-page document called "All AIS," it's
7  a work order apparently.
8      A.    Okay.
9      Q.    Take a look at that, please, and the
10  attachment.
11         There was testimony in response to
12  questions from Mr. Miller about the -- I think you
13  used the word process by which the work was -- if I
14  use the word "pushed to AIS," is that a phrase you are
15  familiar with?
16     A.    No.  It would be "soft booked."
17     Q.    Fine.  Is this an illustration of the soft
18  booking?
19     A.    In a sense, yes, but it can be completely
20  modified any way they see fit.  So if they have a need
21  where one of their technicians may have called out and
22  they want to pick up the work themselves, then they
23  can do so from this system, from this report.
24     Q.    In the time period, let's say, two to three
25  weeks prior to the time Exhibit 9 was prepared, is it

79

**EXHIBIT I**

1  fair to say that DTV would have learned that a
2  customer wanted an install at a certain date, certain
3  time, certain time window?  Is that how your business
4  runs?
5      A.    No.
6      Q.    How would you have learned that the
7  customer wanted an install on a certain date?
8      A.    So the customer is the one that calls in
9  and assigns -- they're assigned a date based on
10 availability through our soft book system.  So imagine
11 a big bowl and we need to fill that bowl with work.
12 And this is how this would be generated from
13 (indicating).
14     Q.    Can you tell from Exhibit 9 who performed
15 the installs described on the pages of Exhibit 9, who
16 actually did them?
17     A.    It does have tech number and tech name on
18 that, but at the time that these jobs were actually
19 closed, if they moved those jobs around and assigned
20 them to another technician, then this report would be
21 inaccurate.
22     Q.    Who is "they"?
23     A.    The AIS supervisors.
24     Q.    Did you have any understanding as to
25 whether AIS assigned the techs who actually did the

                                                    80

**EXHIBIT I**

1  work?

2       A.    No, sir.  Unless they were doing a re-tech,

3  like we stated earlier in one of our exhibits, if they

4  were asking us to put the job onto another technician,

5  then, no, because they could call in and also have

6  that process.

7       Q.    Okay.  Understood.  Take a look at Exhibit

8  7, which you described as -- I think you called it a

9  weekly tailgate?

10      A.    That is correct.

11      Q.    Multi-page document.

12      A.    Yeah.

13      Q.    That was a safety training, I think you

14  said?

15      A.    That is correct.

16      Q.    Was that for contractor techs or for any --

17  just for W-2's?

18      A.    This specific training, the 52-week

19  tailgate series that we're talking about, is only for

20  W-2 technicians.

21      Q.    If you take a look at Exhibit 5, this was

22  an e-mail about them not having equipment, and you

23  saying "I might be going up there anyway."  Do you

24  recall that testimony?

25      A.    I do.

                                                      81

**EXHIBIT I**

1      Q.    When you used the term "equipment," are you
2 talking about tools?
3      A.    I am not.
4      Q.    Can you just clarify for the record what
5 you mean by "equipment"?
6      A.    Equipment specifically related to the
7 installation of the customer's DirecTV system.  So
8 receivers and L&B's that would go on the end of
9 ODU's to allow the signal to be received by the
10 receiver.
11      Q.    The box, the dish, is that what you mean by
12 "equipment"?
13      A.    Correct.
14      Q.    Looking at Exhibit 6, this also deals with
15 "We don't have equipment, we're waiting until 11:00."
16 Do you recall that testimony?
17      A.    I do.
18      Q.    Was it the practice, while you were in the
19 position, to provide tools to AIS techs if they didn't
20 have tools?
21      A.    Tools, no.  We would not do that.
22      Q.    And when you were suggesting that you go
23 through the trucks to see what equipment you had, what
24 equipment were you asking them to check and see what
25 they had on hand?

EXHIBIT I

1           A.      That's equipment that we have issued them

        2    from our warehouse that's been flagged as equipment

        3    needed to perform the installation for the customer's

        4    specific request.

        5           Q.      Again, the dish, the cable, the box; is

        6    that right?

        7           A.      Yes, sir.

        8           Q.      You used the term "re-tech" both in

        9    response to the questions from Mr. Miller and

       10    recently.  If you take a look at Exhibit 4, this is

       11    the one where, to be flip, there was some issue about

       12    the speed with which you responded to the request for

       13    a re-tech; is that right?

       14           A.      That is correct.

       15           Q.      So they were asking DirecTV to re-tech?

       16           A.      The contractors, AIS, was asking DirecTV to

       17    take job -- down here "Yango" is the customer's last

       18    name -- and put it onto technician B.

       19           THE COURT REPORTER:  I'm sorry, I couldn't

       20    hear you.

       21           Q.      And it's a document that's with the system

       22    or in the system?

       23           A.      Yes.

       24           Q.      If you take a look at Exhibit 3, this is

       25    the exhibit that shows you're not going to be on

                                                                    83

1   Comedy Central any time soon.  Do you recall that?

 2       A.    I do.

 3       Q.    So, again, they were giving you information

 4   about who had time off approved and were asking you to

 5   document it so they wouldn't be soft booked.  Do I

 6   have that right?

 7       A.    Yes, sir.

 8       Q.    Take a look at Exhibit 2.  This concerns an

 9   AIS tech by the name Yair, I believe his name is,

10   Y-A-I-R?

11       A.    Yes.

12       Q.    And again, am I correct in understanding

13   Exhibit 2 is a request from AIS to DTV simply to show

14   that somebody is unavailable on a certain date?

15       A.    Correct.

16           MR. KELLY:  And I don't have anything else.

17           MR. MILLER:  So, as we discussed before we

18   went on the record, we're going to waive the notary

19   requirement and you guys will have two weeks to review

20   once you get the transcript.

21           MR. KELLY:  So stipulated.  Madam reporter,

22   counsel and I are friends here, that we've been living

23   together for the last couple of weeks.  So there are

24   stipulations in prior volumes.  We have another

25   deposition set for tomorrow in this room.

                                                        84

**EXHIBIT I**

1          Will you be our reporter for tomorrow?

2          THE COURT REPORTER:  Yes.

3          MR. KELLY:  Then we'll agree to the same

4 stip.

5          MR. MILLER:  Those same two stipulations

6 that we just discussed?

7          MR. KELLY:  Yes.

8          MR. MILLER:  That's fine.  Thank you for

9 your time.  Appreciate it very much.

10          (Deposition concluded at 11:17 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

85

**EXHIBIT I**

```
 1                    D E C L A R A T I O N

 2

 3

 4

 5          I declare under penalty of perjury that I

 6   have read my within deposition, and the same is true

 7   and accurate, save and except for changes and/or

 8   corrections, if any, as indicated by me on the

 9   correction sheet hereof.

10

11          Dated this _____day of _____,

12   2015.

13

14                                 _____

15                                 JOSHUA GUTTORMSEN

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT I**

```
 1               C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON      )

 4                            ) ss.

 5   COUNTY OF KING           )

 6

 7         I, the undersigned Washington Certified Court

 8   Reporter, pursuant to RCW 5.28.010, authorized to

 9   administer oaths and affirmations in and for the State

10   of Washington, do hereby certify:

11         That the annexed and foregoing deposition

12   consisting of Page 1 through 85 was taken

13   stenographically before me and reduced to a typed

14   format under my direction;

15         I further certify that according to CR 30(e) the

16   witness was given the opportunity to examine, read and

17   sign after the same was transcribed, unless indicated

18   in the record that the review was waived;

19         I further certify that all objections made at the

20   time of said examination to my qualifications or the

21   manner of taking the deposition, or to the conduct of

22   any party, have been noted by me upon said deposition;

23         I further certify that I am not a relative or

24   employee of any such attorney or counsel, and that I

25   am not financially interested in said action or the
```

87

**EXHIBIT I**

1  outcome thereof;

 2      I further certify that the witness before

 3  examination was by me duly sworn to testify to the

 4  truth, the whole truth and nothing but the truth;

 5      I further certify that the deposition, as

 6  transcribed, is a full, true and correct transcript of

 7  the testimony, including questions and answers, and

 8  all objections, motions, and exceptions of counsel

 9  made and taken at the time of foregoing examination

10  and was prepared pursuant to Washington Administrative

11  Code 308-14-135, the transcript preparation format

12  guideline;

13      I further certify that I am sealing the

14  deposition in an envelope with the title of the above

15  cause and the name of the witness visible, and I am

16  delivering the same to the appropriate authority;

17

18      IN WITNESS WHEREOF, I have hereunto set my hand,

19  and affixed my official seal this 9th day of

20  February 2015.

21                    _____

22                    Certified Court Reporter No. 2498

23                    in and for the State of

24                    Washington, residing at Shoreline,

25                    Washington.

                                                       88

**EXHIBIT I**

```
 1   ERRATA SHEET FOR THE DEPOSITION OF JOSHUA GUTTORMSEN
     DATE TAKEN: JANUARY 28, 2015
 2   PAGE    LINE    CORRECTION

 3   _____   _____   _____

 4   _____   _____   _____

 5   _____   _____   _____

 6   _____   _____   _____

 7   _____   _____   _____

 8   _____   _____   _____

 9   _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25   DEPONENT'S SIGNATURE_____DATE_____

                                                          89
```

**EXHIBIT I**