1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF WASHINGTON
2              AT SEATTLE

3  THOMAS PEREZ, Secretary      )
   of Labor, United States      )
4  Department of Labor,         )  Case Number:
                                )  2:12-cv-01406
5              Plaintiff,        )
                                )
6  v.                           )
                                )
7  LANTERN LIGHT                )
   CORPORATION, d/b/a           )
8  ADVANCED INFORMATION         )
   SYSTEMS,a corporation;       )
9  DIRECTV LLC, a limited       )
   liability company; and       )
10 RAMON MARTINEZ, an           )
   individual,                  )
11                              )
               Defendants.      )
12 _____)

13              DEPOSITION OF

14              DAVID BAKER

15            January 22, 2015

16

17         PURSUANT TO NOTICE, the deposition of DAVID

18  BAKER, called for examination by the Plaintiff, was

19  taken at 1244 Speer Boulevard, Second-Floor Conference

20  Room, Denver, Colorado, commencing at the hour of

21  10:36 a.m., January 22, 2015, before Carla D. Capritta,

22  Registered Professional Reporter and Notary Public in

23  and for the State of Colorado.

24

25  JOB No. 150122CAC

                                                         1

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4        JOSEPH M. LAKE, ESQ.
          U.S. Department of Labor
 5        90 7th Street, Suite 3-700
          San Francisco, California  94103

 6

      JEREMIAH MILLER, ESQ.
 7        U.S. Department of Labor
          300 Fifth Avenue, Suite 1120
 8        Seattle, Washington 98104-2397

 9

      FOR THE DEFENDANTS:
10
          JOEL P. KELLY, ESQ.
11        Jackson Lewis, P.C.
          725 South Figueroa Street, Suite 2500
12        Los Angeles, California  90017

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                     2
```

**EXHIBIT K**

```
 1                    I N D E X
 2   EXAMINATION                                    PAGE
 3   By Mr. Lake                                       4
 4   By Mr. Kelly                                     --
 5
 6
 7                 PLAINTIFF'S EXHIBITS
 8   NO.   DESCRIPTION                              PAGE
 9    1 - Standard Professional Installation Guides   22
10    2 - Dynamic Dispatcher FS Scheduler             23
11    3 - Services Provider Agreement dated August 3rd,  27
          2009
12
      4 - Declaration Of David Baker                  28
13
      5 - Time & Motion Study                         34
14
      6 - DIRECTV Required Training                   41
15         Phone Lines, Tech Success, Cool Tools &
           RIO August 2009
16
      7 - December 2014 Video of the Month            45
17         Technician Exercise
18    8 - DIRECTV Field Operations Training           46
           Signature & Test Form
19
      9 - Ethics Acknowledgment via Handheld Device   48
20
     10 - E-mail chain                                49
21
22
23
24
25
                                                       3
```

**EXHIBIT K**

DAVID BAKER,

called as a witness herein, having been first duly

sworn, was examined and testified as follows:

                              EXAMINATION

BY MR. LAKE:

        Q.    Good morning, Mr. Baker.

        A.    Yeah.

        Q.    For the record, my name is Joseph Lake.  I'm

the attorney with the U.S. Department of Labor.  We'll

be taking your deposition today.

        A.    Okay.

        Q.    Before we get started, I just want to put on

the record the Department's position that we are

reserving the right -- we just received a lot of

documents and e-mails last week from DIRECTV.

              If, for some reason, in there, we see things

that we want to go back and ask you questions about,

we're just putting on the record that we reserve the

right to attempt to take -- continue your deposition to

another day.

              But that being said, have you had your

deposition taken before?

        A.    Yes.

        Q.    Okay.  Well, even though you're -- you have

experience with being in depositions, I'm just going to

                                                          4

**EXHIBIT K**

go over a few basic ground rules, to make sure that we

can get through this and take the deposition properly.

You've been sworn in by the court reporter,

so you are under oath.  It's the same as if you were

testifying in court.  Do you understand that?

A.    Yes.

Q.    Okay.  And in general, when I ask questions,

you'll need to make an oral response, instead of just

nodding your head or anything like that, just so the

court reporter can write down a verbal response, okay?

A.    Okay.

Q.    When I'm asking the questions and when you're

also answering, let's make sure to wait until each other

is finished.  So until I'm finished asking the question,

don't start answering, even if you think you know what

I'm going to -- where I'm going with the question.  That

way, we won't be talking over each other on the

transcript.

Also, your attorney may object, at various

points during the deposition today, to questions that I

ask.  Unless your attorney instructs you not to answer

the question, you still have to answer.  And if, you

know, for some reason, you don't remember, we can have

the court reporter read back the question.

In general, in your deposition, you're

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

**EXHIBIT K**

1  required to give the knowledge that you have about any
2  of the questions I have, your personal knowledge.  What
3  that means is, if you don't know the answer to
4  something, saying "I don't know" is an acceptable
5  answer.
6          But I'm entitled to the knowledge that you
7  have throughout the deposition.  So if, for some reason,
8  later in the deposition, you remember additional
9  information to a question that I brought up earlier,
10 maybe something triggers additional information, then
11 you have to give -- you have to let me know, and we can
12 go back and you can provide that additional information,
13 okay?
14      A.   Okay.
15          MR. KELLY:  Object, it's argumentative.
16 There's no ongoing obligation to respond to questions
17 asked an hour or two hours earlier.  You can continue.
18      Q.   (By Mr. Lake)  Do you -- okay.  The next
19 instruction is about, I guess, the difference between a
20 guess and an estimate.  And so during your deposition,
21 if you can provide an estimate, an approximation, even
22 if you don't have an exact number, then you should
23 provide an estimate.
24          Now, when I say what the difference is between
25 an estimate and a guess, an estimate would mean, you

6

**EXHIBIT K**

know:  You've been outside today.  What, approximately,
do you think the temperature is?  Where a guess would
be, what is the -- what is the weather right now in Cabo
San Lucas, or something like that, something based on a
vague --

          MR. KELLY:  Nicer than it is here, probably.

     Q.   (By Mr. Lake)  So do you kind of understand
what I mean between the difference between an estimate
and a guess?

     A.   I think so.

     Q.   Okay.

          MR. KELLY:  One is based on your personal
knowledge, you've seen it, you've experienced it; one,
you haven't.

     Q.   (By Mr. Lake)  And if at any point you don't
understand the questions that I'm asking, please let me
know.  Because if you don't say anything, then I'll
assume that you understand the questions and that your
answer is the answer to my question.

          And so it's perfectly okay to let me know you
didn't understand the question.  I'll either try to
rephrase or explain a little further about what I mean,
okay?

     A.   Okay.

     Q.   Now, what is your current position?

                                                    7

**EXHIBIT K**

1    A.    I'm a senior vice president of field services

2  at DIRECTV.

3    Q.    Okay.  And how long have you been in this

4  position?

5    A.    Since, oh, almost seven years.

6    Q.    So since approximately 2008?

7    A.    March 31st of 2008.

8    Q.    Okay.  And my next series of questions is just

9  kind of understanding what the structure is between --

10  from your position to the people who are -- who actually

11  directly communicate with the defendants in this case,

12  Lantern Light Corp- -- the other defendant, Lantern

13  Light Corporation, also known as AIS.

14        So what would be the line of the structure

15  from DIRECTV, from you, all the way down to the Lantern

16  Light Corporation, who I'm going to refer to as AIS in

17  this case?

18        MR. KELLY:  No foundation, calls for

19  speculation.  You can answer.

20    A.    Let's see.  The -- the -- that sort of

21  contractual relationship, I believe, is normally managed

22  at either the site or regional level, a site being a

23  specific location that has probably twenty to a hundred

24  and twenty technicians in it, a specific office.  Or it

25  may be managed at the regional level, which would be --

**EXHIBIT K**

1  so between me and them, there'd be the regional vice

2  president, regional director of operations, and

3  potentially a site manager.

4          Depending on a region, there could be

5  another -- there could be an area manager between the

6  regional director of operations and the site manager.

7      Q.   (By Mr. Lake)  And do you know who the

8  regional vice president is, who's in -- currently who's

9  in charge of the Seattle area?

10     A.   Yes.

11     Q.   And who is that?

12     A.   Steve Crawford.

13     Q.   And how long has Mr. Crawford been in that

14 position?

15     A.   Since approximately July of 2008.

16     Q.   Do you know who the current regional director

17 of operations is, in charge of the Seattle area?

18     A.   Yes.

19     Q.   And who is that?

20     A.   Marc Mastin, M-a-r-c.

21     Q.   M-a-s-t-i-n?

22     A.   M-a-s-t-i-n.

23     Q.   How long has Mr. Mastin been the regional

24 director of operations?

25     A.   Approximately six months.

9

**EXHIBIT K**

1    Q.   Before Mr. Mastin, do you know who the
2    regional director of operations was, in charge of the
3    Seattle area?
4    A.   I'm sorry, I'm trying to recall.  I know it
5    was Chris King back in -- when we started in 2008.  And
6    I don't -- I believe -- I don't recall if there was
7    someone in between.  I'm trying to recall who it was.
8    Q.   Do you recall approximately when Mr. King
9    stopped as the regional director of operations for the
10   Seattle area?
11   A.   Twelve to 18 months ago.
12   Q.   So there was someone between Mr. King and
13   Mr. Mastin, but just right now you don't -- you don't
14   recall that person's name?
15   A.   I believe that's right.
16   Q.   Okay.  Do you know who the -- or if there is
17   an area manager in the Seattle area?
18   A.   I don't believe there is.
19   Q.   Do you know who the site manager is for the
20   Seattle area?
21   A.   I'm sorry, I'm drawing a blank on his name at
22   the moment.  That one may come to me.
23   Q.   Okay.  In your role can you -- and I assume
24   your role has many responsibilities, but can you give a
25   brief overview of what you do as the senior vice

                                                         10

```
 1  president for field services?

 2      A.   Yeah, I'm sorry, I need to back up.  Marc

 3  Mastin is not the current.  He was recently reassigned

 4  to northern California.  There's a different RDO there

 5  now.

 6      Q.   Okay.

 7      A.   Who was the previous site manager for Seattle.

 8      Q.   Who's that person's name?

 9      A.   I'm sorry, I'm drawing a blank.

10      Q.   Okay.

11      A.   But Mr. Mastin was reassigned something in the

12  last six months, to northern California.

13      Q.   So going back to my previous question, can you

14  please --

15      A.   Somewhere up there.

16      Q.   -- please provide an overview of your job.

17      A.   Sure.  So I'm responsible for all the

18  installation, upgrade, maintenance repair of DIRECTV

19  systems in the 50 United States.

20      Q.   So responsible for having the installations

21  completed?

22      A.   Correct.

23      Q.   DIRECTV has in-house individuals who perform

24  installations, correct?

25      A.   Yes.
```

11

**EXHIBIT K**

```
 1        Q.   But also uses contractors like, in this case,

 2   AIS?

 3        A.   Yes.

 4        Q.   There's also another outside entity that they

 5   use, called home service providers?

 6        A.   Correct.

 7        Q.   Okay.  Now, what is a home service provider?

 8        A.   It's a -- an entity that has an assigned

 9   territory that is -- does substantially the same things

10   that the in-house, or Owned & Operated, people do, but

11   within a defined territory.

12        Q.   Do they do upgrades and service calls as well?

13        A.   They do.

14        Q.   How do you decide, or how does DIRECTV decide,

15   whether to give territory -- or assign territory to an

16   HSP or have in-house people do it?

17             MR. KELLY:  Objection on relevance grounds.

18   There is no HSP in this case.  It's irrelevant, Counsel.

19   There's a direct relationship, as far as you're

20   concerned, between AIS and DIRECTV.  We're here to talk

21   about the case, not to fish.

22        A.   The --

23             MR. KELLY:  There is an objection, a relevance

24   objection.

25             MR. LAKE:  Right.  And I noted -- I mean, it's
```

                                                        12

```
 1  been noted for the record.  Are you instructing the
 2  witness not to answer?
 3              MR. KELLY:  I'd like an answer to my question.
 4  This has nothing to do with the case.
 5              MR. LAKE:  I mean, this is background in
 6  understanding the structure.  And actually, looking at
 7  the documents that you provided last week, it looks like
 8  Lumin, the predecessor to AIS, was working through an
 9  HSP, Ironwood, so that -- we don't know exactly what the
10  time periods are, because we just got the documents last
11  week, but there was an HSP potentially involved in this
12  case.
13              MR. KELLY:  That all was prior to the time
14  period in this case.  Because the contract at issue here
15  was executed in 2008, it was assigned in 2009, and
16  there's no HSP arrangement at any time at issue in the
17  statute of limitations.
18              MR. LAKE:  Looking at the contract, which is
19  in front of me, it's actually assigned in 2009, which --
20              MR. KELLY:  I just said that.
21              MR. LAKE:  You said "2008."  But the question
22  is whether you're instructing the witness not to answer,
23  because this is just background questioning, and we're
24  trying to understand the structure of where AIS fits
25  into the role.  That's what we're looking at.  And I
```
                                                        13

**EXHIBIT K**

think you'll see that we'll be moving on from these

questions very quickly.  Or we can --

          MR. KELLY:  An HSP is an entity with an

assigned territory.  It does installs and maintenance.

What's your question, please?

          MR. LAKE:  What was my last question to him?

          MR. KELLY:  Um-hmm.

          MR. LAKE:  Can the court reporter please read

back my last question.

          (Last question read.)

     A.   The -- when I took this job in 2008, the -- it

was a hundred percent outsourced to 12 or 13 HSPs.  The

whole country was divided up.  DIRECTV, over the course

of 2008, terminated one, purchased one, and then took

over and then purchased assets of a third one as it

failed financially.

          So DIRECTV went from zero percent owned and

operated to approximately 35 percent owned and operated

during the course of 2008.  Subsequent decisions on --

on what was bought in-house had been based on the

entity -- on the HSP either failing or choosing to exit

the business.

     Q.   The defendant in this case, AIS, is not an

HSP?

     A.   Is not an HSP, correct.

                                                      14

1      Q.   Okay.  So what is --

2      A.   Has not been during the -- during my tenure.

3      Q.   Okay.  And so what is their -- what does

4  DIRECTV consider AIS to do?  What's their status then?

5      A.   They're a -- a contractor to the Owned &

6  Operated operations.

7      Q.   Why did DIRECTV make the decision to use this

8  contractor, AIS, rather than having it handled in-house?

9      A.   I have no idea.

10     Q.   Okay.  Who would be the -- who would know?

11     A.   Whoever entered into the agreement with them

12  in the Seattle area, wherever -- which is, as I

13  understand, where they operate.

14     Q.   Is AIS unique or does DIRECTV have other,

15  similar companies who are contractors for Owned &

16  Operated?

17     A.   There -- there are a number of others.

18     Q.   Why -- and why does DIRECTV use contractors

19  for their Owned & Operated operations?

20     A.   Two reasons; the most important is to deal

21  with fluctuations in the workload.  We prefer not to

22  have to hire and then laypeople off, and so we have a

23  very seasonal business, and so we rely heavily on

24  contractors to deal with the upswings in the business.

25  The second reason is, is economics; in some cases,

                                                      15

**EXHIBIT K**

```
 1  they're less expensive.

 2       Q.   The first reason is to deal with fluctuations

 3  in the workload.  Does that mean -- my understanding --

 4  and this isn't a question.  This is to get back to the

 5  other question.  My understanding is that AIS has

 6  employees who work full time.

 7            Now, does -- how does that correspond to the

 8  fluctuations in the workload, if their contractors have

 9  full-time employees?

10       A.   It's an interesting problem.  The -- in order

11  to maintain a relationship with a contractor, you have

12  to provide them some work, even when times are slow.

13  But they, for whatever reason, tend to be able to ramp

14  up more quickly than we can, hiring.

15       Q.   Approximately what percentage of DIRECTV's

16  work is done by contractors like AIS?

17       A.   Are you asking with regard to the Owned &

18  Operated or all of DIRECTV, including the HSPs?

19       Q.   I guess, can you -- can you break that up, as

20  in HSPs versus Owned & Operated versus contractors?

21       A.   The -- although it varies widely by the four

22  -- within the four Owned & Operated regions,

23  approximately 30 percent of the work is done by -- by

24  contractors, within Owned & Operated.

25            It's actually -- oh, wrong date.  It's
```

16

**EXHIBIT K**

1  actually approximately the same number for the HSPs, but

2  there's less variability between the areas or between

3  HSPs.

4      Q.   Now, AIS -- or, excuse me, do contractors

5  perform all the services of DIRECTV's in-house

6  technicians?

7      A.   Generally, no.

8      Q.   Okay.  Generally, what are the contractors

9  doing that the in-house -- or, excuse me, Owned &

10 Operated employees are doing?

11     A.   Very few of the contractors do service calls

12 or maintenance repair.  We're -- it's being done on a

13 limited test basis in a few areas right now, but

14 overwhelmingly, they do not.  They will do installs and

15 upgrades but not service repair.  They also typically do

16 not do specialty jobs like commercial jobs.

17     Q.   Approximately how -- what percentage of

18 installs are done by contractors?

19     A.   I guess it would be probably somewhere between

20 30 and 40 percent; more than 30 percent of the -- of the

21 total, so . . .

22     Q.   What about what upgrades, about the same?

23     A.   Yes.

24     Q.   Has that -- when you -- when you took over in

25 your position, in March 31st, 2008, was DIRECTV using

**EXHIBIT K**

1   contractors at that time?

2        A.   When I took over in March, there was -- I

3   believe there was a hundred percent outsource, so there

4   was no Owned & Operated.

5        Q.   Okay.  When did DIRECTV start using

6   contractors?

7        A.   I believe, in July of 2008, when we bought

8   180 Connect.  With that came -- that's when we entered

9   the owned-and-operated business, and with that came a

10  base of contractors that were already in place, doing --

11  doing work for them.

12       Q.   So is it fair to say that in July 2008, after

13  acquiring the first -- or having the first owned-and-

14  operated business open, at that time contractors were

15  not doing 30 to 40 percent of installs nationwide?

16       A.   The percentage would have been less than that.

17  At that time the HSP contract specified, I believe, no

18  more than 20 percent.  We relaxed that, subsequent to

19  that.  I'm not sure which year.  And I've not -- I have

20  not actually enforced the percentage for a while.

21       Q.   In the last two years, has the percentage of

22  installs and upgrades performed by contractors

23  increased, stayed the same, or decreased?

24       A.   I believe it's stayed the same, stayed

25  substantially the same.

                                                        18

**EXHIBIT K**

1    Q.    What about over the last three to four years?

2    A.    Well, it increased when we relaxed the -- the

3 contractual requirement.

4    Q.    Okay.

5    A.    So it went from -- it was probably above

6 20 percent of contractors, regardless of the contract.

7 That probably went upwards of 30 percent, and it's been

8 around 30 percent.  That's sort of an economical rule of

9 thumb for that right now.

10    Q.    And when was that?  When was the requirement

11 relaxed?

12    A.    About four years ago.

13    Q.    Do DIRECTV's HSPs also use contractors?

14    A.    Yes.

15    Q.    So the -- the 30- to 40-percent figure, of

16 installs and upgrades, does that include contractors

17 used by HSPs?

18    A.    Yes.

19    Q.    Then the remaining between 60 and 70 percent

20 is performed either by Owned & Operated entities or

21 HSPs?

22    A.    Correct.  One clarification:  There is a chunk

23 of the installations that's done by dealers, that has

24 nothing to do with my operations at all.  So when I'm

25 talking of the world, I'm talking about the stuff that I

19

**EXHIBIT K**

1  do, 20 percent of the installations, give or take, are

2  done by independent dealers, a network of thousands of

3  independent dealers that do their own fulfillment.

4      Q.   Do those independent dealers also go out and

5  solicit business as well?

6      A.   Yes.

7      Q.   Solicit customers?

8      A.   Yes.

9      Q.   So they're kind of a full-service stand-alone

10  operations that do the servicing -- do the servicing as

11  well?

12     A.   No.

13     Q.   Okay.

14     A.   They'll -- they'll do the sales and

15  installation.  They typically don't do upgrades, and

16  they very rarely do service.  They have -- very few of

17  them do service.  By "service," I mean repair and

18  maintenance.

19     Q.   When a customer orders DIRECTV services,

20  decides to subscribe, how does DIRECTV decide whether to

21  assign it to a contractor or a Owned & Operated

22  installer?  What's the decision-making process that goes

23  to it?

24     A.   The -- when the customer calls in, the -- the

25  appointment is -- is -- is assigned based on the

                                                          20

**EXHIBIT K**

available -- availability in that area or that region of the -- by Zip Code, in essence.

And we have a software system that -- that manages the -- where we manage the skill sets, to be sure the person has the right training to do whatever it is that's being requested, and has their -- their work schedules and what commitments have already been made. So it tries to look for the first available -- generally offers them the first available. If they don't take that, whatever appointment, they would choose out of what's available in that area.

The -- the available capacity in that area is for -- if it's an Owned & Operated area, would include the Owned & Operated technicians and whatever contract -- whatever -- whatever the contractors have agreed is available in that area.

So all of that capacity is out there, and the system assigns it based on customer preference and availability and skills.

Q. So the system could as easily assign it to a contractor or an in-house installer?

A. Yeah, it has -- it has no bias or preference with regard to that, to the best of my knowledge.

Q. The installers or the technicians who work for the Owned & Operated business of DIRECTV, are they

21

**EXHIBIT K**

1   DIRECTV employees?

2        A.    Yes.

3        Q.    Okay.  The installation guidelines that are

4   given to installers, whether or not they're -- do those

5   change, whether or not they are a contractor installer

6   or an Owned & Operated installer?

7        A.    No.  They're the same for Owned & Operated

8   subcontractors and HSPs.

9             MR. LAKE:  I'm going to mark this document as

10  Exhibit 1.

11            (Exhibit 1 marked.)

12       Q.    (By Mr. Lake)  And, Mr. Baker, I've presented

13  to you a document marked -- or titled the "Standard

14  Professional Installation Guidelines."

15            I'm not going to ask you to read through the

16  whole thing right now, but if you'd like to, you know,

17  just to skim through it or read through it as much as

18  you'd like, to get familiar with it.  I'm just going to

19  ask a couple background or higher level questions about

20  it.

21            These installation guidelines, are these --

22  did you have any role in putting these together?

23       A.    I approved them.

24       Q.    Are these the guidelines that have to be

25  followed by the installers, whether or not they're

                                                        22

**EXHIBIT K**

contractor or HSP or Owned & Operated?

    A.   Yes.

    Q.   So you are familiar with this document marked as Exhibit 1?

    A.   I am.  I don't know the current revision level or current revision date or whether this is the latest version.

    Q.   Right, right.  And that's -- but generally, these are the -- these guidelines, whether or not this is the most current version, there are guidelines that look like this, that are supposed to be followed?

    A.   Yes.

    Q.   Okay.  You can set the document aside.  That's all the questions I have about that one.

        MR. LAKE:  I'll mark this document as Exhibit 2.

        (Exhibit 2 marked.)

    Q.   (By Mr. Lake)  Are you familiar with the Dynamic Dispatcher FS Scheduler?

    A.   Yes.

    Q.   Is that the -- and this -- are you familiar with this, this document?  Have you seen this document before?

        And this is -- I'll represent, for the record, that this is only the table of contents and the

23

**EXHIBIT K**

```
 1  introduction, so -- but these portions that are in front

 2  of you, have you seen these before?

 3      A.   I don't recall specifically seeing it, but I

 4  probably have been provided a copy at some point.

 5      Q.   Okay.  I understand how that can go.  So the

 6  Dynamic Dispatcher, what is Dynamic Dispatcher, I guess,

 7  in a overview situation?

 8      A.   This is really the -- the routing engine that

 9  assigns -- it helps assign from technicians, from their

10  availability, to -- to route them to specific jobs on

11  each day.  So it's the thing that decides how far each

12  technician drives to each job.

13      Q.   Okay.  Is it currently being used by DIRECTV?

14      A.   Yes.

15      Q.   Okay.  Is it currently being used as well by

16  contractors of DIRECTV?

17      A.   I don't believe they have access to it.  It

18  impacts their -- their -- the assignment of their work,

19  however.

20      Q.   Can you explain a little more what you mean by

21  that?

22      A.   That -- what I just said may have been a

23  misstatement.  The -- it is used differently.  The Owned

24  & Operated technicians have -- are on a drip-feed basis,

25  so after each job, it decides where the next course --
```

                                                        24

next best job is to assign them.

Contractors are typically assigned on a batch
basis, which is, they get all the jobs for tomorrow, and
they -- they get those jobs done as best they can.  It
doesn't try to tell them which one to go to first.  It
tells them which one are a.m. or p.m.  But it doesn't
say:  You should go from here, to there, to there.

With my Owned & Operated technicians, it tells
them one job at a time:  When you're done with that one,
I'll tell you where your next one is.

Q.   All right.  So it updates in real time?

A.   Yes.

Q.   What is FS Scheduler?

A.   Field Services Scheduler.  This is the -- this
is the -- there is Dynamic Dispatch, also known as
Click, is the actual provider of the software.

Q.   So is -- Dynamic Dispatcher is then the
company that provides the FS Scheduler?

A.   Click is the that company provides it.
They're the -- the owners of the software.

Q.   Okay.  And what's the -- what's the difference
then, I guess, between --

A.   Dynamic Dispatch is what I refer to as drip
feed, which is the -- the real time adjustments to the
schedule.

                                                       25

**EXHIBIT K**

1    Q.   And then what's FS Scheduler?

2    A.   That's a generic term that our lawyers told us

3 we could use to call the thing, because we weren't

4 supposed to call it Click because that's someone else's

5 brand name, and someone didn't like the name "Dynamic

6 Dispatcher."

7    Q.   Okay.  So do the -- do the contractors then

8 use FS Scheduler?  And I guess maybe I'm mis- -- I'm

9 misstating what -- that these are different things.

10    A.   Their work is in the system but is assigned,

11 again, on a batch basis, daily, as opposed to job by

12 job.

13    Q.   Okay.

14    A.   I don't think any of the contractors are on

15 drip feed today.  There may be one or two, but I'm not

16 aware of any that are.

17    Q.   How does -- how do the Owned & Operated

18 businesses find contractors?

19    A.   I don't know.

20    Q.   Okay.  Who in the structure would be the

21 people who might be the best ones to talk to about that?

22    A.   The -- the site manager or RDO are probably

23 the most knowledgeable.

24          THE REPORTER:  REO or --

25          THE DEPONENT:  RDO, regional director of

26

**EXHIBIT K**

```
 1   operations.
 2        Q.   (By Mr. Lake)  Okay.  You can set aside
 3   Exhibit 2 as well.
 4             MR. LAKE:  This is the service provider
 5   agreement, that I'll mark as Exhibit 3.
 6             (Exhibit 3 marked.)
 7        Q.   (By Mr. Lake)  This document's been --
 8             MR. KELLY:  Just for the record, this is an
 9   agreement with Lumin, dated August 3, '09.
10        Q.   (By Mr. Lake)  Yeah, this document has been
11   marked DTV 283 to 324.  If you could turn to Page 321 of
12   it, which is, I guess, the fourth-to-the-last page.  Or,
13   excuse me, 322.
14             MR. KELLY:  Okay.
15        Q.   (By Mr. Lake)  Third-to-the-last page.
16             MR. KELLY:  That's the first amendment?
17             MR. LAKE:  Right.
18             MR. KELLY:  Okay.
19        Q.   (By Mr. Lake)  Well, actually go to Page 324.
20   I want to ask about.  Is that your signature on
21   Page 324?
22        A.   It is.
23        Q.   All right.  Now, you filed a declaration in
24   this case.  Do you recall signing a declaration?
25        A.   I do.
```

27

```
 1              MR. LAKE:  Okay.  I'll mark a copy of that as
 2    Exhibit 4.
 3              (Exhibit 4 marked.)
 4         Q.   (By Mr. Lake)  If you could turn to
 5    Paragraph 3 of your --
 6         A.   Yes.
 7         Q.   -- declaration.
 8              MR. KELLY:  Give me one quick second, Counsel,
 9    please.  Proceed.
10         Q.   (By Mr. Lake)  In the first sentence of
11    Paragraph 3, you state that you signed provider
12    agreements with DIRECTV and turned into a contractor
13    solely as a means of oversight.  Do you see that?
14         A.   Yes.
15         Q.   Can you explain a little bit more about what
16    the oversight function was that you were performing when
17    you signed this contract, Page 3 -- Page 324, the
18    amendment?
19         A.   Well, first, I don't recall specifically
20    signing this agreement or this amendment.
21         Q.   Okay.
22         A.   I signed a great many documents during that
23    period of time.  Because I was -- did not come from a
24    field services background, when I took the job, I was --
25    after we bought 180 Connect, I was trying to understand
```

                                                          28

**EXHIBIT K**

what we were doing, what commitments we were making.
And so I believe I essentially requested that contracts
be routed to me for signature, so that I could look at
them and try to gain an understanding of what we were
doing.

Q.   Okay.

A.   So this was part of my learning my new job.

Q.   So you would -- you would read over the
agreements?

A.   Usually.  I don't swear that I've read every
word of every one of them.

Q.   Right.

A.   But typically, yes.

Q.   Okay.  If you could turn to the first page of
Exhibit 3, which is marked 283.  Do you see, at the top,
that it's dated August 3rd, 2009?

A.   Yes.

MR. KELLY:  What page again, please?

MR. LAKE:  The first page.

MR. KELLY:  Okay.  Sure, thank you.

A.   I do.

Q.   (By Mr. Lake)  So at that time, you were
reviewing the agreements?

A.   Yes.

Q.   Okay.  So but I assume, at this -- sitting

**EXHIBIT K**

1 here today, you can't specifically remember reviewing
2 this agreement.
3     A.    No.
4     Q.    Okay.  When you were reviewing the agreements
5 during this period of time that you identified in your
6 declaration as --
7     A.    Um-hmm.
8     Q.    -- 2008 to 2009 and part of 2010, did you at
9 any time request any changes be made to any agreements?
10     A.    Not that I recall.
11     Q.    Okay.  Do you know who drafted the service
12 provider agreements that DIRECTV used?
13     A.    I don't know for certainty.
14     Q.    Okay.  Which area -- or which position was
15 responsible for actually either negotiating or drafting
16 this agreement?
17     A.    My understanding is, the legal, the legal
18 department.  And if I had questions, that's certainly
19 who I would contact about it.
20     Q.    Now, but if the legal department had
21 questions about the day-to-day operations that needed to
22 be captured in this agreement, who would they talk to?
23     A.    Probably the site manager or RDO.  Probably
24 RDO or -- or a regional vice president.  Site managers
25 typically don't -- they try not to call legal

                                                    30

1  department.

2      Q.   If you could turn to Page -- let's see.

3      A.   Let me -- let me clarify something.  With

4  180 Connect, we inherited the form of agreements that

5  existed at that time.

6      Q.   Um-hmm.

7      A.   I believe that, by this time, they had been

8  somewhat modified by the DIRECTV legal department.  I

9  have no idea what the modifications were or why.

10      Q.   Right.  And --

11      A.   I accepted them.  I worked for that.  Legal

12  signed off on them.  That's what I was more accurate

13  about.

14      Q.   The original contracts that were formed with

15  180 Connect or with the HSPs, who was the -- who were

16  the folks in DIRECTV who were deciding what to put in

17  that contract?

18      A.   Like I said, when we bought 180 Connect, we

19  bought it in the -- we bought the entity, so that means

20  we bought all, including all of its contractual

21  relationships.  As things were renewed, they were

22  renewed by the legal department in Denver, primarily Jan

23  Farrell, since he's the only lawyer assigned to Denver,

24  assigned to operations full time.

25      Q.   I guess my question is, with these service

                                                        31

**EXHIBIT K**

1    agreements with the contractors.

2        A.    Um-hmm.

3        Q.    Presumably Jan Farrell didn't -- doesn't have

4    or the legal department doesn't necessarily have the

5    field background or the operations background to know,

6    you know, what kind of terms to put in here.  So who

7    would be the folks that the legal department works with

8    at DIRECTV to decide what to put into these agreements?

9        A.    Again, the -- because they're starting from

10   existing contracts, there would be changes, and that

11   would be typically the -- whatever bubbled up through

12   our regional vice presidents, to say we need to change

13   this or we needed to make changes.  The finance

14   organization might recommend changes.

15       Q.    Yeah.

16       A.    They're more typically involved more in the

17   rate development, but they recommended some of the

18   changes in payment terms and things like that.

19       Q.    Can you explain a little more what you mean by

20   you're more involved in the rate development?  You mean

21   the field operation, what the field operation is?

22       A.    Yes, yeah.

23       Q.    What does that mean?  What's the role, the

24   rate development that you're talking about?

25       A.    There are a number -- there's several

                                                          32

1 different rate structures, depending on part of the
2 country and demands and so on, for the contractors.
3        I don't know -- we refer to them as rate
4 cards.  I don't know, there's probably between five and
5 ten, which the local operating management worked with
6 finance to come up with what those rates were and which
7 was the applicable ones for any particular contractor.
8      Q.   So that was the local operations department
9 and the finance department would be --
10     A.   Yes.
11     Q.   -- typically the -- the two parts of DIRECTV
12 that would come to decide on what a rate card would be?
13     A.   Yes.  I believe finance maintains what the
14 rate cards were, and then it was a budgetary negotiation
15 as to which was the applicable one, where the operator
16 would say, "Gee, I want to use the higher rate card."
17 "Well, then you got to find the money for it," that kind
18 of a discussion.
19     Q.   Okay.  Now, how does -- I guess, with the rate
20 cards, I assume -- well, maybe you can explain.  Along
21 besides the geographic considerations, how does DIRECTV
22 determine what to charge -- or what to pay a contractor
23 for an installation, for example?
24     A.   It's -- again, it's a negotiation.  If we can
25 get the people we want, at a lower rate, we do that; if

                                                        33

```
 1  not, we move to a higher rate card to get more -- if we

 2  need more help from a company.

 3      Q.    But how does DIRECTV decide what number to put

 4  in the rate card initially?

 5      A.    That would be a finance question.  I don't

 6  know.

 7      Q.    Okay.  Is there any consideration given to how

 8  much time a specific task is going to take?

 9      A.    Of course.

10      Q.    Okay.  Are you aware of time-and-motion

11  studies that have been done by DIRECTV?

12      A.    Yes.

13      Q.    Okay.  Does DIRECTV make changes based on what

14  they learn in the time-and-motion studies in the rate

15  cards?

16      A.    Yes.

17      Q.    I'll actually have you take a look at a time-

18  and-motion study that was provided.

19          MR. LAKE:  We're on Exhibit 5.

20          (Exhibit 5 marked.)

21      A.    Thank you.

22      Q.    (By Mr. Lake)  Are you familiar with this

23  document?  Have you seen that before?

24      A.    Yes.

25      Q.    Can you turn to Page 14 of the document.
```

                                                        34

**EXHIBIT K**

1      A.    Um-hmm.

2      Q.    In the box, on the top left, the study found

3 that, on average, actual installation time exceeded

4 planned time by 31 minutes.  Do you see that?

5      A.    Yes.

6      Q.    Do you recall learning that information in

7 either -- in 2013?

8      A.    I do.

9      Q.    Okay.  Did DIRECTV make any changes based on

10 learning this information?

11      A.    Yes.

12      Q.    What were those?

13      A.    The -- the changes, the -- the focus here was

14 more on the -- how to make the FS Scheduler system work

15 better.

16            What we found was, the -- the durations that

17 we were using to plan the jobs were shorter than they

18 were actually running, and there was -- most everything

19 about sort of the history of the industry, and all that,

20 causes you to want to be optimistic.  You don't want

21 to -- you don't want to have extra time in the schedule,

22 and so you tend to be very optimistic on the

23 installation time.

24            FS Scheduler actually wants you to be

25 accurate, as opposed to optimistic.  And so we are

                                                        35

1  trying to make the scheduling system work more
2  efficiently and also show up on time for customers more
3  frequently.
4          There was -- I don't -- this was -- I don't
5  believe -- I don't recall if there were any financial
6  changes made, in terms of the rates that were paid based
7  on this.  This was -- this was -- that was considered,
8  but I think we felt like we were -- the rates that were
9  being paid were adequate at that time.  There may have
10 been some adjustments.  I don't specifically recall.
11     Q.   Okay.
12     A.   But this was focused primarily on making the
13 scheduling system work better.
14     Q.   So you don't recall the amount DIRECTV paid
15 contractors for installations being increased as a
16 result of this study?
17     A.   Yes.  Or anyone else, for that matter.
18     Q.   Who else would it be?  Who do you mean by
19 "anyone else"?
20     A.   It could potentially affect what I paid my
21 employees or what I paid HSPs.
22     Q.   Are HSP installers paid hourly or on a piece
23 rate?
24     A.   The overwhelming majority are paid on a
25 commission basis.  That's not hourly.

                                                    36

1    Q.    Okay.    What about DIRECTV's Owned & Operated

2    employees?

3    A.    Again, the vast majority are paid on a

4    commission basis.    Owned & Operated has a few more

5    hourly employees that do service calls because of the

6    model that we attempted for that a couple years ago.

7    The HSP's resisted that changes, to say it nicely.

8    Q.    So the only installers who are paid hourly are

9    the ones who do service calls?

10    A.    Not quite, that's not exactly accurate.    There

11    were about ten sites from one company we -- we bought

12    the assets of in the southeast, that were hourly when we

13    bought them; and they have maintained the primarily

14    hourly base, although a number of them have converted to

15    a commission basis voluntarily, conditional employees

16    have converted.

17    Q.    So other than that specific example?

18    A.    So that and service technicians.    There are a

19    number of service technicians we use for hourly, in an

20    attempt to improve sort of the service quality.    Because

21    we had too many repeat service calls, where we fixed

22    something and had to go back and fix it again.

23            Concern was, people were trying to cut

24    corners.    We wanted them to take the time to do it -- do

25    it right the first time.

                                                         37

**EXHIBIT K**

1     Q.   If you could turn back to -- you can set aside

2  Exhibit 5 now.  I think that should be all my questions

3  on that.

4     A.   Um-hmm.

5     Q.   If you could turn back to the contract,

6  though, the service provider agreement that's been

7  marked previously as Exhibit 3.  If you could turn to

8  what looks like Page 14 of that.  It's marked as 296 on

9  the bottom.  Under the signature line for DIRECTV, it's

10 not signed by anybody, as you can see, right?

11    A.   Yes.

12    Q.   Would you normally, in August of 2009, have

13 been a person to sign these agreements?

14    A.   I think so.  I'm not certain.

15    Q.   Okay.

16    A.   The other person I know signed and then

17 brought them was Ed Balcerzak, who is CMVP of finance.

18 I think he was often that, alternate for many things.

19    Q.   Would it be just because you were unavailable,

20 or would there be any specific reason why he would sign

21 one, versus you signing one?

22    A.   Not that -- there was no -- not that -- not

23 that I recall.  During that time, he and I tried to do

24 things, administrative matters like that, as

25 interchangeably as we could.

                                                    38

EXHIBIT K

1    Q.   Was he also new to the position, relatively?

2    A.   No.

3    Q.   Oh, okay.

4    A.   He had been the top finance person at

5   180 Connect when we bought them, and he also had prior

6   history with DIRECTV, at DIRECTV Latin America, in the

7   early 2000s.

8        To complete the thought, I worked with him

9   there, so we knew each other.  So I knew him there.

10   Q.   At which place?

11   A.   DIRECTV Latin America.

12   Q.   Oh, okay.

13   A.   So he and I had worked together before this.

14   Q.   Were you at DIRECTV Latin America prior to

15  accepting your current position?

16   A.   Yes.  There were several other stops in

17  between, but, yes.

18   Q.   Oh, okay.  Do you recall any instance, during

19  the time -- well, let me back up to clarify.  So in your

20  declaration, you state that it was in 2000 -- through

21  part of 2010, you used service provider agreements.

22   A.   Yes.

23   Q.   What was the reason that you stopped doing

24  that?

25   A.   Volume.

                                                        39

1      Q.   Okay.

2      A.   I was -- I was trying to assign everything,

3   and it was -- I couldn't do it.  It was too much volume,

4   and I wasn't -- you know, it became overwhelming, and I

5   wasn't paying enough attention to any of them.  So I

6   said:  Okay, you all go back to what you're doing and

7   delegate it back to the -- to the regions.

8      Q.   Okay.  So now who signs service provider

9   agreements?

10     A.   Either a regional director of operations or

11  regional vice president, typically.  I'm not even sure

12  which.  What I know is that I don't.

13     Q.   And during the time period that you were

14  reviewing the agreements, did you -- were there any

15  instances where you recall there having to be any

16  negotiation between DIRECTV and the service provider,

17  regarding any of the terms in the contracts?

18     A.   No.  By the time I saw them, things had

19  already been settled; it was really just an approval.

20     Q.   So who would be the one directly working with

21  a contractor to negotiate the terms of the contract?

22     A.   Either, you know, site manager, area manager,

23  or regional director of operations.

24     Q.   Okay.  Okay.  I think you can set aside

25  Exhibit 3.  The other exhibits for now --

                                                        40

1    A.   Okay.

2    Q.   -- as well.  DIRECTV requires installation

3  technicians to complete training, on an ongoing basis?

4    A.   I'm not sure "ongoing" is an accurate

5  description, but it's a yes, generally.

6    Q.   On a periodic basis?

7    A.   Yes.

8    Q.   As the need comes up?

9    A.   Yes.

10    Q.   Okay.  So if there's, you know, new features

11  or new products or anything like that?

12    A.   Yes.  We typically don't require repeat

13  training, that they've already had, unless there's some

14  other circumstances that suggest a need for it.

15         MR. LAKE:  I'll mark this document as

16  Exhibit 6.

17         (Exhibit 6 marked.)

18    Q.   (By Mr. Lake)  Is Exhibit 6 an example of --

19  well, actually, first, are -- are you familiar with this

20  specific document, Exhibit 6?

21    A.   I don't recall having seen it, although,

22  again, I probably was provided a copy at some point.

23    Q.   Okay.  But when DIRECTV has a training to

24  give, it practices to present or prepare these

25  facilitator guides?

                                                        41

**EXHIBIT K**

```
 1            MR. KELLY:  Training for whom?  Training for

 2    its employees?  Training for contractors?  Training for

 3    HSPs?  Training for whom?

 4            MR. LAKE:  Training for its installation

 5    technicians.

 6            MR. KELLY:  "Its" meaning?

 7            MR. LAKE:  DIRECTV's installation technicians.

 8    Are you asking -- I don't understand your question.

 9            MR. KELLY:  You have made -- in prior

10    questions, you've distinguished between O&O employees,

11    HSPs, and contractors.  I'm asking you to be more clear,

12    because your question's vague and ambiguous as stated.

13        Q.   (By Mr. Lake)  Okay.  Well, we can back up and

14    ask it this way:  Does DIRECTV require contractors to

15    complete training?

16        A.   Yes.

17        Q.   Does DIRECTV require HSPs to complete

18    training?

19        A.   Yes.

20        Q.   Does DIRECTV require its Owned & Operated

21    installation technicians to complete training?

22        A.   Yes.

23        Q.   Is there any difference in the trainings that

24    are given between the different categories, Owned &

25    Operated versus HSPs versus contractors?
```

42

**EXHIBIT K**

1          A.    The method of -- well, the delivery is
       2    different because we do not train other people's
       3    employees.
       4          Q.    Okay.
       5          A.    The DIRECTV trainers will do train-the-trainer
       6    for HSPs or contractors, if they request.  And we'll
       7    provide the materials in whatever form, be they video,
       8    computer-based, text, whatever.  The materials are
       9    provided at no charge, typically, to the HSPs or
      10    contractors, anyone that has a need.
      11          Q.    All right.
      12          A.    But we typically do not train other people's
      13    employees.
      14          Q.    Right.  But so, for example, if there was a
      15    training topic like the topic on Exhibit 6, you would
      16    provide the contractor with the materials like
      17    Exhibit 6, a facilitator's guide?
      18          A.    Correct.  And if the principal or their -- if
      19    they had a trainer or a trainer's principals that wanted
      20    to participate, we might make that -- might allow them
      21    to participate in something there.
      22          Q.    Okay.  Now, is -- any training that's provided
      23    to DIRECTV's Owned & Operated installers, does it also
      24    have to be completed by installation technicians who
      25    work for contractors?

                                                                   43

1      A.   Depends on what it is.

2      Q.   Okay.  Well, can you think of an example of

3 one that would have to be completed by Owned & Operated

4 installation technicians but not by contractor ones?

5      A.   Sure.  We had training on what we call

6 continuous improvement management system, which is like

7 lean manufacturing.  It's how we -- you know, it's just,

8 you know --

9           THE REPORTER:  I'm sorry, "it's just" --

10     A.   Continuous improvement management system,

11 which is a variation of lean manufacturing techniques,

12 where this is the -- so this is about how we manage the

13 operations.  We don't require them to complete that.

14     Q.   (By Mr. Lake)  Okay.

15     A.   Again, we make it available to them, but

16 they're not required to complete it.

17          If it has to do with a piece of hardware or

18 technology, they typically, if they're -- if they're --

19 if they're to have a skill set that says that they're

20 authorized to do that work, they have to complete that

21 training that says that they're certi- -- they're

22 capable of completing it.

23     Q.   So if a contractor performs installation or

24 upgrades, then any training related to installation or

25 upgrades that is completed by DIRECTV's Owned & Operated

                                                    44

1  installers would also have to be completed by the

2  contractor assigned?

3       A.    Yes.

4            MR. LAKE:   This document, I'll mark as

5  Exhibit 7.  It's a technician exercise.

6            (Exhibit 7 marked.)

7       Q.   (By Mr. Lake)  Now, Exhibit 7 I don't think

8  relates to the -- I don't think it relates to the same

9  topic as Exhibit 6, but so I'm just going to generally

10  ask you about the training exercises.

11           So if a contractor is required to complete a

12  training on a topic, are they also required to have

13  their technicians complete these exercises?

14      A.    I don't know.

15      Q.    Okay.  Do DIRECTV Owned & Operated installers

16  have to complete exercises after trainings?

17      A.    Apparently.  I -- I'm -- I don't -- I have not

18  seen this particular document.  Are -- this appears,

19  appears, to be a -- a -- one of the monthly updates of

20  just the informational update.  And this is a -- to be

21  sure, this is a:  Hey, did you see what -- did you

22  actually get what we were talking about?

23           This is not -- does not appear to be any form

24  of certification or anything like that.

25      Q.    In general, though, when Owned & Operated

45

**EXHIBIT K**

1    installation technicians have to complete a training --

 2         A.    Um-hmm.

 3         Q.    -- do they also have to complete an exercise

 4    to go with the training, to ensure that they learned the

 5    material?

 6         A.    Depends on whether there's any sort of

 7    certification that goes with it or not.  And as far as I

 8    know, I'm not -- not -- not my expertise, sorry.

 9         Q.    Okay.

10              MR. LAKE:  This document, I'll mark as

11    Exhibit 8.

12              (Exhibit 8 marked.)

13         Q.    (By Mr. Lake)  Have you seen a document like

14    Exhibit 8 before?

15              MR. KELLY:  One second, please.  Let him just

16    look at it.

17              MR. LAKE:  Yeah.

18              MR. KELLY:  Thank you.

19         A.    (Deponent examined exhibit).  Actually, no.

20         Q.    (By Mr. Lake)  Okay.  So looking at the top,

21    in the box at the very top, called "Training Manager,"

22    it states, "In partial fulfillment of your contractual

23    requirements with DIRECTV . . . this form serves as

24    proof of your training and testing.  After each training

25    session, have each field technician complete a line on

                                                        46

**EXHIBIT K**

1  this form."

2          Do you see that?

3      A.   I do.

4      Q.   Are you aware whether DIRECTV's contracts with

5  either HSPs or contractors requires them to complete

6  training and tests on that training?

7      A.   I do not.  I'm not aware.

8      Q.   If you could turn to the bottom of the

9  contract, above the signature lines.  It says, in bold,

10 "I understand that DIRECTV may at any time review the

11 signature sheet to verify compliance with the contract."

12         Do you see that?

13     A.   Yes.

14     Q.   Are you aware that DIRECTV has the authority,

15 in its contracts with either contractors or HSPs, to

16 review training completion forms like Exhibit 8?

17     A.   No.

18     Q.   Okay.  Are you aware if contractors will hire

19 technicians as either employees or independent

20 contractors?

21     A.   I'm aware that they may be either, yes.

22     Q.   Does DIRECTV treat an installer who works for

23 a contractor any differently if that installer is an

24 employee or independent contractor of the contractor?

25     A.   Not to my knowledge.

                                                    47

**EXHIBIT K**

1      Q.   Okay.

2           MR. LAKE:  This document will be marked as

3  Exhibit 9, I think.

4           (Exhibit 9 marked.)

5      Q.   (By Mr. Lake)  In the -- or on the second line

6  of Exhibit 9, there is reference to a company-required

7  ethics course.  Do you see that?

8      A.   I do.

9      Q.   Are you familiar with an ethics course that's

10  required by DIRECTV?

11      A.   I'm aware of one that's required for

12  employees.

13      Q.   Okay.  Are you aware if employees -- or,

14  excuse me, installation technicians for either HSPs or

15  contractors also have to complete this ethics course?

16      A.   I do not know.

17      Q.   Okay.  Is the ethics course required to be

18  completed by all DIRECTV employees?

19      A.   Yes.

20      Q.   Including the installation technicians?

21      A.   Yes.

22      Q.   Okay.  What kind of topics are covered in it?

23      A.   I don't know.  I know it's just being done

24  right now for them, but I don't know.  But there --

25  there is a specific ethics training for them.

                                                    48

```
 1        Q.    That's just for the installation technicians?

 2        A.    I believe so, yeah.

 3        Q.    Okay.  Who are WTs?

 4        A.    WTs, yes, I'm sorry.

 5        Q.    Do you have any role in preparing the

 6   materials for that course?

 7        A.    I did not.  People who work for me did.

 8              MR. LAKE:  Okay.  This is an e-mail that will

 9   be marked as Exhibit 10.

10              (Exhibit 10 marked.)

11        Q.    (By Mr. Lake)  I guess it probably makes

12   sense, since it's an e-mail chain, to start at the

13   bottom.

14              MR. KELLY:  Let's just take two seconds and

15   read it before --

16              MR. LAKE:  That's what I was going to --

17              MR. KELLY:  -- we ask questions.

18              MR. LAKE:  Yeah, I was going to tell Mr. Baker

19   to start there.

20              MR. KELLY:  Thank you.

21        A.    The good news, I now recall the name of the

22   RDO for Seattle.

23        Q.    (By Mr. Lake)  Oh, okay.

24        A.    Billy Maez.

25              MR. KELLY:  M-a-e-z.
```

                                                                   49

**EXHIBIT K**

1       A.      M-a-e-z.  Billy was the site manager in
2  Lynnwood.  When Mastin got reassigned, Billy moved up.
3       Q.      (By Mr. Lake)  Do you know how long Mr. Maez
4  was the site manager in Lynnwood, how long he's been --
5       A.      A year and a half, maybe two years.  Year and
6  a half, something like that.
7       Q.      Do you recall when he became RDO,
8  approximately?
9       A.      About three or four months ago.
10      Q.      Do you know if he was with DIRECTV prior to
11 becoming site manager in Lynnwood?
12      A.      He was not.  He was with someone else.  I
13 don't recall.  I don't recall who.  Maybe Verizon.
14      Q.      That's okay.  Have you had a chance to look
15 over Exhibit 10?
16      A.      Yes.
17      Q.      Okay.  At the bottom is an e-mail from Chris
18 Phillips about weekly NPS reporting.  Do you know what
19 weekly NPS reporting is?
20      A.      I do.
21      Q.      Okay.  Can you explain what that is?
22      A.      Yes.  So the net promo- -- it's "net promoter
23 scores," what "NPS" stands for.  And that's sort of the
24 current -- you know, most -- many or most companies
25 these days use that as their primary measure of customer

                                                        50

**EXHIBIT K**

satisfaction.  It's considered broader or more -- a
simpler version of customer satisfaction.

          The concept is that you ask people:  On a
scale of 1 to 10, how likely are you to recommend this
company to your friends or family?  A 9 or a 10 is a
promoter, a 7 or 8 is a neutral, 6 or below is a
detractor.  Net promoter score, so they take the
promoters, minus the detractors, and that's the net
promoter score.

     Q.   Now, in the next e-mail in the chain, above
the original, it appears to be an e-mail from you to
Steven Crawford, wherein you state, "We gotta get you
across that 80 line."

          Do you see that?

     A.   Yes, sir.

     Q.   Do you have any reason to believe that that's
not an accurate e-mail, that anything in there is
incorrect?

     A.   I have no doubt that I said that.

     Q.   Okay.  And can you explain what you meant by
what you said in that e-mail?

     A.   Yes.  The -- his -- Steve Crawford's region
was the lowest in the -- of the four Owned & Operated
regions and also was lagging behind the HSPs in terms of
net promoter score.  The goal for 2014 was to get to 85.

51

1  He was the only one that was substantially below 80

2  going into -- in early 2014.  And so I was giving him a

3  managerial nudge.

4       Q.   Does that score, the net promoter score,

5  include the -- include contractors?

6       A.   Includes everyone.  The score is based on a

7  call that follows every -- every installation, service,

8  every -- every in-home visit.  The customer's contacted,

9  regardless of who did the work.

10           Response rate is somewhere between 30 and

11  40 percent.  And so our score, as reported, is based on

12  those who chose to respond to that survey, which has

13  customer satisfaction questions, and the final question

14  is the NPS question.

15       Q.   Does -- does DIRECTV parse out whether it was

16  an Owned & Operated technician or a contracted

17  technician?

18           MR. KELLY:  What do you mean by "parse out"?

19       Q.   (By Mr. Lake)  Parsing out, as in, do you,

20  does DIRECTV, prepare reports or do you in any way

21  distinguish between the two?

22       A.   Not that I'm aware of.  I'm sure it is

23  possible to tell, at the detail level, which -- you

24  know, who the technician works for.

25       Q.   Okay.

                                                      52

**EXHIBIT K**

1     A.    The kind of data that I see, I -- there's no

 2   distinction.

 3     Q.    Okay.  And the -- and the net promoter score

 4   that you were evaluating Mr. Crawford on?

 5     A.    Is for all the activities in his region.

 6     Q.    You can set aside Exhibit 10 for now.  During

 7   the times that it's busier, when contractors are --

 8   presumably contractors are getting more installations to

 9   complete during that time.

10     A.    Um-hmm.

11     Q.    What would be some of the reasons that cause

12   business to be busier?  What are the biggest reasons?

13     A.    More sales.  The -- there's a -- there's a

14   seasonal pattern with pay TV, that goes back 30 or

15   40 years, that says, for example, second quarter is the

16   slowest.  Conventional wisdom is that it's based on

17   people -- or, you know, in the spring, people do outdoor

18   sports; they don't sit home and watch television.

19        But this is a well-established pattern.  We

20   make that worst by -- in the third quarter, with the NFL

21   Sunday Ticket promotion, which is typically our biggest

22   promotional sales effort of the year.  So third quarter

23   is typically the largest quarter for DIRECTV and has

24   been since we started selling NFL Sunday Ticket 10, 20

25   years ago.

                                                        53

**EXHIBIT K**

1    Q.    What about the first and fourth quarters?

2    A.    They're -- they're -- they're okay.

3 They're -- they're not -- third quarter is biggest.  I

4 think fourth quarter is second, first quarter is third,

5 and second quarter is last, is typical.

6    Q.    Does the schedule of installations, as far as

7 the -- what times they can be done or what days they can

8 be done, does that change at all as things get busier?

9    A.    Yes.

10    Q.    How does that change?

11    A.    As required, we go to six -- six-day or

12 sometimes seven-day workweeks or extended workdays.

13 Preferences for that vary by site and region.

14    Q.    Does that include -- that change in schedule,

15 does that include HSPs or --

16    A.    Includes everyone.

17    Q.    Contractors?

18    A.    Yeah.  Like I said, it's more based on the

19 demands in the area, because the demand is not -- the

20 growth is not uniform, it's -- it varies widely by

21 market, and our ability to predict by market is not very

22 good.

23    Q.    Um-hmm.  When DIRECTV decides that things are

24 busy and we want to extend the schedule, does -- how is

25 that decision, I guess, given to the contractors?

                                                      54

**EXHIBIT K**

1        A.   I don't know.

2        Q.   Is it given in a, So then they have a choice?

3   Or is it given in a, Pursuant to the contract, you need

4   to move it up to six days or seven days?

5        A.   As far as I know, it involves a discussion of:

6   Hey, we need you to do this.  Can you do it?  We need

7   more capacity.  What do you got?  Can you give me six

8   days?  Can you give me seven days?  Can you give me more

9   technicians?

10       Q.   In a given area, so -- so this case is about

11  the Seattle area.

12       A.   Okay.

13       Q.   Would DIRECTV have more than one contractor in

14  the same area, performing installations or upgrades?

15       A.   Typically, yes.

16       Q.   Do you know, specifically in the Seattle area,

17  if DIRECTV has any contractors besides AIS?

18       A.   I don't know.  I don't know specifically, no.

19  I believe -- I'm not -- I believe I would know if they

20  were the only one there, because that would be an

21  unusual circumstance.  But I don't know how many others.

22       Q.   One of the changes in capacity, you also said,

23  was extended workdays?

24       A.   Yes.

25       Q.   What does that mean?

                                                         55

**EXHIBIT K**

1    A.    So we may work -- go to ten-hour -- the

2  ten-hour work schedules; or the scheduling system will

3  allow you, for example, to specify eight-hour day

4  plus -- plus two, a soft two-hour overtime kind of an

5  arrangement, that allows you to get more work scheduled

6  per day.

7    Q.    Does that extending of the workday also go for

8  contractors and HSPs?

9    A.    They can.  It's probably, to some extent, up

10 to them, but the answer's yes.

11   Q.    It would be a proposal from DIREC --

12   A.    Yeah, yes.

13   Q.    -- a proposal from DIRECTV and then a

14 discussion would happen?

15   A.    Correct.  There also is, during summer hours,

16 it's not -- during Daylight Savings Time, it's not

17 unusual, we -- we offer a 4:00-to-8:00 time slot to

18 customers.  In addition, there's typically two four-hour

19 windows offered, 12 -- 8:00 to 12:00 and 1:00 to 5:00,

20 you know, whatever; I'm sure 12:00 to 4:00.  And there's

21 also a 8:00-to-4:00 offered, to some extent.  It's not

22 required.

23   Q.    Not required?

24   A.    It's not -- we do not -- in years past we

25 required people to make the 10 percent capacity

                                                      56

**EXHIBIT K**

1  available during the 4:00-to-8:00 shift.  We no longer

2  require that.  Most people prefer to do ten-hour days

3  and still have people home before dark.

4      Q.    Okay.  When did DIRECTV change that

5  requirement?

6      A.    Been two or three years ago, we stopped

7  requiring -- I think probably it's at least three years

8  ago, we stopped requiring people to have capacity

9  available on the 4:00-to-8:00.

10      Q.    And the requirement was that they have at

11  least 10 percent capacity for the --

12      A.    There was some number; it was somewhere around

13  10 percent, was what we typically expected.

14      Q.    And that included contractors and HSPs?

15      A.    Everybody, yeah.

16      Q.    Are contractors given any kind of incentives

17  to improve their performance on some of the -- like the

18  net promoter score?

19      MR. KELLY:  Read that back, please.

20      (Last question read.)

21      MR. KELLY:  Thank you.  You can answer.

22      A.    I believe there are a few things in the

23  contract that there are incentives, yeah.  And there

24  have been some -- some things they've done on a limited

25  basis, for a few months, or something like that.  But I

    57

**EXHIBIT K**

1    don't know -- I don't know what the current -- I don't
2    know what's in there right now.
3         Q.   (By Mr. Lake)  Okay.  DIRECTV evaluates and --
4    its technicians with many metrics, correct?
5         A.   Yes.
6         Q.   Okay.  There's -- there's one that's called, I
7    think, the post-call score.
8         A.   Yes.
9         Q.   And that evaluation is also done -- that's
10   done of all installation technicians, whether they're --
11        A.   Correct.
12        Q.   -- in-house or contract, or HSP?
13        A.   Post-call score and the NPS are on the same
14   phone call.  To be clear, I mentioned, some other
15   customers have questions.  Post-call and the CSAT are
16   the same thing, in our vernacular.
17             So all the -- there are like eight or nine
18   questions and then the NPS question all on the same
19   phone call and the survey that comes 2 to 24 hours
20   after -- after every job is closed.
21        Q.   And there are instances where contractors are
22   given incentives to do better on their post-call scores
23   or their net promoter scores?
24        A.   I think that -- yeah, I think that has been
25   the case, yes.  I don't -- I don't -- I couldn't -- I

                                                          58

**EXHIBIT K**

1  don't know specifically what's in the contracts today or

2  what --

3      Q.   Okay.  But are you aware of how any of those

4  incentives have been structured in the past?  Is it

5  like, you know, we'll give you an extra $2 per call if

6  your post-call score is above a certain number?

7      A.   I assume it's probably dollars per work order

8  and there's particular types of work orders.  I don't

9  know.  That's where the finance people weigh in, in

10  terms of how -- how -- exactly how the things are

11  structured.

12      Q.   DIRECTV will also have chargebacks if a

13  contractor's performance has issues on certain metrics,

14  like the return -- the return calls or the -- like the

15  SIN7 or SIN30?

16      A.   There -- there are, as far as there may be --

17  I'm not sure if there are still chargebacks there or

18  not.  There have been historically.

19      Q.   Okay.  Does DIRECTV have any requirements

20  about whether a contractor can pass along those charge-

21  backs to its installers?

22      A.   No.

23      Q.   So it's not -- contractors are not either

24  prohibited from doing that or required to do that?

25      A.   Correct.

59

1       Q.   What about the incentives?  Does DIRECTV have

2    any requirement that the install -- the contractor has

3    to pass along the incentive?

4       A.   No.

5            MR. LAKE:  Okay.  If we can just take a

6    five-minute break, just to look over everything, I think

7    we're just about done.

8            MR. KELLY:  Sure, thank you.

9            MR. LAKE:  Okay, thanks.

10           (Recess taken from 12:00 p.m. to 12:07 p.m.)

11           MR. LAKE:  We actually don't have any further

12   questions --

13           MR. KELLY:  Oh, okay.

14           MR. LAKE:  -- at this time.

15           MR. KELLY:  That was a big disappointment, I'm

16   sure.

17           THE DEPONENT:  Thanks.

18           MR. KELLY:  We're too far removed from the

19   other ones.  I think we should just stip to whatever we

20   did last time.  Do you want to just put a proposal on

21   there?

22           MR. LAKE:  Right.  So I guess -- well, I

23   assume DIRECTV's going to order a copy of the

24   transcript.

25           MR. KELLY:  We'll order a copy of the

                                                          60

```
1   transcript and a condensed.  You have my contact
2   information.
3           MR. LAKE:  Right.  But then whenever the
4   transcript is prepared, send it to Mr. Kelly, and he'll
5   pass it along to Mr. Baker to review.  So from whenever
6   you get it, you'll get it back within two weeks?
7           MR. KELLY:  That's fine.  And if there's an
8   issue with his schedule, I'll let you know.
9           MR. LAKE:  Right, okay.  We'll go off the
10  record.
11          (The deposition concluded at 12:08 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT K**

```
 1          I, DAVID BAKER, the witness in the above

 2   deposition, do hereby certify that I have read the

 3   foregoing transcript of my testimony and state under

 4   oath that it, together with any attached Amendment to

 5   Deposition pages, constitutes my sworn testimony.

 6

 7          _____ I have made corrections to my deposition.

 8          _____ I have NOT made any corrections to my deposition.

 9

10          EXECUTED on this _____ day of _____,

11    20_____, at _____, _____.
                       (City)                  (State)
12

13

14

15          _____

16          DAVID BAKER

17

18

19

20

21

22

23

24

25

                                                        62
```

**EXHIBIT K**

```
1   STATE OF COLORADO)
                     ) ss.
2   COUNTY OF DENVER )

3          THIS IS TO CERTIFY that the deposition of

4   DAVID BAKER was taken before me, Carla D. Capritta,

5   Registered Professional Reporter and Notary Public

6   within and for the State of Colorado.

7          THAT SAID DEPONENT WAS, by me, previous to

8   examination, duly sworn to testify to the truth, the

9   whole truth, and nothing but the truth in said cause.

10         THAT THE TESTIMONY of said deponent was herein

11  set forth, and was thereafter reduced to typewritten

12  form; and that the foregoing constitutes a full, true,

13  and correct transcription.

14         I FURTHER CERTIFY that I am not related to or

15  otherwise associated with any of the parties to said

16  cause of action, and that I am not interested in the

17  result of the event thereof.

18         WITNESS MY HAND and official seal this

19  7th day of February, 2015.

20         My commission expires May 23, 2017.

21

22

23

                    _____
24                  Carla D. Capritta, RPR

25

                                                      63
```

**EXHIBIT K**

```
 1   ERRATA SHEET FOR THE DEPOSITION OF DAVID BAKER
     DATE TAKEN:  JANUARY 22, 2015
 2   PAGE    LINE   CORRECTION

 3   _____   _____   _____

 4   _____   _____   _____

 5   _____   _____   _____

 6   _____   _____   _____

 7   _____   _____   _____

 8   _____   _____   _____

 9   _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25   DEPONENT'S SIGNATURE_____DATE_____
```

64

**EXHIBIT K**