1    UNITED STATES DISTRICT COURT
2    WESTERN DISTRICT OF WASHINGTON
3
4  HILDA L. SOLIS, Secretary of    )
   Labor, United States Department )
5  of Labor,                       )
                                   )
6            Plaintiff,            )
                                   ) Case No.:
7       -vs-                       ) 2:12-cv-01406-RSM
                                   )
8  LANTERN LIGHT CORPORATION,      )
   d/b/a ADVANCED INFORMATION      )
9  SYSTEMS, a corporation;         )
   DIRECTV, LLC, a limited         )
10 liability company; and RAMON    )
   MARTINEZ, an individual,        )
11                                 )
              Defendants.          )
12                                 )
   _____)
13
14
15      DEPOSITION UPON ORAL EXAMINATION
16                  OF
17            RAMON MARTINEZ
18
         Tuesday, June 10, 2014
19
             9:00 a.m.
20
           300 Fifth Avenue
21
         Seattle, Washington
22
23
24 Reported by:
   Cheryl Macdonald, CRR, RMR
25 JOB No. 140610CMA

                                                    1

**EXHIBIT U**

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4                     NIAMH E. DOHERTY
                       Trial Attorney
 5                     U.S. DEPARTMENT OF LABOR
                       Office of the Solicitor
 6                     350 South Figueroa Street
                       Suite 370
 7                     Los Angeles, California 90071
                       doherty.niamh@dol.gov
 8
                            and
 9
                       JOSEPH M. LAKE
10                     Trial Attorney
                       U.S. DEPARTMENT OF LABOR
11                     Office of the Solicitor
                       90 7th Street
12                     Suite 3-700
                       San Francisco, California 94103
13                     lake.joseph@dol.gov
14
15    FOR DIRECTV:
16                     JOEL P. KELLY
                       Attorney at Law
17                     JACKSON LEWIS
                       725 South Figueroa Street
18                     Suite 2500
                       Los Angeles, California 90017
19                     Kelly@jacksonlewis.com
20
21    FOR LANTERN LIGHT CORPORATION:
22                     JENNIFER L. TRUONG
                       Attorney at Law
23                     AMS LAW
                       1711 South Jackson Street
24                     Seattle, Washington 98144
                       jliutruong@amslaw.net
25
```

                                                            2

**EXHIBIT U**

```
 1                          I N D E X

 2

 3   EXAMINATION                                      PAGE

 4   BY MR. LAKE:      .........................        5

 5

 6
     EXHIBITS MARKED                                  PAGE
 7
     No. 1            Amended Notice of
 8                    Deposition.................        9

 9   No. 2            Lantern Light registration
                      data search.................      12
10
     No. 3            Lumin registration data
11                    search.....................       30

12   No. 4            Plaintiff's Interrogatories
                      and Fourth Amended Answers..      35
13
     No. 5            DirecTV Services Provider
14                    Agreement with Lumin........      45

15   No. 6            DirecTV instructions for
                      residential installations...      51
16
     No. 7            DirecTV to contracting
17                    partner 3/5/12..............      68

18   No. 8            Plaintiffs requests for
                      admission and responses.....      74
19
     No. 9            All Nations/AIS Pay Scale...      95
20
     No. 10           Lumin billing sheets........     108
21
     No. 11           All Nations Pay Sheet.......     123
22
     No. 12           Lumin Payroll Summary
23                    12/12/10...................      124

24   No. 13           AIS Time Tracking
                      Guidelines.................      127

25
                                                         3
```

**EXHIBIT U**

```
1                    I N D E X (Cont'd.)

2

3    EXHIBITS                                        PAGE
```

```
4    No. 14        AIS Employee Handbook.......      129

5    No. 15        AIS billing sheet 2/3/12 -
                   2/9/12.....................        133
6
     No. 16        Rate card..................        144
7
     No. 17        Attic Safety information
8                  sheet......................        160

9    No. 18        Lantern Light/Martinez
                   initial disclosures........        170
10
     No. 19        Plaintiff's Requests for
11                 Admission and Amended
                   Responses..................        181
12
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

**EXHIBIT U**

```
 1   RAMON MARTINEZ, witness herein, having been first
                     duly sworn by the Certified Court
 2                   Reporter, deposed and said as
                     follows:

 3

 4                          EXAMINATION

 5   BY MR. LAKE:

 6        Q.    Good morning, Mr. Martinez.

 7        A.    Morning.

 8        Q.    Can you please state your full name for the

 9   record?

10        A.    Ramon Martinez.

11        Q.    And my name is Joe Lake.  I'm with the

12   Department of Labor.  I'm going to be taking your

13   deposition today.  Have you been deposed before?

14        A.    No.

15        Q.    So the way the deposition works is I'm

16   going to be asking you questions.  You're going to be

17   answering my questions.  The testimony that you're

18   giving today is testimony that's just the same as if

19   you were in court.  It's under the penalty of perjury.

20   Do you understand all of that?

21        A.    Yes.

22        Q.    Now, when we're going through the

23   deposition, like I said, I'll be asking questions,

24   you'll be giving answers.  The court reporter is going

25   to be taking down all of our -- all the discussion
```

**EXHIBIT U**

```
 1   that we're having.  So we need to make sure that the
 2   record is clear for the court reporter.  And so what
 3   I'd ask is, when you're answering my questions, you
 4   need to give an oral response, not just nodding your
 5   head or anything like that, or not just saying
 6   "uh-huh" or "huh-uh."  Saying "Yes" or "No."
 7        A.    I understand.
 8        Q.    Okay.  And also, please, I'll ask that you
 9   let me finish my questions before you start answering,
10   and conversely, I'll make sure to finish letting you
11   respond to my questions before I start asking another
12   question.  That way the transcript will be clear.  We
13   won't be talking over each other or anything like
14   that.
15        A.    Sure.
16        Q.    When I'm asking questions today, if you
17   can't hear any of my questions at any point, please
18   let me know, and I can repeat the question, or if for
19   some reason you don't understand the question in any
20   way -- I'm going to be asking several questions today.
21   I'm sure some of them could have been phrased better,
22   so if you have any questions with understanding,
23   please let me know.  I don't want to -- this
24   deposition isn't a test or anything.  We want to make
25   sure that you understand the questions that I'm
```

6

**EXHIBIT U**

asking.  Okay?

A.    Yes.

Q.    If you need to take a break at any time,
that's generally okay.  If I've asked you a question,
you'll need to give an answer to the question before
we take a break, but otherwise, this isn't a marathon
or anything like that.  If you need to take a break,
just let me know and we can take a break for a couple
of minutes.

A.    Sounds good.

Q.    It may happen that, during the deposition,
you could remember the answer to a question that I
asked earlier in the deposition.  You know, something
could trigger a response to something that I asked
earlier.  If you do remember information later on in
the deposition that relates to an earlier question,
you are required to provide that information.  Okay?

A.    Yes.

Q.    Now, during the deposition there may be
questions that call for you to provide an estimate as
to the answer.  A range or something like that.  Now,
what you shouldn't do during the deposition is guess.
If you have absolutely no idea then that would be a
guess, but it is required that you do provide an
estimate, if you can.  Do you understand the

7

**EXHIBIT U**

difference between a guess versus an estimate?

     A.    I do.

     Q.    Now, Mr. Martinez, did you do anything to
prepare for today's deposition?

     A.    No.  Like what?

     Q.    Well, did you have -- did you speak to
anybody about today's deposition?

     A.    No.  I mean, I met with my attorney early
last week.  She informed me of the dates and stuff
like that, but that was about it.

     Q.    Did you review any documents to prepare for
today's deposition?

     A.    No.

     Q.    Did you bring any documents with you today?

     A.    No.

     Q.    And Mr. Martinez, have you taken any
medication that might affect your ability to
understand my questions today?

     A.    No.

     Q.    Any medication that would affect your
ability to answer my questions truthfully or
accurately, that might affect your memory?

     A.    No.

     Q.    Is there any reason that you can think of
why you wouldn't be able to answer my questions fully

**EXHIBIT U**

1  and truthfully today?

2       A.    No.

3       Q.    Mr. Martinez, you're aware of a corporation

4  named Lantern Light Corporation that does business as

5  Advanced Information Systems?

6       A.    Yes.

7       Q.    Throughout this deposition, I will refer to

8  this corporation as "AIS."  Do you understand that?

9       A.    Yes.

10      Q.    So when I say "AIS" I'm referring to

11  Lantern Light Corporation, which does business as

12  Advanced Information Systems.  Okay?

13      A.    Yes.

14      Q.    Please take a look at a document which will

15  be marked as Exhibit 1 by the court reporter.  Mr.

16  Martinez, when I present to you documents throughout

17  the course of today's deposition, please always take

18  your time reviewing the documents as fully as you

19  would like to do before I ask any questions.

20            (Marked for identification Exhibit 1.)

21      A.    Okay.  I understand.

22      Q.    Have you seen this document before?

23      A.    This one right here?

24      Q.    Yes.

25      A.    I don't remember.  I might have.  We've had

9

**EXHIBIT U**

1  a lot of documents, so it seems familiar.

2      Q.    Well, Mr. Martinez, this is a notice of

3  deposition to AIS.  And under the rules AIS has --

4  actually, first let's look to page 2 and 3.  Do you

5  see 11 topics that are listed, a list of 11 topics

6  starting on page 2 going on to page 3?

7      A.    Yes.  Yes, I do.

8      Q.    Now, AIS has designated you as the person

9  most knowledgeable at AIS on all 11 of these topics.

10          MS. TRUONG:  Was that a question?

11          MR. LAKE:  Not yet.  I was letting him look

12  it over first.

13      A.    For the most part, yes.  You guys are going

14  to be talking to Lisa tomorrow?

15      Q.    We do have a notice of deposition out to

16  Ms. Kelly tomorrow as well.

17      A.    So she's the controller of the company.  So

18  she's going to have -- she should have more acute

19  knowledge of topic No. 2 as far as the record keeping.

20  But for the most part I do have the most knowledge

21  with anything concerning AIS.

22      Q.    So besides topic No. 2, the other 10

23  topics, do you believe that you are the person most

24  knowledgeable?

25      A.    Yes.  I mean, one and two, you know,

                                                    10

**EXHIBIT U**

controller stuff, but I do have a good knowledge of
it.  She should have more specific knowledge of it,
but I do have a working knowledge of it.  But for
topics 3 through 11, I'm your guy.

          Q.    Thank you.

          MR. KELLY:  Can I request, just so the
record is clear, can you identify what category 1 is
for the record, mention that as well?

          MR. LAKE:  Category 1 on the notice of
deposition of AIS is the payment practices at AIS.

          Q.    And Mr. Martinez, is it your testimony
today that Ms. Kelly would be more knowledgeable than
you are about the payment practices at AIS?

          A.    When you guys say "payment practices," do
you mean how we pay our employees or -- is that what
you mean?

          Q.    Generally, yes.

          A.    Yeah.  Lisa has the Quick Books.  I have a
working knowledge of it, but she's generally the
bookkeeper and the controller of the company.

          Q.    And then turning to topic 2, the record
keeping at AIS.  It's your testimony today that Ms.
Kelly would be the person most knowledgeable on that
topic?

          A.    I have a good working knowledge, but she

**EXHIBIT U**

1    would have a better working knowledge.

2        Q.    Thank you.  You can set aside that exhibit

3    for now.  I'll have you take a look at a document to

4    be marked as Exhibit 2.

5            Mr. Martinez, this is the registration

6    information for Lantern Light Corporation that is from

7    the Secretary of State's website.  Now, according to

8    page 2 of this website, you are the president and

9    chairman of AIS registered as Lantern Light

10   Corporation; is that correct?

11           (Marked for identification Exhibit 2.)

12       A.    Yes.

13       Q.    And what are your duties in that role?

14       A.    I'm the principal of the company.  I

15   oversee all operations.  I manage the day to day and

16   run the business in general.  I -- does that answer

17   your question?

18       Q.    Mr. Martinez, the questions I'm asking

19   today, as I stated before, you are under oath.  What

20   you should -- are required to provide is all the

21   information that you believe, that is, that you know

22   about the question that you believe is responsive to

23   the question.  So if you believe that you've

24   completely described your duties as the president and

25   chairman, then that's an appropriate answer.

                                                    12

1      A.    Okay.

2      Q.    And is there any difference between your

3  role as president and your role as chairman?

4      A.    No.

5      Q.    Turning to page 1 of Exhibit 2.  AIS,

6  registered as Lantern Light Corporation, first filed

7  with the Secretary of State, according to this

8  document, on September 7, 2010; is that correct?

9      A.    Yes.

10     Q.    And since the corporation first filed in

11 September 2010, have you been the president and

12 chairman?

13     A.    Yes.

14     Q.    And why does AIS go by "Advanced

15 Information Systems" but register under the name

16 "Lantern Light Corporation"?

17     A.    We're an S-type corporation.  When I first

18 went into doing this I wanted the -- it was just

19 something I wanted.  I wanted the corporation to be

20 one thing and the d/b/a as another.

21     Q.    And according to page 2 of Exhibit 2, Lisa

22 Kelley is the secretary and treasurer of AIS; is that

23 correct?  Is Ms. Kelley the secretary and treasurer?

24     A.    Yes.

25     Q.    And what are Ms. Kelley's duties in that

                                                      13

**EXHIBIT U**

1  role?

2       A.    Lisa is the controller of the company and

3  my right hand.

4       Q.    And can you describe a little bit more what

5  you mean by the "controller" or the "right-hand man"?

6       A.    She basically handles all of the

7  bookkeeping, the financials.  She is someone I bounce

8  ideas off of as far as my decisions on ways -- things

9  I'm doing with the company and things of that nature.

10      Q.    And has Ms. Kelley been in that role since

11  the corporation first filed its papers in September

12  2010?

13      A.    Yes.

14      Q.    And are there any other officers of AIS

15  besides yourself and Ms. Kelley?

16      A.    No.

17      Q.    Have there been at any time?

18      A.    No.

19      Q.    How many offices does AIS have?

20      A.    One.

21      Q.    Where is that office located?

22      A.    In Kent.  This address right here, 1819

23  Central Avenue South, Suite 46, Kent, Washington

24  98032.

25      Q.    And at any time has AIS had more than one

                                                      14

1  office?

2      A.    Yes.

3      Q.    What's the most offices that AIS has had?

4      A.    Three.

5      Q.    And when did AIS stop having three offices?

6      A.    When we had three offices, we had the Kent

7  facility, which was our main office.  Then we had a

8  Tacoma office and a Gig Harbor -- Bremerton location.

9  We decided to move from Bremerton to Gig Harbor

10  location, and at that point is when we decided to

11  consolidate Tacoma and Gig Harbor -- Tacoma and

12  Bremerton to Gig Harbor.  So at that point we had two

13  offices, Tacoma and Gig Harbor.  As time went on a

14  decision was made to further consolidate and just

15  house everybody in one building.

16      Q.    When was that decision made to consolidate

17  into one building?

18      A.    I don't have an exact date.

19      Q.    Approximately how long ago?

20      A.    A year and a half ago.

21      Q.    And currently how many employees does AIS

22  have?

23      A.    Currently we have -- including supervisors?

24      Q.    Anyone that AIS classifies as an employee,

25  yes.

15

1      A.     Estimate of 23.

2      Q.     And of those 23 how many are installers?

3      A.     Eighteen.

4      Q.     Since AIS started in September 2010, has

5  AIS at any time had more than 18 installers?

6      A.     Yes.

7      Q.     What's the most installers that AIS has had

8  at any one time?

9      A.     32.

10      Q.     And approximately when was that?  When did

11  AIS have 32 installers?

12      A.     When we had the Tacoma, Bremerton and Kent

13  facilities, and each facility approximately ran about

14  10 technicians, or installer technicians.

15      Q.     So, you testified earlier that AIS

16  consolidated into one location approximately one and a

17  half years ago.  So was it approximately one and a

18  half years ago that AIS had 32 installers?

19      A.     No.  No.  At that point, one of the main

20  reasons why we decided to consolidate, it was because

21  of our shortened tech count.  And -- yeah, that's the

22  answer to your question.

23      Q.     So it was prior, it was more than a year

24  and a half ago?

25      A.     Possibly.  I can't tell you exactly what

                                                        16

**EXHIBIT U**

1    date.

2         Q.    And what is -- what's your understanding of

3    the reasons for the reduction in installation

4    technicians?

5         A.    Staffing.  Staffing is tough.  Churn rates.

6    Technicians leaving.  Our ability to hire and keep the

7    foundation of our staff at a certain level.

8         Q.    When you say "churn rate," what does that

9    mean?

10        A.    Basically "churn rate" means the rate at

11   which your staff increases or decreases at any given

12   moment.  When we churn technicians it's basically

13   somebody leaving or somebody coming in.

14        Q.    And so are you saying -- is your testimony

15   that AIS has a high churn rate?

16        A.    Yes.

17        Q.    Does that mean there's a lot of turnover?

18        A.    Yes.

19        Q.    When you say that the effect of -- or,

20   excuse me, that the reduction in installers is partly

21   due to the ability to hire, what do you mean by that?

22        A.    To find good candidates.  Ability to

23   recruit and interview and find good fits for the type

24   of work that we do.  And then employee retention is a

25   big thing also.  Once we've hired and trained somebody

                                                          17

EXHIBIT U

1   from the ground up, just retain them.  Keeping them,

2   the technician, motivated or happy with the job.

3          Q.    So, there's currently 23 employees, and 18

4   are installers?

5          A.    Yes.

6          Q.    So what are the other five employees?

7          A.    19 -- 19, 20 would be two supervisors.  21

8   would be part-time warehouse employee.  22 would be

9   somebody that helps with payroll.  And then 23 would

10  be -- I actually included Lisa in that 23.  So it's

11  actually 22.  Excuse me.

12         Q.    And the supervisors, the two current

13  supervisors at AIS, what are their duties?

14         A.    They assist in the day-to-day management of

15  the 18 installer technicians.

16         Q.    And what do they do to assist in the

17  day-to-day management?  What is kind of their

18  day-to-day responsibilities?

19         A.    In the morning they take a look at the

20  workload received through the work orders.  They make

21  sure that they're divided up evenly.  They assign what

22  they -- certain projects to certain technicians.  They

23  have a full working knowledge of the capability of all

24  of our installer technicians.  Once that is done, the

25  technicians that do report to the office are assigned

                                                        18

**EXHIBIT U**

the work or given out paper copies of work orders, and
then they request whatever equipment they need for
that day, and the supervisors issue out the equipment
they need for that day to the technicians. It's
basically slash warehouse duty. They scan out the
receivers that they need for that day, or whatever
equipment they need for that day.

At that point they also -- supervisors
mentor and counsel the technicians on anything that --
any feedback that we've received or anything that --
meeting type of -- informational type of short
one-on-ones with the technicians on what they've seen
out in the field as far as their installation
practices or how their work is looking, you know, day
to day, week to week.

Once the technicians are issued their
equipment and they leave the facility to go to their
work assignment or their first scheduled install or
upgrade, the supervisors are then delegated to just
managing the day, supporting the technicians. Making
sure that they have everything they need to complete
the work assigned to them. They answer any -- answer
questions throughout the day any technician might
have, specifically with instances with equipment not
working properly to needing more equipment. They

19

**EXHIBIT U**

1   drive out equipment to the technicians if a technician

2   needs something more or a technician forgot to pick

3   something up.

4           They monitor the technician's progress

5   throughout the day with this website application

6   called "Click" where they can see specifically where a

7   technician is at, their progress.  If they're falling

8   behind they have the ability to shuffle jobs around.

9   If a technician is falling behind, if a technician

10  gets done early they'll take a job off technician A

11  and put it on technician B and vice versa.

12          They also do quality inspections of our

13  installations from either days prior, weeks prior, or

14  months prior.  Verifying that installations that we

15  are doing are up to standards.  They also assist me

16  with whatever projects that I may have going outside

17  of anything with DirecTV.  They're -- you know, they

18  -- I described Lisa as my right hand.  They'd be my

19  left and left second hand, if that makes any sense.

20      Q.    So you stated that the supervisors will do

21  quality inspections of the installations?

22      A.    Yes.

23      Q.    And does that mean that they -- what does

24  that mean?

25      A.    They could either do one of two ways.  They

20

could either do a live-time quality inspection, which
means they'll visit one of our technician's job sites,
while they're on the job site and view how they're
doing their job.  Making sure that they're putting
things where they need to be and just doing an
overall assessment of the performance of the
technician.  Making sure they're showing their ID
badges to the customer.  Making sure they're cleaning
up after themselves.  That's one type of quality
inspection, live time.

         The second type is they'll do a visit for a
job site that's already been completed, most times the
day prior, sometimes weeks, just depending on the
workload for that day and what they have time to do.
And in that instance, they'll go to a job site that's
already been completed, try to make customer contact
if the customer is home.  They'll, you know, ask the
customer questions, questions like did the technician
show his or her ID badge.  Did the technician clean up
after him or herself.  Did the technician show you
where he or she was going to put the satellite dish.
Just interview questions, basically, on the whole
scope of the job.  If the customer is home.

         If the customer is not home then they
generally -- or not generally.  They just inspect the

21

**EXHIBIT U**

1    outside work and see dish placement, cable routing and

2    ground block placement.  Ground block is basically the

3    connection point between the satellite dish and the

4    receiver on the side of the home.

5         Q.    And how do the supervisors determine which

6    jobs to go do quality inspections on?

7              MR. KELLY:  One more time, please, Joe.  I

8    just didn't hear it.  Can you repeat the question.

9         Q.    The question was how do the supervisors

10   determine which quality -- which jobs to perform these

11   quality inspections on?

12             MR. KELLY:  Thank you.

13        A.    Most of the time it's at their discretion.

14   There have been times where I have specifically asked

15   them to take a look at a specific technician's work

16   based on the reporting -- reports that I get back.  A

17   technician that has high service numbers, basically

18   what that is is that a technician -- we have

19   technicians that do work, and for some reason a

20   service tech from DirecTV has to follow behind us to

21   fix something that we did or did not do.  So -- and I

22   get reports basically telling me percentages of said

23   service work.

24             So if I have a technician that has high

25   service numbers that causes -- raises a red flag and

                                                        22

**EXHIBIT U**

1  causes concerns of quality, at that point, I

2  specifically tell the supervisors to do quality

3  inspections on that technician that I have concerns

4  about.  But for the most part, it's mostly at their

5  discretion.  The second part, it's anybody that I

6  designate, that I want QC'd.

7      Q.    And you said that you would determine the

8  individuals based on reports that you receive?

9      A.    Yes.

10     Q.    And who do you receive these reports from?

11     A.    DirecTV upper management, specifically the

12 site manager of the site.

13     Q.    And what will these reports detail?

14     A.    Those reports detail service -- they're the

15 call metrics, metric reporting.  And the metrics give

16 me a detailed assessment of service percentages, how

17 much work they're having to go back on behind us.

18 They give me completion percentages of the total work

19 issued to my -- to AIS by DirecTV, how much of it

20 we're actually completing.  They give me percentages

21 on post call data.

22         All of DirecTV's customers get what's

23 called a post call done on them.  It's a quality call

24 designed to show DirecTV basically customer

25 satisfaction survey.  And that post call has things in

                                                    23

**EXHIBIT U**

1    it like did the technician show his or her ID badge.
2    Did the technician clean up after him or herself.  So
3    post call data is part of the metrics.
4            Also part of the metric reporting is phone
5    line connectivity data, how many receivers did our
6    technicians hook up to phone lines.  Cinema connection
7    kit data.  How many cinema connection kits did we
8    install and are they reporting back.  Protection plan
9    data.  How many -- those are basically warranties or
10   things of that nature.  How many protection plans did
11   the technician upgrade the customer to or offer the
12   customer and did the customer sign up for.
13           There's a lot of metrics.  Those are the
14   main ones.  I could continue if you'd like.
15       Q.    Yeah, please.
16       A.    Sure.  So we talked about post calls,
17   protection plan, telephone lines, cinema connection
18   kits.  NPS data, net promoter score.  And basically
19   what a net promoter score is, it's part of the post
20   call process, but net promoter score is something new
21   within the last year where basically at the end of the
22   post call a technician -- the customer gets asked a
23   question.  And specifically the question is, based on
24   your experience with this technician here on your job
25   site, would you promote the product to your friends

                                                      24

EXHIBIT U

1    and family.  So that's a specific metric.  Excuse me.
2    I'm drawing a blank.  I'm sorry.
3              Estimated time of completions, that's part
4    of the metric reporting.  And what that is, is, when a
5    technician goes on site they need to input what time
6    they believe they're going to be completed with the
7    work that they're doing at that point.
8              Failure tracking.  Failure tracking is
9    basically when we install a piece of equipment that is
10   serialized, we need to make sure we're adding that to
11   the work order.  To my knowledge, right now that's it.
12   If I remember anything I'll go back.
13        Q.   Okay.  Thank you.  And these -- this metric
14   reporting, is it divided up by installer?  So does it
15   say, for example, how an installer is doing on their
16   service percentage or completion percentage as opposed
17   to AIS generally?
18        A.   Both.  I get a group reporting and specific
19   company reporting.
20        Q.   And what do you do when the reporting
21   you're getting about a specific technician is below
22   what you expect?
23        A.   Well, initially we get these reports
24   weekly.  Sometimes they're inconsistent, but for the
25   most part we get them on a weekly basis.  What

                                                      25

**EXHIBIT U**

```
 1    initially I do when I get the reporting is I do my own

 2    initial assessment on the team's performance and the

 3    company's performance.

 4              And I do my own diagnosis and, you know,

 5    take my own notes in preparing for my next supervisor

 6    meeting, which I have every Monday at 10:00.  I have a

 7    meeting with my supervisors.  We go over the metrics

 8    and I go over my concerns.  And I go over

 9    specifically, when I see a technician having trouble

10    with a certain metric, identify who we need to mentor

11    and who we need to up train and who we need to monitor

12    to basically improve certain aspects of his or her

13    performance.

14        Q.   And what does AIS do if those performance

15    improvement methods don't succeed, if the installer

16    continues to not perform?

17        A.   Well, it's in my best interests to continue

18    mentoring and up training a technician, and that can

19    take week after week, or even months, but if I see a

20    technician is either ignoring our attempts in up

21    training, or is, for some reason, unsuccessful -- we

22    cannot get him or her to succeed in a certain metric

23    -- then I start the process of -- I'm a small company.

24    It's nothing formal like a big company where write-up

25    one, two, three and you're out, but then I start
```

                                                        26

**EXHIBIT U**

having conversations of if -- listen, if this doesn't improve, I'm going to have to let you go, or if this doesn't improve I'm going to have to put you on some type of suspension or whatnot. It's all at my discretion. I've let things go sometimes longer than they should, but it's -- it's technician to technician. It's based on what I see right there and effort.

Q. And has AIS fired any installers because they continued to receive poor metric reporting?

A. Yes.

Q. And can you give an approximate number as to how many since AIS was formed in September 2010?

A. I cannot.

Q. Is it something that happens every month?

A. No, no. Not even close. Like I said, it's -- I'm a small company. I give lots of chances. I have members of my team that have consistently drug us down month after month and I'll still hold on to them hoping for the best. Well, not hoping for the best, but just continually working for them, waiting to see some glimmer of hope. But I haven't fired anybody due to metrics on a consistent basis, no.

Q. Has it occurred at least five times in the last year?

1          A.     No.

2          Q.     You testified earlier that one of the

3    duties for the supervisor is dividing up the work

4    orders that come in from DirecTV?

5          A.     Yes.

6          Q.     And that the supervisors will assign

7    certain jobs to certain technicians?

8          A.     Yes.

9          Q.     And what do you mean by that?

10         A.     Based on ability levels, some of our more

11   senior technicians are more experienced than our newer

12   technicians, so they can handle a larger work volume

13   than a newer technician.  So, in the mornings they'll

14   take a look at what a technician has in his or her

15   Click or whatnot.  Click is basically a terminology

16   for what they have on their associated tech number.

17              And they'll make a decision whether they'll

18   either find that as an acceptable workload or say, no,

19   no.  I want this tech to do X.  And they'll take jobs

20   -- two jobs from here and put it on to here.  And

21   they'll take the jobs from here and put it on to here.

22   So they do a good shuffling of work every morning.

23         Q.     And the supervisors that are currently at

24   AIS, are they former -- were they former installation

25   technicians?

                                                           28

**EXHIBIT U**

1      A.    Yes.

2      Q.    Is AIS's general practice to have

3   supervisors be former installers?

4      A.    No.

5      Q.    Okay.

6      A.    It just worked out that way.

7      Q.    And what are the names of the current

8   supervisors at AIS?

9      A.    Dennis Edson and Ryan Caldara.

10     Q.    When AIS had up to 32 installers, did it

11  have more than two supervisors?

12     A.    Yes.

13     Q.    And what's the most amount of supervisors

14  that AIS has had?

15     A.    Five.

16     Q.    And beside the supervisors and the

17  installers and the other payroll folks, are there any

18  other managers or executives at AIS?

19     A.    No.

20     Q.    So you and Lisa are the sole executives?

21     A.    Yes.

22     Q.    And that's always been the case?

23     A.    Yes.

24           MR. LAKE:  Why don't we take a look at a

25  document that will be marked as Exhibit 3.

                                                    29

1          (Marked for identification Exhibit 3.)

2     Q.     Have you had a chance to review Exhibit 3?

3     A.     Yes.

4     Q.     Are you aware of a corporation named Lumin,

5  Incorporated?

6     A.     Yes.

7     Q.     And this document, from the Secretary of

8  State's website, states that you are the

9  vice-president of Lumin, Incorporated; is that

10  correct?

11     A.     Yes.

12     Q.     And what were your duties at Lumin?

13     A.     Similar to what I'm doing with AIS right

14  now.  I joined Mike, or Lumin, Inc. -- I can't give

15  you an exact date.  It was around 2008.  Sometime in

16  2008 I joined Lumin, Inc.  And when I joined I was

17  there to manage -- pretty much exactly what I do right

18  now.

19     Q.     And so when you joined Lumin in

20  approximately 2008, did you have the same role as you

21  did when you left Lumin?

22     A.     Pretty much.  It's -- Mike and I decided to

23  part ways, or I decided to leave Lumin, or Mike

24  decided to shut down Lumin around when we -- actually

25  not around -- 2010, when I started AIS.  But what I

                                                        30

**EXHIBIT U**

1  was doing here at Lumin is similar to what I was doing

2  at Lantern Light, more in a -- where here I have

3  pretty much -- it's mine, it's sole, I run it.  Here

4  it was more of a partner situation, where we both had

5  input in how we ran things and things like that.  I'm

6  sorry, I don't mean to say "things like that."  We had

7  input on how we ran things together.

8      Q.    And so, according to Exhibit 3, Lumin

9  became an inactive corporation as of February 1st,

10  2011, after registration expired on October 31st,

11  2010.  Does that sound correct to you?

12      A.    The exact date when it got inactive, I

13  don't know.  Mike was in charge of that, but it should

14  be correct, yes.  We dissolved our partnership

15  sometime in 2010.  And he -- being that I joined Lumin

16  and Lumin was more his than mine he was to dissolve

17  Lumin also.

18      Q.    What were the circumstances as to the

19  dissolution of the partnership?

20      A.    Mike wanted to go one way and I wanted to

21  go another is basically it.

22      Q.    Soon after you left Lumin you started AIS?

23      A.    Yes.

24      Q.    Did any of the installers from Lumin

25  continue to work for AIS?

31

1          A.    All of them.

2          Q.    So, AIS effectively absorbed Lumin?

3          A.    Yes.

4          Q.    Beside the installers, what other assets

5     did Lumin bring in to the -- to AIS?

6               MR. KELLY:  One more time.

7          Q.    I said, besides the installers what other

8     assets did Lumin bring to AIS?

9               MR. KELLY:  Objection.  Mischaracterizes

10    his testimony about "bringing in."  I think you can

11    rephrase.  He said it was dissolved.

12         Q.    You can answer the question.  You can

13    answer the question, Mr. Martinez.

14              MS. TRUONG:  If you can answer the

15    question.

16              THE WITNESS:  Yeah.

17              MS. TRUONG:  Go ahead.

18         A.    So part of our -- when Mike and I dissolved

19    Lumin, wrote out our dissolution of partnership,

20    basically at that time we had -- I can't give you an

21    exact number, but we had some Ford Rangers, a box

22    truck, and whatever we had in the office at the time,

23    being some laptops, a computer, laptops and a

24    computer, some office supplies.  Mike, when we -- when

25    we agreed on the dissolution Mike left with two trucks

                                                        32

1   to -- a van and a truck.  That's it.

2       Q.    And did AIS take over Lumin's offices?

3       A.    Yes.  It's the same -- where it says --

4   yes.  We were operating in the same facilities where

5   Lumin operated, yes.

6       Q.    So, how was Lumin different than AIS, if at

7   all?

8       A.    Well, no.  Aside from who solely runs the

9   companies there's not much difference.

10      Q.    Was Lumin's --

11      A.    Well, excuse me, can I amend that?

12      Q.    Please.

13      A.    As far as that is concerned there's a huge

14  difference on the business model and how we operate.

15      Q.    Okay.

16      A.    Does that make any sense?

17      Q.    Well, if you could elaborate a little bit

18  on what you mean by that.

19      A.    Well, whereas Lumin, for a portion of the

20  time, operated under a 1099 format and then was

21  converted to a W-2 format, whereas Lantern Light has

22  always been W-2.  As time has gone on and we've got --

23  I've had more business acumen, more managerial

24  courage, I've learned how to operate the business in

25  more efficient manners.  I've made changes as far as

                                                        33

1  compliance, compliance, and make sure we comply in

2  certain rules and regulations locally, statewide and

3  federally.  But those are the major changes.  As far

4  as the work that is being done, that's the same.

5       Q.    So Lumin was -- was Lumin's primary

6  customer DirecTV?

7       A.    Yes.

8       Q.    And did Lumin installers perform

9  essentially the same services that the installers at

10 AIS perform?

11      A.    Yes.

12      Q.    Now, you mentioned that Lumin converted the

13 installers from a 1099 independent contractor status

14 to W-2 employees?

15      A.    Yes.

16      Q.    Were you involved in that decision?

17      A.    No.

18      Q.    Were you at Lumin when that decision

19 happened?

20      A.    No.

21      Q.    So do you know anything about that

22 decision?

23      A.    There was a time -- excuse me if my

24 knowledge is not exact.  This is like around -- I

25 joined Lumin in 2008, and at that point the employees

were all W-2.  Before that, to my knowledge, they were
1099 subs.  And the reason for that change was, as
with all changes, somebody came and did an inspection
or did some type of audit and it was deemed,
specifically in the state of Washington, that the type
of work that we were doing and how we were managing
the technicians was classified not as 1099s.  W-2's.
So that's when that change came about.  But when I
joined Lumin they were already -- that change had
already happened.

    Q.    And do you know anything about what other
information was provided by the state of Washington at
that time?

    A.    No.

        MR. LAKE:  I'll have you take a look at a
document to be marked as Exhibits 4.  With the
exhibits that we've already used we can put them aside
for the court reporter.

        THE WITNESS:  Okay.

        (Marked for identification Exhibit 4.)

    Q.    Now, Mr. Martinez, these are the responses
for information of AIS.  I'd like you to turn to page
7.  Do you see a heading called "Timeline of Changes"?

    A.    Yes.

    Q.    The first sentence states, "After the

EXHIBIT U

August 2008 Washington state audit, Lumin,

Incorporated, the predecessor company to Lantern Light

Corporation, d/b/a AIS, changed pay structure for all

technicians from 1099 subcontractors to employees."

Do you see that?

    A.    That sounds about right, yeah.

    Q.    Is it your testimony today that that change

occurred in approximately August 2008?

    A.    Around that time, yes.

    Q.    And at that time were you -- had you joined

Lumin?

    A.    A month or two within that, something like

that, yes.

    Q.    But when you started it's your testimony

that the installers were already employees?

    A.    Yes.

    Q.    Is there any other information you can

provide today about that decision to turn the

installers from 1099 subcontractors to employees?

    A.    No.

    Q.    And Mr. Martinez, how did you -- was Lumin

the first -- your first job in the business of cable

or satellite installation?

    A.    No.

    Q.    And how did you first become involved in

**EXHIBIT U**

1    that business?

2         A.    2007 I became -- I went to work for a

3    company called -- it was a subcontractor for -- the

4    name of the company was -- I'm sorry, I can't remember

5    the name of the company, but I started as a contractor

6    with them, and I performed installation of the DirecTV

7    product for them.

8              From there I went to another company called

9    Star Satellite and did the same exact thing.

10   Performed installations of the DirecTV product for

11   Star Satellite.  And then from there I kind of --

12   that's when I started to -- wanting to start my own

13   company and kind of branched out and things of that

14   nature.  I'm sorry.  I keep on doing that.

15             So I wanted to branch out.  And in those

16   days the heads of the -- the different contracting

17   firms would have monthly meetings with the site

18   managers to go over compliance and things of that

19   nature.  And that's where I met Mike, and that's where

20   Mike invited me to join Lumin, Inc.

21        Q.    And when you joined Lumin, Inc., were you

22   also doing installation work?

23        A.    Yeah.  I was managing and doing an install

24   here and there, yes.

25        Q.    And at Lumin, Inc., did you have primary

                                                          37

1    day-to-day responsibilities of the corporation?

2        A.    At Lumin, yes.

3        Q.    From the time that you began?

4        A.    Yes.

5        Q.    Did you have prior experience before 2007

6    running businesses?

7        A.    No.  I'm sorry.  No, I don't.

8        Q.    How does AIS find installers to hire?

9        A.    We -- basically there's one way, the

10   Internet.  We post an ad on craigslist, and there's an

11   e-mail associated with that advertisement of

12   employment.  Resumes get e-mailed to that e-mail, and

13   we go through the resumes and call the applicants that

14   we think would be good fits.  Once we call the

15   applicant and they answer, we try to set up an

16   interview and interview the applicant, and at that

17   point make a decision whether to extend an offer or

18   not.

19       Q.    And what requirements does AIS have for

20   installers?

21       A.    They have to be able to pass a background.

22   The background consists of criminal, motor vehicle,

23   and drug test.  As far as requirements, most of our

24   technicians drive their own rigs.  Trucks, I mean.  As

25   far as what I'm looking for in a candidate, I tend to

                                                        38

**EXHIBIT U**

look for somebody that maybe has some construction
experience or somebody that has -- I lean towards
things like that.  Somebody that knows how to use
tools.  But that's never the deciding factor.  I
mostly am looking for somebody that has a good energy.
Wants -- wants full-time work.  Wants -- has ability
to learn.

          I've trained people from -- that's worked
at the Gap.  So there's no real determining factor as
far as what I'm looking for.  But the basic stuff is
they have to be able to pass a background.  They have
to be able to do those things.  And they just have to
have a real good attitude and a real willingness to
want to learn.

    Q.   And do the candidates have to have prior
experience as installers?

    A.   No.

    Q.   Who participates in the decision to hire an
installer?

    A.   Me.  I do.

    Q.   Anyone else?

    A.   No.

    Q.   And DirecTV imposes certain requirements
before installers can work on jobs for their
customers; correct?

**EXHIBIT U**

1      A.    Of my employees?

2      Q.    Yes.

3      A.    Correct.  Well, they have certain

4   standards.  All employees -- all of my employees,

5   before they can step foot on a job site, they have to

6   have two certifications.  They need to be SBCA

7   certified, and they need to have something called a

8   "Jones certification."  And a Jones certification is

9   basically a determining test that the -- that my

10  employee, AIS employees, have a base knowledge -- base

11  working knowledge of the product and how to install

12  it.  And what rules there are as far as -- in

13  installing that product.

14           And SBCA is a similar test.  The SBCA is a

15  similar base working knowledge of the satellite

16  industry in general as far as -- it has questions like

17  how -- satellite A, how far away is it from earth and

18  things of that nature.  Did it again, "things of that

19  nature."  It has questions of things from earth and

20  specific satellite questions of the industry.

21     Q.    And the SBCA and the Jones certification,

22  who provides this training to the new AIS installers?

23     A.    We do.  Jones -- we have an account set up

24  with the Jones facility.  We have two options.  When

25  we are training -- we train a new candidate, new hire,

                                                      40

1    typically training lasts between four to five weeks.

2    Training typically is about 80 to 85 percent in the

3    field, on the job; 15 percent classroom.  And when I

4    say classroom, specifically with the Jones

5    certification, it's an on-line self-paced course work

6    that a technician can take at his or her leisure from

7    home or in our offices.  But is -- and that test --

8    actually, going through that course is only required

9    if a technician fails their first attempt at the exam.

10          So we can take the exam without going

11   through the course work, which we generally try to do

12   because the course costs more money than, obviously,

13   just taking the exam.  And we have our own training

14   materials and our own notes.  So we -- when we do some

15   of the classroom stuff, we give our candidates study

16   materials for, you know, question and answer sheets

17   for the test, stuff that they'd be seeing.  And that's

18   for that one.

19          The SBCA, we have our own account with

20   SBCA.  And it's a similar -- there's no course work,

21   but there is training materials that we have to

22   prepare them for the test.  And that's, again, that's

23   here in our facilities, and it's 100 percent on line.

24       Q.    You stated that there was an exam for the

25   Jones certification?

                                                        41

1     A.    Yes.

2     Q.    Where does that exam come from?

3     A.    Those exams are administered based on the

4  candidate's home locale.  It can be anywhere from a

5  Boeing facility to -- you may have to correct me if

6  I'm wrong -- to a library.  Lisa would know, actually,

7  the answer to that question better than I do.  It's at

8  a secure location designated by Jones.  It's like a

9  testing facility where you go to take a test to become

10  an electrician.  It's computer-based, but it's an

11  off-site facility.

12     Q.    And why does AIS require installers to

13  complete the Jones certification?

14     A.    Well, we won't -- our technician that we

15  hired wouldn't get -- wouldn't be able to complete any

16  work for DirecTV otherwise.  It's a requirement of

17  DirecTV that all of our technicians have those two

18  certifications.

19     Q.    The Jones and the SBCA?

20     A.    Yes.

21     Q.    So the requirement comes from DirecTV?

22     A.    Yes.

23     Q.    And who pays for the SBCA certification or

24  the Jones certification?

25     A.    AIS does.

42

**EXHIBIT U**

1    Q.    Are installers paid for the time spent in
2   these trainings?
3    A.    Yes.  We pay for training -- training is
4   paid at an hourly rate.  It's paid at Washington state
5   minimum wage, which is nine -- it's changing pretty
6   soon, but as it is right now it's nine -- I don't know
7   the exact cents.  It's whatever it says on the poster
8   that we have in the office.  And right now it's paid
9   at an hourly rate and all trainees are -- hours are
10  tracked hourly.
11   Q.    The training is conducted at AIS's offices
12  or do they --
13   A.    Both.  Like I said, 85 percent is
14  on-the-job training.  So they're physically out with
15  our technicians out in the field seeing how we install
16  a product, learning that way.
17   Q.    Let me rephrase the question.  The course
18  work training takes place at AIS's offices?
19   A.    Yes.  We show them videos.  I have videos,
20  installation videos, training videos how to do this or
21  how to do that.
22   Q.    How to do the specific tasks they'll be
23  doing on DirecTV products?
24   A.    (Nodding head.)
25   Q.    So does DirecTV give AIS the videos?

43

1      A.    Yeah.  We have access to DirecTV training
2    websites that has all those videos on it, and we're
3    able to download those videos, have them on our hard
4    drives, our equipment.  And we can access that at any
5    time.
6      Q.    So AIS requires installers pass a
7    background check and drug test; correct?
8      A.    Correct.
9      Q.    And where does that requirement come from?
10     A.    Like --
11     Q.    Why does AIS require installers to pass a
12   background check and a drug test?
13     A.    Similar to the Jones and the SBCA, without
14   it a technician wouldn't be authorized to perform work
15   for DirecTV.
16     Q.    So DirecTV requires that AIS installers
17   pass a background check and drug test?
18     A.    Yes.
19     Q.    Do you know what sort of past conduct would
20   cause an individual to fail the background check?
21     A.    Yes.
22     Q.    What sort of conduct?
23     A.    Motor vehicle.  They can't have more than
24   four speeding tickets.  I don't have the specifics in
25   front of me, but we do have literature that tells us

                                                        44

**EXHIBIT U**

exactly what's a pass/fail.  I know as far as criminal

they can't have any felonies.  I believe a candidate

cannot have any serious misdemeanors, specifically

anything with theft involved.  DUIs are a big deal.

So that's a big disqualifier.  As far as drugs, if you

show positive for things, like any type of illegal

drug is a disqualifier.  Illegal drugs right now still

is marijuana, cocaine.  Things of that nature.  Motor

vehicle, criminal, drug.  To my knowledge that's...

    Q.    And who sets the terms of what will fail

the background check?

    A.    It says -- the company's name is Sterling,

and it's a Sterling -- the name of the literature that

we have is Sterling criteria for pass/fail.

Specifically who sets Sterling's criteria, it's

DirecTV.

    MR. LAKE:  Mr. Martinez, I'll have you take

a look at a document to be marked as Exhibit 5.

    (Marked for identification Exhibit 5.)

    Q.    Have you seen this document before?

    A.    This the contract between DirecTV and

Lumin.

    Q.    Well, please take your time looking over

that, and I'd like you to confirm that.

    A.    Sure.  Yes.  This looks like the contract

between DirecTV and Lumin.  It looks similar to the
contract I have with DirecTV right now.  But the Lumin
one I didn't sign, so I don't have specific knowledge
of it, but I have more knowledge of the one that I
signed.

Q.    So there's another contract that AIS has
signed --

A.    Uh-huh.

Q.    -- with DirecTV?

A.    Uh-huh.  Yeah.

Q.    Is that a yes?

A.    Yes.  I'm sorry.  Yes, it is.  I don't have
-- AIS has got its own signed contract with DirecTV.

Q.    Can you turn to page 43.  It's the second
to last page of the document.  And also look over page
44 as well.  Is that your signature above the heading
"Ramon Martinez, vice-president Lumin, Incorporated"?

A.    Yes.

Q.    Do you recall signing this assumption
agreement on approximately January 6, 2011?

A.    Yes.

Q.    And is that your signature above "Ramon
Martinez, president/CEO, Lantern Light Corporation"?

A.    Yes.

Q.    Do you recall signing on behalf of Lantern

46

1    Light approximately January 6, 2011?

2        A.    Yes.

3        Q.    So you've seen this assumption agreement

4    before?

5        A.    Yes.

6        Q.    Pages 43 and 44?

7        A.    Yes.  So, can I speak?

8        Q.    Please.

9        A.    So, basically this was the segue between

10   Lumin and Lantern.  And this was basically a document

11   saying that I was authorized to make that transition.

12   And I think it was an easy segue between companies.

13       Q.    And after signing that assumption

14   agreement, you then, at some point later on, executed

15   a new contract with DirecTV?

16       A.    Yes.

17       Q.    Can you turn to page 26 of the document, of

18   this contract.  Do you see the paragraph entitled

19   "Subcontractors"?

20       A.    Yes.

21       Q.    Do you see the three subheadings "(i),"

22   "(ii)," and "(iii)" in the first sentence?

23       A.    Yes.

24       Q.    The first "(i)" states that the contractor

25   will provide evidence of insurance, background check,

                                                        47

drug screen, which we've talked about.  The second

deals with receiving and successfully completing the

SBCA or other approved training.

Now, the third states that, going back to

the beginning first:  In no event shall a contractor

appoint or allow any third party or subcontractor to

perform and provide any services prior to -- turning

to subpart 3 -- receiving an approval from DirecTV,

which approval may or may not be granted in DirecTV's

discretion.  Do you see that?

A.    Yes.

Q.    Does the contract that DirecTV has with AIS

have a similar provision?

A.    I believe so.

Q.    Well, let me ask the question differently.

When AIS determines that it wants to hire an

installer, does AIS have to receive approval from

DirecTV?

A.    No.

Q.    Before an installer can perform work on

DirecTV customer homes, does AIS have to receive an

approval from DirecTV?

A.    No.

Q.    So once AIS hires an individual and that

individual completes the training and background

48

checks that we've discussed, are there any other steps
that AIS goes through before that installer goes out
and starts working on DirecTV projects?

A.     We submit a request for a tech number to be
issued.  Once that tech number is issued we submit a
-- we let them know the technician has completed
training and has passed the certifications and we want
them to start pulling a work -- pulling a route or
work as of a certain date.

Q.     Does AIS provide any evidence of completing
-- the installer completing the training or passing
the background check or drug test?

A.     Yes.  Certain numbers associated with
passed course work.  I don't know if it's a serial
number, but it's a completion number or...

Q.     After AIS makes this request to have that
installer get a tech ID and start receiving work
orders, has DirecTV ever responded with requests for
additional information before it will do that for an
installer?

A.     No.

Q.     Has DirecTV ever made any follow-up of any
kind about an installer that AIS wants to start
working on DirecTV products?

A.     No.

1      Q.    Has DirecTV ever said that it does not

2  approve of a certain installer before that installer

3  can do any work on their customers' homes?

4      A.    No.

5      Q.    Mr. Martinez, can you please describe the

6  duties of installers for AIS?

7      A.    The duties of an AIS technician is

8  basically the installation and activation of DirecTV's

9  product, be it either high definition or basic digital

10  installation.  A technician reports to the -- reports

11  to AIS offices to pick up whatever paperwork or

12  equipment needed to fulfill installation duties

13  throughout the day.

14          Once they've picked up the equipment and

15  paperwork that they need they report to the job site

16  and install what the DirecTV customer has requested on

17  a work order that's been issued to them.  The date can

18  either consist -- every day varies.  The workload

19  varies day to day.  So, on any given day a technician

20  could have two or three or four appointments.  And a

21  technician goes through his or her day as the

22  appointments get completed of the installation of the

23  DirecTV product.

24      Q.    Besides installation, are there other

25  services performed by the AIS installers?

                                                    50

**EXHIBIT U**

1      A.      No.

2      Q.      How -- where do the specifications come

3   from on how AIS installers are supposed to perform the

4   installations?

5      A.      There's a standard installation practice

6   and policy guideline, and it's all directed by

7   DirecTV.  They tell us exactly how they want to see

8   the work performed.

9              (Marked for identification Exhibit 6.)

10     Q.      Mr. Martinez, please take a moment to

11  review this document that's been marked as Exhibit 6.

12     A.      Okay.

13     Q.      Have you seen this document before?

14     A.      No.  This specific one, no.

15     Q.      Have you seen a similar list of

16  instructions on performing residential installations?

17     A.      Yes.

18     Q.      And did that document, the one that you're

19  describing, come from DirecTV?

20     A.      Yes.

21     Q.      Do you provide a copy of these instructions

22  from DirecTV to installers so they understand how to

23  perform their duties?

24     A.      No.

25     Q.      So, are installers given any written

                                                      51

**EXHIBIT U**

materials instructing them how to perform their

duties?

A.   We have -- AIS has training materials that

we've put together.  Training materials consist of how

installations are to proceed.  How -- where the

satellites are located, best practices.  The training

videos that we also watch have all of this in there

also.

Q.   All of the information that's in Exhibit 6?

A.   Pretty much.  It has, you know, calling the

customer before we get out there, what -- best

practices.  What we're supposed to do when we get

there.

Q.   And these training videos are provided by

DirecTV?

A.   They give it -- yes.  They give us access

to their training website, and we grab them off their

website.

Q.   The written training materials that you

were just describing about how installations are to

proceed and where satellites are located, who

generates those materials?

A.   We do.  And we've gone through a couple of

processes.  Again, best practices.  In years past

we've put books together for our installers.  We've

**EXHIBIT U**

gotten information from a variety of places.  We found
that those books sometimes end up at the bottom of
somebody's truck.  So then we've gone to best
practices, you know, a highlighted book that only had
a couple of pages.  Each technician is different on
how they absorb and use the materials that we give
them.

        We're still fine tuning the process of
training and how we disseminate the information, but
as far as literature given to the technician, these
days it's pretty limited because, like I said,
sometimes we spend a lot of money on these books.  And
they're just -- they disappear within a week or --
because the job is the same.  The job is identical day
to day, and through process in doing the job the
expectations are met.

        Q.    How many days per week do AIS installers
work?

        A.    Right now we're on a six-day rotation.
Well, throughout the year it's either five-day or
six-day rotation.  What designates that is the
workload in the region.

        Q.    So, you said currently it's a six-day
rotation?

        A.    Yes.

                                                    53

**EXHIBIT U**

1      Q.      Since AIS was started in 2010, has it
2   always been either a five or six-day rotation?
3      A.      Yes.
4      Q.      When you were at Lumin, was it also either
5   a five or six-day rotation?
6      A.      Yes.
7      Q.      The entire time you were at Lumin?
8      A.      Yes.
9      Q.      What do you mean when you say it is based
10  on demand or work flow in going between the five or
11  the six-day schedule?
12     A.      Throughout the work year there's -- it has
13  ebbs and flows.  There's busy times of the year and
14  there's not so busy times of the year.  I don't like
15  using the word "seasonal," but that seems to be the
16  best way to describe it.  Seasonally there are times
17  where, you know, the workload is really there.  I
18  mean, there's an abundance of work and we can't keep
19  up with it.  But there are times of the year where
20  there's not a lot of work, and that's why we're on a
21  five-day rotation.
22     Q.      Approximately how many months a year are
23  you on a six-day rotation?
24     A.      That varies also.  Last year I believe we
25  were on six days for six months.  The year prior I

                                                        54

**EXHIBIT U**

1  believe it was four months, but that totally varies

2  with the workload and, I guess, the best offer out

3  there for DirecTV customers and who is signing up for

4  it.

5      Q.    What information does AIS have to be able

6  to anticipate, in advance, whether the next week

7  should be a six-day week or a five-day week?

8      A.    Zero.

9      Q.    So how do you decide, in a given month or a

10 given week, whether it's going to be a six-days or

11 five-days?

12     A.    I get a call from a -- the site manager at

13 DirecTV, and we go over something that's called ADTX.

14 Basically what that is is the workload currently, the

15 projected workload and what it's going to be looking

16 like going forward.  And at that time, we get a

17 request asking us, hey, are you guys willing to go six

18 days, or can you go six days, this is what the work

19 week is looking like and this is what we need.  And I

20 say either yes or no.

21     Q.    And that request comes from?

22     A.    The site manager.

23     Q.    Of DirecTV?

24     A.    Yes.

25     Q.    What goes into your decision whether to say

                                                    55

**EXHIBIT U**

1  yes or no to that request?

2       A.    Basically that's when the company really

3  makes its money for the year.  We struggle through

4  parts of the year, and when we are given the

5  opportunity to go to six days more often than not we

6  jump at the chance.  Technicians are excited.  It

7  gives them an opportunity to make more money also.

8  The company is able to make more money and able to pay

9  off old debt.  But it's -- the decision is easy.  It's

10  basically more money.

11      Q.    Do you recall ever saying "No" to the

12  request from DirecTV to go six days per week?

13      A.    Honestly, no.  That's -- seriously, it's

14  the time that we make the most money.

15      Q.    And how often do these ADTX conversations

16  happen with the DirecTV site manager?

17      A.    They're periodic.  It's something that I'm

18  assuming he's monitoring on a weekly basis.  I don't

19  know the exacts of his job, but I know that he

20  monitors it.  And when the projection is showing that,

21  you know, the workload is going to be that, that's

22  when I get pulled in, saying, hey, this is how things

23  are looking, can you do it; if you can, when can you

24  do it, you know.  So they don't dump it on me like,

25  boom, you're on six days.  They give me opportunities

                                                    56

1    to prepare for it.

2        Q.    So, is it fair to say that the norm is five

3    days a week unless the site manager has told you from

4    DirecTV that there's enough demand to have installers

5    work six days per week?

6        A.    Yes.

7        Q.    And how frequently do those conversations

8    happen with the site manager?

9        A.    Well, the ADTX conversations are loosely a

10   couple times throughout the year.  When they get more,

11   you know, like consistent, such as when we're getting

12   close to going on to being requested to go on a

13   six-day rotation -- but those are loosely throughout

14   the year.

15       Q.    When the DirecTV site manager requests that

16   AIS installers begin working six days per week, are

17   you given a time period for how long -- how many weeks

18   that demand will be there to work six days per week?

19   Like, can you work six days per week for the next

20   couple months or something like that?

21       A.    I don't have an end date, if that's what

22   you're asking.

23       Q.    It's just can you start doing this?

24       A.    Yes.

25       Q.    Generally, how much lead time does the

                                                          57

1  DirecTV site manager give you before he wants the
2  installers to begin working six days per week?
3      A.    Two to three weeks.  Depends on what I
4  want.  If I -- if I want my team to have an extra
5  weekend or I want -- I don't want to just dump it on
6  them, and, hey, next week you're on six days, so
7  whatever you had planned, stop.  But generally it's
8  been two to three weeks.
9          As far as the end time, if I start seeing,
10 you know, gaps in our schedule, if I start seeing,
11 hey, you know, there's no need for us to be on six
12 days, I'll call that meeting and let them know what
13 I'm seeing.  And then we'll -- again, at that point,
14 that's what I was telling you, periodically we'll
15 reassess it and we'll look at that time and be, like,
16 is this need still there.
17     Q.   Once AIS decides that the installers will
18 move up to a six-day-per-week schedule, does AIS then
19 -- how does AIS relay that information to its
20 installers?
21     A.    It's a two-part process, or actually
22 three-part process.  Initially it's the supervisors
23 informing the technician, hey, we're going to be going
24 to six days pretty soon.  Then formally a group e-mail
25 is sent to all the guys letting them know exactly what

                                                        58

EXHIBIT U

1  date we're going to be going on six days.  And if I
2  can, I'll have an all-employee meeting, and as a team
3  we'll discuss it, what it looks like in the
4  timelines.
5       Q.   Are the installers given the choice whether
6  to remain at five days or move up to six days per
7  week?
8       A.   Not really.  When I say "not really," no.
9  If -- well, no, let me backtrack.  That's not exactly
10 true.  I do have some technicians that are on five
11 days.  Right now I have a technician that's on five
12 days because he's had a -- he goes to see sometimes --
13 I don't really get into specifics with personal lives,
14 but he goes to see some type of -- I don't know if he
15 gets -- I don't know.  He's got, like, six Thursdays
16 booked out that he's got to go see a chiropractor,
17 something like that, or acupuncture, something like
18 that.  So he asked me, hey, can I stay on five, and I
19 have this thing going on, and so, yeah.
20            On a case by case basis, I will let
21 somebody stay on five days.  Like I say, that decision
22 is mine because I really need the whole team to stay
23 on six days because that's when we make the most
24 money.  So when we are given that opportunity, I jump
25 at it.

                                                    59

EXHIBIT U

1      Q.    So absent some type of medical reason, like

2  the individual you mentioned, generally the installers

3  are expected to work six days per week?

4      A.    Yes.  When I interview a candidate, and

5  we're still on a five-day rotation, I let them know

6  that eventually, you know, the workload will increase

7  and we will be going to six-day work week.  So, yeah,

8  that expectation is laid out clearly.

9      Q.    Who determines what days the installers

10  will work?  So if they're working five or six days per

11  week, who determines what would be the off days?

12      A.    I do.  Generally, again, when I'm

13  interviewing a candidate, I let them know that we

14  generally work through the weekend.  We're in the

15  customer service business, so we have to be home when

16  the customers are home.  When do we have most access,

17  or when do we complete the most work is going to be on

18  the weekends.

19      So when we're on a five-day rotation

20  generally we have technicians have either a Tuesday/

21  Wednesday off or a Wednesday/Thursday off, but I do

22  have guys that have asked me to have Sundays off.  And

23  I do -- currently on my staff, I have three

24  technicians that have Sundays off.  And that's solely

25  at my discretion.  Long-term employees, they ask me,

60

1  hey, I like to go to church on Sundays, whatnot, but
2  for the most part I expect everybody to work the
3  weekends.
4      Q.    How many hours per day do the installers
5  typically work?
6      A.    Honestly, that varies.  I couldn't answer
7  that specifically.  Some days a technician might be
8  off at one or 2:00.  Some days the technician might be
9  off at four or 5:00.  It solely depends on the
10 workload for that day.
11     Q.    What time do installers start their shift?
12     A.    I have two types of installers.  I have
13 remote technicians and I have technicians that report
14 to the office.  The technicians that report to the
15 office are supposed to be there at 7:00.  Whether that
16 happens or not is another story.  But they're supposed
17 to report to the office at 7:00, gather their
18 equipment, and be on the job site between 8 and 8:30.
19 Our remote technicians, they work straight from home,
20 report straight to the job site, and that's at between
21 8 and 8:30.
22     Q.    How do you decide whether to have an
23 installer be a remote technician or one who has to
24 report to the office?
25     A.    Most of the time it's a geographic

                                                      61

location.  If I have a technician -- for example, I
have a technician that lives in Lake Stevens.  My
offices are in Kent.  So, it makes sense for us to
start that -- create that process of where he comes
down to the office maybe once a week to pick up
equipment for the week, and him just report straight
to the job site straight from his house or from his
home locale.  But it's strictly geographic.  There's
no -- it's strictly geographic.

Q.    So on a shorter day, the installers, you
testified, will finish between one and two p.m.?

A.    Sometimes noon.  It depends.

Q.    What does it depends on?

A.    The workload for that day, what we got
issued and what's available.

Q.    When installers first are hired by AIS, are
they given any kind of schedule as to how many hours
per week that they can expect to work?

A.    They're given -- no, no.  When I'm
interviewing somebody and we're going over the job, I
tell them exactly what I just told you as far as what
the days look like.  I tell them how we monitor the
jobs.  I tell them that their hours are monitored
heavily, and they're expected to account for all of
their hours.

GRADILLAS COURT REPORTERS
(310) 859-6677

EXHIBIT U

1          They're told if they go over 40 hours there

 2     is a -- which I've learned through my dealings with

 3     the Department of Labor, there is an overtime rate

 4     that we're supposed to apply, but as far as

 5     specifically what to expect, I always give them a

 6     generality.  Report to the office at seven and

 7     normally you're off between four and five.  Whether

 8     that turns into 12, one or two, but they're generally

 9     told they're expected to be there at that time, those

10     times.

11          Q.     Generally between 7 a.m. and 5 p.m.?

12          A.     Four to five, something like that, yeah.

13          Q.     Are there instances when installers will

14     work later than 5 p.m.?

15          A.     Yes.

16          Q.     What would cause that to happen?

17          A.     Well, currently right now -- so there's --

18     we work with two time frames right now.  Let me get --

19     so currently, typically throughout the year, we work

20     with either an AM or a PM appointment.  AMs are eight

21     to 12.  PMs are 12 to fours.  But in the summertime,

22     in the summer months, there's a third time frame

23     opened up, which is called a four to eight.  And

24     typically in the summer months, a technician may be

25     out later than four due to those four to eight

                                                          63

EXHIBIT U

1    appointments.

2         Q.    This 4 p.m. to 8 p.m. time frame, has this

3    been in place since AIS started?

4         A.    Yes.

5         Q.    For the summer months?

6         A.    Yes.

7         Q.    Was it also in place at Lumin?

8         A.    Yes.

9         Q.    During the summer, do installers have

10   4 p.m. to 8 p.m. appointments most days?

11        A.    Yes.

12        Q.    If an installer is working a five-day-per-

13   week schedule in the summer, are they doing 4 p.m. to

14   8 p.m. time appointments four of those days, four out

15   of five?

16        A.    It's possible.  The reason why I say it's

17   possible is because -- so we do see the four to eights

18   in the summer months.  The AMs and the PMs are

19   predominantly part of the workload for most days, but

20   we'll see a portion of it be four to eights.

21             Technicians like to juggle their jobs

22   around also.  They'll contact another technician and

23   they'll say, hey, can you take my four to eight.  I

24   mean, as long as they get approval from one of our

25   supes to kind of move a job around like that, saying,

64

EXHIBIT U

```
 1   hey, I don't want this four to eight or whatever, they
 2   can do things like that.  But, I mean, your question,
 3   five-day work week, four days, see you four to eight,
 4   yeah, that is possible.
 5            MR. LAKE:  I think now would be a good time
 6   for the first break.
 7            MR. KELLY:  Sure.
 8            (Off the record from 10:30 to 10:45 a.m.)
 9       Q.   So, Mr. Martinez, how does AIS evaluate the
10   performance of its installers?
11       A.   We do it through our QC process and we use
12   the metrics.
13       Q.   Besides the information provided by
14   DirecTV, what other input goes into the evaluation of
15   installers, if anything?
16            MS. TRUONG:  I'm just going to object as to
17   the use of the term "information provided by DirecTV"
18   as to vague.  But you can answer if you understand.
19       A.   We get e-mail from customers.  You know,
20   like "atta boys."
21       Q.   So AIS will directly hear from customers
22   sometimes?
23       A.   Yes.
24       Q.   When AIS installers go out to perform a
25   job, do the installers provide AIS's contact
```

**EXHIBIT U**

1  information?

2      A.    They shouldn't, but at times the technician

3  will.

4      Q.    So when AIS customers -- or excuse me, when

5  the customers contact AIS, do you know how the

6  customers are getting the contact info for AIS?

7      A.    Probably from the technician that knows

8  they did a good job, and they're getting a -- because

9  I'll get an e-mail and not know where it's from where,

10  but they'll refer to their latest installation.

11      Q.    Does AIS or do you, as the president of

12  AIS, give much weight to those kind of communications

13  from customers?

14      A.    I do, I do.  If somebody has gone out of

15  their way to give me some positive feedback or

16  negative, I do.

17      Q.    So there's the metric reporting from

18  DirecTV, and then occasionally direct communication

19  from customers to AIS.  Is there anything else that

20  goes into AIS's performance evaluation of installers?

21      A.    Yes.  The QCs that I have the supervisors

22  do on the technician's installation.

23      Q.    And I know we talked a little bit about

24  those earlier, but how frequently is a given installer

25  evaluated by a supervisor?

66

**EXHIBIT U**

1      A.    Monthly.

2      Q.    So every month -- does that mean every

3   month the supervisor will accompany the installer on a

4   job, or will just give an overall evaluation?

5      A.    They'll do a one-on-one with the

6   technician.  A supervisor will choose whatever time is

7   convenient for him to do the one-on-one.  And

8   basically they're going over the information that we

9   got back.

10     Q.    How frequently do the supervisors accompany

11  an installer on a job?

12     A.    Not frequently.

13     Q.    Does AIS have any kind of policy that a

14  supervisor should accompany an installer every six

15  months or every year to see how they're doing on the

16  job?

17     A.    No.  We don't have a policy like that.

18     Q.    And you also testified earlier that the

19  supervisors will sometimes do follow-up at the

20  customer's homes?

21     A.    Yes.

22     Q.    To evaluate the performance?

23     A.    Uh-huh, yes.

24     Q.    Does AIS have any policy about how often a

25  given installer should have that kind of follow-up

67

EXHIBIT U

1   work done?  At least once a year or --

          2        A.    No.

          3        Q.    Please review a document that will be

          4   marked as Exhibit 7.

          5              (Marked for identification Exhibit 7).

          6              MR. KELLY:  Several of the documents that

          7   we used today did not include Bates numbers on the

          8   bottom.  Can you represent that Exhibit 7 was produced

          9   in discovery in response to requests, Exhibit 6 was

         10   produced in discovery in response to requests?

         11              MR. LAKE:  I'm not going to make any

         12   representations on that on the record.

         13              MR. KELLY:  You think it's appropriate,

         14   when we've asked for documents relating to your

         15   allegations, that you do not produce them and then

         16   surprise us with them in a deposition?

         17              MR. LAKE:  Well, I think it's inappropriate

         18   to have this discussion during the deposition on the

         19   record, first.

         20              MR. KELLY:  Well, since we are already in

         21   deposition, and since you are surprising us with

         22   documents that are not Bates stamped, other than

         23   Exhibit 5, and since you asked for these documents in

         24   discovery, I think it's highly appropriate.

         25              MR. LAKE:  Well, your objection is noted.

                                                                    68

**EXHIBIT U**

```
 1          MR. KELLY:  Well, I would like to get an

 2    answer to the question for the record.

 3          MR. LAKE:  I'm going to choose to not

 4    provide an answer because there is no need to do one.

 5    This is a deposition of AIS.  I'm not the person who

 6    is going to be here answering questions today, but in

 7    an appropriate forum I'd be happy to have that

 8    discussion.

 9          MR. KELLY:  For the record, it is 10:51.

10    We've been at the deposition a couple hours now.  Two

11    documents which we specifically asked for in discovery

12    were not produced, and we know what our rights are.

13        Q.    Mr. Martinez, turning to Exhibit 7, have

14    you seen this document before?

15        A.    Yes.

16        Q.    What is your understanding of this

17    document?

18        A.    It's an incentive program DirecTV has

19    created for their contracting partners in order to

20    achieve good post calls.

21        Q.    So DirecTV is offering incentives if

22    installers perform well on the customer service?

23        A.    Yes.

24        Q.    What happens -- or excuse me.  First, has

25    AIS received any of the incentives that have been
```

                                                      69

**EXHIBIT U**

1   described in Exhibit 7?

2       A.      Yes.

3       Q.      What happens when that money is received by

4   AIS?

5       A.      Do you mean what do we do with it?

6       Q.      Correct.

7       A.      It goes to our bank account.

8       Q.      Does it -- does it go to the installer?

9       A.      No, no.  That money is the money of AIS.

10      Q.      Okay.  Now, the post call index that is

11  described in Exhibit 7, is it keyed to the performance

12  of individual installers or is it the performance of

13  AIS as a whole?

14      A.      The performance of AIS as a whole.

15      Q.      Okay.  Now, do you know what goes into

16  determining the post call index?

17      A.      Yes.  It's part of the metrics that I told

18  you about.  The post call index consists of ID badge,

19  technician clean up, equipment working properly.  It's

20  whatever the customer reports back to to DirecTV.

21      Q.      Towards the bottom of the page, under the

22  table for post call index, the next sentence reads,

23  "All other aspects of the incentive remain the same."

24  Do you see that?

25      A.      Yes, I do.

**EXHIBIT U**

1     Q.     Do you know what this is referencing?

2     A.     Actually, I don't.

3     Q.     Were there other incentives that DirecTV

4  provided to AIS besides this post call index?

5     A.     No.

6     Q.     At any time?

7     A.     No.

8     Q.     What about when you were at Lumin?  Can you

9  think of other incentives beside the post call index?

10    A.     No.

11    Q.     When AIS would receive the -- any money

12 through this incentive, the post call index, would AIS

13 provide any kind of bonus or anything to installers

14 for their performance?

15    A.     Typically, no.

16    Q.     In general, does AIS provide any kind of

17 incentives for its installers?  Any kind of bonuses?

18 Anything like that?

19    A.     Once in a while we'll develop an incentive

20 program where we include the post call index, and if a

21 technician individually achieves a certain mark, we

22 will bonus him or her out a certain percentage of

23 monies.

24    Q.     And when you say they hit a certain mark,

25 what do you mean by that?

71

**EXHIBIT U**

A.    Above 96 percent.

         Q.    So it's based on the information from
DirecTV?

         A.    Yes.

         Q.    What kind of range could this bonus be as
far as how much?

         A.    It's a good Lisa question, but in general
two to three dollars per good call.

         Q.    And what do you mean by "good call"?

         A.    Anything above 96 percent.

         Q.    So is AIS given data on the performance of
an installer on each call?

         A.    No.  Not consistently, no.

         Q.    What do you mean when you say "Not
consistently?"  Is AIS sometimes given data by DirecTV
on installers on each call?

         A.    On each specific call, no, but we can dig
for the information through -- let me go back.  I'm
trying to give you a good answer as far as
specifically how this works.  Individually, good
calls, no.  But if a technician has got a score of 96
or above, I know how many post calls have been done on
a certain technician, so that's how I know how many.
I'll assume all those calls got him the 96.

         Q.    So, you're saying that if a technician

                                                      72

**EXHIBIT U**

scores above a 96 over a given time period that most

of the calls, or, excuse me, essentially all of the

calls had to be good calls?

A.    Yes.  So they'll get like two or three

dollars for each good call, yes.

Q.    And what kind of a time period are we

talking about?  Like is this for a pay period?

A.    Monthly.  I'm sorry.  Monthly.

Q.    So does AIS provide bonuses on a monthly

basis?

A.    Currently, yes.

Q.    When you say "currently," is this a

relatively new program?

A.    The current program, yes.

Q.    When did it -- when did this current

program begin to be instituted?

A.    January of 2014.

Q.    Prior to January of 2014, what was the

bonus program, if any, at AIS?

A.    It was -- we used the post call, what we

just described.  That's it.

Q.    Was it less frequent than monthly?

A.    No.

Q.    What I'm trying to find out is -- you said

that AIS has instituted a program in January.  So what

73

**EXHIBIT U**

1  was -- what was new about this program that you're

2  describing in January as opposed to before January?

3      A.    Basically the new program takes all the

4  metrics into consideration, whereas the old one I just

5  looked at post calls.

6      Q.    When you say "all the metrics" you're

7  referring to the metrics we discussed earlier?

8      A.    Yes.

9      Q.    And when AIS is paying bonuses or

10 incentives to installers, where does that money come

11 from to pay those?

12     A.    Where does it come from?

13     Q.    (Nodding head).  Is it money that comes --

14 that has come from DirecTV through its incentive

15 program or is this money that comes from AIS?

16     A.    It's straight from AIS.

17           MR. LAKE:  Mr. Martinez, I'll next give you

18 a document that will be marked as Exhibit 8.

19           (Marked for identification Exhibit 8.)

20     Q.    And Mr. Martinez, these are AIS's responses

21 to requests for admission from the Department of

22 Labor.  Specifically I'd like you to turn to page 7,

23 requests for admission No. 20.  Do you see that?

24     A.    Yes.

25     Q.    Do you see the "X" and then the word

                                                    74

1  "Deny," and then a couple of sentences after that,

2  about in the middle of the page, starting with "AIS

3  began receiving" --

4       A.    Yes.

5       Q.    -- "a monthly bonus based off the average

6  for all of our technicians for this metric from

7  DirecTV in January 2011."  Do you see that?

8       A.    Yes.

9       Q.    So was it in January 2011 that AIS first

10  started receiving incentives for the post call index?

11       A.    It's possible.  I don't know.

12       Q.    Did you have any role in preparing these

13  responses?

14       A.    These responses?

15       Q.    Yes.

16       A.    Were these the question and answer kits

17  that we were given?

18       Q.    These are requests for admission from the

19  Department of Labor where we ask AIS to either admit

20  or deny certain factual assertions.

21       A.    Well, then, yes, I definitely was involved.

22       Q.    Okay.  So turning back to the response to

23  No. 20, which states that AIS began receiving a

24  monthly bonus in January 2011 based on the post call

25  index, do you know where that information, that

                                                      75

January 2011 date, could have come from if you don't

know it?

     A.     We probably were looking at referencing

some documents that we had to verify that.

     Q.     So, when you started AIS, was AIS receiving

any kind of incentives from DirecTV?

     A.     No.

     Q.     When you were at Lumin, was AIS receiving

any kind of incentives from DirecTV?

     A.     Not that I can remember.

     Q.     So this post call index, as to your memory,

is the first incentives that was received?

     A.     Yes.

     Q.     Turning to the next sentence, "AIS has

offered different incentives programs for our

technicians based on several metrics including the

post call index." Can you describe what these

different incentives programs are? I know we've

talked about some, but is there anything else? Any

other information you can provide?

     A.     The protection plan. If a technician

offers a customer a protection plan, not an exact

number, but I believe we paid technicians two dollars

for every protection plan. That's an incentive that

they had to do that.

                                                      76

**EXHIBIT U**

1    Q.    And why does AIS specifically offer this
2   incentive for protection plans?
3    A.    It's part of the expectation.
4    Q.    And why is that?  What is the protection
5   plan?
6    A.    It's a -- it's like a warranty for the
7   customer offered by DirecTV.
8    Q.    Why is it part of the installers'
9   expectations that they complete -- or that they sell
10  protection plans?
11   A.    Because it's a DirecTV requirement.
12   Q.    What do you mean by that?
13   A.    They ask us to offer the protection plan at
14  every single appointment that we visit.
15   Q.    Does DirecTV offer any incentives to AIS to
16  sell protection plans?
17   A.    Yes.
18   Q.    How much per protection plan?
19   A.    I believe we get four dollars.
20   Q.    Currently?
21   A.    Yes.
22   Q.    Do you recall that number changing any time
23  in recently or --
24   A.    No, I don't.
25   Q.    Besides the protection plan, are there any

77

**EXHIBIT U**

other incentives programs that AIS has offered to its
technicians?

    A.    No.

    Q.    You can set aside Exhibit 8 for now.  So
does DirecTV -- if DirecTV receives negative feedback
about the work that's being done by AIS, does that
information get passed on to AIS?

    A.    Yes.

    Q.    And what does AIS do when it receives
negative customer feedback about an installer?

    A.    We mentor -- we sit down with the
technician and mentor them.

    Q.    I know we talked about this a little bit
earlier.  Has AIS fired an installer based on negative
feedback from DirecTV customers?

    A.    I can't give you an exact, but my initial
answer would be yes.

    Q.    Has DirecTV otherwise disciplined an
installer based on negative feedback received from
DirecTV customers?

    MR. KELLY:  Vague and ambiguous as to
"discipline."  Calls for a legal conclusion.  You can
answer.

    A.    DirecTV has no involvement with any of my
technicians.

78

**EXHIBIT U**

1    Q.    Right.  My question, though, was has AIS

2    disciplined any installer based on feedback received

3    from DirecTV customers?

4         MR. KELLY:  Objection.  It's a technical

5    one, counsel.  That wasn't your prior question, so

6    whichever one you want answered, but the question is

7    different.

8    Q.    My question to you is the one I just said.

9    Has AIS disciplined installers short of termination

10   for -- based on the feedback received from DirecTV

11   customers?

12   A.    Yes.

13   Q.    And what sort of measures -- short of

14   termination, what sort of disciplinary measures has

15   AIS taken?

16   A.    Like I said before, we're a small company,

17   so nothing is super black and white, but we've -- any

18   feedback we've gotten from DirecTV customers, be it

19   positive or negative, always gets a one-on-one with

20   either me or the supervisors.  We are constantly

21   mentoring the technicians, but there's no official

22   write-up or things of that nature.

23   Q.    I think you had testified earlier that

24   there are -- suspensions is one disciplinary measure.

25   Can you recall any instances where AIS has suspended

                                                    79

**EXHIBIT U**

1    an installer?

 2          A.    Specifically, no.  But I know that in the

 3    past we may have put somebody on, like, a two-day

 4    suspension or whatnot.

 5          Q.    Do you recall what they were suspended for?

 6          A.    No.

 7          Q.    Mr. Martinez, I'll have you look back at

 8    Exhibit 4, I believe.  It's the contract between Lumin

 9    and DirecTV.  Excuse me, Exhibit 5.  And if you could

10    turn back to page 26.  There's a sentence in

11    approximately the middle of the page on DTV 26.

12    "DirecTV, in its sole discretion, and upon notice to

13    contractor, may terminate the subcontractor status of

14    any such third party or subcontractor, and contractor

15    may not engage or otherwise utilize such third party

16    or subcontractor in the performance of services as set

17    forth herein unless and until DirecTV, in writing,

18    reinstates such third party or subcontractor as a

19    subcontractor, if ever."

20          Do you see that sentence I'm reading?

21          A.    No.  Actually, in the event --

22          Q.    So, it's the paragraph under

23    "Subcontractors," and it's towards the bottom of that

24    paragraph.  The sentence begins on the right side.

25    The previous sentence states, "In addition each

                                                          80

1  subcontractor shall be identified"?

2      A.    I got it.

3      Q.    So I'm looking at the follow-ups on DirecTV

4  -- regarding DirecTV's authority to terminate.

5      A.    Okay.

6      Q.    Do you see that sentence?

7      A.    Yes.

8      Q.    Are you aware if the contract between AIS

9  and DirecTV has any similar such provision?

10      A.    No.  I'd have to look at it.

11      Q.    Is it your understanding that DirecTV has

12  the right to terminate an AIS installer?

13      A.    One of AIS's?  No, I don't think they have

14  that right.

15      Q.    Is it your understanding that DirecTV has

16  the right to tell AIS they do not want a given

17  installer to perform work orders any more for DirecTV?

18      A.    They may have customer service issues or

19  concerns, or they may -- when I say "they" I mean

20  DirecTV.  DirecTV may have concerns on the general

21  workmanship of a certain technician.  So, yes.  So

22  they -- if they have concerns over the quality of the

23  work being installed or, you know, constant complaints

24  from customers over a specific technician, then yes.

25      Q.    And has DirecTV come to you with

                                                    81

**EXHIBIT U**

circumstances like the one you just described?

A.   Very rarely.  To the point where I can't even remember the last time they did that.

Q.   But do you recall that it has happened?

A.   Yes.

Q.   In the circumstances and the situations that you're describing, has DirecTV asked AIS not to give an installer, who has been having frequent complaints, any more work orders from DirecTV?

A.   No.

Q.   Have there been any circumstances where DirecTV has said to AIS that they don't want an installer performing work orders for DirecTV?

A.   Yes.

Q.   What were the circumstances of that?

A.   Similar to what we had just discussed.  A technician -- and I can't give you specifics, but I recall a time where a technician had some serious quality issues.  They had serious workmanship and craftsman issues, and they were causing damage to, you know, the system, whatnot.  At that point we've had conversations where they informed me if this continues they will no longer issue work to a certain tech number unless something changes.

Q.   And do you recall how that situation

82

EXHIBIT U

1  resolved?

2      A.    Most of the time, once it gets to that

3  point, I quickly turn the technician around.

4      Q.    Has this happened more than once that

5  DirecTV has made such --

6      A.    Yes.

7      Q.    Has it happened at least once a year?

8      A.    No.

9      Q.    In any circumstances where DirecTV has

10 noted their concerns with a specific installer

11 performing work orders, has AIS subsequently taken any

12 disciplinary measures?

13     A.    Initially, no.  We do our own homework and

14 we investigate whatever is being reported.  From there

15 I make the decision on how to proceed.

16     Q.    Has DirecTV's concerns with a specific

17 installer led to an installer eventually being

18 terminated by AIS?

19     A.    No.  No.  I honestly -- we don't fire a

20 lot.  We're a small company and we work really hard

21 to grow the foundation and make it work.

22     Q.    Has anyone with DirecTV ever suggested or

23 implied to AIS that it wanted AIS to terminate a

24 specific installer?

25     A.    No.

                                                      83

**EXHIBIT U**

1    Q.    And what about when you were at Lumin?  Did
2  DirecTV ever ask Lumin not to give an installer any
3  more work orders?
4    A.    So we're talking in 2008, 2009?
5    Q.    To 2010.
6    A.    Right.  Excuse me, 2010.  No.  It's pretty
7  much operated similar to what we just talked about.
8    Q.    So, more generally, installers perform work
9  orders for DirecTV customers; correct?
10    A.    Yes.
11    Q.    And these work orders come from DirecTV?
12    A.    Yes.
13    Q.    DirecTV's computers assign, initially
14  assign, an installer to a given work order?
15    A.    Yes.
16    Q.    Do you know what factors are considered by
17  DirecTV before they assign a work order to a specific
18  installer?
19    A.    I know it's a computer assigning the work,
20  and I know that the factors involved would be any
21  information that we've given them to input into the
22  computer, i.e., skill set.  If I think a technician
23  can only do so much work I'll let them know I only
24  want them pulling work from eight to three.  Or if I
25  think a technician has progressed and can do more

84

**EXHIBIT U**

work, I'll open up a range.

Q.    What do you mean when you say that you'd only have the installer pulling work from eight to three.  Are you talking about 8 a.m. to 3 p.m.?

A.    Yes.

Q.    And why would that be?

A.    Inexperience.  A new technician that I've just trained and launched can only handle so much work.

Q.    So you want to -- well, let me take a step back.  What hours do you typically work at AIS?

A.    My hours?

Q.    Yes.

A.    Well, that's -- it varies.  Like what time does my day start?

Q.    Yes.  You know, what's -- in a typical day how many hours do you work?  When do you start?  When do you finish?

A.    Well, there's an official start and stop time and an unofficial start and stop time.  In this day and age, I'm constantly working via e-mails, iPhones, iPads, and things of that nature.  But typically I'm up 6:30, seven, kind of looking over what e-mails have come in and what the workload is looking like, how many jobs we have that day.

85

EXHIBIT U

1       From there I -- you know, I have a morning

2  routine, do my thing.  Report to the office.  That can

3  vary between eight and 9:00.  From there I'm at the

4  office throughout the day.  I don't leave the office,

5  and I'm, at times, in the field also doing other

6  things, QC'g myself.  I involve myself in all aspects

7  of the business.  Or I may have a meeting here or a

8  meeting there.

9       My schedule is constantly changing.  I

10  don't have an official one, but typically, you know,

11  the day starts, like, 7:00.  I'm going over at six,

12  7:00.  And at times it can vary.  Sometimes I'll play

13  hooky.  Sometimes I'll, you know, work until seven.

14       Q.    So with the inexperienced installers, do

15  you want them working in the daytime because you know

16  there will be more supervision?

17       A.    Exactly.  And I will want to limit the

18  amount of work that they get.  My goal, when we first

19  launch a technician, is not to overwhelm them.  So we

20  limit the amount of -- we limit their workload.  And I

21  will only assign one, maybe two jobs to somebody we

22  just launched.

23       MR. KELLY:  Excuse me.  Off the record for

24  a second.

25       (Off the record from 11:19 to 11:20 a.m.)

86

**EXHIBIT U**

1          (Record read as requested.)

2     Q.     Besides the information on the time -- the

3 times that you want installers to work, what other

4 information does AIS provide to DirecTV about its

5 installers?

6     A.     That's it.

7     Q.     So can you think of any other factors that

8 go into how DirecTV assigns work orders to installers,

9 or are you aware of any?

10     A.     I tell them exactly where I want them to

11 start.  I'll give them a starting ZIP Code.

12     Q.     Okay.  For the installer?

13     A.     Yes.  Where I want the technician to pull

14 the jobs from.

15     Q.     Now, once DirecTV, or excuse me, once AIS

16 receives the work orders from DirecTV, what is the

17 process by which those work orders are given to

18 installers to be completed?  What's AIS's process from

19 there?

20     A.     Once the work is issued supervisors will

21 take a look at -- they'll use what's called Click,

22 Click software.  Click is a program used to not only

23 see what work we have for the day, but like I told you

24 before, to track the progress of the technicians.  It

25 gives us the ability to manipulate the jobs and move

**EXHIBIT U**

jobs around from technician A, B or C.  So the
supervisors in the morning will look at that, will
look at Click, see what we have, see where everybody
is located, and make the necessary changes that they
deem necessary in the mornings to adjust for who can
handle what.

Q.    How often do AIS's supervisors make changes
to the assignments brought in from DirecTV?

A.    Daily.  Every single morning.

Q.    For each installer or --

A.    They look at each and every installer, yes.

Q.    So typically what percentage of DirecTV
work orders are reassigned by AIS supervisors?  Most?

A.    A lot.  A lot.  Every day factors -- the
big factors are when we have somebody that calls in
sick.  If we have multiple call-ins that's a big day
where we have to just completely rearrange the whole
workload for that day and load somebody up that we
know can handle it, unload somebody that can't.
Monitor progress throughout the day and just,
throughout the day, assign work orders also.  So, it
does happen daily and throughout the day.

Q.    Now, when the installers report for work in
the morning, for the ones who do go to the shop, what
are they supposed to do once they get to the shop?

88

**EXHIBIT U**

1      A.    Once they report to the offices, they
2  perform a variety of duties or functions.  Everybody,
3  you know, operates differently.  Some will work on
4  their billing/time sheets.  Finish filling something
5  out.  Some will immediately go to the warehouse bench
6  and request whatever materials they need for that day.
7  Some like to sit down and go over their work orders
8  slowly and write down on a pen and pad what they're
9  going to need.

10           But typically, what they're supposed to be
11  -- what they're supposed to be doing is just getting
12  ready for the day.  Restocking their vehicles with
13  small parts that they may need.  Putting in vacation
14  requests.  General office type of duties.

15      Q.    The installers are then supposed to be out
16  at their first job?  Or let me rephrase.  How long are
17  the installers supposed to be at the offices before
18  they head out to their first job?

19      A.    Typically what we want to see is we want to
20  see a technician report at seven and be out in the
21  field -- go into the first job by at least 7:40, 7:45.
22  That's what I want.  Whether that happens or not is
23  something else.

24      Q.    Well, when that doesn't happen, does AIS do
25  anything to work with the installers to get them out

                                                        89

**EXHIBIT U**

1 of the office earlier?

2     A.    Yes, yes.  We get a little more aggressive.

3 We kind of herd the team, you know.  Stop from

4 lollygagging, talking, hanging out.  Yes.  We like to

5 see everybody on the job site between eight and 8:30.

6     Q.    When the installers are getting the

7 equipment for the day, what sort of equipment are we

8 talking about?

9     A.    Receivers, high definition receivers or

10 standard digital receivers.  The actual satellite dish

11 that we will be installing on the home and small parts

12 needed to do that, i.e., cable fittings that go at the

13 end of the cable.  Ground blocks.  Just all the small

14 parts needed to perform the installation.

15     Q.    The receivers come from DirecTV?

16     A.    Yes.

17     Q.    The satellite dish comes from DirecTV?

18     A.    Yes.

19     Q.    Who provides the cable and the other small

20 parts that you're talking about?

21     A.    AIS does.

22     Q.    Do the installers pay for this?

23     A.    No.

24     Q.    Have the installers ever paid for

25 equipment?

90

**EXHIBIT U**

```
 1        A.    Probably back in 2008, when they were 1099

 2   subs.

 3        Q.    So at Lumin?

 4        A.    Possibly.  I wasn't there.

 5        Q.    Okay.  Let me rephrase.  At AIS have

 6   installers ever paid for equipment?

 7        A.    Never.

 8        Q.    What about tools?  What kind of -- who pays

 9   for the tools that the installers uses during their

10   day?

11        A.    AIS does.

12        Q.    What sorts of tools are the installers

13   using on a day-to-day basis?

14        A.    Satellite meters that measure the signal

15   strength.  Coaxial cable crimpers.  Coaxial cable

16   strippers.  That's what they're called.  Cable

17   mappers.  A cable mapper helps find the cable.  Cable

18   reels to carry the cable in.  If a candidate does not

19   have a drill set we will provide them a drill set.

20   Ladders, uniforms.

21        Q.    The uniforms, are they paid for by AIS?

22        A.    Yes.

23        Q.    Why does AIS have its installers wear

24   uniforms?

25        A.    It's a requirement.  It's an expectation
```

                                                          91

1    for us to wear the uniform we're supposed to wear.

2        Q.    Requirement from DirecTV?

3        A.    Yes.

4        Q.    And what does the uniform look like?

5        A.    It's a blue DirecTV shirt.

6        Q.    And does it say anything on it besides

7    DirecTV?

8        A.    No.

9        Q.    I assume it's a DirecTV logo?

10       A.    Yes.

11       Q.    The vehicles the installers are working in,

12   whose vehicles are they?

13       A.    Theirs.

14       Q.    The installers' vehicles?

15       A.    Yes.

16       Q.    Who pays for the gas that the installers

17   use during their day?

18       A.    They do.

19       Q.    And does AIS reimburse them at all for gas?

20       A.    No.

21       Q.    What about for mileage?

22       A.    No.  Now, I do have a new program where I

23   couldn't give you a specific percentage of the staff,

24   but we launched it, I believe, a year ago where we do

25   pay a percentage -- it's called a per diem -- of the

GRADILLAS COURT REPORTERS
(310) 859-6677

EXHIBIT U

1    fuel consumption candidates use while on the job.  Not

2    to and from work, but while they're on the job.

3          Q.    Why did you start that program?

4          A.    It's a retention.  We're testing it out,

5    seeing, you know, what works.

6          Q.    And approximately how long ago did you

7    start that program to pay the percentage of the gas?

8          A.    Possibly a year and a half ago.

9          Q.    What percentage of the gas does AIS pay

10   under this program?

11         A.    A good percentage.  I'm sorry.  Lisa would

12   know the answer better than I do.

13         Q.    Does -- has AIS offset any other

14   compensation to the installers to make up for what

15   it's now paying in gas?

16         A.    Can you say that again?

17         Q.    Has AIS offset any other compensation to

18   installers to -- or excuse me.  Has AIS reduced any

19   other compensation to installers to offset the

20   additional gas expenses?

21         A.    Oh, right.  Yes.  They work on an adjusted

22   rate card, yes.

23         Q.    Do most of the installers take advantage of

24   this gas percentage payment?

25         A.    I wouldn't know.

                                                          93

1      Q.   The vehicles that are being used by the
2  installers, do they have any signage on them?
3      A.   A DirecTV authorized contractor magnet.
4      Q.   Is that something the installers pay for or
5  does AIS pay for it?
6      A.   AIS does.
7      Q.   Does AIS have vehicles that installers
8  could use if they didn't want to use their own
9  vehicle?
10     A.   We do have some spare vehicles.  It's
11 limited, and we use them to help out the guys if they
12 have vehicle issues or whatnot.  So they don't lose
13 any work time, we let them use some of our spare
14 vehicles.
15     Q.   So they're there more as a backup?
16     A.   Yes.
17     Q.   How are AIS installers paid?
18     A.   Biweekly.
19     Q.   And on a daily basis, are they paid a piece
20 rate?
21     A.   Yes.
22     Q.   Who determines the piece rate, what the
23 installer will be paid for a specific task?
24     A.   AIS does.
25     Q.   And who at AIS makes that determination?

94

1     A.    I do.

2     Q.    In consultation with anyone?

3     A.    Lisa.

4     Q.    Have AIS installers always been paid a

5  piece rate?

6     A.    Yes.

7     Q.    When you were at Lumin, were installers

8  also paid a piece rate?

9     A.    Yes.

10    Q.    Please review a document that will be

11 marked as Exhibit 9, Mr. Martinez.

12          Have you seen these documents before?

13          (Marked for identification Exhibit 9.)

14    A.    Yes.

15    Q.    What is your understanding of what these

16 documents are?

17    A.    These are the pay scales or the rate cards

18 we pay our technicians for completing certain duties

19 or assigned work orders.

20    Q.    Now, these documents in Exhibit 9 have

21 different dates on them when they became effective.

22 Approximately how often does AIS change its pay scale?

23    A.    It's a good question.  AIS currently does

24 not change its pay scale often if at all.  When you

25 see a -- and especially today, the changes that are

                                                      95

1  made are just additions to new requirements.  The

2  reason why you see big changes from 2008 to 2012 and

3  '14, was a transition from that 1099 to the W-2 model.

4         Moreover, this is us figuring it out,

5  seeing what we can do to operate as a business with

6  the expectations of paying new agencies and that whole

7  transition.

8         Q.    Okay.  I guess the first three pages relate

9  to the pay scale at All Nations Communications, which

10  is the business name for Lumin.  Did you have any

11  input on that pay scale?

12         A.    The latter ones, yes.

13         Q.    The pay scale has different columns for

14  level 1 and for level 2 installers.  Do you know, what

15  was the difference between a level 1 or a level 2

16  installer?

17         A.    I believe it was seniority.

18         Q.    Do you recall approximately how many -- how

19  long an installer had to be with Lumin to move up to

20  level 2?

21         A.    No.

22         Q.    Looking at the last two pages in Exhibit 9,

23  the second to last, which is Bates stamped 001394,

24  entitled "Employee Pay Scale," and then the last page

25  of Exhibit 9 Bates stamped 001395 is entitled

96

**EXHIBIT U**

1    "Contractor Pay Scale."  Do you see that?

2        A.    Yes.

3        Q.    Does AIS have contractors?

4        A.    No.

5        Q.    Did AIS have contractors on May 23 of 2012?

6        A.    I believe we had one, yes.

7        Q.    How were the contractors' duties -- was the

8    contractor an installer?

9        A.    Yes.

10       Q.    How was that contractor installer's duties

11   different than the employee installers?

12       A.    You know, it was a bad experience.  The

13   contractor had free rein.  We knew the rules very well

14   at that point.  Come and go as he pleased.  He worked

15   as a retailer, did other things in other places.  The

16   installations and the standards were the same, but as

17   far as the reporting structure he only spoke to one

18   person.  Me.  That's it.

19       Q.    Why was the contractor rates higher than

20   the installer rate, or excuse me, than the employee

21   rates?

22       A.    Contractor was classified as a 1099.  Our

23   employees are classified as W-2.

24       Q.    But how does that explain why contractors

25   were being paid more for the same task than an

97

EXHIBIT U

1  employee?

2      A.   Contractors have essentially their own

3  businesses.  They have their own licenses, insurance.

4  We don't have to worry about damage.  We don't have to

5  pay certain taxes with a 1099, so we have the ability

6  to pay a contractor more for that.

7      Q.   How does AIS determine what to pay for a

8  given task?

9      A.   Well, we have our own rate card with

10 DirecTV that pays us specific amounts for specific

11 tasks.  And we take that rate card and we decide what

12 percentage we can afford to pay our technicians.

13     Q.   Is it a set percentage that AIS applies to

14 each task or --

15     A.   Yes.

16     Q.   What is that percentage?

17     A.   I wouldn't be able to give you an exact

18 percentage, but I know that this is the set rate card.

19 I mean, we've been through this a couple times, and

20 this is the one that works for us as a business.

21     Q.   So has the pay scale changed since May of

22 2012?

23     A.   I couldn't give you a definitive yes or no,

24 but if -- I'd say right now, no.

25     Q.   Now, earlier you were talking about this

98

1  gas program where AIS now pays a percentage of the

2  gas, and that AIS changed the rate, the pay scale, to

3  cover the gas?

4      A.    Yeah.  Actually, you know what?  You're

5  right.  The employees that do participate in the gas

6  program work under an adjusted rate card where -- and

7  I can't give you an exact number, but where here it

8  says basic and triple dish installation pays 50, on

9  their adjusted rate card it may pay 48.

10     Q.    Does AIS do any analysis of how long a

11 given task should take before determining how much

12 installers will be paid for that task?

13     A.    No.

14     Q.    Now, why, to your knowledge, did All

15 Nations or Lumin change its pay scales?

16     A.    To my knowledge, they were transitioning

17 from that 1099 model to the W-2 model and were

18 inexperienced and didn't know exactly what to do.

19     Q.    And in your role as the vice-president of

20 Lumin/All Nations Communications, did you have input

21 into adjusting the rate -- the pay scale?

22     A.    I did have input, but Mike solely ran the

23 show as far as Lumin is concerned.  But I did have

24 input.

25     Q.    Now, looking at the pay scale for

**EXHIBIT U**

installers, starting with the first page of Exhibit 1, or excuse me, Exhibit 9, to the last page of Exhibit 9, it appears that the pay has decreased over time. Do you know why that is?

A.     The same, the same reason.  It's the transition from 1099 to W-2.  So changes need to be made to support the business model in order to make sure it's somewhat profitable.

Q.     Has DirecTV also reduced the amounts it pays for the same tasks over the last several years?

A.     Yes.

Q.     Do you know why?

A.     On one of them, changes in work required.

Q.     Can you elaborate a little more on what you mean by that?

A.     The installation got easier.

Q.     So is the expectation, then, the work will be completed faster?

A.     I believe so.

Q.     When DirecTV changes the rate that they will pay to AIS for a task, is AIS given an explanation for that change?

A.     Yes.

Q.     Is that a conversation or something in writing?  How does that --

100

**EXHIBIT U**

1    A.    I believe it's an e-mail letting us know
2    where they're going with something.
3    Q.    When DirecTV has changed the rates has --
4    can you recall DirecTV ever increasing the rate paid
5    for a task?
6    A.    No.
7    Q.    Has AIS ever increased the rate it pays for
8    a task?
9    A.    Yes.  I believe we've played around with
10   the Wi-Fi Deca unit and the broadband Deca unit.  The
11   bottom, the bottom from the third.
12   Q.    So it currently -- excuse me.  According to
13   the employee pay scale from May of 2012, the broadband
14   Deca unit was worth $8 -- excuse me.  It was --
15   installer was to be paid $8 for that.  The Wi-Fi Deca
16   unit was $4.  So is it your testimony that that amount
17   has increased since then?
18   A.    You know, I couldn't say for sure.
19   Q.    So other than the broadband and Wi-Fi
20   charges, can you think of any other examples where AIS
21   has increased the rate it pays for a given task?
22   A.    No.
23   Q.    When DirecTV proposes a change to the
24   rates, is there any -- has AIS ever resisted the
25   changes?  Ever stated that it didn't agree with it or

101

**EXHIBIT U**

1    wanted -- didn't want the change to go through?

2        A.    No.

3        Q.    When DirecTV presents a change in rates, do

4    you believe that it's an amount that is up for

5    discussion with AIS?

6        A.    No.

7        Q.    There are charge backs with DirecTV;

8    correct?

9        A.    Yes.

10       Q.    Can you describe what the charge backs are?

11       A.    Charge backs, basically, we are supposed to

12   guarantee our work for 90 days.  If DirecTV has to

13   send any of their service technicians out to one of

14   our jobs within that 90-day period the company gets

15   charged back.

16       Q.    For any reason?

17       A.    For any reason.

18       Q.    How much is AIS charged?

19       A.    Again, Lisa will give you an exact number,

20   but I believe it was $50.

21       Q.    Have the charge backs, that charge back

22   provision, has that been in place the whole time that

23   AIS has been in business?

24       A.    Yes.

25       Q.    Was it also in place at Lumin?

                                                      102

**EXHIBIT U**

1     A.    Yes.

2     Q.    Beside the 90-day guarantee charge back,

3    can you think of any other charge backs that DirecTV

4    imposes on AIS?

5     A.    Damage claims.

6     Q.    What sort of damage claims?

7     A.    If a technician goes out to a customer's

8    residence and creates any kind of damage, a customer

9    reports said damage, and it's one of our technicians

10   that created the damage, we're on the hook to repair

11   the damage.

12    Q.    Whatever the cost?

13    A.    We're allowed to find our own vendors or

14   contractor to -- we're allowed to manage that process.

15   So they don't ram anything down our throats as far as,

16   well, the customer said it's going to cost X to fix so

17   now you got to pay it.  We're given the opportunity to

18   find our own method to repair what's -- what is said

19   being damaged.

20    Q.    But it's AIS's responsibility to make the

21   repairs?

22    A.    Yeah.

23    Q.    And pay whatever cost it takes to make the

24   repairs?

25    A.    Yes.

EXHIBIT U

1        Q.    Does AIS have the opportunity, with either

2    the damage claims or the 90-day guarantee, to respond

3    to DirecTV and say that they -- that AIS doesn't agree

4    with it?

5        A.    Yes.

6        Q.    And has that happened?

7        A.    Yes.

8        Q.    And what has come of those discussions?

9        A.    They're pretty frequent.  It's a two-part

10   question.  The first part, specifically with a 90-day

11   guarantee on the service calls, if we get charged back

12   for faulty equipment, in our estimation that's through

13   no fault of our own, and we're able to do what's

14   called dispute.  We have a dispute process where we're

15   -- we dispute certain charge backs where we deem not

16   valid.

17            And there's a process for that where one of

18   my -- the girl, the employee, you know, goes through

19   the charge backs and we dispute.  It's a job.  We

20   dispute a lot.

21       Q.    Really?

22       A.    Yes.  And with the damage claims, if we go

23   out to set some customer claiming a damage, and we

24   think that we're not at fault we deny the claim.

25       Q.    You deny it to DirecTV?

                                                        104

**EXHIBIT U**

1      A.    Yes.

2      Q.    And is there a similar dispute process like

3  with the 90-day guarantee?

4      A.    No.  This one, they have their own

5  division, and it's two different departments, I'm

6  assuming.  But the damage claim department will

7  receive a damage claim via e-mail letting us know

8  what's going on, and we'll be given the opportunity to

9  go and investigate ourselves, interview the customer,

10  take pictures, and determine whether we are at fault

11  or not.

12      Q.    Have you -- has AIS denied a claim?

13      A.    Oh, yes.

14      Q.    What happens when AIS denies the claim

15  then?

16      A.    I believe -- I don't know exactly what

17  DirecTV's processes are, but I believe they take it

18  back to the customer and saying -- you know, they're

19  saying no or whatnot.  And I don't know what happens,

20  maybe a customer pushes back, and DirecTV comes back

21  and says, well, listen, this is not going away.  This

22  is what it looks like.  This is the customer saying

23  they're going to enter legal action or whatnot.

24           At that point, I let the insurance company

25  handle it.  I'm like, well, I still disagree.  And

                                                    105

EXHIBIT U

```
 1    there are times I agree.  I said, yeah, you're right.
 2    We're on the hook.  Let's get this fixed.  But when it
 3    starts getting icky I let the insurance company handle
 4    it.
 5         Q.    Who is the insurance company?
 6         A.    My insurance company.
 7         Q.    And do you know what has happened in the
 8    instances where your insurance company has had to get
 9    involved?
10         A.    No.
11         Q.    The insurance company resolves it one way
12    or the other?
13         A.    Yes.
14         Q.    As to the 90-day guarantee charge back, you
15    said that that comes up frequently?
16         A.    Our dispute?
17         Q.    Yeah.
18         A.    Yes.
19         Q.    How often is AIS given a 90-day charge back
20    from DirecTV?  Is it every month?
21         A.    Weekly.
22         Q.    Weekly?
23         A.    Yes.
24         Q.    More than once a week on average?
25         A.    Several times a week.
```

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

**EXHIBIT U**

```
 1        Q.     What percentage does AIS dispute?

 2        A.     I couldn't give you that number.

 3        Q.     Would you say most of them?

 4        A.     No.

 5        Q.     So once it goes through the dispute process

 6   you've described, ultimately who makes the decision

 7   whether or not AIS will be charged for the charge

 8   back?

 9        A.     DirecTV.

10        Q.     And with the damage claim, when you've had

11   to get the insurance company involved, has there been

12   any instance where DirecTV has said that AIS is no

13   longer responsible for a damage claim?

14        A.     No.

15        Q.     Beside the damage claims and the 90-day

16   guarantee, are there other charge backs?

17        A.     No.

18        Q.     When AIS has to pay for one of the charge

19   backs, does AIS penalize or take any disciplinary

20   steps against the installer who is responsible for it?

21        A.     No.

22        Q.     So the amount doesn't come out of their

23   pay?

24        A.     No.

25        Q.     Does it affect their performance?
```

**EXHIBIT U**

1     A.    Well, I mean, if we get a multitude of

2 charge backs from an employee they'll definitely be

3 mentored and up trained, yes.

4     Q.    Have there been instances where a specific

5 installer has had problems with multiple charge backs,

6 either for the 90-day guarantee or the damage claims?

7     A.    Yes.

8     Q.    And in none of those instances has the pay

9 been docked at all for the installer?

10     A.    Never.  We run a tight ship and the

11 employee's paychecks are their paychecks.

12     Q.    Over the years has this charge back program

13 -- have there been other charge backs?

14     A.    From DirecTV?

15     Q.    Right.

16     A.    No.

17         MR. LAKE:  Mr. Martinez, I'll have you look

18 at a document to be marked as Exhibit 10.

19         (Marked for identification Exhibit 10.)

20         MR. KELLY:  Counsel, do you have a better

21 copy, perhaps?

22         MR. LAKE:  I do not.  The questions are

23 going to concern some of the parts that are plainly

24 visible.

25         MR. KELLY:  Give me a second.

**EXHIBIT U**

1      Q.    Have you had a chance to look over the
2   documents in Exhibit 10?
3      A.    Yes.
4      Q.    Do you recognize what these documents are?
5      A.    They are billing sheets.
6      Q.    From Lumin?
7      A.    It looks like it, yes.
8      Q.    Mr. Martinez, at the bottom of the document
9   are handwritten deductions for supplies every week on
10  these pay sheets?
11     A.    Uh-huh.
12     Q.    Do you see that?
13     A.    Yes.  I'm sorry, yes.
14           MR. KELLY:  Excuse me.  I'm sorry, can you
15  just say again where you're looking?  Are you on the
16  first page?
17           MR. LAKE:  I said on each page there's
18  handwritten deductions for supplies.  Excuse me.
19  Every page except for the third page.
20           MR. KELLY:  Thank you.
21     Q.    Do you know what sort of supplies are being
22  deducted from installer pay at Lumin?
23     A.    You know, I believe on this one it could
24  have been small parts.
25     Q.    What kind of small parts would be --

                                                      109

```
 1        A.    Cable.

 2             MS. TRUONG:  Counsel, I'm just going to

 3   object at this point.  I don't think there's been any

 4   identification about who this is.

 5             MR. KELLY:  Another objection.  They seem

 6   to refer to the week of December 2008, which I think

 7   is outside the class period, which is three years.

 8   And they involve an entity that is not a defendant in

 9   the case.  The documents on the face refer to December

10   '08.  Based on documents received from the Secretary,

11   my understanding was the class period began in 2009.

12        Q.    (By Mr. Lake)  So Mr. Martinez, turning

13   back to Exhibit 10.

14             MR. KELLY:  And further, there is no cause

15   of action relating to (inaudible) reimbursements in

16   the case.

17        Q.    So Mr. Martinez, turning back to Exhibit

18   10, there's a deduction for supplies.  Do you see

19   that?

20        A.    Yes.

21        Q.    And you said that it was for -- that at

22   Lumin installers were deducted for small parts?

23        A.    Yeah.  That is what it's looking like, yes.

24        Q.    Now, what sort of small parts were

25   installers having deducted from their pay?
```

110

**EXHIBIT U**

1          MS. TRUONG:  Counsel, I'm just going to

2    object.  Just for the record, this document that we're

3    looking at, I'll just start with the first page.

4    Everything is crossed out here and scribbled, so I

5    think that there's a lack of foundation in regards to

6    whether this is paid or -- but you can answer if you

7    know.

8          A.    I don't know specifically.

9          Q.    You don't know what?

10         A.    What the supplies were.

11         Q.    You were the vice-president of Lumin;

12   right?

13         A.    Right.

14         Q.    Now, when you were working there, were

15   supplies deducted from installer pay?

16         A.    From what I remember, no.  I don't remember

17   this technician, and I don't even remember the sheets.

18         Q.    So, to the best of your recollection,

19   installers did not have to pay for supplies at Lumin?

20         A.    Yes.

21         Q.    And at AIS have installers ever had to pay

22   for supplies?

23         A.    Never.

24         Q.    What about if the installers are classified

25   as contractors?

                                                        111

**EXHIBIT U**

1      A.    Well then, yes.  1099 subs did, yes.

2      Q.    What about -- excuse me.  To clarify, at

3  AIS, installers who are classified as contractors have

4  to pay for supplies?

5      A.    Yes.

6      Q.    And at Lumin, installers who are classified

7  as contractors also had to pay for supplies?

8      A.    That would have been the case, yes.

9      Q.    It was the case?

10     A.    Yes.

11     Q.    Now, in your time as the president of AIS,

12 you mentioned one contractor installer previously.

13 Have there been other contractor installers?

14     A.    No.

15     Q.    Mr. Martinez, I'm going to have you turn

16 back to a previous document that we marked as Exhibit

17 4.  It was the interrogatory responses of AIS.

18 Specifically, if you could turn to page 6 of the

19 document.  Starting at line 8, AIS states in this

20 interrogatory response, "AIS technician are paid by a

21 piece rate scale or per job that they complete."

22 Skipping down a few sentences, "Their total hours are

23 calculated for the week, and their total pay is

24 divided by the number of hours worked to ensure that

25 they are being paid at least minimum wage."

                                                    112

1           Do you see that?

2      A.    Yes.

3      Q.    Is it your understanding that that is the

4  policy at AIS?

5      A.    Yes.

6      Q.    Can you explain a bit more what the -- how

7  this calculation works?

8      A.    I'll give you a general knowledge.  Again,

9  it's another Lisa question.  We -- no matter how many

10  hours a technician works -- let's say they work under

11  40 hours for the week.  They've only completed

12  specifically -- especially for like a newer

13  technician, we look at the production of the

14  technician, what jobs they've completed, and how much

15  they're billing for that week.

16           And if that -- so you take that number and

17  you divide it by the numbers of hours that they've

18  worked.  If that number goes below minimum wage, we

19  proactively compensate the technician to make sure

20  they're meeting that minimum guideline.

21      Q.    Has this pay system that you've described

22  been in place since AIS was first started?

23      A.    Yes.

24      Q.    Was a similar pay system in place at Lumin?

25      A.    I don't know.

                                                   113

EXHIBIT U

1     Q.    As the vice-president you weren't involved

2    in that kind of stuff at all?

3     A.    No.

4     Q.    Can you turn to page 13 of the same

5    exhibit.  At line 17, the sentence from AIS states,

6    "In 2009, technicians were not recording their hours."

7    Do you see that sentence?

8     A.    Yes.

9     Q.    The next reads, "They had previously worked

10   as subcontractors for Lumin, Incorporated.  AIS was

11   not aware of how their hours should be tracked, and

12   they were not concerned with that tracking because

13   they were used to working on the piece rate system,

14   and they understood the benefit of being paid for the

15   work they could complete."  Do you see that?

16    A.    Yes.

17    Q.    What does -- what sort of benefit is AIS

18   referring to as far as the benefit of being paid for

19   the work they could complete?

20    A.    I believe that's referring to the amount

21   that they were being paid for each closed work order

22   as a 1099 sub.  And as the pay sheets demonstrated,

23   the subs were paid a lot more than employees.  So

24   that's the benefit that I believe we're referring to.

25    Q.    But the subs also had to pay for their

                                                    114

```
 1   supplies?

 2        A.    Yes.

 3        Q.    Are the subs -- when you say "subs" you're

 4   referring to the 1099 independent contractors?

 5        A.    Yes.

 6        Q.    Are these 1099 independent contractors, are

 7   they permitted to participate in the gas program that

 8   you described earlier?

 9              MR. KELLY:  Vague and ambiguous.  He's only

10   identified one, or he said contractor.

11        Q.    You can answer.

12        A.    Can you repeat the question?

13        Q.    Are the 1099 independent contractors at AIS

14   permitted to participate in the gas program that you

15   described earlier?

16              MR. KELLY:  Mischaracterizes the testimony.

17        Q.    You can answer the question.

18        A.    We don't have any 1099 subs right now.

19        Q.    Now, but turning back to Exhibit 10, I

20   believe that would be the pay scales, or Exhibit 9,

21   there is still a contractor pay scale.

22        A.    There probably is, but we don't have any

23   contractors.

24        Q.    Okay.

25        A.    So I haven't, like, erased it from the
```

115

**EXHIBIT U**

1    company information sheets or whatnot, but we don't

2    have any subs, and I'm not going to ever have that

3    again.

4        Q.    Turning back to page 6 of the interrogatory

5    responses that's been marked as Exhibit 4.  Sorry.

6    Page 7.  The last sentence is in red.

7              MR. KELLY:  The timeline?

8              MR. LAKE:  Excuse me?

9              MR. KELLY:  You're referring to the

10   timeline paragraph?

11             MR. LAKE:  Yes.  The very last sentence on

12   page 7.

13       Q.    "Initially, Lumin, Incorporated, estimated

14   hours based upon the types of jobs being completed,

15   i.e., three hours for an install and one and a half

16   hours for an upgrade."  Do you see that?

17       A.    Yes.

18       Q.    Do you have -- you were the vice-president

19   of Lumin, Incorporated, and these are the discovery

20   responses of AIS.  So, with that understanding, can

21   you provide any more information as to how Lumin made

22   these estimates?

23       A.    No.  Can I say something real quick?

24       Q.    Please.

25       A.    As far as titles and vice-president, I was

                                                      116

**EXHIBIT U**

1 the manager.  You know, I ran -- as far as

2 vice-president and billing and stuff like that,

3 there's certain things I wasn't involved with.

4     Q.    And who would be the person at -- who was

5 at Lumin who would be -- who would be the person to

6 ask for more information about this?

7     A.    It would be Mike.

8     Q.    Was Lisa Kelley at Lumin?

9     A.    Yes.

10     Q.    What was her role at Lumin?

11     A.    Controller.  So she may have some input on

12 this.

13     Q.    So do you know -- this discovery response

14 comes from AIS.

15     A.    Right.

16     Q.    So do you know where this information came

17 from?

18     A.    When did we complete these?

19     Q.    If you turn to the last page it is dated

20 January 17, 2014.

21     A.    Probably something that we went over

22 together.  And she had some input on the types of

23 questions that you're asking now as far as bookkeeping

24 and things of that nature.  I answered more the

25 questions of operations, but we worked on this

117

**EXHIBIT U**

1    together.

2         Q.    Do you have any idea why Lumin would even

3    make such estimates, what they were used for?

4         A.    All work orders have units based on them.

5    So they have an average of what a work order is

6    supposed to take.  All work orders do.  So we use that

7    information, and probably our experience told us what

8    the typical average work time for certain jobs

9    estimated to be.

10         Q.    The information that we're describing on

11    page 7 was provided in response to a question to

12    describe and explain the method used for computing

13    employees' weekly compensation.  So, do you know why

14    there would be any kind of estimating of hours that

15    would have any significance on employee compensation?

16         A.    I believe just to make sure that we were

17    meeting minimum standards.

18         Q.    The minimum wage?

19         A.    Yes.

20         Q.    But that was only based on estimates?

21         A.    Well, if -- it says right here, "Initially

22    Lumin estimated hours based upon the types of jobs

23    completed" because we weren't recording hours at that

24    time.  So it was probably why either Lisa or myself,

25    we went over this and we wrote that.

                                                      118

1    Q.    Turning to the next page.  In April --
2 excuse me, the top of the next page, line 1.  "In
3 April 2010, Lumin began requiring technicians to
4 record their actual hours."  Do you see that sentence?
5    A.    Yes.
6    Q.    Do you recall, when you were at Lumin, that
7 change taking place?
8    A.    It was when Amy Ward came and visited us.
9 And she came in -- I don't know what it was called,
10 but she was doing an audit, something like that, but
11 she, at that point, informed us of guidelines and
12 expectations that we weren't meeting.  And that's when
13 the changes started.
14    Q.    So this was before AIS was formed.  This is
15 when you were still at Lumin?
16    A.    Yeah.  But at that point, I mean, AIS -- I
17 don't know exactly what date AIS was fully formed.
18    Q.    We can turn back to Exhibit 2, and I think
19 it states that it was formed in September of 2010.
20    A.    September.
21    Q.    Several months later.  Yeah.
22    A.    September of 2010, here.  In September of
23 2010 Lumin, Inc., began paying overtime for rates.  So
24 that should say in September of 2010.  Lantern.
25    Q.    But going to the first sentence.

                                                    119

1      A.      2010.

 2      Q.      April.  It says April of 2010.

 3      A.      Right.  At that time, yeah,, we were

 4  loosely still operating under Lumin, yes.

 5      Q.      When you say you were loosely operating --

 6      A.      Well, we were on our way -- the partnership

 7  had dissolved, and we were on our way to becoming

 8  Lantern.  So it was a transition period.

 9      Q.      So, by April of 2010, were you in charge at

10  Lumin if the partnership had already dissolved?

11      A.      I'd have to look at the -- when we

12  officially signed the paperwork.

13      Q.      When you were at Lumin, did you have any

14  role in the hiring process?

15      A.      Yes.

16      Q.      Did you have the power to hire or fire

17  installers?

18      A.      Yes.

19      Q.      Did you have any role in determining the

20  rate of pay at Lumin?

21      A.      It was discussed, but it was already

22  preset.  And again, it was also a big transitional

23  period going from the 1099 sub model to the W-2 model.

24      Q.      So turning back to page 8, line 1.  "In

25  April 2010, Lumin began requiring technicians to

                                                      120

**EXHIBIT U**

1   record their actual hours."  Now, it's your testimony

2   that this new practice began in response to the U.S.

3   Department of Labor's investigation?

4        A.   Oh, yeah.

5        Q.   Prior to that you were not aware that

6   installers should be writing down their actual hours

7   worked?

8        A.   Including drive time.  We were under --

9   because we'd already been audited by multiple agencies

10  by that point.  So we were under the impression that

11  we were doing what we were expected to be doing.

12       Q.   But according to AIS in this interrogatory

13  response, before then Lumin was just estimating.  The

14  drivers were not in fact writing down their hours

15  worked?

16       A.   I mean, that sounds right, yeah.  That's

17  four years ago.  I mean, it sounds -- I mean, I know

18  we filled these out, but the questions were dating

19  back to a time.  I don't have an exact recollection.

20       Q.   Fair enough.  But my question is before the

21  U.S. Department of Labor came in and performed its

22  investigation, were you aware that the installers were

23  supposed to be writing down their hours worked?

24       A.   No.  Again, I've assumed, because we had

25  new business owners, that we were doing what we were

                                                    121

**EXHIBIT U**

1   supposed to be doing.  It wasn't until Amy Ward showed

 2   up, told us we were supposed to be doing this, is when

 3   the changes started.

 4        Q.   So from the previous investigations by the

 5   previous agencies that you've described, that that

 6   knowledge was not transmitted to you?

 7        A.   No.

 8        Q.   Or to anyone at Lumin?

 9        A.   No, no.

10        Q.   Turning to the next sentence.  "In

11   September 2010, Lumin began paying overtime rate for

12   overtime hours."  Does that -- is that consistent with

13   your recollection?

14        A.   If that's around the time Amy Ward showed

15   up, then yeah.

16        Q.   So before then installers were not paid

17   overtime rates for overtime hours worked?

18        A.   I mean, technically, no.  It was a piece

19   rate system.  Their hours were accounted for because

20   we kind of loosely knew exactly how -- not loosely.

21   We had a good estimated index of how long work should

22   take.  But, yeah, that's when we started paying

23   overtime hours.

24        Q.   When you say that you had an estimated

25   index of how long the work would take, where did that

                                                      122

**EXHIBIT U**

1   come from?  What information was that based on?

2        A.    Well, like I said, each work order has got

3   a certain allotted units of how long each said work

4   should take.  That, with our experience, as far as how

5   long said work should take.  But as far as tracking

6   the full scope of hours, it wasn't until Amy Ward had

7   showed up.

8        Q.    Right.  And the questions I'm asking are

9   just about the time period before then when you were

10  conducting an estimate.

11       A.    Sure.

12       Q.    So it was based on the information that was

13  in the work orders, which would have an estimate?

14       A.    Yes.

15       Q.    And that work order came from DirecTV?

16       A.    Yes.

17            MR. LAKE:  This document will be marked

18  Exhibit 11.  It's Bates stamped AIS 0087123.

19            (Marked for identification Exhibit 11.)

20       Q.    Have you had a chance to review Exhibit 11,

21  Mr. Martinez?

22       A.    Yes.

23       Q.    Do you recognize this document?

24       A.    Loosely.  I mean, it's a while ago, but

25  yes.

                                                    123

**EXHIBIT U**

1      Q.    And what's your understanding of what

2    Exhibit 11 is?

3      A.    This was a billing sheet filled out by

4    technicians.

5      Q.    Do you see the date in June 2010?

6      A.    Yes.

7      Q.    Do you see there's no place for the

8    installers to write down their hours worked?

9      A.    Yes.

10     Q.    So in AIS's discovery responses it states

11   that "In April 2010, Lumin began requiring technicians

12   to record their actual hours."  So if it wasn't on

13   this sheet, where were technicians supposed to be

14   writing down their hours?

15     A.    I don't know.

16     Q.    Are there any other sheets that you recall

17   that installers would fill out at Lumin where they

18   could write that kind of information down, the hours

19   worked?

20     A.    No.

21           MR. LAKE:  You can set aside Exhibit 11 for

22   now and we'll move on to Exhibit 12.

23           (Marked for identification Exhibit 12.)

24     Q.    And I'm not going to ask you explicit

25   detailed questions about Exhibit 12.  So you don't

                                                    124

1  have to review it in its entirety, if you don't want

2  to, but obviously, if you would like to, take your

3  time.  But do you recognize Exhibit 12?

4       A.    No.

5       Q.    Have you seen payroll summaries at AIS

6  before?

7       A.    Yes.

8       Q.    Does it look anything like this document in

9  front of you as Exhibit 12?

10      A.    No.

11      Q.    When you were at Lumin, in your role as the

12  manager or vice-president, did you review payroll at

13  all then?

14      A.    No.

15      Q.    So the statement in AIS's interrogatory

16  that "In September 2010, Lumin began paying overtime

17  rate for overtime hours," are you the best person to

18  provide information about that statement?

19      A.    So in September of 2010, Lumin started

20  paying overtime hours.

21      Q.    That's what AIS states in its interrogatory

22  responses under Exhibit 4.  Now, my question is, I

23  have additional follow-up questions on that statement.

24  And I'm -- it relates to Exhibit 12, but you're

25  stating that you do not recognize --

                                                    125

1      A.    I'd talk to Lisa about this.

2      Q.    You can set aside Exhibit 12 for now.  At

3  this time, if you could turn back to Exhibit 4, the

4  interrogatory responses.  And you might want to just

5  keep that Exhibit 4 loose and I'll ask you additional

6  follow-up questions later on.

7            Turning back to page 8, line 3, again the

8  response from AIS.  "After the November 2010 U.S.

9  Department of Labor audit, with information thereby

10  gained, the time tracking guidelines was created

11  because technicians were not properly recording their

12  time, e.g., were not including drive times or wait

13  times."  Do you see that?

14      A.    Yes.

15      Q.    Do you recall that change being made?

16      A.    Yes.  And it was a transition, but yes,

17  definitely, yes.

18      Q.    Did you have any role in implementing these

19  new time tracking changes as, I believe, at that time

20  AIS was in business?

21      A.    Yeah.  Principal meetings with the

22  technicians.  Letting them know how to properly fill

23  out their billing sheet.

24      Q.    So prior to the Department of Labor's

25  audit, you were unaware of drive time or wait time

                                                    126

1   being considered work time?

2       A.    Correct.

3       Q.    And you were unaware of the requirement to

4   record hours worked?

5       A.    That would be correct also, yes.

6             MR. LAKE:  Let's have the court reporter

7   mark this as the next exhibit.

8             (Marked for identification Exhibit 13.)

9       Q.    If you could look at Exhibit 13.

10      A.    Okay.

11      Q.    Have you seen this document before?

12      A.    Yes.

13      Q.    And did you have any role in drafting or

14  reviewing or approving this document?

15      A.    I'm sure I did.

16      Q.    Are these the time tracking guidelines that

17  AIS is referring to in its response to interrogatory 1

18  on page 8?

19      A.    I'm assuming so.

20      Q.    Are you aware of any other time tracking

21  guidelines that have been --

22      A.    No.

23      Q.    I'm sorry.  You just want to make sure to

24  keep letting me finish the question before you start

25  answering, just so the transcript is clear.

                                                    127

1      Are you aware of any other time tracking
2  guidelines that have been given out by AIS besides
3  those in Exhibit 13?
4      A.    No.
5      Q.    Based on what information did AIS draft
6  these guidelines?
7      A.    Amy Ward and the DOL website, which is
8  where we got the formula to figure out how to pay
9  overtime on a piece rate system.
10     Q.    Were AIS installers also instructed to
11 write down the time spent on jobs even if they were
12 not completed?
13     A.    Yes.
14     Q.    Where does it say that in Exhibit 13?
15     A.    It might not say it on there, but they are
16 instructed to include all their time.
17     Q.    What about for jobs where customers were
18 not home?
19     A.    All-inclusive, all their time.
20     Q.    But that's not in the time tracking
21 guidelines?
22     A.    You know, if it's not it should be.  I do
23 know for a fact that we do record all of their time.
24 All of their time is compensated for.
25     Q.    So, besides the written guidelines, how

                                                   128

else are -- how else does AIS communicate to drivers

what sorts of time they need to be writing down or how

they need to record their time?

    A.    Well, when we do our -- when we're

preparing our billing we go over every single billing

sheet that's handed in to us.  And we're going over

and we're making sure there's no gaps in their times

to where basically their start times is when they

either get to the job site or they get to the office,

and their stop time is when they close their last job.

So, generally, if it's all-inclusive, that includes

the, you know, reschedules or the jobs that were

uncompleted.  I mean, we make it really easy.  It's

basically when you show up to the office and when you

close your last job.

    MR. LAKE:  Let's mark another exhibit,

Exhibit 14, the AIS employee handbook.

    (Marked for identification Exhibit 14.)

    Q.    Do you recognize this document?

    A.    Yes.

    Q.    Is this the current employee handbook?

    A.    I believe so.

    Q.    And who wrote this handbook?

    A.    I put it together.  It's from the previous

handbook to a new one, and it was put together by me.

129

**EXHIBIT U**

1      Q.    So, do you have the power to make changes
2   to the handbook?
3      A.    Yes.
4      Q.    Has the handbook changed any time recently?
5      A.    No.
6      Q.    Has the handbook stayed the same since AIS
7   was formed in 2010?
8      A.    I believe so.
9      Q.    Is there anything in this handbook about
10  writing down hours worked?
11     A.    I do not believe so.  Well, actually, as
12  far as compensation is concerned, field service
13  technicians are paid for commissions through sales or
14  installations.  Billing sheets to be submitted.  As
15  far as times specifically, no.
16     Q.    Is there any reason that it hasn't been --
17  the handbook hasn't been updated to include that
18  information?
19     A.    No.  There's no specific reason.
20     Q.    Has anyone at AIS been disciplined or
21  mentored or had any kind of follow-up work done
22  because they weren't writing down all their hours?
23     A.    All the time.
24     Q.    What is that -- has any kind of discipline
25  taken place?

                                                  130

**EXHIBIT U**

1    A.    Discipline, no.  But we definitely are on

2    top of the technicians that are not fully recording

3    all of their hours.

4    Q.    And what does that mean?  Just following up

5    with them?

6    A.    Just to sit down, going over the billing

7    sheet they just handed in, and making sure that they

8    understand what they need to be recording.

9    Q.    And you said this happens all the time?

10   A.    Yeah.  We -- we're diligent about the

11   billing sheets and going over them.  Making sure

12   they're as accurate as possible.

13   Q.    You can set aside Exhibit 14, but if you

14   could turn to page 14 of the interrogatory responses

15   in front of you.  The last paragraph of page 14, in

16   red font starting between lines 19 and 20, states that

17   "AIS went through our billing sheets again in the fall

18   of 2011.  At that time, AIS was consistently paying

19   overtime according to the guidelines that she had

20   communicated to us."  Do you see that sentence?

21   A.    Yes.

22   Q.    Do you know who is the "she"?

23   A.    I'm assuming we're talking about Amy Ward.

24   Q.    But are you sure, or can you think of

25   anyone else it would be?

131

1      A.    No.

2      Q.    Any other female?

3      A.    No.   The only person we've dealt with

4   through the Department of Labor has been Amy Ward.

5      Q.    And did anyone at AIS take it upon

6   themselves to read any labor laws or to review other

7   information besides what Amy had told you?

8      A.    After her initial visit, yeah, we started

9   trying to research, navigate to see, you know, what we

10   needed to be doing and whatnot.

11      Q.    Looking at the next sentence of page 14.

12   "After looking at the billing sheets in August or

13   September of 2011, AIS pointed out that some of the

14   technicians were not counting their time between jobs,

15   and that that time should be included in their hours

16   as well."  Do you see that?

17      A.    Yes.

18      Q.    Do you recall that occurring in the fall of

19   2011 or August or September?

20      A.    No.

21      Q.    Do you know what this response means when

22   it's -- it states "AIS pointed out that some of the

23   technicians were not counting their time between

24   jobs"?  What does "point out" mean?

25      A.    I'm assuming just identifying the

                                                        132

**EXHIBIT U**

1  inaccuracies and sitting with the technicians, making

2  sure that they're recording what they're supposed to

3  be recording.

4      Q.   Well, the last sentence states, "AIS made

5  this final correction, and from September 2011, it is

6  believed that AIS has fully complied with all of the

7  requirements."  Do you see that?

8      A.   Yes.

9      Q.   And is that your understanding as well?

10     A.   Yes, it is.

11     Q.   Since September of 2011, has AIS, it sounds

12  like, been doing kind of periodic reviews of the time

13  sheets?

14     A.   We review the time sheets weekly.

15          MR. LAKE:  I'll have you look at these

16  billing sheets that will be marked as Exhibit 15.

17          (Marked for identification Exhibit 15.)

18     Q.   Do you recognize these documents?  Do they

19  look familiar to you?

20     A.   Yes.

21     Q.   And what's your understanding of what

22  Exhibit 15 is?

23     A.   These are billing time sheets the

24  technicians hand in weekly with their completed work

25  orders.

                                                    133

1      Q.   Can you turn to page 4 of Exhibit 15.
2   Looking at the second column called "Time In/Out."
3   And this document is Bates stamped AIS 0043541.  Do
4   you see that it doesn't list travel time?  This is the
5   sheet for Rob Meek, starting date February 3, end date
6   February 9th.
7      A.   Are you saying there should be a column
8   that states travel time?
9      Q.   No.  What I'm stating is, if you look at
10  the time in/time out column, first job, 8:30 to 10,
11  second job, 10:30 to 12:30, do you know why there's
12  not anything listed between 10 and 10:30?
13     A.   Might have taken a break.  I don't know.
14     Q.   The next column -- excuse me.  The next
15  entry, 10:30 to 12:30, that's the second line.  The
16  third line, 1:00 to 4:00, any idea what the gap
17  between 12:30 and one is?
18     A.   No.
19     Q.   And when there are these gaps, does AIS do
20  any follow-up to find out what -- whether the
21  installer was failing to write down travel time or
22  that was a break or lunch or anything like that?
23     A.   We try to catch all inaccuracies.  If some
24  things are missed, I can't speak to that.  Same thing
25  with generalities.  A technician will mark down, you

                                                    134

1  know, eight to 10, 10 to 12.  There's no travel time

2  in there.  But we are assuming that it's included

3  also.

4       Same thing with the note on the first page,

5  right here where we asked the technician to record

6  start times accurately.  Sometimes the technician

7  will, you know, put in an earlier time than they were

8  actually in the office or whatnot.  So I mean, there

9  is due diligence to go over everything from -- exactly

10  what you described, including start and stop times.  I

11  don't know.  I can't answer as far as exactly why

12  there's a gap in those times, though.

13       Q.    Are the installers supposed to list their

14  time at the shop when they arrive in the morning?

15       A.    Yes.  That's their start time.  So even

16  though it's -- on, for example, the first page,

17  Rebecca Wood, that 8:30 should include when they got

18  to the shop.

19       Q.    They don't -- they're not instructed to put

20  a separate entry so that the shop entry is clearly

21  delineated from the time actually spent on a work

22  order?

23       A.    No.

24            MR. KELLY:  One more time, please.

25            (Record read as requested.)

                                                      135

**EXHIBIT U**

1      A.      No.

2              MR. LAKE:  Well, I think this is actually

3    probably a good time for a lunch break for everybody.

4    It's about 12:30.  We've been going for a while.

5              (Off the record from 12:30 to 1:30 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    136

EXHIBIT U

AFTERNOON SESSION

1:30 p.m.

1
2
3
4       MR. LAKE:  We're back on the record.

5       Q.    If you could turn back to the last document

6   we looked at, Exhibit 15.  I just had a couple more

7   follow-up questions.  If you could turn to page 4 of

8   that, which is marked at AIS 0043541.  This is again

9   the billing sheet for Rob Meek.

10          Now, we were speaking earlier about the

11  gaps between the jobs on February 3rd of half an hour.

12  When there are gaps like this on the billing sheet,

13  are the installers paid for that time?

14      A.    Do you mean is the billing going from 8:30

15  to four on that said day?

16      Q.    Right.  Or would it be broken up on the per

17  job basis?

18      A.    I believe they're paid from 8:30 to four,

19  but I can't say for sure.

20      Q.    Would Ms. Kelley be able to testify more

21  accurately on that?

22      A.    Yes.

23      Q.    Now, when the Department of Labor came in

24  and the time tracking guidelines were issued, you

25  explained to the installers that they needed to keep

137

**EXHIBIT U**

more complete track of their hours.  What did you tell them about why they needed to do that?

A.     I don't think I did.  It was just a new process that we were doing.

Q.     Okay.  Did you explain anything about, you know, why it might be important to do that or anything like that?

A.     Basically I explained that we needed to compensate them for their time fully, and we were going towards this new process of capturing all their time going forward.

Q.     Now, how did -- let me back up.  To your knowledge, when you started at Lumin, was Lumin already working with DirecTV?

A.     Yes.

Q.     Did you ever speak with anybody at Lumin as to how that relationship was formed?

A.     I know they started in -- out of the Tumwater facility, and they eventually got asked to work out at the Lynnwood facility.  DirecTV's facilities.  But that's all.

Q.     So, Lumin was working out of DirecTV facilities?

A.     Well, what I mean is they performed work for that office, geographic location.

138

**EXHIBIT U**

1      Q.      And when Lumin was transferred or dissolved
2    and AIS was formed, what steps did you take to, I
3    guess, keep the relationship going with DirecTV?
4      A.      I informed the current -- or the then
5    current director of operations, Chris King, of what
6    was going on.  Let him know that I was still
7    interested in performing services for DirecTV, and
8    what I needed to do to continue that relationship.
9      Q.      And what did you -- what did Mr. King tell
10   you, then, in response?
11     A.      I can't remember for sure, detailed.
12     Q.      Generally.
13     A.      Generally, no problem.  Welcome aboard.
14   And facilitated the transfer of or the acceptance of
15   the new contract.
16     Q.      And has AIS worked with other cable or
17   satellite companies?
18     A.      Ever up until now or --
19     Q.      Yes.
20     A.      Yes.
21     Q.      Which other ones?
22     A.      Currently -- obviously, our main client is
23   DirecTV, but we are also working with Multiband
24   Corporation.  We do service work for their -- when I
25   say "we" I mean me -- do service work for a variety of

                                                    139

**EXHIBIT U**

```
 1   their clients that they have their equipment in and

 2   their dealings with.

 3        Q.     What was the name of the company?

 4        A.     Multiband.

 5        Q.     B-A-N-D?

 6        A.     Yes.  And that's a new relationship,

 7   something that we just fostered in the past couple of

 8   months.  Prior to having other clients, we've tried

 9   working with other products, like Control4.  It's a

10   home automation system.  That was unsuccessful.  We're

11   also authorized retailers of DirecTV.  So we do have

12   the opportunity to sell the product ourselves and

13   install it to generate income that way.

14        Q.     What would you do as a -- or what do you

15   do, then, as a retailer?

16        A.     Well, we've tried a couple of avenues.

17   Also unsuccessful.  We've hired salesmen to advertise

18   and sell the product for us.  Door-to-door marketing

19   campaign to try to attract and gain our own customers.

20   That's it.

21        Q.     But sounds like that's been a pretty minor

22   source of revenue for AIS up until now?

23        A.     Yes.  That would be correct.

24        Q.     And the Multiband Corporation is, you said,

25   just the past couple of months?
```

140

**EXHIBIT U**

1          A.     Yes.

2          Q.     Beside those two, have there been other

3     cable or satellite companies that AIS has worked with?

4          A.     No.

5          Q.     Is there any reason that AIS hasn't worked

6     with other cable companies?

7          A.     Not by choice.  It's just we haven't been

8     able to find new clients.

9          Q.     Are you aware of any restrictions placed by

10    DirecTV on who AIS can work with?

11         A.     No.

12         Q.     So, the vast majority of AIS's revenue

13    comes from DirecTV; correct?

14         A.     Correct.

15         Q.     Is that something that AIS wants to change

16    to become more diversified?

17         A.     Yes.

18         Q.     Can you turn back to the contract we looked

19    at before.  It's Exhibit 5.  Now, I know this contract

20    is the contract between Lumin and DirecTV.  I'm going

21    to use it to ask some follow-up questions on this and

22    some additional questions about your contract with

23    AIS.

24                Now, when you assumed this agreement at the

25    formation of AIS, as detailed on pages 43 and 44, were

                                                         141

EXHIBIT U

1  you given the opportunity to change any terms or
2  negotiate any terms in the agreement?
3       A.    No.
4       Q.    When AIS formed its own new contract with
5  DirecTV, did you negotiate any terms of that -- in
6  that agreement?
7       A.    No.
8       Q.    Were you presented with the agreement by
9  DirecTV as is?
10      A.    Yes.
11      Q.    Did you feel that you could negotiate any
12 terms?
13      A.    Not at the time.  Fresh start.  New
14 contract.  I didn't feel like I was in a position to
15 make demands.
16      Q.    Since then have you attempted to
17 renegotiate any terms in AIS's contract with DirecTV?
18      A.    Yes.  We do work on their adjusted rate
19 card.
20      Q.    And that adjusted rate card was adjusted by
21 DirecTV?
22      A.    Through my request, yes.
23      Q.    Can you talk a little bit more about that?
24      A.    Sure.  When we first formed AIS and began
25 working for DirecTV, it became apparent, specifically

                                                    142

working under the W-2 model under the direction that
we were going in, that the current rate card we were
working under wouldn't work out for us.  We wouldn't
be able to continue performing work for DirecTV unless
we got something better, they paid a little bit more.

So I approached the director of operations
at the time, Chris King.  I let him know of what I
needed and wanted to know what processes I should
follow or what they can do.  They in turn began --
they began working on a new rate card for specifically
AIS in the Washington market, and they gave me a
proposal which sat well with me, and I agreed to it.
And that's the current rate card we're working under
right now.

Q.    How long had AIS been in business at that
point when you did that negotiation?

A.    I couldn't tell you specific dates.

Q.    Any approximation?  I mean, was it right
when AIS started?

A.    It probably was around 2011.

Q.    And since 2011, have there been any changes
to the rates from DirecTV?

A.    No.

Q.    For any of the tasks that AIS performs?

A.    Did you ask me if there was any increases

143

1  or changes?

2       Q.    Changes.

3       A.    Well, I don't know exactly what year, but

4  like we referenced before, as far as change in what

5  the rate card looked like as far as for certain

6  categories, I believe SWM installation went down a

7  couple of dollars.  But aside from that, no.  There

8  hasn't been any major changes.

9       Q.    So no decreases in the rates paid by

10 DirecTV beside the --

11      A.    Aside from that one SWM line item, no.

12            MR. LAKE:  Mr. Martinez, I'll have you

13 review a document which will be marked as Exhibit 16.

14            (Marked for identification Exhibit 16.)

15      Q.    Have you seen this document before?

16      A.    Is this the new rate card we're working

17 under?

18      Q.    That would be --

19      A.    It's a rate card.  I don't know if it's the

20 newer one or not.

21      Q.    What would be different between the newer

22 and the older one?  Just the SWM labor?

23      A.    No.  I mean, the one that we -- the

24 adjusted rate card that we're currently working under,

25 the prices would be different under install, upgrade.

                                                      144

**EXHIBIT U**

1      Q.    Well, right now, do you know how much AIS

2   is paid for an install?

3      A.    You know, honestly, I should know, but Lisa

4   would give you an exact answer to that question.

5      Q.    Now, when the rates changed from DirecTV,

6   when you said that they -- you worked with Chris King

7   and the rates were increased, did the rate of pay to

8   installers change?

9      A.    No.

10      Q.    And have there been periodic additions or

11   subtractions from certain tasks, and have certain

12   tasks been taken off or added to the rate card?

13      A.    Yes.

14      Q.    Can you think of any examples?

15      A.    There's a new wireless client that's being

16   installed now that would have been an addition to the

17   rate card.

18      Q.    So it's not on this -- you don't see it on

19   the rate card that's been marked as Exhibit 16?

20      A.    No, I don't.

21      Q.    Any other examples you can think of sitting

22   here today?

23      A.    No.

24      Q.    Turning back to the contract.  You can also

25   keep that one out, too, while I have some more

                                                        145

**EXHIBIT U**

```
 1    follow-up questions.  If we can turn to page 25.  The

 2    paragraph that's titled "Personnel," towards the

 3    bottom of that paragraph is a sentence that states:

 4    "Contractor shall, throughout the term of the

 5    agreement, maintain a minimum one-to-20 supervisor to

 6    technician ratio, including subcontractors in each

 7    individual market that contractor operates."

 8              My question is, does AIS's contract with

 9    DirecTV have a similar provision?

10         A.    I don't know.

11         Q.    Are you aware of any ratio that AIS is

12    required to maintain between supervisors and

13    technicians?

14         A.    No.  I've never been spoken to about that.

15         Q.    Has AIS had to provide any information to

16    DirecTV regarding the number of technicians or

17    supervisors currently working at AIS?

18         A.    As staffing projections, yes, specifically

19    about technicians.

20         Q.    What about supervisors?

21         A.    No.

22         Q.    What kind of staffing information, then,

23    does AIS have to provide to DirecTV about installers?

24         A.    The work volume that we're able to handle.

25    What our current ability is.  What we project it may
```

146

**EXHIBIT U**

1  be going forward, specifically during a heavier time

2  of year.  They may ask if we can handle more work, and

3  that speaks directly to the size of my staff.

4      Q.      Turning to page 31.  The paragraph under

5  "Response Times" and "Scheduling," in approximately

6  the middle of the page it says, "Contractor shall have

7  sufficient labor available to meet DirecTV's response

8  times, and contractor shall maintain a specified

9  amount of time, seven days a week, for morning

10  appointments and afternoon appointments."

11          Does AIS's contract with DirecTV have a

12  similar requirement?

13      A.      Without the contractor -- contract in front

14  of me I couldn't answer to that.

15      Q.      Is it your understanding that AIS is

16  required to have a sufficient amount of labor to meet

17  DirecTV's needs?

18      A.      There's a certain desire for AIS to be able

19  to meet a certain set amount of workload.  But whoever

20  -- there's only one person that dictates that and it's

21  me, and I'm able to show them exactly what I'm able to

22  offer.  And if they want to continue the relationship

23  it's up to them.

24      Q.      Is AIS required to have installers

25  available seven days per week?

147

**EXHIBIT U**

1      A.      No.  No.  I mean, I read it right in here,

2   but no, I mean, right now my offices are pretty much

3   shut down on Wednesdays.  And, I mean, aside from what

4   I want -- specifically I want certain shifts covered

5   -- they don't dictate us being open seven days a week.

6      Q.      Okay.  Still on page 31.  Towards the

7   bottom of the page it states that if AIS cannot make

8   an appointment time -- the subparagraph B.  "In the

9   event that contractor is unable to perform and

10  complete all assigned, scheduled fulfillment service

11  appointments on the scheduled date and within the

12  scheduled appointment window, contractor shall

13  promptly contact the local DirecTV dispatcher by

14  telephone such that the dispatcher may notify the

15  DirecTV customer of the scheduling problem prior to

16  the scheduled appointment time."

17          Does AIS have a practice of contacting the

18  local DirecTV dispatcher if AIS is going to be unable

19  to meet the assigned appointment time window?

20     A.      It happens very rarely, but yes, we let the

21  dispatch know that we're unable to handle certain work

22  loads for that day.  And first we inform the site

23  manager, whether we let them know exactly what's going

24  on, and then the customer is informed.

25     Q.      The next sentence reads that "DirecTV will

                                                      148

1    promptly reschedule the appointment at the earliest

2    time convenient to the DirecTV customer."  Going on to

3    state that "DirecTV reserves the right to immediately

4    reassign such fulfillment service work order to

5    another party."

6              Is it your understanding that DirecTV has

7    that right to reassign work orders that AIS is not

8    able to complete?

9         A.    Yeah.

10        Q.    Has that happened?

11        A.    Rarely.  If they're reassigning it to

12   anybody, they're reassigning it to themselves.

13        Q.    The next sentence goes on to state that "In

14   such case, contractor shall not receive any

15   compensation and may" -- well, a misprint but "may

16   subject contractor to a charge as a result of a missed

17   appointment."

18             Has DirecTV charged AIS for any missed

19   appointments?

20        A.    No.

21        Q.    Now, we talked -- you spoke a little

22   earlier about the ebbs and flows of the work done by

23   AIS.  What steps, if any, does AIS take during the

24   slow times to make sure there aren't too many

25   installers around, not enough work for everybody?

                                                    149

**EXHIBIT U**

1  Anything?

2      A.    No steps.

3      Q.    And during the slower times versus the fast

4  times, or the busier times, does DirecTV -- or excuse

5  me -- does AIS make any changes in the number of

6  installers?

7      A.    No.

8      Q.    So it's just the number of hours worked by

9  installers that changes?

10     A.    Yes.

11     Q.    Sorry.  Was your answer yes?

12     A.    Yes.

13     Q.    And the number of days per week worked by

14  the installers?

15     A.    Yes.

16     Q.    And does DirecTV provide any direction to

17  AIS on how many installers will be needed to

18  accomplish the projected work orders?

19     A.    Yes.

20     Q.    What does that direction entail?

21     A.    They have projections of the estimated

22  workload, and they request that we be staffed to a

23  certain level to handle the workload.  Whether we get

24  there or not is a different story.  We talked about

25  difficulty staffing, job place market, hiring, things

150

**EXHIBIT U**

1   of that nature.  But the request is put in.

2       Q.      How precise is the request, as in does it

3   state how many installers need to be working at AIS on

4   a given day to accomplish the work orders?

5       A.      Yes.  They give me generalities, but yes,

6   they do give me a number.

7       Q.      Does DirecTV maintain a 1-800 number for

8   installers to call during their shift?

9       A.      Dispatch, yes.

10      Q.      And what is your understanding of why the

11  installers would call the dispatch?

12      A.      The only time any of our installers call

13  dispatch is whenever they're encountering any type of

14  technical difficulty, scheduling difficulties, or

15  difficulties with the work order being incorrectly

16  built.

17      Q.      What about when the installer arrives at a

18  customer's home?

19      A.      They use -- they go to a website on their

20  smart phones and they put themselves on sites.

21      Q.      Whose website?

22      A.      It's a Click also.  Same type of program.

23      Q.      It's a website that's -- is it AIS's

24  website?

25      A.      No, no.  It's a DirecTV website.

151

1    Q.    What about when they leave the customer's

         2  home?

         3    A.    They access the same program and they go

         4  off site.

         5    Q.    So when AIS installers call the dispatch

         6  for the tech difficulties or the scheduling

         7  difficulties, or the incorrect work orders, does an

         8  AIS supervisor or you get involved at all in that

         9  process?

        10    A.    No.

        11    Q.    So, do you know what happens then, though?

        12    A.    We have a general knowledge.  Basically if,

        13  scenario A, a technician gets to a job site, and the

        14  customer wants to reschedule or wants a different

        15  appointment, dispatch is notified of the occurrence,

        16  and the customer gets on the phone, speaks to

        17  dispatch, and they put the work order on hold.

        18    Q.    And in that instance, would the dispatcher

        19  then send the installer to a new job?

        20    A.    No, no.  All work orders -- we're

        21  prerouted.  We are not dynamic, we're static.  So the

        22  technician already has a set amount of work for that

        23  day.  Once there's a resolution to that, the

        24  technician will go to the next job on their own.

        25    Q.    You've mentioned a DirecTV site manager a

                                                              152

1    few times during today's deposition. What is your

2    understanding of the duties of this site manager?

3         A.    DirecTV's site manager, my understanding of

4    his duties, is the day-to-day operations of his

5    facility and his staff, which includes his warehouse

6    and the building.

7         Q.    And what interactions does AIS have with

8    this DirecTV site manager?

9         A.    I have monthly meetings with the site

10    manager.

11         Q.    Or periodic meetings if there's a work

12    force issue as far as needing more workers?

13         A.    Anything that -- any information that needs

14    to be disseminated. Any concerns he may have that he

15    may think I would need to know immediately.

16         Q.    And the DirecTV site manager, does he meet

17    with anybody else beside you?

18         A.    No.

19         Q.    Never talks to the supervisors?

20         A.    Besides from a hi and bye, no.

21         Q.    Are there other individuals with DirecTV

22    that you talk to on a periodic basis?

23         A.    No. Just the site manager.

24         Q.    What about the operations person that you

25    spoke about earlier, the director of operations?

153

1        A.      Oh, the current one, Mark Mastin?  That's
2   even less, but, yes, I do speak with him.
3        Q.      And what kind of reasons would you speak to
4   him about?
5        A.      Whatever concerns he has at the moment.
6        Q.      What kind of concerns has the director of
7   operations spoken to you about previously?
8        A.      Staffing.  You know, how far along are we.
9   Service metrics, if we're causing a big impact in his
10  region as far as service-related issues.
11       Q.      Briefly turning back to the site manager.
12  What kind of concerns has the site manager brought to
13  your attention before?
14       A.      Same type of concerns.  Just on a more
15  local scale.  Specifically his sites and our impact on
16  his site's quality goals, service numbers.
17       Q.      And what is your understanding of what this
18  site manager's area is geographically?
19       A.      The Lynnwood site manager, his area, I
20  believe, begins in Bellingham and ends in -- from
21  north to south it would be from Bellingham to
22  Enumclaw.  East to west it would be from West Seattle
23  to, I'm assuming, Bellevue.
24       Q.      But, so, his area covers all the places
25  where AIS would work?

                                                        154

```
 1        A.    Yes.

 2        Q.    Does anyone with DirecTV contact AIS's

 3   installers during their shift?

 4        A.    No.

 5        Q.    For any reason?

 6        A.    No.

 7        Q.    The dispatcher wouldn't contact the

 8   installers?

 9        A.    No.

10        Q.    And the site manager wouldn't contact the

11   installers?

12        A.    No.

13        Q.    Does DirecTV have any other field personnel

14   who you work with at AIS?

15        A.    No.

16        Q.    So besides the site manager and the

17   director of operations, is it your testimony that

18   there's no one else that, from DirecTV, that you

19   interact with?

20        A.    Field-wise?

21        Q.    In general, in your role as the president

22   of AIS.

23        A.    Well, I've interacted with the warehouse

24   manager when we talked about inventory.  That's pretty

25   much it.  I don't deal with site managers, field
```

155

**EXHIBIT U**

staff, leadership team at all.

Q.   Does the field staff, anyone from the field staff, come into AIS's office for any reason?

A.   Once a month a representative of the Lynnwood office will come down and perform an end-of-month inventory inspection.  Basically they just account for all the equipment that's been issued to us.

Q.   Any other occurrences where DirecTV field staff will come to AIS's field offices?

A.   No.

Q.   And besides the field staff, does the warehouse manager come to AIS's offices?

A.   At a time he may have been one of the representatives to come down to do the end-of-month inventory audit.

Q.   Are there any other DirecTV personnel who come to AIS's offices?

A.   Aside for the audit, no.

Q.   Does DirecTV personnel accompany installers while they're performing their work out in the field?

A.   No.

Q.   At any time has that happened, to your knowledge?

A.   No.

156

**EXHIBIT U**

1    Q.    Does DirecTV personnel follow up after an
2  AIS installer has completed his work?  "Follow up"
3  meaning going to the customer's home to see how the
4  AIS installer did their job?
5    A.    In the past they've had a QC program.  So
6  they are doing a quality inspection of the
7  installation work done.
8    Q.    When you say "in the past," is it your
9  understanding that that no longer happens?
10    A.    Yes.  It's -- I don't think they have a QC
11  program anymore.
12    Q.    Is it something that has -- this QC
13  program, has it been over for several years?
14    A.    It's been over for a while.  Several years?
15  Probably at least two.
16    Q.    How frequently were DirecTV personnel going
17  and doing these follow-up quality control inspections
18  when it was happening?
19    A.    They had a scheduled program.  I don't know
20  exactly how frequently.  We would just receive the
21  feedback at one of my weekly meetings.  We'd get
22  handed, you know, the QCs.
23    Q.    What kind of weekly meeting are you talking
24  about?
25    A.    In the past some of the meetings were more

157

1 frequent. It's changed over time. But there have

2 been times of the year where I had a weekly meeting

3 with the site manager.

4 Q. Were you given any reason for why the more

5 frequent meetings were made less frequent with the

6 site manager?

7 A. No. That's at their discretion.

8 Q. Is it based on -- the frequency of these

9 meetings, I guess, is it based on the ebbs and flows,

10 as you described, of the work coming in, or is it

11 something that's just generally changed over time?

12 A. It's solely at the discretion of the site

13 manager, what he wants.

14 Q. And lately how often have those meetings

15 been --

16 A. Monthly.

17 Q. Has anyone from DirecTV provided any

18 instruction or training to AIS installers?

19 A. Ever?

20 Q. I mean, yes, ever.

21 A. Yes.

22 Q. Can you describe what that instruction or

23 training has consisted of?

24 A. When we had a Tacoma office the DirecTV

25 trainer would come down once a month and do what's

158

**EXHIBIT U**

called a video of the month. I believe this was in

the years -- again, I can't be for sure -- 2008, 2009,

2010. And would show a -- the video of the month,

whatever was on that video.

Q. What kind of topics, I guess, would be on

this video?

A. Just technology coming out. Best

practices.

Q. You said these trainings were limited to

the Tacoma office?

A. Yes, because we would -- at the time, when

we had two offices, we would have a -- bring both

staffs into the Tacoma office, yes.

Q. So the training was for all AIS personnel?

They would just take place in the Tacoma office?

A. Yes. Well, no, no. At that time, we were

working for two different regions. There was a

Tumwater DirecTV office and a Lynnwood DirecTV office.

Those meetings never happened at the Lynnwood DirecTV

office. They were isolated to this offices over here.

So the staff that worked on this side of the bridge

didn't attend those meetings.

Q. And were you given any reason for why

DirecTV stopped having those meetings?

A. No.

**EXHIBIT U**

```
1      Q.    Did it just one day --

2      A.    Stopped coming, yeah.

3      Q.    They just stopped coming?

4      A.    Yeah.

5      Q.    No warning or anything?

6      A.    No.

7            MR. LAKE:  I'll have you take a look at a

8      document to be marked as Exhibit 17.

9            (Marked for identification Exhibit 17.)

10     Q.    Is this the kind of training that you were

11     previously describing?

12     A.    Possibly.  I didn't attend.  I wasn't at

13     all of those meetings, but this possibly could be a

14     topic that was discussed along with the video of the

15     month.

16     Q.    Do you recall whether DirecTV would be --

17     would give out handouts to the installers about the

18     topics to be discussed?

19     A.    No.  I don't recall.

20           MR. KELLY:  Is there some reason this

21     document wasn't produced, counsel?

22           MR. LAKE:  Again, we can talk about this at

23     a later date, but --

24           MR. KELLY:  But you find it appropriate to

25     continue the deposition on a case where we have
```

160

**EXHIBIT U**

1  discovery responses that say we're not -- refusing to

2  produce any documents not privileged.  I don't see you

3  obviously claiming that this document or any of the

4  others that you used today that were not produced were

5  privileged.  Do you think that's proper?

6          MR. LAKE:  Well, again, I'm not going to

7  sit here and answer questions in a deposition that I'm

8  taking.

9          MR. KELLY:  I'm not asking a question.  I'm

10 asking why you think it's appropriate to sandbag

11 parties in a deposition when there have been discovery

12 requests that were served, discovery requests that

13 were responded to.  You have the temerity to file a

14 motion with respect to things that we haven't

15 produced, but yet you think it's perfectly proper to

16 notice a deposition and examine a witness about a

17 document that was requested and not provided.

18          MR. LAKE:  That sounds like a question.  So

19 I don't actually have any response for it at this

20 time.

21          MR. KELLY:  I wouldn't think so.

22          MR. LAKE:  We can move on.

23     Q.    Mr. Martinez, have you seen any handouts

24 like Exhibit 17 before?

25     A.    I can't remember.

                                                    161

**EXHIBIT U**

1      Q.    And it's your testimony that DirecTV no

2   longer gives any kind of weekly -- or, excuse me,

3   monthly trainings?

4      A.    Yes.

5      Q.    At any time did DirecTV give weekly

6   trainings?

7      A.    No.

8            MR. LAKE:  If you could turn back to the

9   contract that we've been discussing.  If you could

10  just -- we can go off the record.  I just need a

11  minute to find the exact spot.  I didn't write it

12  down.

13           (Off the record)

14     Q.    If you could look to page 3, the very last

15  sentence at the bottom of the page.  "During the term

16  of this agreement, as well as any extension thereof,

17  contractor shall make its offices available at any

18  time during business hours so that DirecTV may inspect

19  and otherwise audit the way in which contractor is

20  performing the services, both at contractor's offices

21  or warehouses, and on customer's premises, as well as

22  to inspect the manner in which DirecTV system hardware

23  is being secured."  Do you see that sentence?

24     A.    Yes.

25     Q.    Has AIS been inspected or audited at any

                                                   162

**EXHIBIT U**

1   time by DirecTV?

2        A.    No.

3        Q.    When you were at Lumin, was Lumin ever,

4   while you were there, audited or inspected by DirecTV?

5        A.    No.

6        Q.    Are you aware if, before you started at

7   Lumin, they were ever audited or inspected?

8        A.    No, I'm not.

9        Q.    Does AIS give any ongoing training to its

10  installers?

11       A.    Isolated up training when service numbers

12  dictate a technician is having an issue with a

13  specific process.

14       Q.    What about when DirecTV issues a new

15  product or something like that?  Would AIS hold the

16  training?

17       A.    Yes.

18       Q.    Would DirecTV personnel attend these

19  trainings?

20       A.    No.

21       Q.    Not to explain their product or anything

22  like that?

23       A.    No.  It's on-line video-based.  So we have

24  technicians watch the videos of the new products.

25       Q.    The materials that AIS installers would use

                                                   163

**EXHIBIT U**

1    to complete their work, did DirecTV provide any
2    requirements about what sort of materials AIS
3    installers needed?
4         A.    It had to be on the approved parts list.
5         Q.    So DirecTV would provide such a list?
6         A.    Yes.
7         Q.    What kind of items are we talking about on
8    this list?
9         A.    Anything from cable to fittings to the
10   types of attachment devices you use to attach to the
11   homes.
12        Q.    How specific is this list, as far as what
13   kind of cables, for example, you need to have?
14        A.    Specific.
15        Q.    How long the cable has to be or how --
16        A.    What type.  Solid copper.  Not allowed to
17   use copper clad cable.  But, yeah, the approved parts
18   list is specific on exactly what parts are allowed to
19   be used on a DirecTV install.
20        Q.    And is that approved parts list part of the
21   contract that AIS signed with DirecTV?
22        A.    I don't know if it's part of the contract.
23   It's just the nature of the business, I guess.
24        Q.    Is it something that DirecTV provides or
25   updates on an ongoing basis?

                                                    164

**EXHIBIT U**

1      A.    If they do, I don't know about it.

2      Q.    Well, like, for example, when was the last

3   time you received an approved parts list?

4      A.    It's been a long time.  I can't remember.

5   I mean, things have not changed as far as the items

6   used to do the install.

7      Q.    If you can turn back to the interrogatory

8   responses that have been previously marked as Exhibit

9   4.  If you could turn to page 11.  The last bullet

10  point in AIS's response states that if a technician

11  bills the wrong amounts, i.e., they say four receivers

12  were installed but actually five were installed, AIS

13  will adjust the payment to the technicians to reflect

14  the work that was actually completed.  Do you see

15  that?

16     A.    Yes.

17     Q.    How does AIS verify the actual work

18  completed by the installers as opposed to what they

19  put on their billing sheet?

20     A.    We get a -- what's called a comp sheet, and

21  it shows us all closed work order for a specific time

22  frame, and it shows exactly what was installed on a

23  closed work order.

24     Q.    And who -- do you get that from DirecTV?

25     A.    Yes.

165

1      Q.     Will it be listed by day as far as what

2   work was completed on that day?

3      A.     Yes.

4      Q.     Will it list by installer as far as what

5   work was completed by an installer?

6      A.     I believe so.  I haven't looked at it in a

7   while, but I believe so.

8      Q.     What was the name of that document?

9      A.     Comp sheet.  It's a -- it comes with a --

10  our weekly deposit.

11     Q.     If you could turn to page 29 of the

12  document.  It's one of the last pages.  Here AIS lists

13  its current supervisors as Matt Henderson, Ryan

14  Caldara, Justin Masencup and yourself, Ray Martinez.

15  Earlier you testified that the current supervisors, as

16  of today, are?

17     A.     Dennis Edson and Ryan Caldara.

18     Q.     When was Mr. Edson hired as a supervisor?

19     A.     He's had a number of titles with my

20  company.  Before he was a supervisor he was a trainer.

21  I can give you an exact date on when the transition

22  was when we made him supervisor from trainer.

23     Q.     What were his duties as trainer?

24     A.     He would train the new hires on how to

25  install DirecTV's product.

                                                        166

**EXHIBIT U**

```
 1        Q.    And there was enough new hires coming in to
 2   make that training a full-time job?
 3        A.    Not really.  That's why we made him a
 4   supervisor.
 5        Q.    Matt Henderson is no longer with AIS?
 6        A.    No.
 7        Q.    What was the -- when did he depart,
 8   approximately?
 9        A.    Matt hasn't been with us -- it's not been a
10   year yet.  Within a year.
11        Q.    Why did Mr. Henderson leave?  Was he
12   terminated?
13        A.    He was terminated by me.
14        Q.    Was this based on anything to do with the
15   performance of his installers?
16        A.    No.  Performance by him.
17        Q.    Can you elaborate?
18        A.    He liked to go home a little earlier
19   sometimes and lie to me about it.  That was one of the
20   main reasons.
21        Q.    Mr. Masencup, Justin Masencup, he's no
22   longer with AIS?
23        A.    No.  He's still a part of the company, but
24   he's -- whereas he was an operations manager before,
25   now he more has an analyst role.  He's a part-time
```

167

employee.  Lives in California and he works for me
remotely.

Q.    What are his duties as an analyst?

A.    The metric reporting that we get from
DirecTV, he compiles all the data and creates nice
flashy reports that are easy on the eyes for our
technicians and myself.  He manages all of our
computer systems.  He's kind of analyst/IT guy.  So
he's updating our systems remotely.  He has access to
all of our computers.  He assists with inventory.  A
lot of number crunching.  A lot of, quote-unquote,
analyst-type duties.

Q.    You can set aside that document for right
now.  Earlier we looked at a -- or we had as an
exhibit the responses of AIS to the Secretary of
Labor's requests for admissions.  If you could find
that, I just don't remember the exhibit number.
Exhibit 8, yes.

And if you could turn to page 9.  The
underlined sentence from AIS states:  "Some of our
technicians did use hand-held devices that were
provided to us by DirecTV.  Our technicians were given
the option of doing so.  As of December 2013, none of
our technicians use them any longer."

What are these handsets that are described

**EXHIBIT U**

here?

A. They were offered to us in a limited quantity. Basically a hand-held device had the ability to scan receivers, activate receivers, and it gives the technician the ability to put themselves on and off site.

Q. But now the technicians instead use their smart phones?

A. Yeah.

Q. The hand-held devices, who were they provided by?

A. DirecTV.

Q. Did AIS have to pay anything for these devices?

A. No. We didn't buy them.

Q. Did the installers have to pay anything?

A. The installers paid a portion of the monthly cellular cost because they were using them as cell phones also.

Q. Do you know why installers are no longer using this hand-held device?

A. We decided to just go completely away from them. We told DirecTV if they -- I either wanted them all or none. So I just didn't want to use them any more.

169

**EXHIBIT U**

1  Q. There were never enough hand-held devices

2 available for all the installers?

3  A. No.

4  MR. LAKE: Mr. Martinez, I'll have you take

5 a look at Exhibit 18.

6  (Marked for identification Exhibit 18.)

7  Q. These are the initial disclosures provided

8 in this litigation by AIS and yourself. If you could

9 turn to the third page. Actually, let me back up. On

10 page 2, AIS states that "The defendants disclose the

11 following categories of documents that may be used to

12 support its defenses." And No. 10, on page 3, is

13 mileage logs obtained from technicians in the course

14 of discovery. Do you see that?

15  A. Yes.

16  Q. Do you know what that's referring to?

17  A. No.

18  Q. Have you seen any mileage logs?

19  A. No.

20  Q. Have you requested that any installers keep

21 mileage logs?

22  A. I advise that they do, but I don't manage

23 it for them.

24  Q. Why did you advise them to?

25  A. They're using their own vehicles, so they

170

should, at the end of the year, claim those miles
because they're using it for work.

Q. Has AIS requested that the technicians
provide a copy of any of these mileage logs?

A. No.

Q. So do you know why any such mileage logs
would be used by AIS in this litigation?

A. No.

Q. And when did you first -- how did you first
learn that the Department of Labor was investigating
AIS?

A. That Amy Ward visit.

Q. What did you learn were the reasons for the
investigation?

A. She didn't give us any. She didn't tell us
what prompted her to be there or why. She told us why
she was there, what she was there to do and to make
sure, but she didn't tell us what prompted her to be
there.

Q. And have you spoken, at any time, to any
installers or former installers about the Department
of Labor's investigation?

A. No.

Q. Have you spoken to, besides your attorney,
have you spoken to anyone else about the Department of

171

**EXHIBIT U**

1    Labor investigation?

2         A.    My fiancee.

3         Q.    Okay.  And anyone else at AIS?

4         A.    My supervisors know about something going

5    on.  Obviously, the technicians have been interviewed.

6    And, you know, people get together, a little

7    scuttlebutt, whatnot, but I personally have not gone

8    over any of those things with those guys.

9         Q.    And what have the supervisors told you

10   about what they've heard?

11        A.    They've heard that the technicians have

12   been getting calls from government agencies asking

13   them questions.  Wondering what's going on.  But I've

14   never addressed it personally with the technicians.

15        Q.    And what have you said to the supervisors

16   about the investigation or about the technicians

17   getting calls?

18        A.    That it's a -- that we're currently under

19   an investigation with the Department of Labor, and

20   they're making sure that we're in compliance with

21   certain regulations.

22        Q.    Have you expressed any negative feelings or

23   any kind of displeasure about the Department's

24   investigation to either supervisors or other AIS

25   personnel?

                                                    172

**EXHIBIT U**

1     A.    No.

2           MR. LAKE:  We can go off the record.  Take

3     a brief break for a few minutes.  I just want to look

4     over anything.  I think I might be almost done.

5           (Off the record from 2:45 to 2:54 p.m.)

6           MR. LAKE:  Back on the record.  Mr.

7     Martinez, I'm going to present you a document which

8     will be marked as Exhibit 19 in this case.

9     Q.    These are the requests for admission/

10    amended responses of AIS.  And specifically, if you

11    could look to page 5, the response to request for

12    admission No. 1.  At line 19, AIS states that it

13    denies the requests for admission as the employees,

14    for the majority of the year, averaged eight hours or

15    less per day.  Do you see that?

16    A.    Yes.

17    Q.    Do you agree with that statement?

18    A.    Yes, I do.

19    Q.    You believe that the installers generally

20    worked eight hours or less per day for most of the

21    year?

22    A.    I believe that's what they average, yes.

23    Q.    During the busy time, or the busier times,

24    how many hours per day do you believe the installers

25    were averaging?

173

1    A.    Some technicians are better than others.

2 Some technicians -- it's funny.  I'm sure we'll be

3 able to show specifics later.  You can have a

4 technician work a six-hour work week and still not hit

5 40 hours.

6         MR. KELLY:  Excuse me.  Can you read that

7 back, please.

8         (Record read as requested.)

9         THE WITNESS:  I meant a six-day work week.

10    A.    But yes, you can -- of course working a

11 six-day work week, you do have technicians that

12 definitely work over 40 hours, but it's my belief

13 that, on the average, annually they don't average 40

14 hours a week.

15    Q.    Even when they're working six days per

16 week?

17    A.    Yes.

18    Q.    And your testimony earlier was that last

19 year, approximately six months of the year, the

20 installers were working six days per week?

21    A.    Yes.  I think it's six months.  Five or

22 six, give or take a month.

23    Q.    Right.  And nevertheless, installers were

24 not working an average of 40 hours per week?

25    A.    Annually.

                                                    174

**EXHIBIT U**

1    Q.    Annually?

2    A.    I don't think so.  And I think, you know,

3    with some of the models I've been working on with Lisa

4    we can show it.

5    Q.    What do you mean "models"?

6          MR. KELLY:  Objection.  Attorney-client

7    work product.  All kinds of things.  You're not

8    supposed to be talking about what you did with

9    lawyers.

10          MR. LAKE:  I don't believe there's an

11    attorney with Lisa involved in this case, as I

12    understand it.

13          MR. KELLY:  I'll let counsel handle that.

14          MS. TRUONG:  It was done at the request of

15    counsel.

16          MR. LAKE:  So as an attorney are you

17    instructing him not to answer?

18          MS. TRUONG:  Yes.

19    Q.    When the installers are working the four to

20    eight shift during the summer, are they -- do you

21    believe that they're still not averaging 40 hours per

22    week?

23    A.    In the -- that short time frame, probably.

24    Q.    Okay.  But you believe that the rest of the

25    year they're working enough under 40 hours that the

175

**EXHIBIT U**

1  annual average is less than 40?

2      A.    Forty or less.

3      Q.    Does AIS have any policies or any

4  intentions of how many hours a week that they want

5  installers to work?

6      A.    No.

7      Q.    How many hours installers are expected to

8  work?

9      A.    No.  We don't restrict the hours.

10      Q.    In either way, there's no minimum or

11  maximum?

12      A.    No.

13      Q.    Does AIS take any steps to ensure that --

14  or to minimize the amount of overtime worked?

15      A.    No.  No.

16      Q.    You had testified earlier about some

17  on-line videos for new DirecTV products?

18      A.    Yes.

19      Q.    Who produces those videos?

20      A.    I believe they're on DirecTV's training

21  websites.

22      Q.    Does DirecTV have access to AIS facilities?

23      A.    You mean our offices?

24      Q.    Yes.

25      A.    They can visit if they want.

176

**EXHIBIT U**

1      Q.    When they -- when they're doing their

2  inventory checks that you're describing?

3      A.    Yes.

4      Q.    If they have -- -- excuse me, because I

5  don't recall.  Were there other reasons that DirecTV

6  personnel would regularly come to AIS's office?

7      A.    No.

8      Q.    So when they come in for the inventory, do

9  they have to come in at the -- do they have access to

10  the offices without anyone from AIS being there?

11      A.    No.

12      Q.    No one has a key?

13      A.    No.

14      Q.    And you've testified about multiple agency

15  audits of AIS.  We talked about, of course, the U.S.

16  Department of Labor's audit, the prior audits of Lumin

17  by the state of Washington.  Are there other agency

18  audits that have happened?

19      A.    I believe Labor & Industries did an audit a

20  while back.  A safety.

21      Q.    Do you recall the Labor and Industry audit,

22  what the allegations were?

23      A.    We didn't have emergency exit evacuation

24  signs on the walls.

25      Q.    Is that the safety audit?

177

**EXHIBIT U**

```
 1        A.    Yes.

 2        Q.    And what about the Labor and Industry

 3   audit?

 4        A.    I don't know exactly what that was about.

 5        Q.    Do you recall what the resolution was?

 6        A.    No.

 7        Q.    Whether AIS or Lumin had to pay any back

 8   wages or anything like that to an employee?

 9        A.    No.

10        Q.    Do you recall approximately how many years

11   ago that was?

12        A.    No.

13        Q.    You also spoke earlier about the leadership

14   team, I believe, at AIS with -- is that leadership

15   team yourself and Lisa?

16        A.    And the supervisors.

17        Q.    Is there anyone else that you would

18   consider part of AIS's leadership?

19        A.    No.

20              MR. LAKE:  At this time, I have no further

21   questions for Mr. Martinez on behalf of AIS, but I do

22   reserve the right to request additional time, if

23   necessary, to ask additional deposition questions of

24   AIS.  There's been documents that have been mentioned

25   today that were not provided, such as the contract
```

                                                        178

**EXHIBIT U**

between AIS and DirecTV.

Mr. Martinez has testified that he's not the person most knowledgeable on all the topics, so the Department of Labor reserves its right, at a later date, if necessary, to request additional deposition time.

MR. KELLY: The document -- the contract has been produced by DTV. It was discussed in Chris King's deposition. If there's any other document you think should be produced, take a second. It's 3:00. We've got at least two hours left today. Some of us have traveled great distances to be here, and he's told you generally what his knowledge is. And he's told you he's going to be speaking to (inaudible), I believe, in less than 20 hours or so.

On behalf of DirecTV I'm not agreeing to anything. If you think there's another document that you don't have a copy of the contract, just pull your notes from the deposition that was taken last week and have the --

MR. LAKE: Well, Joel, the contract that we were using last week was the same one that we've marked today, which was between Lumin and DirecTV. And Mr. Martinez has stated there was actually another contract entered into between --

179

EXHIBIT U

1          MR. KELLY:  Call his office.

2          MR. LAKE:  Let me finish.

3          MR KELLY:  We can call his office and have

4     it faxed to you like we did last week.  It would take

5     about 10 minutes.

6          MR. LAKE:  Well, this is a contract that

7     should have been provided months ago that hasn't been

8     provided.

9          MR. KELLY:  I would imagine --

10          MR. LAKE:  I'm not going to commit in any

11     way to getting the document within 10 minutes,

12     reviewing it, and asking follow-up questions today.

13     I'm reserving the right to request additional time at

14     a later date.  If you want to object at a later date

15     then we can have that fight.  I don't think there's

16     any reason to do that right now.  But for today, I

17     have no further questions for Mr. Martinez.

18          MR. KELLY:  That's fine.

19          MS. TRUONG:  Counsel doesn't have any

20     additional questions?

21          MR. KELLY:  I don't have any questions.

22          MR. LAKE:  I guess, on the record, we

23     should work out the review of the transcript as we did

24     last week with Mr. King.  Obviously, Mr. Martinez will

25     have the opportunity to review the transcript.  We

                                                    180

| | |
|---|---|
| 1 | would ask that -- or the Department of Labor will take |
| 2 | custody of the original, but a certified copy will be |
| 3 | given to AIS.  I assume AIS will order one, actually. |
| 4 | MS. TRUONG:  Yes. |
| 5 | MR. LAKE:  And then, I don't know about how |
| 6 | much time you think you're going to need to have Mr. |
| 7 | Martinez review the transcript. |
| 8 | MS. TRUONG:  I think we would request at |
| 9 | least two weeks from the time that it's -- we receive |
| 10 | it.  So I'm not sure how quickly we can get the |
| 11 | transcript. |
| 12 | THE COURT REPORTER:  Two weeks. |
| 13 | MR. LAKE:  So if today is the 13th, if you |
| 14 | would get it, approximately, at the end of -- why |
| 15 | don't we say from the date that you receive it Mr. |
| 16 | Martinez will review it, and will let us know about |
| 17 | any changes within 14 days of that date. |
| 18 | MS. TRUONG:  That works. |
| 19 | (Marked for identification Exhibit 19.) |
| 20 | (Deposition concluded at 3:06 p.m.) |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

181

**EXHIBIT U**

```
 1              D E C L A R A T I O N

 2

 3

 4

 5         I declare under penalty of perjury that I

 6   have read my within deposition, and the same is true

 7   and accurate, save and except for changes and/or

 8   corrections, if any, as indicated by me on the

 9   correction sheet hereof.

10

11

12   _____

13                    RAMON MARTINEZ

14

15

16

17

18

19         Dated this ___31st___ day of ___July___,

20   2014.

21

22

23

24

25

                                              182
```

**EXHIBIT U**

```
1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON        )

4                              ) ss.

5    COUNTY OF KING             )

6

7         I, the undersigned Washington Certified Court

8    Reporter, pursuant to RCW 5.28.010, authorized to

9    administer oaths and affirmations in and for the State

10   of Washington, do hereby certify:

11        That the annexed and foregoing deposition

12   consisting of Page 1 through 181 was taken

13   stenographically before me and reduced to a typed

14   format under my direction;

15        I further certify that according to CR 30(e) the

16   witness was given the opportunity to examine, read and

17   sign after the same was transcribed, unless indicated

18   in the record that the review was waived;

19        I further certify that all objections made at the

20   time of said examination to my qualifications or the

21   manner of taking the deposition, or to the conduct of

22   any party, have been noted by me upon said deposition;

23        I further certify that I am not a relative or

24   employee of any such attorney or counsel, and that I

25   am not financially interested in said action or the
```

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

**EXHIBIT U**

1   outcome thereof;

2      I further certify that the witness before

3   examination was by me duly sworn to testify to the

4   truth, the whole truth and nothing but the truth;

5      I further certify that the deposition, as

6   transcribed, is a full, true and correct transcript of

7   the testimony, including questions and answers, and

8   all objections, motions, and exceptions of counsel

9   made and taken at the time of foregoing examination

10   and was prepared pursuant to Washington Administrative

11   Code 308-14-135, the transcript preparation format

12   guideline;

13      I further certify that I am sealing the

14   deposition in an envelope with the title of the above

15   cause and the name of the witness visible, and I am

16   delivering the same to the appropriate authority;

17

18      IN WITNESS WHEREOF, I have hereunto set my hand,

19   and affixed my official seal this 17th day of

20   June 2014.

21              _____

22              Certified Court Reporter No. 2498

23              in and for the State of

24              Washington, residing at Shoreline,

25              Washington.

**EXHIBIT U**

ERRATA SHEET FOR THE DEPOSITION OF RAMON MARTINEZ
DATE TAKEN:   JUNE 10, 2014
PAGE      LINE      CORRECTION

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 46 | 13 | Strike "own" |
| 10 | 16 | Kelley |
| 11 | 12 | Kelley |
| 11 | 23 | Kelley |
| — | — | All references to Ms. Lisa |
| — | — | Kelley need to include an "e". |

DEPONENT'S SIGNATURE _____   DATE 7/2/14

185

**EXHIBIT U**